No. 25-1153

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CASA, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Maryland
No. 8:25-cv-00201-DLB

**AMICUS BRIEF OF THE STATE OF TENNESSEE
IN SUPPORT OF DEFENDANTS-APPELLANTS**

Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

Whitney D. Hermandorfer
  *Director of Strategic Litigation*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
matt.rice@ag.tn.gov
whitney.hermandorfer@ag.tn.gov

# TABLE OF CONTENTS

Interest of Amicus Curiae ................................................................................ 1
Introduction ..................................................................................................... 2
Argument ......................................................................................................... 3
    I.   Plaintiffs' Textual Problems ..................................................... 3
    II.  Plaintiffs' Historical Problems ................................................ 6
    III. Plaintiffs' Problems Under Supreme Court Precedent ............... 9
Conclusion ..................................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dep't of Homeland Sec. v. Thuraissigiam,*
  591 U.S. 103 (2020) ............................................................. 12, 13

*Elk v. Wilkins,*
  112 U.S. 94 (1884) .................................................................. 10

*Kaplan v. Tod,*
  267 U.S. 228 (1925) ................................................................ 12

*Leng May Ma v. Barber,*
  357 U.S. 185 (1958) ................................................................ 12

*Lopez-Sorto v. Garland,*
  103 F.4th 242 (4th Cir. 2024) .................................................. 12

*Minor v. Happersett,*
  88 U.S. 162 (1874) .................................................................. 10

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953) ................................................................ 12

*Slaughter-House Cases,*
  83 U.S. 36 (1873) ...................................................................... 9

*Somerville v. Somerville,*
  31 Eng. Rep. 839 (1801) ........................................................... 5

*United States v. Ju Toy,*
  198 U.S. 253 (1905) ............................................................ 12, 13

*United States v. Rahimi,*
  602 U.S. 680 (2024) .................................................................. 6

*United States v. Wong Kim Ark,*
  169 U.S. 649 (1898) ........................................................... 10, 11

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ................................................................ 12

**Constitutional Provision**

U.S. Const. Amend. XIV, § 1 ................................................................. 3, 5

**Statutes and Legislative Materials**

Civil Rights Act of 1866, 14 Stat. 27 ............................................................. 4

Cong. Globe, 39th Cong., 1st Sess. (1866) ................................................. 7

**Other Authorities**

*2 A Dictionary of Words and Phrases Used in Ancient and Modern Law*
(1899) ......................................................................................................... 5

Alexander Porter Morse, *A Treatise on Citizenship* (1881) ...................... 8

Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*,
24 Tex. Rev. L. & Pol. 135 (2019) ................................................. *passim*

Hannis Taylor, A *Treatise on International Public Law* (1901) ............... 9

Henry Campbell Black, *Handbook of American Constitutional Law*
(3d ed. 1910) ............................................................................................. 9

Joseph Story, *Commentaries on the Conflict of Laws* (1834) ................... 8

Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) .......................... *passim*

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ....... 6

S. Rapalje & R. Lawrence, *A Dictionary of American and English Law*
(1888) ..................................................................................................... 5, 6

Samuel Freeman Miller, *Lectures on the Constitution of the United States United States* (J. C. Bancroft Davis ed., 1893) .......................... 8

William Edward Hall, *A Treatise on International Law*
(5th ed. 1904) ........................................................................................... 9

## INTEREST OF AMICUS CURIAE

Tennessee has an interest in ensuring that courts appropriately exercise their judicial power within the bounds of the law and separation-of-power principles. That interest is heightened here, where a sweeping preliminary injunction has thwarted the President's effort to address one aspect of a national immigration crisis that has harmed States. Recent years have seen an influx of illegal aliens—over 9 million—overwhelming the national infrastructure. U.S. Customs and Border Protection, *Nationwide Encounters* (Feb. 5, 2024), https://perma.cc/EDU3-98CP. And "many noncitizens proceed to interior States" after crossing the border illegally. *See* DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* 26 (Oct. 29, 2021), https://perma.cc/5DNE-B9AE. Tennessee thus faces significant economic, health, and public-safety issues from immigration policies that extend beyond what the Citizenship Clause requires.

**INTRODUCTION**

Constitutional assessment of a President's policies should rest on sound legal analysis, not snap judgments. Yet Plaintiffs dismissed any need for a deep dive here, casting their reading of the Citizenship Clause as too settled to debate. Never mind that a mere-presence rule cannot be right all the time, as Plaintiffs concede. Or that Plaintiffs' position perversely rewards illegal behavior with birthright citizenship in a manner no drafter or ratifier of the Citizenship Clause endorsed. These anomalies did not stand in the way of nationwide injunctive relief.

But they should have. Plaintiffs' first-principles case for a mere-presence approach to the Citizenship Clause is not only not obvious—it has serious problems under text, history, and Supreme Court precedent. Contemporaneous sources instead support what common sense suggests: Conferring United States citizenship requires a more meaningful connection than mere presence by happenstance or illegality. That connection, history and precedent reveals, was parental domicile. Contra Plaintiffs' contentions and the district court's conclusions, this is not an open-and-shut case.

**ARGUMENT**

The core question here is not, as many commentators cast it, whether all persons born within U.S. borders obtain citizenship—even Plaintiffs agree that's not right. It's whether "born ... in the United States, and subject to the jurisdiction thereof" excludes only some unstated set of limited exceptions based on then-prevailing understandings of immunity (Plaintiffs' view), or provides a generally applicable rule that bars all those without meaningful residence-based ties to the United States (Defendants' view). And Plaintiffs' view faces serious textual, historical, and precedential problems.

## I. Plaintiffs' Textual Problems.

The Fourteenth Amendment's Citizenship Clause provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1. That text poses two problems for Plaintiffs' mere-presence position.

First, the Clause directs that covered persons not only must be "born … in the United States"; they also must be "subject to the jurisdiction thereof"—a later-added limitation to the originally proposed text. U.S. Const. Amend. XIV, § 1; *see* Amy Swearer, *Subject to the (Complete)*

*Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135, 143 (2019). So the text, as revised, must do more than adopt England's common-law rule of pure *jus soli*, which turns only on the location of a child's birth. Plaintiffs do not dispute as much.

Plaintiffs instead contend that "jurisdiction" is a low bar, referring only to the bare sense of being subject to *some* U.S. control. But that narrow reading doesn't work—after all, tribal members and foreign diplomats are "in some way subject to the basic level of sovereign authority the United States government exerts over its geographical territory," even though their "exclusion from birthright citizenship is uncontested." Swearer, *supra*, at 149 & n.35.

Plaintiffs' contrary reading also places the Citizenship Clause in collision with the 1866 Act, which allows citizenship only to those "not subject to any foreign power." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27. That phrasing was "specifically intended to withhold birthright citizenship from those who did not owe a complete, permanent allegiance to the United States and who were not part of the 'American people.'" Swearer, *supra*, at 157-59. Historical evidence indicates that the

metric for measuring the requisite connection to U.S. jurisdiction was domicile or lawful permanent residence. *Infra* pp. 6-9.

Second, the Citizenship Clause applies only to persons who also have a "State *wherein they reside*." U.S. Const. Amend. XIV, § 1 (emphasis added). The term "reside," in context, connotes a person's legal residence or domicile. *See, e.g.*, "Residence," S. Rapalje & R. Lawrence, 2 *A Dictionary of American and English Law* 1114 (1888) (collecting cases treating "residence" as "synonymous with 'domicile'"); "Residence, Legal," 2 *A Dictionary of Words and Phrases Used in Ancient and Modern Law* 692 (1899) ("[t]he place where a man has his fixed place of abode, where he can exercise his political rights and is subject to personal taxation"). That's particularly clear when viewed against then-prevailing concepts of complete jurisdiction and political allegiance, with which domicile's meaning was closely aligned. Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 488-90 (2015).

The general rule of "domicile of origin" or "natural domicile," moreover, is that a child inherits his parent's domicile at birth and that domicile prevails until "clearly abandoned and another taken" via "fixed and

5

settled habitation." *Somerville v. Somerville* (1801) 31 Eng. Rep. 839, 840, 842; 5 Ves. Jun. 750, 750, 755. "Thus," as an 1888 American and English law dictionary instructed, "if a husband and wife domiciled in England take a voyage to India, and a child is born to them on the voyage, or in India before they acquire a domicile there, its domicile is English." "Domicile of origin," *Dictionary of American and English Law*, *supra*, at 410. The Citizenship Clause's focus on "reside[nce]" thus supports a domicile-based approach.

## II. Plaintiffs' Historical Problems.

A core plank of Plaintiffs' position rests on congressional and Executive Branch practice that postdates the Citizenship Clause's ratification. But because the "meaning of constitutional text is fixed at the time of its ratification," the "history that matters most is the history surrounding the ratification of the text." *United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring). Tennessee does not purport to fully survey the complex historical record here. Others have, though. *See* Swearer, *supra*; Lollman, *supra*; Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119

Yale L. J. 1351, 1352 (2010). And suffice it to say, a range of contemporaneous sources[1] cast doubt on Plaintiffs' mere-presence position.

Take the debates and commentary surrounding the passage and ratification of the 1866 Act and the Fourteenth Amendment, which linked eligibility to legal residency:

- Senator Trumbull, the primary drafter of the 1866 Act's citizenship provision, explained that the Act excluded "persons *temporarily resident* in [the United States] whom we would have no right to make citizens." Cong. Globe, 39th Cong., 1st Sess. 572 (1866) (emphasis added).
- Senator George Henry Williams, a member of the Joint Committee on Reconstruction, wrote similarly: "In one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States, *but they are not subject to the jurisdiction of the United States in every sense.*" Cong. Globe, 39th Cong., 1st Sess. 2897 (1866) (emphasis added).
- Summarizing the Civil Rights Act, Senator Trumbull explained that the Act "declares 'all persons' born of *parents domiciled in the United States* … to be citizens of the United States." Swearer, *supra*, at 158-59 (emphasis added).
- In explaining how the Citizenship Clause tracked the Civil Rights Act, Senator Howard emphasized that the Clause "will not, of course, include persons born in the United States *who are foreigners, aliens*, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (emphasis added).

---

[1] The sources quoted throughout this section are collected in Swearer, *supra*, and Lollman, *supra*.

7

Early Executive Branch practice was in accord:

- In the 1880s, two Secretaries of State denied citizenship to persons born in the United States because their parents "remained domiciled" overseas. Swearer, *supra*, at 170. Letters setting out their reasoning confirmed that "[t]he fact of birth" in the United States, "under circumstances implying alien subjection, establishes of itself no right of citizenship." *Id.* at 171.

- The Secretary of the Treasury applied similar reasoning in an 1890 opinion letter, which denied "citizenship of a child born to a would-be immigrant who had not 'landed' but was awaiting immigration approval." Swearer, *supra*, at 171.

Contemporary commentary likewise recognized parental domicile as a distinction between the British and U.S. citizenship rules:

- Justice Joseph Story, writing in his *Commentaries on the Conflict of Laws*, urged in 1834 that "[a] reasonable qualification o[n] the rule" of *jus soli* "would seem to be, that it should not apply to the children of parents … who were abiding there for temporary purposes." Lollman, *supra*, at 481.

- In an 1881 book entitled *A Treatise on Citizenship*, Alexander Porter Morse asserted that "[t]he words 'subject to the jurisdiction thereof' exclude[d] the children of foreigners transiently within the United States … as … subjects of a foreign nation." Lollman, *supra*, at 482.

- In an 1891 article, former Supreme Court Justice Samuel Miller observed: "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction." Samuel Freeman Miller, LL.D., Naturalization and Citizenship, *in* Lectures on the Constitution of the United States 275, 279 (J. C. Bancroft Davis ed., 1893).

- Scholar Henry Campbell Black distinguished between U.S.-born children of "a stranger or traveler passing through the country, or temporarily residing here," who are not entitled to citizenship, and "children, born within the United States, *of permanently resident aliens*, who are not diplomatic agents or otherwise within the excepted classes," who are entitled to citizenship no matter their race. *Handbook of American Constitutional Law* 634 (3d ed. 1910) (emphasis added).

- International law treatises reached the same conclusion. *See, e.g.*, William Edward Hall, M.A., *A Treatise on International Law* 224-25, 227 (5th ed. 1904) ("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Hannis Taylor, LL.D., *A Treatise on International Public Law* 220 (1901) ("It appears, therefore, that children born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'").

If nothing else, these excerpts and sources show that Plaintiffs oversell their position as the historical consensus.

### III. Plaintiffs' Problems Under Supreme Court Precedent.

Nor does Supreme Court precedent mandate a maximalist reading of the Citizenship Clause.

1. The earliest cases point towards a domicile-based approach. The Court's 1872 decision in the *Slaughter-House Cases* stated that the Citizenship Clause "was intended to *exclude* from its operation children of ministers, consuls, and *citizens or subjects of foreign States born within the United States*." 83 U.S. 36, 73 (emphasis added). Two years later,

the Court observed that "common-law" principles informed "who shall be natural-born citizens" and noted "doubts" as to whether children of "aliens or foreigners" born in the United States constituted "natural-born citizens." *Minor v. Happersett*, 88 U.S. 162, 167-68 (1874).

The Court's decision in *Elk v. Wilkins*, 112 U.S. 94 (1884), also counsels against a mere-presence approach. There, the Court assessed how the Citizenship Clause applied to an Indian born into a tribe who then severed tribal relations. *Id.* at 99. The Court held that "Indians born within the territorial limits of the United States, … although in a geographical sense born in the United States" were not "'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment." *Id.* at 102.

Contra the district court's ruling, *Wong Kim Ark* does not hold otherwise. The Court there decided how the Citizenship Clause applied to a U.S.-born child of lawfully present and permanently domiciled Chinese aliens. *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898). So unlawful presence was not at play. Still, the Court emphasized throughout that the alien parents were "resident[s]" and "domiciled within the United States." *Id.* at 652, 653, 693, 696, 705. It reasoned that "[e]very

10

citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States" for purposes of the Clause. *Id.* at 693 (emphasis added). And it held that "Chinese persons … *so long as they are permitted by the United States to reside here*" enjoy the same birthright protections "as all other aliens residing in the United States." *Id.* at 694 (emphasis added).

The Court's emphasis on parental domicile was no accident. It responded directly to the parties' briefing and the dissent's concern about covering persons "born of aliens whose residence was merely temporary, either in fact or in point of law." *Id.* at 729 (Fuller, C.J., dissenting). Not surprisingly, "[i]n the years immediately following *Wong Kim Ark*, several commentators read the Court's reference to domicile as actually doing work in the opinion." Lollman, *supra*, at 462, 471. So did the Court and the Department of Justice. *See* U.S. Br., Dist. Ct. Dkt. No. 8:25-cv-00201-DLB, at 9-12.

2. Additional precedent clashes with Plaintiffs' physical-presence rule. The Supreme Court has long recognized that not every alien physically present within U.S. soil, water, or airspace "has *effected an*

11

*entry* into the United States" for "constitutional purposes." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see United States v. Ju Toy*, 198 U.S. 253, 263 (1905).

*Kaplan v. Tod*, 267 U.S. 228 (1925), is instructive. There, the Court rejected a mere-presence rule when considering whether children obtain citizenship through their parents' naturalization. It held that, even though an illegal alien lived with her father in the United States for nearly a decade, she never "lawfully … landed in the United States," and "until she legally landed," she "could not have dwelt within the United States." *Id.* (quotations omitted). As a matter of law, she remained "at the boundary line and had gained no foothold in the United States." *Id.* Absent a permissible "entry," the Court concluded, "an alien can neither 'dwell' nor 'reside' within the United States, as those words are understood in the immigration context." *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024) (quoting *Kaplan*).

The Supreme Court has invoked this at-the-border legal fiction time and again. *E.g.*, *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958). Under it,

an alien may be "physically within our boundaries," but treated under the law "as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate." *Ju Toy*, 198 U.S. at 263. And that rule applies to aliens who "arrive at ports of entry" or are detained "after unlawful entry," for example, even if later "paroled elsewhere in the country." *Thuraissigiam*, 591 U.S. at 139.

The clash between Plaintiffs' interpretation and settled immigration-law principles further weighs against a mere-presence position.

## CONCLUSION

The Court should grant the stay.

Dated: February 19, 2025

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

*/s/J. Matthew Rice*
J. Matthew Rice
  *Solicitor General*

Whitney D. Hermandorfer
  *Director of Strategic Litigation*

OFFICE OF THE TENNESSEE ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
matt.rice@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
(615) 741-3491

*Counsel for the State of Tennessee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 2,594 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/J. Matthew Rice*
J. Matthew Rice

# CERTIFICATE OF SERVICE

On February 19, 2025, I filed an electronic copy of this brief with the Clerk of the Fourth Circuit using the Court's electronic-filing system. That system sends a Notice of Docket Activity to all registered attorneys in this case.

*/s/J. Matthew Rice*
J. Matthew Rice
