No. 25-1153

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CASA, INC., et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, In his official capacity as President
of the United States, c/o Attorney General of the United States, et al.,

Defendants-Appellants

On Appeal from the United States District Court
for the District of Maryland

## JOINT APPENDIX

YAAKOV M. ROTH
*Acting Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
*Attorneys, Appellate Staff*
*Civil Division, Room 7325*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*

*Counsel for Defendants-Appellants*

WILLIAM POWELL
MARY B. MCCORD
RUPA BHATTACHARYYA
JOSEPH W. MEAD
ALEXANDRA LICHTENSTEIN
GREGORY BRIKER
*Institute for Constitutional*
*Advocacy and Protection*
*Georgetown Law*
*600 New Jersey Ave. NW*
*Washington, D.C. 20001*
*(202) 661-6629*

*Counsel for Plaintiffs-Appellees*
*(continued on inside cover)*

**ADDITIONAL COUNSEL LISTED ON INSIDE COVER**

NICHOLAS KATZ, ESQ.
 *CASA, Inc.*
 *8151 15th Avenue*
 *Hyattsville, MD 20783*
 *(240) 491-5743*

CONCHITA CRUZ
ZACHARY MANFREDI
DOROTHY TEGELER
LEIDY PEREZ
 *Asylum Seeker Advocacy Project*
 *228 Park Ave. S., #84810*
 *New York, NY 10003-1502*
 *(646) 600-9910*

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

District Court Docket Report..............................................................JA1

Complaint (Jan. 21, 2025) (Dkt. 1)..................................................JA19

Declaration of George Escobar, Chief of Programs and Services for
    CASA, Inc. (Jan. 21, 2025) (Dkt. 2-2)....................................JA57

Declaration of Swapna C. Reddy, Co-Executive Director of the
    Asylum Seeker Advocacy Project, ("ASAP") (Jan. 21, 2025)
    (Dkt. 2-3)...................................................................................JA68

Declaration of Juana (Jan. 21, 2025) (Dkt. 2-4) ............................JA81

Declaration of Liza (Jan. 21, 2025) (Dkt. 2-5)................................JA83

Declaration of Maribel (Jan. 21, 2025) (Dkt. 2-6)..........................JA85

Declaration of Monica (Jan. 21, 2025) (Dkt. 2-7) ..........................JA87

Declaration of Trinidad Garcia (Jan. 21, 2025) (Dkt. 2-8) ...........JA89

Memorandum Opinion (Feb. 5, 2025) (Dkt. 65)...........................JA92

Order (Feb. 5, 2025) (Dkt. 66).......................................................JA124

Notice of Appeal of Preliminary Injunction (Feb. 11, 2025) (Dkt. 69)....JA127

Order Denying Motion for Stay Pending Appeal (Feb. 18, 2025) (Dkt.
    76) ...............................................................................................JA129

APPEAL

# U.S. District Court
## District of Maryland (Greenbelt)
## CIVIL DOCKET FOR CASE #: 8:25−cv−00201−DLB

Casa Inc. et al v. Trump et al
Assigned to: Judge Deborah L. Boardman
Case in other court:        Fourth Circuit Court of Appeals,
        25−01153
        USCA, 25−01223
Cause: 42:1981cv Civil Rights

Date Filed: 01/21/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Casa, Inc.**

represented by **Joseph Mead**
Georgetown University Law Center
Institute for Constitutional Advocacy and
Protection
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662−9765
Email: jm3468@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Lichtenstein**
Institute for Constitutional Advocacy and
Protection
600 New Jersey Avenue NW
Washington, DC 20001
757−581−1046
Email: alex.lichtenstein@georgetown.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Conchita Cruz**
Asylum Seeker Advocacy Project
228 Park Ave. S. #84810
New York, NY 10003
3054849260
Fax: 6469680279
Email: conchita.cruz@asylumadvocacy.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dorothy Tegeler**
Asylum Seeker Advocacy Project (ASAP)
228 Park Ave. S. #84810
New York, NY 10003−1502
6466009910
Fax: 6469680279
Email: dorothy.tegeler@asylumadvocacy.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory Briker**
Institute for Constitutional Advocacy and
Protection
600 New Jersey Avenue NW
Washington, DC 20001
202−662−9765
Email: gb954@georgetown.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leidy Perez**
Asylum Seeker Advocacy Project (ASAP)
228 Park Ave. S. #84810
New York, NY 10003–1502
6466009910
Fax: 6469680279
Email: leidy.perez@asylumadvocacy.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary B McCord**
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
571–447–3902
Email: mbm7@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Rupa Bhattacharyya**
Institute for Constitutional Advocacy and
Protection
600 New Jersey Avenue, NW
Washington, DC 20001
202–662–4036
Email: rb1796@georgetown.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Powell**
600 New Jersey Ave NW
Washington, DC 20001
202–661–6629
Email: whp25@georgetown.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Manfredi**
Asylum Seeker Advocacy Project
228 Park Ave. S. #84810
New York, NY 10003
2488400744
Fax: 6469680279
Email: zachary.manfredi@asylumadvocacy.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Asylum Seeker Advocacy Project, Inc.** | represented by | **Joseph Mead** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Alexandra Lichtenstein** (See above for address) *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |
| | | **Conchita Cruz** (See above for address) *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |
| | | **Dorothy Tegeler** |

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory Briker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leidy Perez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary B McCord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rupa Bhattacharyya**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Powell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Manfredi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Maribel**
*Individually and as next friend to her future child; c/o Casa, Inc.*

represented by  **Joseph Mead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Lichtenstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Conchita Cruz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dorothy Tegeler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory Briker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leidy Perez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary B McCord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rupa Bhattacharyya**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Powell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Manfredi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Juana**
*Individually and as next friend to her*
*future child; c/o Casa, Inc.*

represented by **Joseph Mead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Lichtenstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Conchita Cruz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dorothy Tegeler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory Briker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leidy Perez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary B McCord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rupa Bhattacharyya**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Powell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Manfredi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Trinidad Garcia**
*Individually and as next friend to her future child; c/o Asylum Seeker Advocacy Project*

represented by **Joseph Mead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Lichtenstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Conchita Cruz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dorothy Tegeler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory Briker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leidy Perez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary B McCord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rupa Bhattacharyya**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Powell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Manfredi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Monica**
*Individually and as next friend to her future child; c/o Asylum Seeker Advocacy Project*

represented by **Joseph Mead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Lichtenstein**
(See above for address)
*PRO HAC VICE*

JA005

*ATTORNEY TO BE NOTICED*

**Conchita Cruz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dorothy Tegeler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory Briker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leidy Perez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary B McCord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rupa Bhattacharyya**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Powell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Manfredi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Liza**
*Individually and as next friend to her*
*future child; c/o Institute for*
*Constitutional Advocacy and Protection*

represented by **Joseph Mead**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Lichtenstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Conchita Cruz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dorothy Tegeler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory Briker**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leidy Perez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary B McCord**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rupa Bhattacharyya**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Powell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Manfredi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Petitioner**

**Mark Marvin**                    represented by   **Mark Marvin**
                                                   135 Mills Road
                                                   Walden, NY 12586
                                                   PRO SE

V.

**Defendant**

**Donald J. Trump**                 represented by   **Brad P Rosenberg**
*In his official capacity as President of the*      Civil Division, Federal Programs Branch
*United States; c/o Attorney General of*            1100 L Street, NW
*the United States*                                 Washington, DC 20005
                                                   202–514–3374
                                                   Email: brad.rosenberg@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Eric Hamilton**
                                                   U.S. Department of Justice
                                                   950 Pennsylvania Avenue NW
                                                   Washington, DC 20530
                                                   202–514–3301
                                                   Email: eric.hamilton@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Melissa E Goldmeier**
                                                   DOJ–USAO
                                                   36 S Charles
                                                   Ste 4th Floor
                                                   Baltimore, MD 21201
                                                   410–209–4855

JA007

Email: melissa.goldmeier@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
US Department Of Justice Federal
Programs Branch
1900 East Main St. Ste. 1900
Richmond, VA 23219
2026168098
Fax: 8048197417
Email: robert.c.merritt@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**
DOJ–Civ
1100 L St NW
Washington, DC 20005
202–598–3869
Email: yuri.s.fuchs@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Secretary of the United States**
**Department of State**
*In their official capacity*

represented by **Brad P Rosenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa E Goldmeier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Attorney General of the United States**
*In their official capacity*

represented by **Brad P Rosenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa E Goldmeier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Secretary of the United States**                   represented by     **Brad P Rosenberg**
**Department of Homeland Security**                                     (See above for address)
*In their official capacity; c/o Office of the*                         *LEAD ATTORNEY*
*General Counsel*                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Eric Hamilton**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Melissa E Goldmeier**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Robert Charles Merritt**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Yuri Fuchs**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Director of United States Citizenship**            represented by     **Brad P Rosenberg**
**and Immigration Services**                                           (See above for address)
*In their official capacity; c/o Office of the*                         *LEAD ATTORNEY*
*Chief Counsel*                                                         *ATTORNEY TO BE NOTICED*

                                                                       **Eric Hamilton**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Melissa E Goldmeier**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Robert Charles Merritt**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Yuri Fuchs**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Commissioner of the Social Security**              represented by     **Brad P Rosenberg**
**Administration**                                                     (See above for address)
*In their official capacity; c/o Office of the*                         *LEAD ATTORNEY*
*Chief Counsel*                                                         *ATTORNEY TO BE NOTICED*

                                                                       **Eric Hamilton**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Melissa E Goldmeier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States of America**                 represented by   **Brad P Rosenberg**
*c/o Attorney General of the United States*                   (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Eric Hamilton**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Melissa E Goldmeier**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Robert Charles Merritt**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Yuri Fuchs**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Amicus**

**Local Government Entities c/o Mayor**       represented by   **Sara Elaine Gross**
**and City Council of Baltimore**                             Baltimore City Law Department
                                                              100 N. Holliday Street
                                                              Baltimore, MD 21202
                                                              4103963947
                                                              Fax: 410–547–1025
                                                              Email: sara.gross@baltimorecity.gov
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Katherine Courtney**
                                                              Public Rights Project
                                                              490 43rd Street
                                                              Ste 115
                                                              Oakland, CA 94609
                                                              510–738–6788
                                                              Email: katiec@publicrightsproject.org
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

**Amicus**

**Immigration Reform Law Institute**          represented by   **Daniel Alan Stein**
                                                              10215 Lakestone Place

Rockville
Rockville, MD 20850
202–674–5314
Email: dstein@gowebway.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Hajec**
Immigration Reform Law Institute
25 Massachusetts Ave., NW
Suite 335
Washington, DC 20001
202–232–5590
Email: chajec@irli.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gabriel R. Canaan**
25 Massachusetts Ave NW
Suite 335
Washington, DC 20001
202–642–4374
Email: gcanaan@irli.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Tennessee**            represented by   **Cameron T. Norris**
Consovoy McCarthy PLLC
1600 Wilson Blvd
Ste 700
Arlington, VA 22209
7032439423
Email: cam@consovoymccarthy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Matthew Rice**
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202–0207
615–532–6026
Email: matt.rice@ag.tn.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Whitney D. Hermandorfer**
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202
615–741–7403
Email: whitney.hermandorfer@ag.tn.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/21/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AMDDC–11719566.), filed by Trinidad Garcia, Asylum Seeker Advocacy Project, CASA Inc., Liza, Maribel, Juana, Monica. (Attachments: # 1 Civil Cover Sheet)(Mead, Joseph) (Entered: 01/21/2025) |

| 01/21/2025 | 2 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by Maribel, Juana, CASA Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project (Attachments: # 1 Memorandum in Support Brief in Support, # 2 Exhibit Declaration of George Escobar (CASA), # 3 Exhibit Declaration of Swapna Reddy (ASAP), # 4 Exhibit Juana Declaration, # 5 Exhibit Liza Declaration, # 6 Exhibit Maribel Declaration, # 7 Exhibit Monica Declaration, # 8 Exhibit Trinidad Garcia Declaration, # 9 Text of Proposed Order)(Mead, Joseph) (Entered: 01/21/2025) |
|---|---|---|
| 01/21/2025 | 3 | MOTION for Other Relief *To Proceed Under a Pseudonym* by Maribel, Juana, Trinidad Garcia, Monica, Liza (Attachments: # 1 Text of Proposed Order)(Mead, Joseph) (Entered: 01/21/2025) |
| 01/21/2025 | 4 | NOTICE by Maribel, Juana, CASA Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project *Regarding Counsel's Efforts to Provide Notice to Defendants* (Mead, Joseph) (Entered: 01/21/2025) |
| 01/22/2025 | 5 | QC NOTICE: 1 Complaint, filed by Asylum Seeker Advocacy Project, Inc., Juana, Maribel, Liza, Casa, Inc., Monica, Trinidad Garcia was filed incompletely. *\*\*The following attachments or exhibits are missing − Summons for named defendants. To correct this problem, file summons for named defendants using the event Notice (Other) and link summons for named defendants to 1* . (jh6s, Deputy Clerk) (Entered: 01/22/2025) |
| 01/22/2025 | 6 | QC NOTICE: 1 Complaint, filed by Asylum Seeker Advocacy Project, Inc., Juana, Maribel, Liza, Casa, Inc., Monica, Trinidad Garcia was filed incorrectly. \*\*No corrective action is required in regard to this filing. The changes have been made by the Clerk.\*\* When opening new cases in the future, please refrain from capitalizing entire names of parties. (jh6s, Deputy Clerk) (Entered: 01/22/2025) |
| 01/22/2025 | 7 | NOTICE by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc. re 1 Complaint, *For the clerk to issue summons* (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons)(Mead, Joseph) (Additional attachment(s) added on 1/22/2025: # 7 FLATTENED SUMMONS) (heps). (Entered: 01/22/2025) |
| 01/22/2025 | 8 | MOTION to Appear Pro Hac Vice for William Powell (Filing fee $100, receipt number AMDDC−11721407.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/22/2025) |
| 01/22/2025 | 9 | MOTION to Appear Pro Hac Vice for Gregory Briker (Filing fee $100, receipt number AMDDC−11721418.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/22/2025) |
| 01/22/2025 | 10 | PAPERLESS ORDER confirming that a call is scheduled for 10:30 a.m. on January 23, 2025. Signed by Judge Deborah L. Boardman on 1/22/2025. (lmys, Chambers) (Entered: 01/22/2025) |
| 01/22/2025 | 11 | MOTION to Appear Pro Hac Vice for Rupa Bhattacharyya (Filing fee $100, receipt number AMDDC−11722782.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/22/2025) |
| 01/22/2025 | 12 | MOTION to Appear Pro Hac Vice for Alexandra Lichtenstein (Filing fee $100, receipt number AMDDC−11722783.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/22/2025) |
| 01/22/2025 | 13 | QC NOTICE: 7 Proposed Summons, filed by Asylum Seeker Advocacy Project, Inc., Juana, Maribel, Liza, Casa, Inc., Monica, Trinidad Garcia was filed incorrectly. *\*\*Not all pdf documents were flattened prior to filing. All pdfs uploaded to CM/ECF MUST BE FLATTENED for all future filings. Failure to comply may result in rejected filings and delays in case processing. \*\*This filing has been corrected by court staff and no further corrective action is required.* (heps, Deputy Clerk) (Entered: 01/22/2025) |
| 01/22/2025 | 14 | Summons Issued 60 days as to Attorney General of the United States, Commissioner of the Social Security Administration, Director of United States Citizenship and Immigration Services, Secretary of the United States Department of Homeland Security, Secretary of the United States Department of State, Donald J. Trump, United States of America, U.S. Attorney and U.S. Attorney General.(heps, Deputy Clerk) (Entered: 01/22/2025) |

| 01/23/2025 | 15 | NOTICE of Appearance by Melissa E Goldmeier on behalf of All Defendants (Goldmeier, Melissa) (Entered: 01/23/2025) |
|---|---|---|
| 01/23/2025 | 16 | Telephonic Status Conference held on 1/23/2025 before Judge Deborah L. Boardman. (FTR – Gomez – 4A) (dg3s, Deputy Clerk) (Entered: 01/23/2025) |
| 01/23/2025 | 17 | ORDER setting schedule for Plaintiff's Motion for Temporary Restraining Order. Signed by Judge Deborah L. Boardman on 1/23/2025. (heps, Deputy Clerk) (Entered: 01/23/2025) |
| 01/23/2025 | 18 | NOTICE of Appearance by Mary B McCord on behalf of All Plaintiffs (McCord, Mary) (Entered: 01/23/2025) |
| 01/24/2025 | 19 | PAPERLESS ORDER granting 8 Motion to Appear Pro Hac Vice on behalf of William Powell. Directing attorney William Powell to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/24/2025. (mh4s, Deputy Clerk) (Entered: 01/24/2025) |
| 01/24/2025 | 20 | PAPERLESS ORDER granting 9 Motion to Appear Pro Hac Vice on behalf of Gregory Briker. Directing attorney Gregory Briker to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/24/2025. (mh4s, Deputy Clerk) (Entered: 01/24/2025) |
| 01/24/2025 | 21 | NOTICE of Appearance by Brad P Rosenberg on behalf of All Defendants (Rosenberg, Brad) (Entered: 01/24/2025) |
| 01/24/2025 | 22 | PAPERLESS ORDER granting 11 Motion to Appear Pro Hac Vice on behalf of Rupa Bhattacharyya. Directing attorney Rupa Bhattacharyya to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/24/2025. (mh4s, Deputy Clerk) (Entered: 01/24/2025) |
| 01/24/2025 | 23 | PAPERLESS ORDER granting 12 Motion to Appear Pro Hac Vice on behalf of Alexandra Lichtenstein. Directing attorney Alexandra Lichtenstein to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/24/2025. (mh4s, Deputy Clerk) (Entered: 01/24/2025) |
| 01/24/2025 | 24 | MOTION to Appear Pro Hac Vice for Conchita Cruz (Filing fee $100, receipt number AMDDC–11729419.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/24/2025) |
| 01/24/2025 | 25 | MOTION to Appear Pro Hac Vice for Zachary Manfredi (Filing fee $100, receipt number AMDDC–11729467.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/24/2025) |
| 01/24/2025 | 26 | MOTION to Appear Pro Hac Vice for Dorothy Tegeler (Filing fee $100, receipt number AMDDC–11729550.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/24/2025) |
| 01/24/2025 | 27 | MOTION to Appear Pro Hac Vice for Leidy Perez (Filing fee $100, receipt number AMDDC–11729552.) by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.(Mead, Joseph) (Entered: 01/24/2025) |
| 01/27/2025 | 28 | PAPERLESS ORDER granting 25 Motion to Appear Pro Hac Vice on behalf of Zachary Manfredi. Directing attorney Zachary Manfredi to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/27/2025. (mh4s, Deputy Clerk) (Entered: 01/27/2025) |
| 01/27/2025 | 29 | PAPERLESS ORDER granting 26 Motion to Appear Pro Hac Vice on behalf of Dorothy Tegeler. Directing attorney Dorothy Tegeler to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. |

| | | Signed by Clerk on 1/27/2025. (mh4s, Deputy Clerk) (Entered: 01/27/2025) |
|---|---|---|
| 01/27/2025 | 30 | PAPERLESS ORDER granting 27 Motion to Appear Pro Hac Vice on behalf of Leidy Perez. Directing attorney Leidy Perez to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/27/2025. (mh4s, Deputy Clerk) (Entered: 01/27/2025) |
| 01/27/2025 | 31 | PAPERLESS ORDER granting 24 Motion to Appear Pro Hac Vice on behalf of Conchita Cruz. Directing attorney Conchita Cruz to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/27/2025. (mh4s, Deputy Clerk) (Entered: 01/27/2025) |
| 01/27/2025 | 32 | NOTICE of Appearance by Robert Charles Merritt on behalf of All Defendants (Merritt, Robert) (Entered: 01/27/2025) |
| 01/27/2025 | 33 | NOTICE of Appearance by Yuri Fuchs on behalf of Donald J. Trump, Secretary of the United States Department of State, Attorney General of the United States, Secretary of the United States Department of Homeland Security, Director of United States Citizenship and Immigration Services, Commissioner of the Social Security Administration, United States of America (Fuchs, Yuri) (Entered: 01/27/2025) |
| 01/28/2025 | 34 | MOTION for Leave to File *Amicus Brief* by Local Government Entities c/o Mayor and City Council of Baltimore (Attachments: # 1 Attachment Proposed Amicus Brief, # 2 Text of Proposed Order)(Gross, Sara) (Entered: 01/28/2025) |
| 01/29/2025 | 35 | PAPERLESS ORDER granting 34 Consent Motion for Leave to File Amicus Brief. Signed by Judge Deborah L. Boardman on 1/29/2025. (lmys, Chambers) (Entered: 01/29/2025) |
| 01/29/2025 | 36 | Unopposed Motion to Provide Remote Public Access to Courtroom Audio for the February 5, 2025 Hearing by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc. (Attachments: # 1 Text of Proposed Order)(Mead, Joseph) Modified on 1/31/2025 (heps). (Entered: 01/29/2025) |
| 01/29/2025 | 37 | Brief of Amici Curie of Local Government Entities c/o Mayor and City Council of Baltimore in Support of Plaintiff's Motion for Preliminary Injunction (Gross, Sara) Modified on 2/3/2025 (heps). (Entered: 01/29/2025) |
| 01/30/2025 | 38 | MOTION to Appear Pro Hac Vice for Katherine Courtney (Filing fee $100, receipt number AMDDC−11737449.) by Local Government Entities c/o Mayor and City Council of Baltimore(Gross, Sara) (Entered: 01/30/2025) |
| 01/31/2025 | 39 | RESPONSE to Motion re 3 MOTION for Other Relief *To Proceed Under a Pseudonym* filed by Donald J. Trump, Secretary of the United States Department of State, Attorney General of the United States, Secretary of the United States Department of Homeland Security, Director of United States Citizenship and Immigration Services, Commissioner of the Social Security Administration, United States of America.(Fuchs, Yuri) (Entered: 01/31/2025) |
| 01/31/2025 | 40 | RESPONSE in Opposition re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Donald J. Trump, Secretary of the United States Department of State, Attorney General of the United States, Secretary of the United States Department of Homeland Security, Director of United States Citizenship and Immigration Services, Commissioner of the Social Security Administration, United States of America.(Fuchs, Yuri) (Entered: 01/31/2025) |
| 01/31/2025 | 41 | QC NOTICE: 38 Motion to Appear Pro Hac Vice filed by Local Government Entities c/o Mayor and City Council of Baltimore needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 01/31/2025) |
| 02/03/2025 | 42 | NOTICE of Appearance by Daniel Alan Stein on behalf of Immigration Reform Law Institute (Stein, Daniel) (Entered: 02/03/2025) |
| 02/03/2025 | 43 | Consent MOTION for Leave to File *Amicus Brief* by Immigration Reform Law Institute (Attachments: # 1 Attachment IRLI Amicus Brief, # 2 Text of Proposed |

| | | Order Proposed Order)(Stein, Daniel) (Entered: 02/03/2025) |
|---|---|---|
| 02/03/2025 | 44 | MOTION to Appear Pro Hac Vice for Christopher J. Hajec *for Amicus Immigration Reform Law Institute* (Filing fee $100, receipt number AMDDC–11742348.) by Immigration Reform Law Institute(Stein, Daniel) (Entered: 02/03/2025) |
| 02/03/2025 | 45 | MOTION to Appear Pro Hac Vice for Gabriel R. Canaan *for Amicus Immigration Reform Law Institute* (Filing fee $100, receipt number AMDDC–11742473.) by Immigration Reform Law Institute(Stein, Daniel) (Entered: 02/03/2025) |
| 02/03/2025 | 46 | REPLY to Response to Motion re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc.. (Attachments: # 1 Attachment 1 William Blackstone, Commentaries on the Laws of England (1st ed. 1765), # 2 Attachment 2 James Gillespie Blaine, Twenty Years of Congress (1884), # 3 Attachment Clement L. Bouv, A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States (1912), # 4 Attachment Calvins Case, 77 Eng. Rep. 377 (1608), # 5 Attachment Congressional Globe excerpts, # 6 Attachment William Rawle, A View of the Constitution of the United States (1829), # 7 Attachment Spanish Treaty Claims Commn, U.S. Dept of Justice, Final Report of William Wallace Brown, Assistant Attorney General (1910), # 8 Attachment Joseph Story, Commentaries on the Conflict of Laws (1834), # 9 Attachment Frederick Van Dyne, Citizenship of the United States (1904), # 10 Attachment 6 Daniel Webster, Works of Daniel Webster (1851), # 11 Attachment 2 Francis Wharton, A Digest of the International Law of the United States (1887))(Mead, Joseph) (Entered: 02/03/2025) |
| 02/03/2025 | 47 | QC NOTICE: 44 Motion to Appear Pro Hac Vice filed by Immigration Reform Law Institute needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 02/03/2025) |
| 02/03/2025 | 48 | CORRECTED MOTION to Appear Pro Hac Vice for Katherine Courtney by Local Government Entities c/o Mayor and City Council of Baltimore. The fee has already been paid.(Gross, Sara) (Entered: 02/03/2025) |
| 02/03/2025 | 49 | Amicus Curiae APPEARANCE entered by Cameron T. Norris on behalf of State of Tennessee(Norris, Cameron) (Entered: 02/03/2025) |
| 02/03/2025 | 50 | Amicus Curiae Brief of the State of Tennessee in Support of Defendants (Norris, Cameron) Modified on 2/3/2025 (heps). (Entered: 02/03/2025) |
| 02/03/2025 | 51 | MOTION to Appear Pro Hac Vice for James Matthew Rice (Filing fee $100, receipt number AMDDC–11757909.) by State of Tennessee(Norris, Cameron) (Entered: 02/03/2025) |
| 02/03/2025 | 52 | MOTION to Appear Pro Hac Vice for Whitney D. Hermandorfer (Filing fee $100, receipt number AMDDC–11758460.) by State of Tennessee(Norris, Cameron) (Entered: 02/03/2025) |
| 02/03/2025 | 53 | PAPERLESS ORDER granting 43 Consent Motion for Leave to File Amicus Brief. Signed by Judge Deborah L. Boardman on 2/3/2025. (lmys, Chambers) (Entered: 02/03/2025) |
| 02/03/2025 | 54 | NOTICE by Maribel, Juana, Casa, Inc., Trinidad Garcia, Monica, Liza, Asylum Seeker Advocacy Project, Inc. re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *Notice of Filing Corrected Maribel Declaration* (Attachments: # 1 Exhibit Corrected Maribel Declaration)(Mead, Joseph) (Entered: 02/03/2025) |
| 02/04/2025 | 55 | PAPERLESS ORDER granting 45 Motion to Appear Pro Hac Vice on behalf of Gabriel R. Canaan. Directing attorney Gabriel R. Canaan to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 56 | PAPERLESS ORDER granting 48 Corrected Motion to Appear Pro Hac Vice on behalf of Katherine Courtney. Directing attorney Katherine Courtney to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy |

| | | |
|---|---|---|
| | | Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 57 | PAPERLESS ORDER granting 51 Motion to Appear Pro Hac Vice on behalf of James Matthew Rice. Directing attorney James Matthew Rice to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 58 | PAPERLESS ORDER granting 52 Motion to Appear Pro Hac Vice on behalf of Whitney D. Hermandorfer. Directing attorney Whitney D. Hermandorfer to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 59 | CORRECTED MOTION to Appear Pro Hac Vice for Christopher J. Hajec by Immigration Reform Law Institute. The fee has already been paid.(Stein, Daniel) (Entered: 02/04/2025) |
| 02/04/2025 | 60 | PAPERLESS ORDER denying 36 motion for public access to the preliminary injunction hearing on February 5, 2025. The public hearing will be held in Courtroom 4C. If capacity inside Courtroom 4C is reached, members of the public may watch the proceedings on a live video feed in Courtroom 4A. No electronics may be used inside the courtrooms. The press may watch the proceedings via live video feed in the jury assembly room on the first floor of the courthouse. The use of cellphones, laptops, and other electronic devices is permitted by the press only and only in the jury assembly room. There is no WiFi in the jury assembly room. Under no circumstances may the proceedings be recorded. Signed by Judge Deborah L. Boardman on 2/4/2025. (sb5s, Chambers) (Entered: 02/04/2025) |
| 02/04/2025 | 61 | PAPERLESS ORDER granting 59 Corrected Motion to Appear Pro Hac Vice on behalf of Christopher J. Hajec. Directing attorney Christopher J. Hajec to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 62 | NOTICE of Appearance by Eric Hamilton on behalf of All Defendants (Hamilton, Eric) (Entered: 02/04/2025) |
| 02/05/2025 | 63 | Brief of Immigration Reform Law Institute as Amicus Curaie in Support of Defendants and in Opposition to Plaintiff's Motion for Injunctive Relief. (heps, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 64 | Motions Hearing held on 2/5/2025 re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction and 3 MOTION for Other Relief *To Proceed Under a Pseudonym* before Judge Deborah L. Boardman. (Court Reporter: Patricia Klepp – 4C) (dg3s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 65 | MEMORANDUM OPINION. Signed by Judge Deborah L. Boardman on 2/5/2025. (kns, Deputy Clerk) (Entered: 02/06/2025) |
| 02/05/2025 | 66 | ORDER granting 2 Motion for a Preliminary Injunction and denying as moot Motion for a Temporary Restraining Order. Signed by Judge Deborah L. Boardman on 2/5/2025. (kns, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 67 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 2/5/25, before Judge Deborah L. Boardman. Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Total number of pages filed: 41. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 2/27/2025. Redacted Transcript Deadline set for 3/10/2025. Release of Transcript Restriction set for 5/7/2025. (Entered: 02/06/2025) |
| 02/06/2025 | 68 | PAPERLESS ORDER granting 3 Motion to proceed under pseudonyms. Signed by Judge Deborah L. Boardman on 2/6/2025. (lmys, Chambers) (Entered: 02/06/2025) |

| 02/11/2025 | 69 | NOTICE OF INTERLOCUTORY APPEAL as to 65 Memorandum Opinion, 66 Order on Motion for TRO, Order on Motion for Preliminary Injunction by Attorney General of the United States, Commissioner of the Social Security Administration, Director of United States Citizenship and Immigration Services, Secretary of the United States Department of Homeland Security, Secretary of the United States Department of State, Donald J. Trump, United States of America. (Fee Status: Filing Fee Not Paid)(Fuchs, Yuri) (Entered: 02/11/2025) |
|---|---|---|
| 02/11/2025 | 70 | MOTION to Stay re 66 Order on Motion for TRO, Order on Motion for Preliminary Injunction by Attorney General of the United States, Commissioner of the Social Security Administration, Director of United States Citizenship and Immigration Services, Secretary of the United States Department of Homeland Security, Secretary of the United States Department of State, Donald J. Trump, United States of America (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Merritt, Robert) (Entered: 02/11/2025) |
| 02/12/2025 | 71 | PAPERLESS ORDER directing plaintiffs to respond to 70 motion to stay by Friday, February 14. Defendants may file a reply by Sunday, February 16. Signed by Judge Deborah L. Boardman on 2/12/2025. (sb5s, Chambers) (Entered: 02/12/2025) |
| 02/13/2025 | 72 | Transmission of Interlocutory Notice of Appeal and Docket Sheet to US Court of Appeals re 69 Notice of Interlocutory Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 02/13/2025) |
| 02/13/2025 | 73 | RETURN DOCUMENT ORDER. Signed by Judge Deborah L. Boardman on 2/13/2025. (Attachments: # 1 First Page of Returned Document)(c/m 2/13/2025 heps, Deputy Clerk) (Entered: 02/13/2025) |
| 02/14/2025 | 74 | RESPONSE in Opposition re 70 MOTION to Stay re 66 Order on Motion for TRO, Order on Motion for Preliminary Injunction filed by Asylum Seeker Advocacy Project, Inc., Casa, Inc., Juana, Liza, Maribel, Monica, Trinidad Garcia.(Powell, William) (Entered: 02/14/2025) |
| 02/18/2025 | 75 | USCA Case Number 25–1153 for 69 Notice of Interlocutory Appeal, filed by Secretary of the United States Department of Homeland Security, Secretary of the United States Department of State, United States of America, Commissioner of the Social Security Administration, Attorney General of the United States, Director of United States Citizenship and Immigration Services, Donald J. Trump – Case Manager – Emily Borneisen. (slss, Deputy Clerk) (Entered: 02/18/2025) |
| 02/18/2025 | 76 | ORDER denying 70 Defendant's Motion for a partial stay pending appeal. Signed by Judge Deborah L. Boardman on 2/18/2025. (heps, Deputy Clerk) (Entered: 02/18/2025) |
| 02/20/2025 | 77 | RETURN DOCUMENT ORDER. Signed by Judge Deborah L. Boardman on 2/20/2025. (Attachments: # 1 First Page of Returned Document)(c/m 2/20/2025 heps, Deputy Clerk) (Entered: 02/20/2025) |
| 02/28/2025 | 78 | ORDER of USCA Denying Government's motion to stay appeal as to 69 Notice of Interlocutory Appeal, filed by Secretary of the United States Department of Homeland Security, Secretary of the United States Department of State, United States of America, Commissioner of the Social Security Administration, Attorney General of the United States, Director of United States Citizenship and Immigration Services and Donald J. Trump. (slss, Deputy Clerk) (Entered: 02/28/2025) |
| 03/03/2025 | 79 | Mail Returned as Undeliverable. Mail sent to Rubin Young. (Attachments: # 1 First Page of Returned Document) (heps, Deputy Clerk) (Entered: 03/04/2025) |
| 03/07/2025 | 80 | NOTICE OF INTERLOCUTORY APPEAL as to 77 Order by Mark Marvin. (Attachments: # 1 Envelope)(kns, Deputy Clerk) Modified on 3/10/2025 (kns). (Entered: 03/10/2025) |
| 03/10/2025 | 81 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 80 Notice of Interlocutory Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(kns, Deputy |

| | | |
|---|---|---|
| | | Clerk) (Entered: 03/10/2025) |
| 03/11/2025 | 82 | USCA Case Number 25–1223 for 80 Notice of Interlocutory Appeal filed by Mark Marvin. Case Manager – Emily Borneisen (av4s, Deputy Clerk) (Entered: 03/12/2025) |
| 03/17/2025 | 83 | Consent MOTION for Extension of Time to File Answer by Attorney General of the United States, Commissioner of the Social Security Administration, Director of United States Citizenship and Immigration Services, Secretary of the United States Department of Homeland Security, Secretary of the United States Department of State, Donald J. Trump, United States of America (Attachments: # 1 Text of Proposed Order)(Fuchs, Yuri) (Entered: 03/17/2025) |
| 03/18/2025 | | Assembled Electronic Record Transmitted to Fourth Circuit –– Initial.(slss, Deputy Clerk) (Entered: 03/18/2025) |
| 03/19/2025 | 84 | PAPERLESS ORDER granting 83 motion for extension of time. Defendants' response to the complaint is due April 23, 2025. Signed by Judge Deborah L. Boardman on 3/19/2025. (sb5s, Chambers) (Entered: 03/19/2025) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

CASA, INC.,
8151 15th Avenue
Hyattsville, MD 20528;

ASYLUM SEEKER ADVOCACY
PROJECT, INC.,
228 Park Ave. S #84810
New York, NY 10003-1502;

MARIBEL, *individually and as next friend*
*to her future child*,
c/o CASA, Inc.,
8151 15th Avenue
Hyattsville, MD 20528;

JUANA, *individually and as next friend to*
*her future child*,
c/o CASA, Inc.,
8151 15th Avenue
Hyattsville, MD 20528;

TRINIDAD GARCIA, *individually and as*
*next friend to her future child,*
c/o Asylum Seeker Advocacy Project,
228 Park Ave. S #84810
New York, NY 10003-1502;

MONICA, *individually and as next friend to*
*her future child*,
c/o Asylum Seeker Advocacy Project,
228 Park Ave. S #84810
New York, NY 10003-1502; *and*

**Case No.: _____**

**COMPLAINT**

LIZA, *individually and as next friend to her future child*,
c/o Institute for Constitutional
Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave NW
Washington, DC 20001;

        Plaintiffs,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
c/o Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001;

SECRETARY OF THE UNITED STATES
DEPARTMENT OF STATE, in their
official capacity,
The Executive Office of the Legal Adviser
and Bureau of Legislative Affairs
600 19th Street NW
Suite 5.600
Washington DC 20522;

ATTORNEY GENERAL OF THE
UNITED STATES, in their official
capacity,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001;

SECRETARY OF THE UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY, in their official capacity,
c/o Office of the General Counsel
U.S. Department of Homeland Security
245 Murray Lane, SW
Mail Stop 0485
Washington, DC 20528-0485;

DIRECTOR OF UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICES, in their official capacity,
c/o Office of the Chief Counsel
5900 Capital Gateway Drive
Mail Stop 2120
Camp Springs, MD 20588-0009;

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION, in their
official capacity,
c/o Office of the General Counsel
Social Security Administration
6401 Security Boulevard
Baltimore, MD 21235; *and*

UNITED STATES OF AMERICA,
c/o Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001;

            Defendants.

## INTRODUCTION

1.      This complaint challenges the Executive Order entitled "Protecting the Meaning and Value of American Citizenship," which purports to end birthright citizenship in the United States for the children of many immigrants living and working in the United States.

2.      The Executive Order is a flagrant violation of the Fourteenth Amendment, a federal statute, and the history underlying the text of those enactments, all of which guarantee the fundamental right to citizenship for all children born in the United States. The President has no unilateral authority to override rights recognized in the Constitution or in federal statutes.

3.      Founded as a nation of immigrants, the United States of America has always recognized the common-law principle of *jus soli* (or "right of the soil"), under which children born in the United States, whether to citizen or noncitizen parents, are United States citizens

from birth. The principle of birthright citizenship is a foundation of our national democracy, is woven throughout the laws of our nation, and has shaped a shared sense of national belonging for generation after generation of citizens.

4.      Although the nation departed from the principle of *jus soli* in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), denying citizenship to African-Americans born in the United States, the people of this country ratified the Fourteenth Amendment to right that wrong and express the nation's commitment to the principle of birthright citizenship for all. Section 1 of the Fourteenth Amendment therefore begins, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." By enshrining the guarantee of birthright citizenship in the Constitution, the people of this country ensured that citizenship could not be withheld from disfavored classes of native-born persons by mere legislation or executive action. The President has no power to eliminate a right guaranteed by the Constitution.

5.      The 14th Amendment's language is clear. Over a century ago, the U.S. Supreme Court confirmed that the Fourteenth Amendment's Citizenship Clause means that people born in the United States are U.S. citizens at birth without regard to their immigration status, except for children born to foreign diplomats, on foreign ships, to occupying armies, or to Indian tribes.[1] *See United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). The Court has adhered to that understanding time and again in the ensuing decades.

6.      Congress has reaffirmed and implemented the Fourteenth Amendment's guarantee by codifying birthright citizenship into a federal statute, which, in its current form,

---

[1] Congress has overridden the last of these exceptions by statute, extending territorial birthright citizenship to all Native Americans. *See* Act of June 2, 1924, ch. 233, 43 Stat. 253 (current version at 8 U.S.C. § 1401(b)).

reiterates that everyone "born in the United States and subject to the jurisdiction thereof" "shall be nationals and citizens of the United States at birth." 8 U.S.C. § 1401(a). The President has no power to unilaterally abrogate an Act of Congress.

7.      The Executive Order violates this long-settled law. It denies citizenship to children born to mothers whose presence in the country is either "unlawful[]" or "lawful but temporary" and whose father is neither a citizen nor a lawful permanent resident, even though those children are plainly "subject to the jurisdiction" of the United States and entitled to citizenship by birth.

8.      Organizational Plaintiffs are two membership-based immigrants-rights organizations, CASA, Inc. ("CASA") and Asylum Seeker Advocacy Project ("ASAP"), whose members include noncitizens who reside in the United States, who have immigration statuses covered by the Executive Order, and who are either pregnant or plan to have children while they are living within the United States (collectively, "Members").

9.      Individual Plaintiffs are two members of CASA, Maribel and Juana; two members of ASAP, Trinidad Garcia and Monica; and one additional individual, Liza. All five Individual Plaintiffs are pregnant, reside in the United States, and fear that their children will be denied United States citizenship under the Executive Order based on their immigration status and that of their children's fathers.

10.     The Executive Order will cause immediate and irreparable harm to Individual Plaintiffs and Members. Every day, babies are being born in the United States whose constitutionally guaranteed citizenship will be called into doubt under the Executive Order. These include many babies whose parents are Members of ASAP or CASA. Indeed, thousands of Members will give birth to children in the United States in the coming months. Those children

will be born in the United States and will be subject to its jurisdiction. They will therefore be

entitled to citizenship under the Fourteenth Amendment and 8 U.S.C. § 1401(a) regardless of

their parents' immigration status.

11.     "Citizenship is a most precious right." *Kennedy v. Mendoza-Martinez*, 372 U.S.

144, 159 (1963). "It would be difficult to exaggerate [the] value and importance" of United

States citizenship. *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Citizenship

signifies that a person is a full member of the United States community and is entitled to all of

the privileges, benefits, and freedoms that citizenship guarantees. As citizens, individuals born in

the United States enjoy an unqualified right to enter and remain in their homeland. Moreover,

citizens are ensured the opportunity to pursue the American dream and participate fully in the

civic and political life of the United States. They are allowed to vote, travel under a United States

passport, hold certain public offices, and qualify for many public benefits that noncitizens do not.

12.     If allowed to go into effect, the Executive Order would throw into doubt the

citizenship status of thousands of children across the country, including the children of

Individual Plaintiffs and Members. The Executive Order threatens these newborns' identity as

United States citizens and interferes with their enjoyment of the full privileges, rights, and

benefits that come with U.S. citizenship, including calling into question their ability to remain in

their country of birth.

13.     That deprivation of the benefits of citizenship is a grave injury not only to those

children but to their entire families, who will be directly harmed by the denial of the benefits of

citizenship to their children. The children deprived of citizenship have no status or right to

remain in the United States with their family, even as their older siblings will often be United

States citizens and as their parents will often be authorized to live in the United States. Indeed,

these children may not have access to citizenship in *any* country, leaving them stateless, living forever at the temporary sufferance of wherever they find themselves.

14.    Parents will face significant harm, including increased stress and anxiety that comes from the U.S. government treating their children differently from other U.S.-born children, and from the prospect of their children facing statelessness and an uncertain fate in the land of their birth. Immigrant parents, including those who cannot be deported because of a pending asylum claim or other immigration application, will also face the reality that their U.S. born child could be subject to deportation.

15.    This country would, in literal terms, be poorer for the elimination of birthright citizenship to the covered children. Research shows that birthright citizenship has contributed to economic growth and prosperity in the United States.

16.    Plaintiffs therefore seek a declaration that the Fourteenth Amendment and 8 U.S.C. § 1401(a) protect the right to birthright citizenship and that the constitutional guarantee of birthright citizenship cannot be eradicated by Executive Order, as well as a preliminary and permanent injunction prohibiting Defendants from implementing the Executive Order to deny any child born in the United States the benefits of their constitutionally guaranteed birthright citizenship.

**JURISDICTION AND VENUE**

17.    The Court has jurisdiction under the United States Constitution and 28 U.S.C. §§ 1331 and 1346.

18.    Venue is proper in this District under 28 U.S.C. § 1391(e) and in this division because Defendants are officers and employees of the United States or an agency thereof acting in their official capacities, Plaintiff CASA has its principal place of business in this division and

District, a Defendant resides in this division and District, and a substantial part of the events or omissions giving rise to this action are occurring in this division and District.

## PARTIES

19.     Plaintiff CASA, Inc. ("CASA") is a nonprofit membership organization headquartered in Prince George's County, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 175,000 members. Many of CASA's members have children who were born in the United States, and many plan to grow their families in the future while living in the United States.

20.     CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia, as well as a more limited suite of remote services to Members across the United States.

21.     In order to become a CASA member, an individual must apply for membership, pay dues (or have the dues requirement waived), and subscribe to the principles of CASA. A CASA member shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in working- class and immigrant communities. CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

22.     CASA provides comprehensive services to its members, including a public benefits outreach and enrollment program that assists community members with understanding and enrolling in various government aid and health insurance programs. CASA also counsels members who are seeking to become U.S. citizens, including through citizenship education, mentoring and interview preparation, application assistance, and post-naturalization support. And CASA provides free legal consultation to its members regarding, among other topics, immigration matters.

23.     CASA members have the opportunity to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

24.     Although CASA does not issue formal membership directly to individuals under 15 years of age, CASA routinely provides services to youth and their families.

25.     CASA's membership includes many individuals who are pregnant or planning to give birth, and whose U.S.-born children would be denied U.S. Citizenship under the Executive Order. The following are illustrative examples of such CASA members, who are identified in CASA's declaration and in this complaint using pseudonyms.

26.     **Marta** is a CASA member who lives in Maryland and is currently three months pregnant. Both Marta and the father of her unborn child are undocumented. Marta came to the United States from Guatemala seeking a better future and opportunity. When she found out that she was pregnant, she envisioned the life that her unborn child would have, free from the hardships she experienced in Guatemala. Marta deeply understands how important being a

citizen of the United State is, and although she is not currently able to adjust her status in this country, she took solace from the fact that her child would be born a U.S. citizen. She wants her child to be born happy and healthy, and with the opportunity to access a quality education, and believes that the best chance for her child's future is if her child is considered a U.S. citizen upon birth.

27.     **Adelina** is a CASA member living in Maryland who has been in the United States for seven years and is currently six months pregnant. Both Adelina and her partner are currently undocumented. Adelina has one other child, who was born in the United States and is a U.S. citizen. She wants her unborn child to have the same rights and opportunities that she has seen her five-year-old child enjoy in this country. It pains her to think that one of her children will have more benefits than the other, even though they were both born here. She is concerned that if her unborn child is not considered a United States citizen, they will experience significant hardship and not have the same opportunity as their sibling.

28.     **Rita** is a CASA member who lives in Maryland and has been in the United States for five years.   Both Rita and her partner are currently undocumented. Rita is seven months pregnant with her first child and she thanks God that her child will be born here. If her child were born in Rita's home country of Guatemala, they would not have access to a good education, adequate healthcare or other basic services. It would be a struggle just to survive, without any realistic prospect of a brighter future. In light of the Executive Order, Rita fears that her first child will face more hardship, unable to access their full rights as a U.S. citizen.  Rita herself was deeply impacted by the Coronavirus pandemic and she doesn't want her child to go through the pain and struggles that she has endured.  It is important to her that her child is fully recognized as a citizen of the U.S. so they can receive the benefits they deserve.

29.     **Georgina** is a CASA member currently living in Maryland and originally from El Salvador.  She is two months pregnant.  Georgina has lived in the United States for six years, but neither she nor the father of her unborn child have lawful immigration status.  She is a single mother, with very limited financial resources and is fearful that if her unborn child isn't granted the benefits of U.S. citizenship she won't be able to support the baby.  Georgina fears that her child will not have access to good food and quality education in the same way her two other children born in the United States will.  Georgina is also afraid that her child will be subject to discrimination, because she has seen how noncitizens are treated poorly in this country.

30.     **Andrea** is a CASA member originally from Mexico, who lives in Georgia and is currently pregnant, expecting to give birth in late mid-March. Andrea wants her future child to enjoy the full dignity of citizenship in the United States and fears that they will be denied educational opportunities and suffer from a lack of opportunity if they are denied citizenship. Andrea dreams that her children will lead a better life in the United States, a country she has long viewed as a land of opportunity.  Andrea is currently in removal proceedings and neither she nor the father of her child have lawful immigration status. As an immigrant, Andrea is looking for a better life for her children, and came here because the United States is a country of opportunity. She is thankful for this country for giving her opportunities that she never would have had in Mexico, and only asks that her children are given the opportunities that they are entitled to by the constitution.

31.     Plaintiff Asylum Seeker Advocacy Project ("ASAP") is a nonprofit organization headquartered in New York, New York. ASAP is the largest membership organization of asylum seekers in the United States, with over 680,000 members from more than 175 countries who reside in all 50 U.S. states and several U.S. territories.

32.    ASAP is a national voluntary membership-based 501(c)(3) nonprofit organization incorporated in New York. ASAP's mission is to help its members—individuals seeking asylum—to build a more welcoming United States. ASAP provides members with community and legal support and advocates for nationwide systemic reform based on the priorities identified by its membership.

33.    Asylum seekers apply to join ASAP by filling out a voluntary online membership form. ASAP welcomes new members who are asylum seekers age 14 or over who believe in ASAP's mission.

34.    ASAP issues each member a digital membership card and member ID that they can use to identify themselves to ASAP and access the full range of member benefits.

35.    Although ASAP does not issue separate membership cards to anyone under the age of 14, the benefits of ASAP membership also extend to the children of ASAP members as derivative of their parents' membership.

36.    ASAP's members have fled persecution to seek safe haven in the United States. Most members have applied for asylum in accordance with federal law. Federal law provides that immigrants with a pending asylum application are not subject to removal while their claims are pending. Many ASAP members have access to a Social Security number and are authorized to work, for example, because they are waiting for their asylum application to be processed, have already won asylum, have Temporary Protected Status, have a pending green card application, or have other pending immigration applications.

37.    Many of ASAP's members have children who were born in the United States, and many plan to have children while they are living in the United States. Hundreds or even thousands of ASAP members will give birth to children in the United States over the coming

weeks and months, and the Executive Order threatens the citizenship status of these U.S.-born children. The following are a few illustrative examples of members who will be harmed by the Executive Order. ASAP's members are identified using pseudonyms (or using only part of their full names).

38.    **Dina** is an ASAP member living in Washington State. She is pregnant and due in July of 2025. She and her partner are both from Kenya, and they are seeking asylum in the United States. Diana and her partner have been living in the United States since 2018. Diana came to the United States on a student visa, then applied for asylum affirmatively with USCIS. She and her partner have been working legally in the United States for more than 5 years. Diana has a degree in cybersecurity and works as an IT manager. Her partner works for the county government as an IT Specialist. She and her partner are worried that their child will not be able to receive U.S. citizenship. Being an immigrant in the United States has been very stressful for Diana and her partner, and they do not want their son to go through the same struggles they have had to go through.

39.    **Niurka** is an ASAP member living in Florida. She is pregnant and due in March of 2025. Niurka and her partner are both from Cuba, and they are currently seeking asylum in the United States. They crossed the Mexico-U.S. border, and were placed in deportation proceedings before the U.S. immigration courts. Niurka and her partner have a pending asylum application and a pending lawful permanent residency application under the Cuban Adjustment Act. Niurka was a medical doctor in Cuba, but she is not working at this time. Her partner studied food science and was a biopharmacist in Cuba. He is now a food safety and quality assurance manager in the food production industry. She and her partner are very worried their child will not receive U.S. citizenship when he is born. They want their son to achieve success in the United States and

worry about how not receiving citizenship at birth will impact his future. Niurka and her partner

have no intention of ever going back to Cuba because of the dictatorship, would never want their

child to be a Cuban citizen, and do not want their child to ever have to set foot in Cuba. If he is

denied U.S. citizenship, they are worried that their son would be in a state of limbo and would

not have citizenship from any country.

40.     **Nivida** is an ASAP member living in Louisiana. She is pregnant and due in April

of 2025. Nivida is from Honduras and sought asylum in the United States in 2020. She had filed

her asylum application with the U.S. immigration courts. However, her case was recently

dismissed. Nivida's partner is from Mexico, and he has an application pending for a U-visa.

Nivida and her partner believe it is very important that their child becomes a U.S. citizen at birth.

If their child does not have U.S. citizenship at birth, Nivida and her partner are afraid of him

having to live in either Honduras or Mexico because they fear violence and persecution in both

countries. Nivida and her partner worry about their son's future if he is not a birthright citizen of

the United States, and how it could change his life trajectory, his development, and the

educational opportunities afforded to him. Nivida and her partner's daughter has U.S. citizenship

from birth already, which also means their son would have a different status than his sister,

despite both of them being born in the United States.

41.     **Lesly** is an ASAP member living in New Jersey. She is pregnant and due in July

of 2025. She crossed at the Mexico-U.S. border using the CBP One app, and subsequently

applied for asylum in the U.S. immigration courts. Her next hearing is not until 2028. Lesly has

worked as a cleaner in the U.S. and has a work permit. Neither Lesly nor her partner are U.S.

citizens or lawful permanent residents. Lesly and her partner want to apply for their child's U.S.

passport as soon as possible, but they are worried their child will not receive U.S. citizenship.

They are concerned that without birthright citizenship, their child will not have as many opportunities—either educational or professional. Lesly is very stressed because she is not sure if she is going to have to start a U.S. immigration process for her child who will be born in the United States. Lesly is worried because an immigration attorney could cost a lot of money, and she does not know if she would have to hire an immigration attorney or pay application fees.

42.    **Nohelimar** is an ASAP member living in California. She is pregnant and due in March of 2025. She and her partner came to the United States seeking safe haven. Nohelimar's partner has applied for asylum, but she has not been able to yet. Nohelimar studied criminalistics abroad, but she is not working because she has not yet received her work permit. Nohelimar and her partner are worried that their child will not be able to receive U.S. citizenship. Nohelimar believes that if her son becomes a U.S. citizen, he will have a better future. If he is denied U.S. citizenship, she is confused and scared about what the process would be for her to get her son citizenship from any other country, and she would be worried about her son's future in the United States.

43.    **Adriana** is an ASAP member living in New York. She is pregnant and due in March of 2025. Adriana and her partner are both currently seeking asylum in the United States. They came to the United States as tourists, and subsequently applied for asylum with USCIS. Adriana has previously worked as an administrative and finance assistant abroad, but she is not currently working because she had a difficult pregnancy. Adriana's partner works as a driver for a company that handles transportation for senior citizens and children. Adriana and her partner are worried that their daughter will face discrimination in the United States if she is not made a U.S. citizen at birth. Adriana is using a pseudonym. She brings this lawsuit on behalf of herself and her future child.

44.    CASA and ASAP bring this suit to vindicate the interests of their members and the U.S.-born children their members will have over the upcoming weeks, months, and years.

45.    Plaintiff **Maribel** is a CASA member who has lived in the U.S. for 18 years and resides in Prince George's County, Maryland. She is currently pregnant, expecting to give birth in July of 2025. She lives with her husband and two young U.S. citizen daughters, who are 14 and 10 years old. She is an immigrant from El Salvador who was born in Guatemala. She is undocumented despite having lived in the U.S. for nearly half her life. Her husband is also undocumented. She fears her unborn child will not have the same rights to citizenship as the future child's older sisters, and could even be subject to deportation, separating the family. She is afraid that her child won't have access to healthcare because they won't be eligible for federal benefits. She feels it is deeply wrong to subject an innocent newborn to such cruelty. Maribel is using a pseudonym. She brings this lawsuit on behalf of herself and her future child.

46.    Plaintiff **Juana** is a CASA member who resides in Montgomery County, Maryland. She is a native of Colombia. She moved the United States after fleeing from Colombia and has a pending asylum claim. Her 12-year-old daughter is also in the United States and is a derivative on her petition for asylum. She is currently two months pregnant. She is worried that her child will be born without a country as a result of the Executive Order, since she is afraid to return to Colombia. She wants her unborn child to be able to grow up without fear and with a sense of belonging in the United States. The thought that her unborn child could be denied U.S. citizenship and deported to Colombia without her is terrifying. It is important to her that her unborn child be a U.S. citizen so they can have a better quality of life and fully engage with all that the United States has to offer. She wants her child to have educational opportunities and to be a good person who serves their country and community. She does not think it makes

sense for her child to be denied the benefits of citizenship they deserve once they are born in the U.S. Juana is using a pseudonym. She brings this lawsuit on behalf of herself and her future child.

47.    Plaintiff **Trinidad Garcia** is an ASAP member living in North Carolina. She is pregnant and due in August of 2025. She and her partner are both from Venezuela, and they have been living in the United States since 2017. She and her partner came to the United States on a tourist visa. They have a pending affirmative asylum application with USCIS, and have not been given an appointment for an interview in their case yet. She and her partner both have work permits, and they have been working in their local community. She graduated with a degree in business administration in Venezuela, and she worked in human resources before coming to the United States. Upon arriving in the United States, Trinidad Garcia began to clean homes. She has since started her own home cleaning business. Her partner was an environmental engineer in Venezuela, but he now works in the U.S. as a technician to restore stone, tile, and grout in home remodels. Trinidad Garcia and her partner are worried that there is no way for them to approach the Venezuelan government regarding their child's citizenship because there are no Venezuelan consular services in the United States. They believe it would be impossible to get their child Venezuelan citizenship. Because of that, both Trinidad Garcia and her partner want to get their child a U.S. passport and proof of U.S. citizenship as soon as possible, but they are worried their child will not be able to receive U.S. citizenship. If their U.S.-born child is not able to get U.S. citizenship at birth, Trinidad Garcia is very stressed that their child will not be a citizen of any country or be able to get important identity documents. She is worried that they will have to apply for asylum for their child, is confused about what the process would like, and is worried that they will have to hire someone to help them pay the government for application fees, which

could cost them a significant amount of money. Trinidad Garcia is using a pseudonym. She

brings this lawsuit on behalf of herself and her future child.

48.    Plaintiff **Monica** is an ASAP member living in South Carolina. She is pregnant

and due in August of 2025. She and her partner are both originally from Venezuela, and they

both have Temporary Protected Status (TPS) as well as a pending affirmative asylum application

with USCIS. They have been in the United States since 2019. Maria is a trained medical doctor

who is seeking to validate her medical degree in the United States. She is worried that it would

be next to impossible to get her child Venezuelan citizenship even if she tried. Because of that,

both Maria and her partner want to get their child a U.S. passport and proof of U.S. citizenship as

soon as possible, but they are worried their child will not be able to receive U.S. citizenship. If

that happens, they are very concerned that their child will not be a citizen of any country. Monica

is using a pseudonym. She brings this lawsuit on behalf of herself and her future child.

49.    Plaintiff **Liza** is married to an ASAP member, Igor, and lives in Texas. Liza is

expecting a child in May of 2025. Liza and Igor are from Russia. Igor applied for asylum with

the U.S. immigration courts. Liza came to the United States on a student visa and is receiving her

master's degree. Liza and Igor want to apply for their child's U.S. passport as soon as possible,

but they are worried their child will not receive U.S. citizenship. Neither Liza nor Igor feel they

can return to Russia without being persecuted, and they therefore do not feel they can apply for

Russian citizenship for their child. Because of that, Liza and Igor are worried their child will be

stateless. She brings this lawsuit on behalf of herself and her future child.

50.    Defendant Donald J. Trump is the President of the United States. He is sued in his

official capacity.

51.    Defendant Secretary of the U.S. Department of State ("Secretary of State") is the official exercising the power of the head of the federal agency responsible for, among other things, issuing passports to U.S. citizens. Defendant Secretary of State is sued in their official capacity. The Department of State is an executive department of the United States Government, headquartered in Washington, D.C.

52.    Defendant Attorney General of the United States ("Attorney General") is the head of the United States Department of Justice and is the chief law enforcement officer of the federal government. Among other things, Defendant Attorney General is responsible for adjudicating immigration cases. Defendant Attorney General is sued in their official capacity. The Department of Justice is an executive department of the United States Government, headquartered in Washington, D.C.

53.    Defendant Secretary of the U.S. Department of Homeland Security ("Secretary of DHS") is the official exercising the power of the head of the federal agency responsible for, among other things, naturalization of potential U.S. citizens and enforcement of immigration laws against those in the country without authorization. Defendant Secretary of DHS is sued in their official capacity. DHS is an executive department of the United States Government, headquartered in Washington, D.C.

54.    Defendant Director of the U.S. Citizenship and Immigration Services ("Director of USCIS") is the official exercising the power of the head of the federal sub-agency within DHS responsible for, among other things, granting applications for naturalization. Defendant Director of USCIS is sued in their official capacity. USCIS is a sub-agency of DHS, headquartered in Camp Springs, MD.

55.    Defendant Commissioner of the Social Security Administration ("SSA") is the official exercising the power of the head of the federal agency responsible for, among other things, issuing social security numbers. Defendant Commissioner of SSA is sued in their official capacity. SSA is an agency of the United States Government, headquartered in Baltimore, MD.

56.    Defendant United States of America is the sovereign whose power is delineated by the United States Constitution. Although in violation of federal law, Defendants' actions as described in this complaint were taken under color of the United States' authority.

## FACTS

### Legal Background

57.    "Citizenship is a most precious right." *Mendoza-Martinez*, 372 U.S. at 159. It is a "cherished status" that "carries with it the privilege of full participation in the affairs of our society." *Knauer v. United States*, 328 U.S. 654, 658 (1946).

58.    Under the ancient common-law principle of *jus soli* (or "right of the soil"), "every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign State, or of an alien enemy in hostile occupation of the place where the child was born." *Wong Kim Ark*, 169 U.S. at 658.

59.    After the Constitution's adoption, the United States continued to follow "the established rule of citizenship by birth within the United States." *Id.* at 660. This was so regardless of whether a child was born of United States citizens or "of foreign parents." *Id.* at 674. The Supreme Court's decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), holding that African-Americans were ineligible to become citizens of the United States, represented a notable and ultimately much-reviled departure from the principle of *jus soli*.

60.     Following the Civil War, Congress sought to repudiate forever the logic of *Dred Scott* and guarantee that the citizenship of people born in the United States would never be dependent on political whims. Recognizing that "an ordinary act of legislation" would not be sufficient to ensure that "so important a declaration of rights" be preserved indefinitely, Congress wrote birthright citizenship into the Fourteenth Amendment. *Wong Kim Ark*, 169 U.S. at 675; *see also* James C. Ho, *Defining "American,"* 9 Green Bag 2d 359, 360, 368 (2006) (noting attempts to undermine birthright citizenship and observing "*Dred Scott II* could be coming soon to a federal court near you.").

61.     Section 1 of the Fourteenth Amendment opens with the guarantee that "[a]ll persons born . . . in the United States, and subject to the jurisdiction thereof," are U.S. citizens at birth. U.S. Const. amend. XIV, § 1 ("Citizenship Clause"). This Amendment reaffirmed "the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of parents," *Wong Kim Ark*, 169 U.S. at 688, doing so in "the most explicit and comprehensive terms," *id.* at 675.

62.     By enshrining this protection in the Constitution with such clear language, the framers "put citizenship beyond the power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967). The Fourteenth Amendment recognizes the sanctity of citizenship and acknowledges that "[t]he very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Id.* at 268. In light of the Fourteenth Amendment, the government has "no authority . . . to restrict the effect of birth, declared by the constitution to constitute a sufficient and complete right to citizenship." *Wong Kim Ark*, 169 U.S. at 703. Never again would the government be permitted to discriminate against disfavored

classes in deciding which children born in the United States are entitled to citizenship. Absent a

constitutional amendment, *Dred Scott* would never again be the law.

63.      The only condition placed on this right of citizenship is that the person be "subject

to the jurisdiction" of the United States. At the time the Fourteenth Amendment was adopted,

"subject to the jurisdiction" was a commonly used phrase with "a clear meaning and scope."

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 437-40 (2020)

(collecting sources). And nearly everyone present in a sovereign's territory, including

noncitizens, is subject to that sovereign's power of "governing or legislating," entitled to that

sovereign's protection, and thus "subject to the jurisdiction" of that sovereign. *Id.*; *accord, e.g.*,

1 Blackstone's Commentaries on the Laws of England 357 (1st ed. 1765) ("Natural allegiance is

such as is due from all men born within the king's dominions immediately upon their birth. For,

immediately upon their birth, they are under the king's protection; at a time too, when (during

their infancy) they are incapable of protecting themselves.").

64.      For centuries before the 14th Amendment was enacted, "beginning before the

settlement of this country, and continuing to the present day, aliens, while residing in the

dominions possessed by the crown of England, were within the allegiance, the obedience, the

faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and

therefore every child born in England of alien parents was a natural-born subject." *Wong Kim

Ark*, 169 U.S. at 658 (collecting sources). The Citizenship Clause preserved this ancient

understanding as a constitutional promise.

65.      Consistent with this history and language, the U.S. Supreme Court held in *Wong

Kim Ark* that all persons born within the territorial United States are citizens of this Nation from

the moment of birth—regardless of their parents' citizenship status—unless they fit into a

historically recognized exception: (1) "foreign sovereigns or their ministers," (2) noncitizens

serving on a "foreign public ship[]," (3) "enemies within and during a hostile occupation of part

of our territory," or (4) "children of members of the Indian tribes owing direct allegiance to their

several tribes." *Wong Kim Ark*, 169 U.S. at 693. These children, and these children alone, were

not "subject to the jurisdiction" of the United States despite being born within its territory.

66.     The Court specifically rejected the view that children must be subject to the

jurisdiction *only* of the United States in order to enjoy territorial birthright citizenship. *See id.* at

693 ("Every citizen or subject of another country, while domiciled here, is within the allegiance

and the protection, and consequently subject to the jurisdiction, of the United States."); *id.* at 694

(denying that the Fourteenth Amendment "excludes from citizenship the children, born in the

United States, of citizens or subjects of other countries").

67.     In addition to enshrining the principle of birthright citizenship, Section 1 of the

Fourteenth Amendment also prohibits each state from "deny[ing] to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court

has clarified that any person deemed to be "within [the] jurisdiction" of a state for purposes of

the Equal Protection Clause is necessarily "subject to the jurisdiction" of the United States for

purposes of the Citizenship Clause. *See Wong Kim Ark*, 169 U.S. at 687 ("It is impossible . . . to

hold that persons 'within the jurisdiction' of one of the States of the Union are not 'subject to the

jurisdiction of the United States.'").

68.     In *Plyler v. Doe*, 457 U.S. 202 (1982), the Court held that undocumented aliens

are "within [the] jurisdiction" of any state in which they are physically present. "That a person's

initial entry into a State, or into the United States, was unlawful . . . cannot negate the simple fact

of his presence within the State's territorial perimeter." *Id.* at 215. "Given such presence," the

Court explained, "he is subject to the full range of obligations imposed by the State's civil and criminal laws." *Id.* In short, "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10; *see also The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903) (explaining that an alien who allegedly entered the United States unlawfully "bec[a]me subject in all respects to its jurisdiction"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (concluding that the Equal Protection Clause protects "all persons within the territorial jurisdiction" of a state).

69.     Regardless of the immigration status of their parents, children born in the United States are undoubtedly "subject to the jurisdiction of the United States" at the moment of their birth. Both federal and state governments today extend to children born in the United States—as well as their parents while physically present in the United States—the equal protection of the laws and assert regulatory authority over them. *E.g.,* 1 U.S.C. § 8 (clarifying that the use of the term "person" in "any Act of Congress, or of any ruling, regulatory, or interpretation of the various administrative bureaus and agencies of the United States" "shall include every infant member of the species homo sapiens who is born alive"); *see also* Executive Order 13952, *Protecting Vulnerable Newborn and Infant Children*, 85 Fed. Reg. 62187 (Sept. 25, 2020) ("Every infant born alive, no matter the circumstances of his or her birth, has the same dignity and the same rights as every other individual and is entitled to the same protections under Federal law."); Md. Code Ann., Health-Gen. § 13-111 (providing for screening of newborns); Md. Code Ann., Fam. Law § 9.5-201 (providing that courts have authority to determine custody of children living in the state); Md. Code Ann., Fam. Law § 5-525 (providing for care of children when parents are unable to do so).

70.    Many other Supreme Court decisions have reiterated the understanding of the Fourteenth Amendment that persons born in the United States of noncitizen parents nonetheless attain citizenship at birth. *See, e.g.*, *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927) (explaining that "one born in the United States" becomes "a citizen of the United States by virtue of the *jus soli* embodied in the [Fourteenth] Amendment"); *Hirabayashi v. United States*, 320 U.S. 81, 96 (1943) (noting tens of thousands of Americans of Japanese descent were "citizens because [they were] born in the United States"); *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957) (noting that a child born in the United States was "of course, an American citizen by birth," despite his parents' "illegal presence"); *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (noting a "child, who, born in the United States, was a citizen of this country," even though parents had "enter[ed] . . . without inspection").

71.    The same is true of Fourth Circuit decisions. *See United States v. Carvalho*, 742 F.2d 146, 148 (4th Cir. 1984) (describing a child as "a United States citizen by virtue of her birth in the United States"); *Herrera v. Finan*, 709 F. App'x 741, 743 (4th Cir. 2017) (explaining that the plaintiff "was born in the United States and, thus, is a United States citizen").

72.    A federal statute, 8 U.S.C. § 1401(a), safeguards birthright citizenship in language closely resembling that of Section 1 of the Fourteenth Amendment. Section 1401(a) provides that "a person born in the United States, and subject to the jurisdiction thereof," is a "citizen[] of the United States at birth." This longstanding statutory provision traces its origins to the Civil Rights Act of 1866 and was re-enacted as Section 301(a) of the Immigration and Nationality Act of 1952 (the INA), against the backdrop of *Wong Kim Ark* and the consensus interpretation it engendered. *See, e.g.*, S. Rep. 1137, 82d Cong., 2d Sess. 39 (1952) ("All persons born in the United States, including Alaska, Hawaii, Puerto Rico, the Virgin Islands of the United States,

and Guam, and subject to the jurisdiction of the United States, are citizens at birth. The only

exceptions are those persons born in the United States to alien diplomats."). Section 1401(a)

therefore incorporates the meaning of Section 1's Citizenship Clause expressed in *Wong Kim Ark*

and subsequent decisions.

73.    The assumption of birthright citizenship permeates federal regulatory law as well,

treating proof of birth in the United States as sufficient to establish United States citizenship.

For example, the Social Security Administration assigns social security numbers upon proof of

U.S. citizenship, which can be established "by submitting a birth certificate or other evidence . . .

that shows a U.S. place of birth." 20 C.F.R. § 422.107(d). The Department of State issues

passports to U.S. Citizens, a status that can be proved with evidence that the applicant was born

in the United States. 22 C.F.R. § 51.42. An employee can establish their authorization to work in

the United States by providing "An original or certified copy of a birth certificate issued by a

State, county, municipal authority or outlying possession of the United States bearing an official

seal." 8 C.F.R. § 274a.2(c)(3). Numerous other provisions throughout the Code of Federal

Regulations similarly provide that proof of birth in the United States is sufficient evidence to

establish United States citizenship. *E.g.*, 8 C.F.R. § 322.3(b)((iv) (providing that an United States

citizen parent seeking to establish citizenship for a child not born in the United States can

establish the parent's citizenship by providing the parent's birth certificate.); 20 C.F.R.

§ 416.1610(a) ("You can prove that you are a citizen or a national of the United States by giving

us (1) A certified copy of your birth certificate which shows that you were born in the United

States."); 28 C.F.R. § 105.11(a)(2) (providing that a "birth certificate" that "establish[es] that the

person was born in the United States" is "proof of Untied States citizenship or nationality" for

purposes of aviation security screening); 33 C.F.R. § 125.23(a) (providing that a birth certificate

is most desirable proof of U.S. citizenship for purposes of obtaining a Coast Guard Port Security Card).

### The Executive Order

74.     On January 20, 2025, President Trump signed an Executive Order entitled "Protecting the Meaning and Value of American Citizenship."

75.     The Executive Order declares that "the privilege of United States citizenship does not automatically extend to persons born in the United States" when the person's mother "was unlawfully present in the United States" or when the mother's presence "was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa)," unless the child's father was a United States citizen or lawful permanent resident at the time of the person's birth. Order § 1.

76.     The Executive Order provides that, starting with children born 30 days after the date on which the Order was signed (i.e., starting with children born February 19, 2025), "no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to persons denied citizenship under the Executive Order. *Id.* § 2.

77.     The Executive Order further directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." *Id.* § 3. And the Order directs the heads of all executive departments and agencies to

"issue public guidance . . . regarding this order's implementation with respect to their operations and activities." *Id.* § 3.

## Effects of the Order

78.     The Executive Order will have a devastating and chaotic impact.

79.     To begin, the Executive Order calls into question the citizenship of countless babies born every day in the United States, thrusting their entire families into turmoil.

80.     As the Executive Order itself notes, "United States citizenship is a priceless and profound gift." Order § 1. Loss of citizenship may represent "the total destruction of the individual's status in organized society," *Trop v. Dulles*, 356 U.S. 86, 102 (1958) (plurality); *see also id.* at 124 (Frankfurter, J., dissenting) ("Loss of citizenship entails undoubtedly severe—and in particular situations even tragic—consequences.").

81.     The Supreme Court has observed that "nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men." *Schneiderman v. United States*, 320 U.S. 118, 122 (1943).

82.     The tangible benefits of United States citizenship are "priceless." *Id*. Denying birthright citizenship to the children of noncitizens and depriving them of their constitutionally guaranteed benefits of citizenship will have immediate and dire consequences for newborn children and their families.

83.     For example, natural-born citizens are "entitled as of birth to the full protection of the United States, to the absolute right to enter its borders, and to full participation in the political process." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001). Citizens enjoy an unqualified constitutional right to enter, reside, and stay in the United States. *See, e.g., id.*; *Worthy v. United*

*States*, 328 F.2d 386, 394 (5th Cir. 1964) ("[I]t is inherent in the concept of citizenship that the citizen, when absent from the country to which he owes allegiance, has a right to return, again to set foot on its soil."). Noncitizens do not share that right. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 587 (1952) ("The Government's power to terminate its hospitality [to noncitizens] has been asserted and sustained by this Court since the question first arose.").

84.    "[I]n clear words and in manifest intent," *Wong Kim Ark*, 169 U.S. at 693, the Fourteenth Amendment protects those born in the United States from discriminatory and differential treatment, providing everyone the same citizenship regardless of their race, color, or the immigration status or national origin of their parents. Yet the Executive Order defies this constitutional mandate, discriminating against countless children born in the United States based solely on their parents' immigration status. The Executive Order thus purports to impose second-class status on a class of children born in the United States, harming not only them but their entire families.

85.    A newborn denied the guarantees of United States citizenship may have no right to stay in or re-enter their native land. Absent citizenship, children born to noncitizens, including the children of Individual Plaintiffs and of Members, may be subject to deportation. These children may therefore be forced to leave the country of their birth to travel to a place where they have never been, where they may have no family ties, and, in the worst cases, where they may face torture, persecution, and death.

86.    By denying citizenship—and the accompanying right to remain in the United States—to newborn babies, the Executive Order threatens to tear families apart. Parents (such as those with a pending asylum application) may have a legal basis to reside in the United States, and a newborn's older siblings will often be United States citizens by birth. But under the

Executive Order, the newborn would not have that same status. This could lead to an unconscionable situation in which some members of a family will have a right to remain in the United States while a U.S.-born child will not. Parents could be separated from their children, denied the ability to travel with their newborns, and forced to make life-changing financial and logistical adjustments to protect their children from danger. Ultimately, parents may be forced to make an impossible choice between returning to a country where they face persecution and death, or remaining in the United States while their U.S.-born child is deported.

87.    If denied United States citizenship, U.S.-born babies may lack citizenship in *any* country, leaving them stateless, "a condition deplored in the international community of democracies." *Trop*, 356 U.S. at 101 (plurality). Without a homeland, a stateless person's "very existence is at the sufferance of the country in which he happens to find himself." *Id*. at 101.

88.    The risk of statelessness is particularly high for children born to parents who are seeking asylum. Many asylum seekers have been persecuted and tortured by the governments of their home countries, and as such do not have access to or feel safe seeking services from a consular office of their country of origin in the United States. Furthermore, it is common practice for immigration attorneys to advise their clients that availing themselves of consular services from their country of origin could harm their asylum case. As a result, many asylum seekers feel they cannot request citizenship for their children from their country of origin. This will have the effect of rendering the children of many asylum seekers stateless, meaning they would not have citizenship from any country. Parents will then have to seek additional immigration representation and support for their children to explore alternative protections. This will increase financial costs, create major logistical burdens, and disrupt their plans to assimilate their families into the United States.

89.    Pregnant Individual Plaintiffs and other Members are experiencing stress and anxiety knowing their children may not become U.S. citizens by birth. Immigration insecurity leads mothers and pregnant women to experience significant stress and experience worse physical and mental health outcomes. Such mothers give birth to babies with lower birthweight and poorer health. Elizabeth U. Cascio, Paul Cornell, Ethan G. Lewis, *The Intergenerational Effects of Permanent Legal Status*, NBER Working Paper No. 32635 (2024), https://www.nber.org/system/files/working_papers/w32635/w32635.pdf. The threat of deportation of loved ones also leads to worse mental health outcomes. Amy L. Johnson et al, *Deportation threat predicts Latino US citizens and noncitizens' psychological distress*, *2011 to 2018*, 121 PNAS e2306554121 (2024), https://www.pnas.org/doi/10.1073/pnas.2306554121.

90.    Beyond potential immigration consequences, the Executive Order will deny children born in the United States to noncitizen parents, including children born to Individual Plaintiffs and Members, other privileges and responsibilities of U.S. citizens. That denial will harm not only the children, but their entire families.

91.    Individual Plaintiffs and Members have spent time and energy planning for the birth of their children; but those plans have been thrown into disarray by the Executive Order, which creates legal uncertainty about their children's immigration status. Individual Plaintiffs and Members want their children to be able to pursue the American dream and participate in the full civic and political life of this Nation, but those hopes have been replaced with fear and doubt.

92.    Ending birthright citizenship would also disqualify children born in the United States to noncitizen parents, including children born to Individual Plaintiffs and Members, from a host of federal, state, and local benefits provided to ensure that all citizens of this country can

succeed. While noncitizens are often ineligible to obtain such benefits in their own right, *see* 8 U.S.C. § 1611(a), U.S. citizen children are generally eligible for such benefits and noncitizen parents can apply for them on behalf of a citizen child.

93.    For instance, the Supplemental Nutrition Assistance Program ("SNAP") provides critical nutrition support for low-income children who are citizens, even if their parents are noncitizens. *See* U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program: Guidance on Non-Citizen Eligibility* 22 (2011), https://perma.cc/LY4H-KUWJ. The same is true of welfare programs like Temporary Assistance for Needy Families ("TANF"). *See* Dep't of Health & Hum. Servs., *Policy Guidance Regarding Inquiries Into Citizenship, Immigration Status, and Social Security Numbers in State Applications for Medicaid, State Children's Health Insurance Program (SCHIP), Temporary Assistance for Needy Families (TANF), and Food Stamp Benefits* 5 (2006), https://www.hhs.gov/sites/default/files/ocr/civilrights/resources/specialtopics/origin/triagencyq&as_pdf.pdf. Crucial healthcare programs like the Children's Health Insurance Program ("CHIP"), the Affordable Care Act ("ACA"), and Medicaid also provide coverage to citizen children of noncitizen parents. *See, e.g., id.* at 2-3 (parent citizenship "irrelevant" to child's eligibility for CHIP or Medicaid); 26 U.S.C. § 5000A(d)(3); 45 C.F.R. § 155.20 (ACA limited to those "lawfully present"). The Executive Order undermines the ability of Individual Plaintiffs and Members to rely on these programs and others to support their families.

94.    As they grow up, children deprived of birthright citizenship will be unable to exercise their right to vote and otherwise participate fully in U.S. democracy by, for example, donating to a political campaign or political party whose policies they support. *See* 8 U.S.C.

§ 611; 52 U.S.C. § 30121. And they will not have the opportunity to serve on a jury, removing

their voices from the representative community that makes important decisions in the courts.

95.    Children denied birthright citizenship may be denied the legal authority to work in

the United States or go to certain universities, hampering their productivity and ability to

contribute to this country's advances in science, technology, and industry. *See* Sam Fulwood III

& Marshall Fitz, Ctr. For Am. Progress, *Less than Citizens: Abolishing Birthright Citizenship

Would Create A Permanent Underclass in our Nation* 7 (May 2011),

https://www.americanprogress.org/wp-content/uploads/sites/2/2012/12/55174537-Less-than-

Citizens.pdf. "Repealing birthright citizenship would severely reduce the ability of the children

of immigrants to thrive educationally, and would make the idea of college graduation, let alone

job retention in critical fields such as science or engineering, virtually impossible." *Id.; accord,

e.g.,* Zachary Liscow and William G. Woolston, *Does Legal Status Matter for Educational

Choices? Evidence from Immigrant Teenagers*, 20 Am. L. & Econ. Rev. 318, 318 (2018),

(finding non-citizen children are more than twice as likely to drop out of high school as their

U.S. citizen siblings); Kalena E. Cortes, *Achieving the DREAM: The Effect of IRCA on

Immigrant Youth Postsecondary Educational Access*, 103 Am. Econ. Rev. 428, 432 (2013)

(finding children with stable, long-term immigration status are also more likely to attend

college). Parents of these children had every expectation and hope that their child will have full

access to the American dream, and these parents face psychological harm knowing that their

child may be deprived of the opportunities that other U.S.-born children have.

96.    Indeed, "Americans whose parents were undocumented immigrants or in

temporary immigration status have joined the U.S. military, founded prosperous businesses,

served the United States as diplomats, and served in high political office. . . . [O]ne can fairly say

that the birthright citizenship rule has been one of the factors in the rise of the United States to superpower status, as birthright citizens have been a social and economic asset." Margaret D. Stock, *Is Birthright Citizenship Good for America?*, 32 Cato J. 139, 149 (2012), https://www.cato.org/sites/cato.org/files/serials/files/cato-journal/2012/1/cj32n1-10.pdf.

97.     In light of the importance of citizenship to a person's status in both the national and international community, and the many benefits that flow from that status, it is vital that a person's citizenship be clear and unmistakable. Yet the Executive Order purports to cloud the certainty that the Constitution provides, inflicting serious costs of uncertainty on the newborns, their families, and society as a whole. Families will be left fearful that the citizenship guaranteed by federal law will not be honored by federal officers.

98.     With its unprecedented departure from the well-settled understanding of birthright citizenship, the Executive Order throws long-established systems into chaos, leaving families to navigate a regime that is not equipped for determining citizenship of children born in the United States. For example, United States citizens have long been able to use their birth certificate as proof of U.S. citizenship, but the Executive Order now raises the specter that something more will be needed—although it is not clear what. And all 50 states participate in the Social Security Administration's Enumeration at Birth program, which allows parents to complete applications for their newborns' Social Security numbers as part of the hospital birth registration process. *See* Social Security Admin., Bur. of Vital Statistics, State Processing Guidelines for Enumeration at Birth (Nov. 2024), https://www.ssa.gov/dataexchange/documents/Updated%20State%20Processing%20Guidelines%20for%20EAB.pdf. These processes are not designed to capture or determine the immigration status of parents.

99.     The Executive Order departs from these settled regulatory practices, directing Defendants to adopt "regulations and policies" consistent with the order within 30 days. This requires agencies to disregard their existing regulations without complying with the process required by the Administrative Procedure Act, 5 U.S.C § 553. The Executive Order places these processes in doubt, leaving all new parents and expecting parents—regardless of their immigration status—with an uncertain path for obtaining social security numbers or passports for their newborns and otherwise proving or establishing their child's citizenship status. Further, eliminating the fact of U.S. birth as proof of citizenship will add billions of dollars a year in extra bureaucratic costs as more complicated citizenship-verification methods will need to be designed and followed. Stock, *supra*, at 153 (calculating it will cost an additional $2.4 billion per year).

100.    Visiting all of these harms on children simply as a consequence of their birth to noncitizen parents "does not comport with fundamental conceptions of justice." *Plyler*, 457 U.S. at 220.

## CAUSES OF ACTION

### Count I
### *Ultra Vires* Action Under Fourteenth Amendment

101.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

102.    Executive actions, including Executive Orders issued by a President, can be challenged as *ultra vires* when they violate the Constitution and the laws of the United States. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667 (2018); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

103.    The Constitution guarantees that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."

104.    By virtue of this constitutional provision, all children who will be born to Individual Plaintiffs and Members in the United States will be United States citizens.

105.    The Executive Branch has no power to unilaterally amend or repeal the Fourteenth Amendment and no power to disobey a clear constitutional command.

106.    Specifically, Defendants lack the authority to interfere with, deny, or fail to recognize citizenship that is granted by the United States Constitution, and they lack the authority to deny any of the rights, benefits, and privileges that accompany that citizenship. By refusing to recognize constitutionally granted citizenship, and by taking actions that are inconsistent with that citizenship, Defendants' actions described above violate the Constitution and are *ultra vires*.

107.    Defendants' violation is causing ongoing, irreparable harm to Individual Plaintiffs and Members, their family members, CASA, and ASAP, for which no other adequate remedy exists.

108.    Plaintiffs have no adequate remedy at law.

**Count II**
***Ultra Vires* Action Under 8 U.S.C. § 1401(a)**

109.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

110.    Section 1401 of Title 8 of the United States Code provides that every "person born in the United States, and subject to the jurisdiction thereof," "shall be nationals and citizens of the United States at birth."

111.    The Executive Branch has no power to unilaterally amend or repeal an Act of Congress and no power to disobey a clear statutory command.

112.    This statute reinforces the Fourteenth Amendment and guarantees that all children who will be born to Individual Plaintiffs and Members in the United States will be United States citizens.

113.    Defendants lack the authority to disregard an Act of Congress that recognizes citizenship. By refusing to acknowledge citizenship that has been recognized by an Act of Congress, and by taking actions that are inconsistent with that citizenship, Defendants actions described above violate 8 U.S.C. § 1401 and are *ultra vires*.

114.    Defendants' violation is causing ongoing, irreparable harm to Plaintiffs, for which no other adequate remedy exists.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a.    A declaration that the Executive Order entitled "Protecting the Meaning and Value of American Citizenship," is unconstitutional and invalid on its face;

b.    A declaration that the Executive Order is unconstitutional and invalid as applied to Plaintiffs;

c.    A declaration that the Executive Order violates 8 U.S.C. § 1401(a) on its face;

d.    A declaration that the Executive Order violates 8 U.S.C. § 1401(a) as applied to Plaintiffs;

e.    A declaration that all children born in the United States to noncitizen parents covered by the Executive Order are citizens of the United States and are entitled to all of the rights and privileges that such status provides, regardless of the immigration status of their parents;

f.  A preliminary and permanent injunction enjoining Defendants from enforcing the Executive Order, or taking any other action that fails to recognize citizenship to individuals born within the United States to noncitizens covered by the Executive Order;

g.  An award to Plaintiffs of reasonable costs and attorneys' fees; and

h.  Such other and further relief that this Court may deem fit and proper.

January 21, 2025
Nicholas Katz, Esq. (D. Md. 21920)
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Conchita Cruz*
Zachary Manfredi*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S., #84810
New York, NY 10003-1502
(646) 600-9910
conchita.cruz@asylumadvocacy.org
zachary.manfredi@asylumadvocacy.org

/s/Joseph W. Mead
Joseph W. Mead (D. Md. 22335)
Mary B. McCord (D. Md. 21998)
Rupa Bhattacharyya*
William Powell*
Alexandra Lichtenstein*
Gregory Briker*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
    AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 662-9765
Fax: (202) 661-6730
jm3468@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
whp25@georgetown.edu
arl48@georgetown.edu
gb954@georgetown.edu

*Attorneys for Plaintiffs*

*Motion for admission pro hac vice forthcoming.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA, INC. *et al.*,<br><br>                 *Plaintiffs*,<br><br>      v.<br><br>DONALD J. TRUMP *et al.*,<br><br>                 *Defendants*. | Case No.: _____ |

### DECLARATION OF GEORGE ESCOBAR, CHIEF OF PROGRAMS AND SERVICES FOR CASA, INC.

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.      I am the Chief of Programs and Services of CASA, Inc. ("CASA").  I have worked at CASA for fourteen years.

2.      I make this statement based upon personal knowledge, files and documents of CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CASA whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CASA business.

3.      CASA is a nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.

4.      Founded in 1985, CASA is the largest membership-based immigrant rights

organization in the mid-Atlantic region, with more than 175,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses.

5.      A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns we work on and how CASA serves the community.

6.      CASA membership is voluntary. In order to become a member, an individual must apply for membership, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community. Although CASA does not issue formal membership directly to individuals under 15 years of age, we routinely provide services to youth and families in a variety of areas described below.

7.      Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived for individuals who experience financial hardship or are otherwise unable to pay. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of our immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

8.      CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and

immigrant communities. From CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

9.      In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and integrated into our member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying a variety of government benefits.

10.     In my role as Chief of Programs and Services, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs. I therefore speak frequently with community members and receive feedback from my staff regarding CASA members' fears, concerns, and decisions.

11.     Noncitizens residing in the United States who have already had children in this country and who plan to have more children while living in this country represent a substantial portion of our membership. We also have many members who have not yet had children born in the United States but who plan to have children while living in this country in the future.

12. Because of the services that we provide our members, we are acutely aware of the harms that ending birthright citizenship will cause to children born in the United States to noncitizen parents and to their entire families. The harm will be especially severe for noncitizen parents who rely on benefits to which their citizen children are entitled.

13. CASA operates a public benefits outreach and enrollment program that assists community members with understanding and enrolling in various government assistance and health insurance programs. CASA offers assistance with registration for government benefits such as the Supplemental Nutrition Assistance Program ("SNAP"), Temporary Assistance for Needy Families ("TANF"), Medicaid, and programs connected to the Affordable Care Act ("ACA"). Between our case management assistance, which connects members with social services to improve physical and mental health; our multilingual health hotline and medical interpreter program; and our comprehensive public benefits outreach and enrollment program, CASA is one of the leading and most trusted organizations providing health support to the immigrant community.

14. Here in Maryland, the CASA health team helps thousands of families and pregnant women navigate the Health and Human Services System each year. CASA also assists pregnant members in Maryland with accessing benefits under the State's Healthy Babies Equity Act, which was passed in 2022 after a CASA member-led campaign. This law mandated the Maryland Department of Health's Medical Assistance Program provide comprehensive prenatal and postpartum coverage to noncitizen pregnant Marylanders with income up to 250 percent of the federal poverty level who would otherwise be eligible for Medicaid but for their immigration status. The law went into effect July 1, 2023, and currently over 15,000 pregnant Marylanders have benefited from the program. Through CASA's advocacy on this particular issue and the

stories shared by our members during the associated campaign and subsequent legislative process, we became extremely familiar with the numerous challenges experienced by immigrant parents with mixed status households. CASA has assisted over 100 expectant parents apply for prenatal coverage, which was made possible by the Heathy Babies Equity Act. CASA has also helped many immigrant parents with follow up assistance postpartum, including helping the family secure their birth certificate, apply for a Social Security Card, US passport, etc. In part due to the availability of our services to expecting families, which aligns with our mission to empower low-income, predominantly immigrant communities, our membership includes many pregnant women who plan to deliver their babies in this country and who expect those babies to be citizens of this country.

15.    Other states do not provide the same level of healthcare benefits to some families based on their immigration status. For example, in Virginia, a child without lawful status is not eligible for health care coverage. Therefore, we partner with medical providers like Kaiser and Advanced Ophthalmology to offer free medical services to members in Virginia. We also host vaccine clinics, support the work of local food pantries, and provide clothing vouchers for eligible members through Goodwill's Good Samaritan program.

16.    Many of our members who are parents seek our help with enrolling their citizen children in public benefits to which they are entitled. For many of our low-income members, the ability to enroll citizen children in public benefit programs is an essential lifeline that keeps their families afloat.

17.    Medicaid and ACA enrollment are of especially great interest to our members. The number one advocacy and service provision priority for our members has always been access to healthcare. Over the last 18 months (July 2023 through December 2024), we have

provided 134, 294 services to 54,031 individuals including assisting: 4,953 CASA members with

navigating and enrolling into a public benefit or social service they are eligible to receive; 2,100

members with getting enrolled in an ESOL or accredited vocational training course; 2,174

members in applying for citizenship; and 3,528 members with a legal consult on a housing,

employment, or immigration matter. We also provided assistance to 2,354 individuals with

navigating the process of enrolling in an ACA Qualified Health Plan, Medicaid, or CHIP

coverage option.

18.     Eliminating birthright citizenship would cut off access to these programs for the

children of many of our members. As citizens by birth, children born in this country are

immediately eligible for a Social Security number. That number, in turn, allows them to apply

for a host of benefits. If, however, those children born in the United States were instead

considered undocumented, they would not be eligible for those same benefits.

19.     The 1996 Personal Responsibility and Work Opportunity Reconciliation Act

("PRWORA") introduced restrictions for federal means-tested benefits programs, including

SNAP, TANF, Medicaid, and CHIP, based on immigration status. Under PRWORA, these

benefits are available only to citizens and noncitizens with certain immigration statuses, such as

lawful permanent residents ("LPRs"), refugees, and asylees. Undocumented noncitizens, those

with Temporary Protected Status ("TPS"), Deferred Action for Childhood Arrivals ("DACA")

recipients, and those with most visas, including H-1B, U, tourist, and student visas, are generally

not eligible.

20.     Noncitizens who arrived after PRWORA's enactment must generally wait five

years after entering the United States in a qualified status before they are eligible for benefits,

with limited exceptions.

21.    The Executive Order threatens to undermine the ability of CASA's members to rely on government benefit programs to support their families. For instance, crucial healthcare programs like CHIP, Medicaid, and the ACA provide coverage to citizen children of noncitizen parents, including the children of CASA members. Those programs require disclosure of the citizenship or immigration status *only* of the person for whom the benefits are sought. If a parent is seeking benefits on behalf of only her child, the child is considered the sole applicant and is the only individual who must establish citizenship or eligible immigration status.

22.    SNAP provides critical nutrition support for low-income citizen children of CASA's noncitizen members. Although SNAP eligibility is based on the circumstances of all household members, a State may not deny SNAP benefits just because a noncitizen member of the household is ineligible. Instead, the state agency must determine eligibility for any remaining household members seeking assistance. A noncitizen may therefore apply for and receive SNAP benefits on behalf of her minor U.S. citizen children.

23.    The same is true of welfare programs like TANF. Although eligibility is based on the circumstances of an entire household, states may elect to have policies that exclude family members who are ineligible because of their immigration status. Some states have adopted "child-only" rules that allow children to receive TANF benefits even if the adults in their household are ineligible.

24.    Because of the Executive Order, children born to CASA's noncitizen members will no longer be U.S. citizens and may have no status at all. Many of them will therefore be ineligible for these programs, depriving them and their families of much-needed nutrition and health benefits.

25.    CASA provides its members with free remote legal assistance, including free

legal consultations on immigration issues. CASA also operates a comprehensive citizenship initiative, which includes citizenship education, mentoring and interview preparation, application assistance, and post-naturalization support. Among the services provided through this program is eligibility analysis for citizenship, in which CASA members meet with a specialist to complete a prescreening form and discuss their immigration cases. CASA also offers assistance with completing citizenship applications and completing applications for renewing and replacing green cards.

26.    If children born to noncitizen parents in the United States cannot obtain American citizenship by birth, they may be left in legal limbo. Other than citizenship by birth, there is no clear path for children born in the United States to noncitizen parents to obtain U.S. citizenship. And such children may not have access to citizenship from any other country.

27.    If children born to noncitizen parents in the United States cannot obtain American citizenship by birth, their parents may also face immigration consequences. One basis on which CASA members apply for green cards and eventually for citizenship is that their children are citizens.  Eliminating birthright citizenship would also close this pathway to legal immigration status and ultimately citizenship for CASA members. Some CASA members also apply for cancellation of deportation based on a showing that deportation would work an "exceptional and extremely unusual hardship" to their children "who [are] citizen[s] of the United States." 8 U.S.C. § 1229b(b)(1). The end of birthright citizenship would similarly remove this important protection for the parents of children who are no longer considered citizens.

28.    CASA has long prioritized the need of its members to obtain proper identification. As mentioned above, CASA's members and their families frequently request CASA's assistance in obtaining a picture identification to prove their identities, which is why CASA members are

offered the opportunity to receive a picture ID when becoming members. Similarly, CASA has long provided assistance to new citizens in obtaining proper government-issued identification. Over the years, we have helped thousands of families with newborns properly secure their birth certificates, apply for a Social Security card or apply for their first US passport. Should this population lose the right to qualify for this type of identification, we anticipate that our members will face many challenges. Foremost among these will be a significant increase in demand for identification documents generated from the consulates and embassies of the countries of origin of those impacted. However, these entities have historically experienced many challenges meeting the existing demand for their services, and some of our most vulnerable members are unwilling or unable to access such services from their countries of origin.

29.     Many CASA members have made personal and financial decisions in reliance on the Fourteenth Amendment's guarantee of birthright citizenship. The Executive Order unsettles those expectations. Many CASA members will now have to change their personal goals and will experience anxiety and economic uncertainty about the future of their families. CASA members would be immediately and irreparably harmed. Below are a few illustrative examples of CASA members who face immediate harm from the Executive Order. This declaration describes each member using a pseudonym rather than their legal name.

30.     **Marta\*** is a CASA member who lives in Maryland and is currently three months pregnant. Both Marta and the father of her unborn child are undocumented. Marta came to the United States from Guatemala seeking a better future and opportunity. When she found out that she was pregnant, she envisioned the life that her unborn child would have, free from the hardships she experienced in Guatemala. Marta deeply understands how important being a citizen of the United State is, and although she is not currently able to adjust her status in this

country, she took solace from the fact that her child would be born a U.S. citizen. She wants her child to be born happy and healthy, and with the opportunity to access a quality education, and believes that the best chance for her child's future is if her child is considered a U.S. citizen upon birth.

31.    **Adelina**[*] is a CASA member living in Maryland who has been in the United States for seven years and is currently six months pregnant. Both Adelina and her partner are currently undocumented. Adelina has one other child, who was born in the United States and is a U.S. citizen. She wants her unborn child to have the same rights and opportunities that she has seen her five-year-old child enjoy in this country. It pains her to think that one of her children will have more benefits than the other, even though they were both born here. She is concerned that if her unborn child is not considered a United States citizen, they will experience significant hardship and not have the same opportunity as their sibling.

32.    **Rita*** is a CASA member who lives in Maryland and has been in the United States for five years.   Both Rita and her partner are currently undocumented. Rita is seven months pregnant with her first child and she thanks God that her child will be born here. If her child were born in Rita's home country of Guatemala, they would not have access to a good education, adequate healthcare or other basic services. It would be a struggle just to survive, without any realistic prospect of a brighter future. In light of the Executive Order, Rita fears that her first child will face more hardship, unable to access their full rights as a U.S. citizen.  Rita herself was deeply impacted by the Coronavirus pandemic and she doesn't want her child to go through the pain and struggles that she has endured.  It is important to her that her child is fully recognized as a citizen of the U.S. so they can receive the benefits they deserve.

---

[*] These names are pseudonyms.

33.    **Georgina\*** is a CASA member currently living in Maryland and originally from El Salvador. She is two months pregnant. Georgina has lived in the United States for six years, but neither she nor the father of her unborn child have lawful immigration status. She is a single mother, with very limited financial resources and is fearful that if her unborn child isn't granted the benefits of U.S. citizenship she won't be able to support the baby. Georgina fears that her child will not have access to good food and quality education in the same way her two other children born in the United States will. Georgina is also afraid that her child will be subject to discrimination, because she has seen how noncitizens are treated poorly in this country.

34.    **Andrea\*** is a CASA member originally from Mexico, who lives in Georgia and is currently pregnant, expecting to give birth in late mid-March. Andrea wants her future child to enjoy the full dignity of citizenship in the United States and fears that they will be denied educational opportunities and suffer from a lack of opportunity if they are denied citizenship. Andrea dreams that her children will lead a better life in the United States, a country she has long viewed as a land of opportunity. Andrea is currently in removal proceedings and neither she nor the father of her child have lawful immigration status. As an immigrant, Andrea is looking for a better life for her children, and came here because the United States is a country of opportunity. She is thankful for this country for giving her opportunities that she never would have had in Mexico, and only asks that her children are given the opportunities that they are entitled to by the constitution.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 21, 2025                                    Respectfully submitted,

                                                            _____

                                                            George Escobar

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CASA, INC. *et al.*,

       *Plaintiffs*,

   v.

DONALD J. TRUMP *et al.*,

       *Defendants*.

Case No.: _____

**DECLARATION OF SWAPNA C. REDDY, CO-EXECUTIVE DIRECTOR OF THE
ASYLUM SEEKER ADVOCACY PROJECT, ("ASAP")**

     I, Swapna C. Reddy, submit this declaration pursuant to 28 U.S.C. § 1746 and declare under penalty of perjury as follows:

     1.     I am the Co-Executive Director of the Asylum Seeker Advocacy Project ("ASAP"). I have served in this role since 2019.

     2.     As Co-Executive Director I oversee much of ASAP's programing, including supervising its membership, technology, and community resource teams. I also oversee the development of all systems for digital communication with ASAP members. I have detailed knowledge about ASAP's membership demographics, membership criteria, member needs and priorities, and the role members play in setting and directing ASAP's mission and advocacy.

     3.     I make this sworn statement based upon personal knowledge, files and documents of ASAP that I have reviewed (such as case files, reports, and collected case metrics), as well as

1

information supplied to me by employees of ASAP whom I believe to be reliable, including

ASAP's management, attorneys, and administrative staff. These files, documents, and

information are of a type that is generated in the ordinary course of our business and that I would

customarily rely upon in conducting ASAP business.

**Background on ASAP**

4.      ASAP is a national voluntary membership organization of asylum seekers

incorporated as a 501(c)(3) nonprofit organization in New York.

5.      As of January 2025, ASAP has over 680,000 members and is the largest

membership organization of asylum seekers in the United States.

6.      ASAP members come from over 175 countries and reside in all 50 states and

several U.S. territories. ASAP provides its members the same benefits and access to resources

regardless of where they are located in the United States.

7.      ASAP members are in various stages of their immigration proceedings. Some

ASAP members have filed an asylum application affirmatively before United States Immigration

and Citizenship Services (USCIS), while other ASAP members have filed an asylum application

defensively and are in immigration court proceedings. Additionally, some ASAP members are in

immigration court proceedings and intend to file an asylum application; some have cases at the

Board of Immigration Appeals (BIA) on appeal; some have lost asylum; and some have won

asylum and are asylees or even green card holders.

8.      We are also aware of ASAP members and their children who have or have had

Temporary Protected Status, parole, student visas, tourist visas, and Special Immigrant Juvenile

Status.

9.      ASAP's mission is to work with our members to build a more welcoming United

States. ASAP provides our membership of asylum seekers with legal and community support. And we work with our members to make great change by standing together. We are creative, collaborative, and nonpartisan. And we believe all asylum seekers deserve to find safe haven in the United States.

10.    Our members voluntarily affiliate themselves with ASAP. Asylum seekers apply to join ASAP by filling out a voluntary online membership form. ASAP welcomes new members who are asylum seekers age 14 or over who believe in ASAP's mission.

11.    ASAP issues each member a digital membership card and member ID that they can use to identify themselves to ASAP and access the full range of member benefits.

12.    ASAP membership is free of charge, and ASAP has never collected any fees or membership dues from its members.

13.    Although ASAP does not issue separate membership cards to anyone under the age of 14, the benefits of ASAP membership also extend to the children of ASAP members as derivative of their parents' membership.

14.    ASAP is in regular contact with our members through text message and email.

15.    ASAP staff produce how-to-guides, frequently asked questions ("FAQs"), and videos that explain how to navigate the immigration system, including how to apply for asylum, how to apply for a work permit, and more. ASAP also produces guidance and FAQs about access to healthcare, food assistance, and other social services that are accessed by members and others online.  Because its resources are so frequently accessed online and due to the size of ASAP's membership, our resources on these issues are some of the most influential and widely read by immigrant communities in the United States.

16.    While members have continuous access to ASAP-created information and

resources shared online, ASAP also sends members updates by text message and email at least
once each month. These updates include immigration news alerts that include information about
policy changes of interest to asylum seekers.

17.     ASAP answers our members' legal questions through our virtual help desk. ASAP
staff and contractors answer members' questions about asylum and the immigration court
process, as well as questions related to work authorization, access to health insurance, education,
social services, food assistance, and more.

18.     ASAP also engages in high-impact advocacy campaigns, utilizing litigation,
policy, and communications work.

19.     ASAP members determine the organization's advocacy agenda and policy
priorities. When members join ASAP, they have the option to write about what they would
change in the immigration system. ASAP staff review these answers, code, and then compile
them to determine members' collective priorities. These priorities then determine what litigation,
policy, and communications work the organization takes on.

20.     Additionally, ASAP gathers feedback from members through a combination of
surveys and one-on-one member interactions. This feedback is used to help develop responsive
how-to-resources, and to help shape the organization's advocacy efforts.

21.     ASAP members vote on whether ASAP can bring a lawsuit alleging associational
standing as a voluntary membership organization. ASAP will only allege associational standing
in a lawsuit if members have voted and agreed to the organization doing so.

**The Executive Order Will Impact ASAP's Members**

4

22.    ASAP members have expressed to ASAP that protecting birthright citizenship is a priority.

23.    When asked in a recent survey of ASAP members, whether ASAP should file a lawsuit defending birthright citizenship, 99% of the ASAP members who responded voted yes and urged ASAP to preserve birthright citizenship for the children of ASAP members and other immigrants.

24.    As of today, ASAP serves 686,737 members. According to the National Center for Health Statistics at the Center for Disease Control (CDC), the current U.S. birth rate is 11 births per 1000 people in the United States per year. By a conservative estimate, ASAP members will have 7,529 children in 2025, or an average of more than 20 U.S.-born children per day. This estimate is conservative because our members tend to belong to ethnic groups and come from countries with higher birthrates.

25.    A recent survey of members confirms that many members are expecting to have children in 2025. To my knowledge, at least 629 ASAP members are expecting a child or children this year and are worried their future child or children will not be able to claim birthright citizenship despite being born in the United States.

26.    ASAP members have already expressed concerns about the threatened action to deny birthright citizenship to children born in the United States to noncitizen parents and have asked questions about how it could impact them as asylum seekers. We have learned from ASAP members that ending birth right citizenship poses unique challenges for asylum seekers and their children.

5

JA072

**How the Executive Order Impacts ASAP's Members**

27.    ASAP is acutely aware of the harms that ending birthright citizenship will cause to children born in the United States to noncitizen parents and to their entire families. The harm will be severe for noncitizen parents, and their U.S.-born children who are denied U.S. citizenship.

28.    ASAP members have expressed that the denial of birthright citizenship would create great psychological distress and emotional pain. The denial of this status, which parents assumed would apply to their unborn children, will disrupt plans regarding immigration status, access to education, and benefits programs.

29.    Parents who are expecting children who could be denied U.S. citizenship are extremely worried about whether they will have to help their children apply for other forms of U.S. immigration relief, including seeking asylum in the United States. Parents are worried that without a pending immigration application, their children could be subject to deportation – even if they as parents are not. Applying for U.S. immigration status for a U.S.-born child would not only be incredibly time consuming and stressful for parents, but it could also be expensive if they have to pay government filing fees, or if they must hire an attorney in order to navigate this complicated and unprecedented immigration process.

30.    Ending birthright citizenship for the children of asylum seekers is particularly concerning because many asylum seekers have been persecuted and tortured by the governments of their home countries, and as such do not have access to or feel safe seeking services from a consular office of their country of origin in the United States. Furthermore, it is common practice for immigration attorneys to advise their clients that availing themselves of consular services from their country of origin could harm their asylum case, because these interactions could be

JA073

interpreted as demonstrating a lack of fear of their country of origin. As a result, many asylum-seeking parents will be forced to decide between negatively impacting their own immigration cases or essentially rendering their children stateless, without proof of citizenship from any country.

31.     Our members from Venezuela have told us that they cannot access consular services from their country of origin from within the United States – even if they wanted to do so. This is one reason why our members from Venezuela have expressed anxiety around their future U.S.-born children not being able to claim any citizenship, and potentially becoming stateless.

32.     ASAP members and other asylum seekers are already facing challenges having to flee their home country due to persecution and coming to a new country where they may not speak the language. ASAP members have communicated that this added concern of obtaining citizenship generally and some type of U.S. immigration status for their U.S.-born children is a sudden shock, and a source of tremendous stress and anxiety.

33.     Many ASAP members have reported to ASAP that they are stuck in asylum backlogs, waiting for their cases to be processed for sometimes even more than a decade. This means individuals with pending asylum applications are likely to be in the U.S. for many years to come. As such, the children of asylum seekers will not only be born in the United States, but will go to school in the U.S., learn English, and become part of the fabric of U.S. local communities before their parents' immigration case is decided.

34.     If they are denied citizenship, children born to many ASAP members will have no status in the U.S. at all. Many of them will therefore be ineligible for important programs that families rely on for nutrition and health benefits. For example, if denied citizenship, ASAP

members' U.S.-born children will not be able to access crucial healthcare programs like the Children's Health Insurance Program (CHIP), Medicaid, and the Affordable Care Act (ACA), which provide coverage to citizen children of noncitizen parents. This would also place additional stress on parents.

35.    Moreover, ASAP members worry about the serious dignitary and status harms to their children who will be denied citizenship status. Children born in the United States, but deprived of its citizenship, may face not only statelessness, but also social exclusion and discrimination by being excluded from U.S. citizenship at birth. In the long run, noncitizen U.S.-born children will also be denied meaningful opportunities to engage in and enrich the civic life of their birth-country, by being deprived of voting rights, educational opportunities, the ability to serve on juries, and other mechanisms to participate in civic institutions as citizens.

**ASAP Members Impacted by the Executive Order**

36.    We know of at least 629 ASAP members who are currently expecting to have children born in the United States in 2025. Below are a few representative examples of ASAP members whose U.S.-born children the Executive Order will unlawfully declare to be non-citizens.

37.    **Dina** is an ASAP member living in Washington State.[1] She is pregnant and due in July of 2025. She and her partner are both from Kenya, and they are seeking asylum in the United States. Dina and her partner have been living in the United States since 2018. Dina came to the United States on a student visa, then applied for asylum affirmatively with USCIS. She

---

[1] Some of the members, including Dina, are identified using a pseudonym rather than the member's real name.

8

JA075

and her partner have been working legally in the United States for more than 5 years. Dina has a degree in cybersecurity and works as an IT manager. Her partner works for the county government as an IT Specialist. She and her partner are worried that their child will not be able to receive U.S. citizenship. Being an immigrant in the United States has been very stressful for Diana and her partner, and they do not want their son to go through the same struggles they have had to go through.

38.    **Niurka** is an ASAP member living in Florida. She is pregnant and due in March of 2025. Niurka and her partner are both from Cuba, and they are currently seeking asylum in the United States. They crossed the Mexico-U.S. border, and were placed in deportation proceedings before the U.S. immigration courts. Niurka and her partner have a pending asylum application and a pending lawful permanent residency application under the Cuban Adjustment Act. Niurka was a medical doctor in Cuba, but she is not working at this time. Her partner studied food science and was a biopharmacist in Cuba. He is now a food safety and quality assurance manager in the food production industry. She and her partner are very worried their child will not receive U.S. citizenship when he is born. They want their son to achieve success in the United States and worry about how not receiving citizenship at birth will impact his future. Niurka and her partner have no intention of ever going back to Cuba because of the dictatorship, would never want their child to be a Cuban citizen, and do not want their child to ever have to set foot in Cuba. If he is denied U.S. citizenship, they are worried that their son would be in a state of limbo and would not have citizenship from any country.

39.    **Igor** is an ASAP member living in Texas. He and his wife, Liza, are expecting a child in May of 2025. Igor and Liza are from Russia. Igor applied for asylum with the U.S. immigration courts. Liza came to the United States on a student visa, and is receiving her

Master's degree. Igor and Liza want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. Neither Igor nor Liza feel they can return to Russia without being persecuted, and because of that do not feel they can apply for Russian citizenship for their child. Because of that, Igor and Liza are worried their child will be stateless.

40.    **Adriana** is an ASAP member living in New York. She is pregnant and due in March of 2025. Adriana and her partner are both currently seeking asylum in the United States. They came to the United States as tourists, and subsequently applied for asylum with USCIS. Adriana has previously worked as an administrative and finance assistant abroad, but she is not currently working because she has had a difficult pregnancy. Adriana's partner works as a driver for a company that handles transportation for senior citizens and children. Adriana and her partner are worried that their daughter will face discrimination in the United States if she is not made a U.S. citizen at birth.

41.    **Nivida** is an ASAP member living in Louisiana. She is pregnant and due in April of 2025. Nivida is from Honduras and sought asylum in the United States in 2020. She had filed her asylum application with the U.S. immigration courts. However, her case was recently dismissed. Nivida's partner is from Mexico, and he has an application pending for a U-visa. Nivida and her partner believe it is very important that their child becomes a U.S. citizen at birth. If their child does not have U.S. citizenship at birth, Nivida and her partner are afraid of him having to live in either Honduras or Mexico because they fear violence and persecution in both countries. Nivida and her partner worry about their son's future if he is not a birthright citizen of the United States, and how it could change his life trajectory, his development, and the educational opportunities afforded to him. Nivida and her partner's daughter has U.S. citizenship

10

from birth already, which also means their son would have a different status than his sister, despite both of them being born in the United States.

42.     **Lesly** is an ASAP member living in New Jersey. She is pregnant and due in July of 2025. She crossed at the Mexico-U.S. border using the CBP One app, and subsequently applied for asylum in the U.S. immigration courts. Her next hearing is not until 2028. Lesly has worked as a cleaner in the U.S. and has a work permit. Neither Lesly nor her partner are U.S. citizens or lawful permanent residents. Lesly and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. They are concerned that without birthright citizenship, their child will not have as many opportunities – either educational or professional. Lesly is very stressed because she is not sure if she is going to have to start a U.S. immigration process for her child who will be born in the United States. Lesly is worried because an immigration attorney could cost a lot of money, and she does not know if she would have to hire an immigration attorney or pay application fees.

43.     **Esther** is an ASAP member living in Delaware. She is pregnant and due in February of 2025. Esther and her partner are currently seeking asylum in the United States in the U.S. immigration courts. Esther worked as a house cleaner in Delaware until she found out she was pregnant. Her husband works at a local pizza shop.  She and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship.

44.     **Nohelimar** is an ASAP member living in California. She is pregnant and due in March of 2025. She and her partner came to the United States seeking safe haven. Nohelimar's partner has applied for asylum, but she has not been able to yet. Nohelimar studied criminalistics abroad, but she is not working because she has not yet received her work permit. Nohelimar and

JA078

her partner are worried that their child will not be able to receive U.S. citizenship. Nohelimar believes that if her son becomes a U.S. citizen, he will have a better future. If he is denied U.S. citizenship, she is confused and scared about what the process would be for her to get her son citizenship from any other country, and she would be worried about her son's future in the United States.

45.     **Barbara** is an ASAP member living in Kentucky. She is pregnant and due in July of 2025. Barbara and her partner are both from Cuba, and they are currently seeking asylum in the United States. Their green card application under the Cuban Adjustment Act has been pending for more than a year, and they hope to have their lawful permanent residency soon. They have been in the United States since 2022. Barbara was a lawyer in Cuba. She is now working at a school as a school custodian. Her partner is also a school custodian. Barbara and her partner are very worried their child will not receive U.S. citizenship.

46.     **Meny** is an ASAP member living in California. She is pregnant and due in July of 2025. She and her partner both have affirmative asylum applications pending at USCIS. Meny's professional background is as an educator for people with disabilities. Meny and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. They feel their child should have the citizenship of the country he is born in, especially since it is a constitutional right.

47.     **Verónica** is an ASAP member living in Connecticut. She is pregnant and due in June of 2025. She and her partner are both originally from Peru. Verónica and her partner have filed for asylum as a defense to deportation and did so using ASAP's self-help resources and how-to videos. Verónica's professional training in Peru is as an accountant. Verónica and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried

12

JA079

their child will not receive U.S. citizenship.

48.    **Carolina** is an ASAP member living in Florida. She is pregnant and due in June of 2025. She and her partner are both from Chile, but her partner is of Haitian and Chilean descent. Neither Carolina nor her partner are U.S. citizens or lawful permanent residents. Carolina came to the United States on a visa, and then subsequently applied for asylum affirmatively with USCIS. Carolina and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. They are particularly concerned their child will face discrimination if they are not seen as the same as other children who were born in the United States.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 21, 2025                          Respectfully submitted,

_____
Swapna C. Reddy

13

JA080

Docusign Envelope ID: 49B525E0-D695-4058-8F12-EBFA20DE9218

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA, INC. *et al.*,

        *Plaintiffs*,

   v.

DONALD J. TRUMP *et al.*,

        *Defendants*.

Case No.: _____

### DECLARATION OF JUANA

I, Juana, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I am a member of CASA and a resident of Montgomery County, MD. I am a native of Colombia.

3. I moved to the United States after fleeing from Colombia. I have a current asylum claim pending.

4. My partner, the father of my unborn child, is also seeking asylum.

5. My 12-year-old daughter is also in the United States. She is a derivative on my petition for asylum.

Docusign Envelope ID: 49B525E0-D695-4058-8F12-EBFA20DE9218

6.  I am currently two months pregnant. I am worried that my child will be born without a country as a result of this Executive Order, since I am afraid to return to Colombia.

7.  I want my unborn child to be able to grow up without fear and with a sense of belonging in the United States. The thought that my unborn child could be denied U.S. citizenship and deported to Colombia without me is terrifying.

8.  It is important to me that my child is a U.S. citizen so they can have a better quality of life and fully engage with all that the United States has to offer. I want my child to have educational opportunities and to be a good person who serves their country and community. I don't think it makes sense for my child to be denied the benefits of citizenship they deserve once they are born in the U.S.

9.  I am worried that participating in this lawsuit as an individual plaintiff will expose me to retaliation by the U.S. government. Specifically, I am concerned that the U.S. government might deny, delay, or interfere with my asylum application because of my participation in this lawsuit.

10. More than anything, I worry that participating in this lawsuit could harm my daughter. I am terrified that she could also face retaliation by the U.S. government if my name were included as part of this lawsuit, especially since she is a derivative on my asylum claim.

11. I do not want to do anything to jeopardize my own ability—and, even more importantly, my daughter's ability—to remain in the United States.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: January 21, 2025

Firmado por:

Juana

8CA88483F3894AF...

Juana

2

Docusign Envelope ID: E5891FDD-CF46-4220-B985-19A60587DB69

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA, INC. *et al.*,

                    *Plaintiffs*,

    v.                                              Case No.: _____

DONALD J. TRUMP *et al.*,

                    *Defendants.*

### <u>DECLARATION OF LIZA</u>

I, Liza, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2.  My husband, Igor, and I moved to the United States from Russia. We are unable to return to Russia because we fear we will be persecuted.  Igor has a pending asylum claim, and is a member of the Asylum Seeker Advocacy Project. I have a student visa, and I am currently pursuing my master's degree.

3.  We are expecting a child in May of 2025.

4.  When I heard that President Trump signed an Executive Order that would deny my child United States citizenship, my world fell apart. Without U.S. citizenship, my child will be stateless, as I do not feel that we can safely apply for Russian citizenship for our child.

JA083

5.  The Executive Order basically says that my child is "a nobody." As a stateless child without any immigration status in the United States, my child would have less status than I have.

6.  Without U.S. citizenship, I worry that my child will be denied access to healthcare and educational opportunities.

7.  I am very worried about the Executive Order. I have even thought that maybe it would be good for the baby to be born prematurely just so that my child will be a United States citizen.

8.  I do not want my full name to be part of this lawsuit. I am afraid that if my full name were known, I would face retaliation by the U.S. Government.

9.  I also am afraid that if my identity and involvement with this lawsuit were made public, private individuals may try to track me down and do harm to me or my family. I am particularly worried about the safety of my unborn child.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: January 21, 2025

Подписант:

*Liza*

B28A7770B2974AE...

Liza

2

JA084

Docusign Envelope ID: 6787F29A-2BF6-42AC-86EA-B699BECE9981

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA, INC. *et al.*,

        *Plaintiffs*,

   v.

DONALD J. TRUMP *et al.*,

        *Defendants*.

Case No.: _____

### DECLARATION OF MARIBEL*

I, Maribel, submit this declaration pursuant to 28 U.S.C. § 1746 and declare under penalties of perjury as follows:

1.    I am a CASA member who has lived in the U.S. for 18 years and reside in Maryland.

2.    I am currently pregnant, expecting to give birth in July 2025.

3.    I currently live with my husband and two young U.S. citizen daughters, who are 14 and 10 years old.

4.    I am an immigrant from El Salvador who was born in Guatemala.

5.    I am undocumented despite having lived in the U.S. for nearly half my life. My husband is also undocumented.

6.    I fear my unborn child will not have the same rights to citizenship as the future child's older sisters, and could even be subject to deportation, separating my family.

Docusign Envelope ID: 6787F29A-2BF6-42AC-86EA-B699BECE9981

7.      I am also afraid that my child won't have access to health care, since they won't be eligible for federal benefits.

8.      I feel that it is deeply wrong to subject an innocent newborn to such cruelty.

9.      I fear using my real name in this case because I am worried about retaliation for my participation, including my potential deportation. I am also worried about potential retaliation against my family.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: January __21.00__, 2025          Respectfully submitted,

                                        Maribel
                                        _____
                                        Maribel

Docusign Envelope ID: 6C51C7B7-71F1-4B45-88DB-230AA63AD692

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA, INC. *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP *et al.*,

        *Defendants*.

Case No.: _____

## DECLARATION OF MONICA

I, Monica, submit this declaration pursuant to 28 U.S.C. § 1746 and declare under penalties of perjury as follows:

1.　　I am a member of the Asylum Seeker Advocacy Project ("ASAP") and I joined the organization voluntarily.

2.　　I am currently living in South Carolina.

3.　　I am  pregnant and due in August of 2025.

4.　　My partner and I are both originally from Venezuela, and we both have Temporary Protected Status (TPS) as well as a pending affirmative asylum application with USCIS.

5.　　We have been in the United States since 2019.

6.　　I am a trained medical doctor who is seeking to validate my medical degree in the United States.

Docusign Envelope ID: 6C51C7B7-71F1-4B45-88DB-230AA63AD692

7.    I am worried that it would be next to impossible to get my child Venezuelan citizenship even if I tried. There is no Venezuelan Consulate in the United States where I could even apply for Venezuelan citizenship for my baby, and we would have to travel outside of the U.S. in order to obtain a Venezuelan passport for our child. Since we are asylum seekers, we are not able to travel outside of the U.S.

8.    Because I do not believe my child will be able to receive Venezuelan citizenship, both my partner and I want to get our child a U.S. passport and proof of U.S. citizenship as soon as possible, but now we are worried our child will not be able to receive U.S. citizenship either.

9.    If that happens, we are very concerned that our child will not be a citizen of any country and will be stateless.

10.    We are afraid that the government will retaliate against us if our full names are publicly disclosed in this lawsuit because we are suing the government directly. We have pending asylum applications and do not want this lawsuit to affect the decision in our asylum claims.

11.    We also want to protect the privacy of our baby who has not been born yet. We don't want information about them to be made public before they are even born, and want to make sure we as the parents are protecting their privacy throughout this entire process.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 21, 2025                    Respectfully submitted,

Firmado por:

Monica

81A9223DF2F74D5...

Monica

Docusign Envelope ID: EEAC81BA-FE4D-473B-A6EA-0BD6247CC295

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA, INC. *et al.*,

     *Plaintiffs*,

  v.

DONALD J. TRUMP *et al.*,

     *Defendants*.

Case No.: _____

### <u>DECLARATION OF TRINIDAD GARCIA</u>

I, Trinidad Garcia, submit this declaration pursuant to 28 U.S.C. § 1746 and declare under penalties of perjury as follows:

1.    I am a member of the Asylum Seeker Advocacy Project ("ASAP"). I joined the organization voluntarily.

2.    I currently live in North Carolina.

3.    I am currently pregnant and due in August of 2025.

4.    My partner and I want our child to receive a U.S. passport and proof of U.S. citizenship as soon as they are born. We are worried because we do not know if the Executive Order will make it impossible for our child to get U.S. citizenship at birth.

5.    My partner and I are both from Venezuela, and we have been living in the United States since 2017. We first came to the United States on a tourist visa.

Docusign Envelope ID: EEAC81BA-FE4D-473B-A6EA-0BD6247CC295

6.      My partner and I have a pending affirmative asylum application with USCIS, and have not been given an appointment for an interview in our case.

7.      We both have work permits, and have been working in their local community.

8.      I graduated with a degree in Business Administration in Venezuela, and he worked in human resources before coming to the United States. Upon arriving in the United States, I began to clean homes. I have since started my own home cleaning business.

9.      My partner was an environmental engineer in Venezuela, but he now works in the U.S. as a technician to restore stone, tile, and grout in home remodels.

10.     My partner and I are worried that there is no way for us to approach the Venezuelan government regarding our child's citizenship because there are no Venezuelan consular services in the United States. We do not want to give our child Venezuelan citizenship, but even if we did, I feel it would be impossible.

11.     If our U.S.-born child is not able to get U.S. citizenship at birth, I am very worried that my child will not be a citizen of any country or be able to get important identity documents. I am worried that I will have to apply for asylum for my child, and am confused about what the process would be like. I am worried that I will have to hire someone to help them pay the government for application fees, which could cost my family a significant amount of money.

12.     I am scared to use my full name in the lawsuit because I am worried about the possibility of government retaliation if my name is disclosed in this case. I am also scared of individuals in the public learning my name and trying to find me in order to harass me or cause me harm. I am also scared for my child and do not want to jeopardize their privacy by using my full name.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  January ___, 2025          01/21/2025          Respectfully submitted,

Trinidad Garcia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CASA, INC.**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-25-201** |
| **DONALD J. TRUMP**, *et al.*, | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

In 1868, the United States Congress ratified the Fourteenth Amendment to the United States Constitution. The Citizenship Clause of the Fourteenth Amendment states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

U.S. Const. amend. XIV, § 1, cl. 1.

More than 150 years after the Fourteenth Amendment was ratified, the newly-sworn-in President of the United States Donald J. Trump signed an Executive Order called "Protecting the Meaning and Value of American Citizenship." *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) (the "Order" or "Executive Order"). The Executive Order interprets the Citizenship Clause of the Fourteenth Amendment in a manner that the Supreme Court has resoundingly rejected and no court in the country has ever endorsed. If the Order is allowed to take effect, it would deny citizenship by birth to U.S.-born persons whose mothers are in the country unlawfully or temporarily and whose fathers are not citizens or lawful permanent residents at the time of the person's birth.

The day after the Executive Order was issued, CASA, Inc. and Asylum Seeker Advocacy Project, two nonprofit organizations that provide services to immigrants, and five pregnant women

without permanent legal status who expect to give birth in the United States in the coming months filed this lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. The plaintiffs allege that the Executive Order violates the Fourteenth Amendment to the Constitution and the Immigration and Nationality Act. They request a preliminary injunction that enjoins implementation and enforcement of the Executive Order until the merits of their claims are resolved. The government opposes preliminary injunctive relief.

The plaintiffs easily have met the standard for a preliminary injunction. There is a very strong likelihood of success on the merits. The plaintiffs will face irreparable harm without injunctive relief. And the balance of the equities and the public interest strongly weigh in favor of a preliminary injunction. The motion for a preliminary injunction is granted. The defendants are enjoined from implementing and enforcing the Executive Order.

## I.    Background

At noon on January 20, 2025, President Trump took the oath of office of the President of the United States. Later that day, President Trump signed an Executive Order called "Protecting the Meaning and Value of American Citizenship." The Executive Order purports to interpret the clause "subject to the jurisdiction thereof" in the Citizenship Clause of the Fourteenth Amendment. In Section 1 of the Order, titled "Purpose," the Order explains that "[t]he Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof.'" Exec. Order § 1. Section 1 continues:

> Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not

automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*Id.*

Section 2 of the Order establishes the policy of the United States government. *See id.* § 2. Under Section 2, no federal department or agency "shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to a person whose mother was unlawfully present or lawfully present with only temporary status and whose father was neither a United States citizen nor lawful permanent resident at the time of that person's birth. *Id.* § 2(a). The policy applies only to persons who are born in the United States on or after February 19, 2025. *Id.* § 2(b). It does not impact the ability of other people, including children of lawful permanent residents, to get documentation of their American citizenship. *Id.* § 2(c).

Section 3 of the Order discusses enforcement. *Id.* § 3. It instructs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and that their agencies' officers, employees, and agents act in accordance with the Order. *Id.* § 3(a). It also instructs the heads of executive departments and agencies to issue public guidance regarding their implementation of the Order within 30 days of its issuance. *Id.* § 3(b).

On January 21, 2025, the plaintiffs filed this lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department

of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. ECF 1, ¶¶ 50–56. Each individual defendant is sued in their official capacity. *Id.* The plaintiffs claim that the Executive Order violates the Fourteenth Amendment, *id.* ¶¶ 101–08, and the Immigration and Nationality Act ("INA"), *id.* ¶¶ 109–14. They seek declaratory and injunctive relief. *Id.* at 37–38.

The two organizational plaintiffs are CASA, Inc. ("CASA") and Asylum Seeker Advocacy Project ("ASAP"). CASA is a nonprofit organization headquartered in Prince George's County, Maryland. *Id.* ¶ 19. It "is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 175,000 members." *Id.* Its mission "is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities." *Id.* ¶ 20. It helps members apply for public benefits and offers free legal consultations. *Id.* ¶ 22. CASA does not issue formal membership to anyone under the age of 15, though it does provide services to young people and their families. *Id.* ¶ 24. CASA's members include women without lawful status who are pregnant or plan to give birth in the United States. *Id.* ¶ 25. Under the Order, their children born in the United States would no longer be U.S. citizens.

ASAP is a nonprofit organization headquartered in New York, New York. *Id.* ¶ 31. It "is the largest membership-based organization of asylum-seekers in the United States, with over 680,000 members from more than 175 countries who reside in all 50 states and several U.S. territories." *Id.* "ASAP's mission is to help its members—individuals seeking asylum—to build a more welcoming United States." *Id.* ¶ 32. To that end, it provides members with community and legal support. *Id.* ASAP does not extend formal membership to people under the age of 14, but the benefits of ASAP membership may extend to them through their parents' membership. *Id.* ¶ 35.

Most ASAP members have applied for asylum and cannot be deported while their asylum applications are pending. *Id.* ¶ 36. ASAP expects that "[h]undreds or even thousands of [its] members will give birth to children in the United States over the coming weeks and months[.]" *Id.* ¶ 37. Despite being born in the United States, those children would not be U.S. citizens under the Order.

The individual plaintiffs—Maribel, Juana, Trinidad Garcia, Monica, and Liza—are proceeding under pseudonyms.[1] ECF 3. Maribel is a member of CASA. ECF 1, ¶ 45. She is undocumented and has lived in the United States for 18 years. *Id.* She is pregnant and due in July 2025. *Id.* Juana is also a CASA member. *Id.* ¶ 46. She has a pending asylum claim. *Id.* She is two months pregnant. *Id.* Trinidad Garcia is a member of ASAP. *Id.* ¶ 47. She and her partner came to the United States on tourist visas in 2017 and filed affirmative asylum applications. *Id.* They are awaiting their asylum interview. *Id.* Trinidad Garcia is pregnant and due in August 2025. *Id.* She and her partner are citizens of Venezuela. *Id.* Venezuela does not provide consular services in the United States, so she fears that her child would be rendered stateless by the Order. *Id.* Monica is also an ASAP member from Venezuela. *Id.* ¶ 48. She has Temporary Protected Status and has filed an application for asylum. *Id.* She is pregnant and due in August 2025. *Id.* Like Trinidad Garcia, she fears that her child would be rendered stateless by the Order. *Id.* Liza is married to an ASAP member who is seeking asylum. *Id.* ¶ 49. Liza is currently in lawful status on a student visa. *Id.* She is pregnant and due in May 2025. *Id.* She and her husband are Russian citizens who fear

---

[1] The individual plaintiffs have asked to proceed under pseudonyms because they "fear that the U.S. government and members of the public could retaliate against them or their minor children because of their participation in this lawsuit." ECF 3, at 1. The government does not oppose the motion "provided that [p]laintiffs provide the identities of those individuals on request if necessary to permit [it] to fully defend this case." ECF 39, at 1. The motion to proceed under pseudonyms is granted. If the government needs to know the identities of the individual plaintiffs to defend this case, it may file a request for relief from the Court.

persecution from the Russian government. *Id.* They are afraid to apply for Russian citizenship for their child and are worried their child will be rendered stateless by the Order.[2]

The plaintiffs filed a motion for a temporary restraining order and preliminary injunction. ECF 2. The government opposed the preliminary injunction. ECF 40. The plaintiffs filed a reply. ECF 46. Three amici filed briefs: a group of local governments and local government officials, ECF 37; the Immigration Reform Law Institute, ECF 63; and the State of Tennessee, ECF 50. The Court heard argument on the motion on February 5, 2025.

## II.    Discussion

The plaintiffs seek a preliminary injunction that enjoins the implementation and enforcement of the Executive Order. The government argues that the plaintiffs do not have a cause of action and that preliminary injunctive relief is unwarranted. The Court finds that the plaintiffs do have a cause of action and that preliminary injuctive relief is warranted.

### A.    Reviewabilty of the Executive Order

As a threshold matter, the Court must decide if the plaintiffs' constitutional claim is subject to judicial review. *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023) ("Before [the court] turn[s] to the merits, [it] must decide whether the plaintiffs' claims are reviewable.").[3]

---

[2] Unless otherwise noted, the "plaintiffs" refers to the individual plaintiffs and members of the organizational plaintiffs who are pregnant.

[3] The Court need not decide whether it may review the plaintiffs' statutory claim because the plaintiffs are entitled to a preliminary injunction on their constitutional claim. The claims are essentially coterminous because the statute mirrors the Citizenship Clause. Although the Court has a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case," *Harmon v. Brucker*, 355 U.S. 579, 581 (1958), the constitutional question presented here is essential to the proper disposition of the issues before the Court.

The plaintiffs claim the Executive Order violates the Fourteenth Amendment's Citizenship Clause. There is no question that the Court may review the constitutionality of the Executive Order and grant injunctive relief. The Supreme Court consistently has "sustain[ed] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *See Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). The Supreme Court has affirmed that "the President's actions may . . . be reviewed for constitutionality." *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also Dalton v. Specter*, 511 U.S. 462, 473–74 (1994). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 815 (Scalia, J., concurring)); *see also id.* at 1326 ("[A]n independent claim of a President's violation of the Constitution would certainly be reviewable."). In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court explained that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. 320, 327 (2015). Pursuant to this authority, the Supreme Court has reviewed constitutional challenges to executive orders. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 795–96 (1985). During President Trump's first term, the Supreme Court decided a constitutional challenge to one of his proclamations. *See Trump v. Hawaii*, 585 U.S. 667, 697–99 (2018) (reaching the merits of an Establishment Clause challenge to a Presidential Proclamation).

The government insists the plaintiffs have an "available and exclusive mechanism to challenge disputes about citizenship under the INA." ECF 40, at 9. According to the government, the plaintiffs must pursue their claims through a declaratory action under 8 U.S.C. § 1503(a) of the INA. Section 1503(a) allows "any person who is within the United States" and who "claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States" to seek declaratory relief after "the final administrative denial of such right or privilege." 8 U.S.C. § 1503(a).

This INA provision does not prevent the plaintiffs from bringing a facial constitutional challenge to the Executive Order. The text of the INA does not indicate that § 1503(a) is the exclusive remedy for challenging the denial of a right to citizenship under the Fourteenth Amendment. The Supreme Court has cautioned against reading a statutory right to judicial review "as an exclusive route to review" when the text neither "expressly" nor "implicitly" limits the Court's jurisdiction. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (statute permitting judicial review of the Securities and Exchange Commission's rules and orders was not the "exclusive route to review" constitutional claims against a government board subject to the Commission's good-cause removal power); *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (concluding federal statutes allowing courts of appeal to review an agency order "d[id] not displace district court jurisdiction over . . . far-reaching constitutional claims"). Indeed, judicial review under the INA is not the exclusive mechanism to challenge policies that deny citizenship. *See, e.g.*, *Tuaua v. United States*, 788 F.3d 300, 302–03 (D.C. Cir. 2015).

Further, the plaintiffs cannot pursue their constitutional challenge to the Executive Order under § 1503(a). The statute provides a cause of action to "any person who is within the United

States" who "claims a right or privilege as a national of the United States." 8 U.S.C. § 1503(a).

The plaintiffs are not seeking "a judgment declaring [their children] to be [] national[s] of the

United States" after the denial of a particular right or privilege, *id.*, such as the denial of a passport,

*see, e.g.*, *Cambranis v. Blinken*, 994 F.3d 457, 465 (5th Cir. 2021) (reviewing challenge under §

1503(a) brought after denial of passport application); *Kiviti v. Pompeo*, 467 F. Supp. 3d 293, 303

(D. Md. 2020) (same). Instead, the plaintiffs seek immediate injunctive relief from the Executive

Order because the Order is facially unconstitutional and denies citizenship to their unborn children.

So the government is incorrect: Section 1503(a) of the INA does not offer the plaintiffs an

exclusive and available remedy for their constitutional challenge to the Executive Order.

The plaintiffs can seek protection from unconstitutional executive action in this Court. As

the Supreme Court has explained:

> "The very essence of civil liberty . . . certainly consists in the right of every
> individual to claim the protection of the laws, whenever he receives an injury. One
> of the first duties of government is to afford that protection." Traditionally,
> therefore, "it is established practice for this Court to sustain the jurisdiction of
> federal courts to issue injunctions to protect rights safeguarded by the Constitution
> and to restrain individual state officers from doing what the 14th Amendment
> forbids the State to do."

*Davis v. Passman*, 442 U.S. 228, 242 (1979) (first quoting *Marbury v. Madison*, 5 U.S. (1 Cranch)

137, 163 (1803); and then quoting *Bell*, 327 U.S. at 684). The Court can review the plaintiffs'

claim that the Executive Order violates the Fourteenth Amendment.

## B.    Motion for Preliminary Injunction

To obtain a preliminary injunction, the plaintiffs must establish four factors: (1) that they

are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary

relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in

the public interest. *See Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The plaintiffs must satisfy all four

factors to obtain a preliminary injunction. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342,

347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). A preliminary injunction is

"an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief." *Winter*, 555 U.S. at 22.

      The plaintiffs have shown they are entitled to this extraordinary remedy.

### 1. Likelihood of Success

      The Citizenship Clause of the Fourteenth Amendment states: "All persons born or

naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United

States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. The plaintiffs

claim the Executive Order violates the Fourteenth Amendment because the order denies

citizenship to persons who are born in the United States and are "subject to the jurisdiction

thereof." The President sees it differently. On the President's account, "the categories of

individuals born in the United States and not subject to the jurisdiction thereof" include any child

(i) whose "mother was unlawfully present in the United States and the father was not a United

States citizen or lawful permanent resident at the time of said person's birth" or (ii) whose

"mother's presence in the United States at the time of said person's birth was lawful but temporary

. . . and the father was not a United States citizen or lawful permanent resident at the time of said

person's birth." Exec. Order § 1. Examples of "lawful but temporary" presence include, "but [are]

not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting

on a student, work, or tourist visa." *Id.* According to the Executive Order, "the privilege of United

States citizenship does not automatically extend to" these U.S.-born children. *Id.*

The President's novel interpretation of the Citizenship Clause contradicts the plain language of the Fourteenth Amendment and conflicts with 125-year-old binding Supreme Court precedent. At the turn of the twentieth century, the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), resolved any debate about the scope of the Citizenship Clause and the meaning of "subject to the jurisdiction thereof." *Wong Kim Ark* forecloses the President's interpretation of the Citizenship Clause.

The case arose when Wong Kim Ark, who was born in San Francisco to parents who were Chinese citizens, traveled to China for a temporary visit and was denied re-entry into the United States "upon the sole ground that he was not a citizen of the United States." *Id.* at 653. Wong Kim Ark insisted he was a U.S. citizen because he was born in California. *Id.* If he was a citizen, the "Chinese Exclusion Acts," which prohibited "persons of the Chinese race, and especially Chinese laborers, from coming into the United States," would not apply to him. *Id.*

The Supreme Court framed "the question presented" like this:

> whether a child born in the United States, of parents of Chinese descent, who at the time of his birth are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the fourteenth amendment of the constitution: 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.'

*Id.*

To answer this question, the Supreme Court began with the text of the Constitution and determined that the "constitution nowhere defines the meaning of these words." *Id.* at 654. It then interpreted the Citizenship Clause "in the light of the common law, the principles and history of which were familiarly known to the framers of the constitution." *Id.* The Court observed that "[t]he language of the constitution . . . could not be understood without reference to [English] common

law." *Id.*; *see id.* at 655 ("The interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." (quoting *Smith v. Alabama*, 124 U.S. 465, 478 (1888))).

The Court prefaced its review of English common law as follows:

> The fundamental principle of the common law with regard to English nationality was birth within the allegiance—also called 'ligealty,' 'obedience,' 'faith,' or 'power'— of the king. The principle embraced all persons born within the king's allegiance, and subject to his protection. Such allegiance and protection were mutual,—as expressed in the maxim, 'Protectio trahit subjectionem, et subjection protectionem,'—and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; but were predicable of aliens in amity, so long as they were within the kingdom. Children, born in England, of such aliens, were therefore natural-born subjects. But the children, born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the king's dominions, were not natural-born subjects, because not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction, of the king.

*Id.* at 655. That principle, as the Court explained, pervaded English common law cases. *See id.* at 655–58.

After a lengthy discussion of common law cases, the Court concluded:

> It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador, or of an alien enemy in a hostile occupation of the place where the child was born.

*Id.* at 658.

The Court found that this "same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established." *Id.* In cases decided after

the Declaration of Independence, courts in the United States "assumed . . . that all persons born in the United States were citizens of the United States." *Id.* (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 119 (1804)). The Court noted that, in *Levy's Lessee v. McCartee*, 31 U.S. (6 Pet.) 102 (1832), Justice Story "treated it as unquestionable that by [the principles of common law] a child born in England of alien parents was a natural-born subject." 169 U.S. at 662. And in *United States v. Rhodes*, Justice Swayne also relied on English common law:

> All persons born in the allegiance of the king are natural-born subjects, and all persons born in the allegiance of the United States are natural-born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as of England. We find no warrant for the opinion that this great principle of common law has ever been changed in the United States. It has always obtained here, with the same vigor, and subject only to the same exceptions, since as before the Revolution.

*Id.* at 662–63 (quoting *United States v. Rhodes*, 27 F. Cas. 785, 790 (C.C.D. Ky. 1866) (Swayne, Cir. J.)). Justice Sewall of the Supreme Court of Massachusetts stated in *Kilham v. Ward*:

> The doctrine of common law is that every man born within its jurisdiction is a subject of the sovereign of the country where he is born; and allegiance is not personal to the sovereign in the extent that it has been contended for; it is due to him in his political capacity of sovereign of the territory where the person owing the allegiance was born.

*Id.* (quoting *Kilham v. Ward*, 2 Mass. (1 Tyng) 236, 264–65 (Mass. 1806)).

After an extensive review of English common law, decisions of courts in the United States, and recent acts of Congress, the Supreme Court concluded: "Here is nothing to countenance the theory that a general rule of citizenship by blood or descent has displaced in this country the fundamental rule of citizenship by birth within its sovereign." *Id.* at 674. The Court concluded that the Fourteenth Amendment and the Civil Rights Act of 1866, enacted two years before the Fourteenth Amendment, "finally put at rest" any "doubt" that before their enactment, "all white persons, at least, born within the sovereignty of the United States, whether children of citizens or

of foreigners, excepting only children of ambassadors and public ministers of a foreign government, were native-born citizens of the United States." *Id.* at 674–75.

With their enactment, the Fourteenth Amendment and the Civil Rights Act of 1866 "reaffirmed in the most explicit and comprehensive terms . . . the fundamental principle of citizenship by birth within the dominion." *Id.* at 675. Enacted first, the Civil Rights Act of 1866 states, in part: "All persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." *Id.* (quoting Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27). Soon after Congress enacted the Civil Rights Act of 1866, the "same congress . . . evidently thinking it unwise, and perhaps unsafe, to leave so important a declaration of rights to depend upon an ordinary act of legislation, which might be repealed by a subsequent congress, framed the fourteenth amendment of the constitution." *Id.* After reciting the text of the Fourteenth Amendment's Citizenship Clause, the Court stated:

> As appears on the face of the amendment, as well as from the history of the times, this was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption.

*Id.* at 676. The "main purpose [of the Citizenship Clause] doubtless was . . . to establish the citizenship of free negroes, which had been denied" in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), and "to put it beyond all doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States, are citizens of the United States." *Id.* The amendment's "opening words, 'All persons born,' are general, not to say universal, restricted only by place and jurisdiction, and not by color or race." *Id.*

The Court then interpreted the clause "subject to the jurisdiction thereof." *Id.* at 676–82. At the time, the only case that had decided the meaning of the clause was *Elk v. Wilkins*, 112 U.S.

94 (1884). *Wong Kim Ark*, 169 U.S. at 680. Justice Gray, the author of *Wong Kim Ark*, authored

*Elk* only four years earlier. As Justice Gray stated in *Wong Kim Ark*, the *Elk* Court held that "an

Indian born a member of one of the Indian tribes within the United States . . . was not a citizen of

the United States, as a person born in the United States, 'and subject to the jurisdiction thereof,'

within the meaning of the clause in question." *Id.* The *Wong Kim Ark* Court stated the rationale for

the *Elk* holding:

> Indian tribes, being within the territorial limits of the United States were not, strictly
> speaking, foreign states, but were alien nations, distinct political communities, the
> members of which owed immediate allegiance to their several tribes, and were not
> part of the people of the United States . . . Indians born within the territorial limits
> of the United States, members of, and owing immediate allegiance to, one of the
> Indian tribes (an alien, though dependent, power), although in a geographical sense
> born in the United States, are no more "born in the United States, and subject to the
> jurisdiction thereof," within the meaning of the first section of the fourteenth
> amendment, than the children of subjects of any foreign government born within
> the domain of that government, or the children born within the United States of
> ambassadors or other public ministers of foreign nations.

*Id.* at 681. Justice Gray then explained why *Elk* did not apply to the case at bar: "The decision in

*Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no

tendency to deny citizenship to children born in the United States of foreign parents of Caucasian,

African, or Mongolian descent, not in the diplomatic service of a foreign country." *Id.* at 682.

Having distinguished *Elk* as a unique case that "concerned only members of the Indian

tribes within the United States," the *Wong Kim Ark* Court determined that:

> [t]he real object of the fourteenth amendment of the constitution, in qualifying the
> words 'all persons born in the United States' by the addition 'and subject to the
> jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest
> words (besides children of members of the Indian tribes, standing in a peculiar
> relation to the national government, unknown to the common law), the two classes
> of cases—children born of alien enemies of hostile occupation, and children of
> diplomatic representatives of a foreign state—both of which . . . by the law of
> England and by our own law, from the time of the first settlement of the English
> colonies in America, had been recognized exceptions to the fundamental rule of
> citizenship by birth within the country.

*Id.* at 682.

> Ultimately, the *Wong Kim Ark* Court made these "irresistibl[e] . . . conclusions":

> The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.

*Id.* at 693. Except in rare instances, the Fourteenth Amendment guarantees U.S. citizenship to any

child born on U.S. soil. *See id.*

The *Wong Kim Ark* Court then applied these holdings to the facts before it. Recall that

Wong Kim Ark was denied re-entry into the United States because it was believed he was not a

citizen, and if he was not a citizen, the Chinese Exclusion Acts barred his entry into the United

States. *Id.* at 653. The Court determined that no legislation to exclude Chinese citizens could apply

to a person "born in the United States of Chinese parents." *Id.* at 694–99. Yet the United States

could "exclude" or "expel from the country persons of the Chinese race, born in China, and

continuing to be subjects of the emperor, though having acquired a commercial domicile in the

United States . . . ." *Id.* at 699. The Supreme Court had upheld the Acts previously based on "the

right to exclude or to expel all aliens," *id.*, including "Chinese persons not born in this country'"—

a population of people who had "'never been recognized as citizens of the United States, nor

authorized to become such under the naturalization laws," *id.* at 702 (quoting *Fong Yue Ting v.

United States*, 149 U.S. 698, 716 (1893)). The Acts could lawfully exclude someone born in China

"who had acquired a commercial domicile in the United States" but "voluntarily left . . .  with the

intention of returning." *See id.* at 700 (citing *Lem Moon Sing v. United States*, 158 U.S. 538 (1895)).

The *Wong Kim Ark* Court acknowledged that Congress could deny naturalization to someone born in China. *Id.* But the Fourteenth Amendment "contemplates two sources of citizenship . . . birth and naturalization." *Id.* Congress's "power of naturalization . . . is a power to confer citizenship, not a power to take it away." *Id.* at 703. The Court affirmed that "citizenship by birth is established by the mere fact of birth under the circumstances defined in the constitution." *Id.* at 702. So although "[a] person born out of the jurisdiction of the United States can only become a citizen by being naturalized," "[e]very person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." *Id.*

In the end, the Court answered the initial question presented—"whether a child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, but have a permanent domicile and residence in the United States . . . and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States"—"in the affirmative." *Id.* at 705.

The government does not dispute that *Wong Kim Ark* is binding precedent. Nor does it argue that *Wong Kim Ark* was wrongly decided or should be overturned. Instead, the government claims that, under *Wong Kim Ark*, to be "subject to the jurisdiction" of the United States, a person's parents must, at the time of the person's birth, be lawfully domiciled in the United States, ECF 40, at 14, 24–26, and bear "'direct and immediate allegiance' to this country, unqualified by an allegiance to any other foreign power," *id.* at 4. Nothing in *Wong Kim Ark* remotely supports the government's narrow reading of the decision.

To address the government's arguments, the Court first must clarify *Wong Kim Ark*'s holding. *Wong Kim Ark* held that, under the Fourteenth Amendment, "[e]very person born . . . in the United States" is "subject to the jurisdiction thereof" and thus a citizen by birth, *id.* at 702, unless they fall into one of the recognized exceptions to citizenship by birth, *id.* at 693. *See also id.* at 657–58 (describing exceptions to citizenship by birth for children of hostile occupiers or diplomats under English common law); *id.* at 658 ("[T]herefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign state, or of an alien enemy in hostile occupation of the place where the child was born."); *id.* at 682 (finding "subject to the jurisdiction thereof" excludes "by the fewest and fittest words (besides children of members of the Indian tribes . . .), the two classes of cases,—children born of alien enemies of hostile occupation, and children of diplomatic representatives of a foreign state"); *id.* at 693 ("The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . with the exceptions . . . of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and . . . children of members of the Indian tribes owing direct allegiance to their several tribes.").

The government seems to dismiss *Wong Kim Ark*'s holding, and the lengthy analysis that supports it, as dicta. On the government's account, *Wong Kim Ark*'s holding was limited to the specific facts of the case: A person born in the United States whose foreign-born parents were "domiciled" in the United States at the time of his birth is "subject to the jurisdiction of" the United States. ECF 40, at 24–26. *Wong Kim Ark* cannot reasonably be read that narrowly. However, even if not part of the Court's holding, *Wong Kim Ark*'s statements that every person born in the United States is "subject to the jurisdiction thereof" and thus a citizen by birth (with certain exceptions)

certainly are not dicta. "Dictum is a 'statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'" *Payne v. Taslimi*, 998 F.3d 648, 654–55 (4th Cir. 2021) (quoting *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999)). If "a precedent's reasoning" is "necessary to the outcome," it "must be followed." *Id.* at 655.

*Wong Kim Ark*'s statement that the "fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth" with certain recognized exceptions, 169 U.S. at 693, could not "have been deleted without seriously impairing the analytical foundations of the holding," *see Payne*, 998 F.3d at 654. Even a cursory review of the decision reveals that this statement and similar statements were not "peripheral" to the holding. They were central to it. And there can be no question that the Court gave them "full and careful consideration." *See id.* at 655. The Court thoroughly discussed the history of citizenship by birth at English common law, the decisions of U.S. courts applying the common law, and the history and text of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S at 655–82. A more "full and careful consideration" is hard to imagine. And these statements and the Court's reasoning were "necessary to the outcome" of the case. *See Payne*, 998 F.3d at 655. Without them, the Court could not have determined that Wong Kim Ark was a U.S. citizen under the Fourteenth Amendment and not excludable from the country under the Chinese Exclusion Acts. They "must be followed." *Id.*

Even if they were dicta, this Court is not free to ignore them. "[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003)). This Court "is 'bound by Supreme Court

dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *See United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)). Though *Wong Kim Ark* can hardly be considered "recent," the Supreme Court's continual recognition that people born in the United States are citizens by birth confirms that this Court must, at the very least, treat *Wong Kim Ark*'s interpretation of the Fourteenth Amendment "as authoritative." *See Wynne*, 376 F.3d at 298 n.3.

Return to the government's arguments. The government argues that, under *Wong Kim Ark*, a person's parents must, at the time of the person's birth, be lawfully domiciled in the country for the person to be "subject to the jurisdiction" of the United States. ECF 40, at 14, 24–26. The government insists *Wong Kim Ark* imposes a parental domicile requirement for citizenship under the Fourteenth Amendment because the Court mentioned "domicile" or "domiciled" throughout the opinion. True, the Court included in the question presented at the beginning of the opinion, and in the answer at the end of the opinion, that Wong Kim Ark's parents "at the time of his birth" had "a permanent domicile and residence in the United States." *Id.* at 653, 705. Also true, the Court stated: "The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, *domiciled* within the United States." *Id.* at 693 (emphasis added). However, the fact that Wong Kim Ark's parents were domiciled and resided in the United States was not essential to the holding or outcome. And even though the Court described the parents of "children born within the territory of the United States" as "domiciled within the United States," the word "domicile" does not appear in the text of the Fourteenth Amendment. And English common law did not impose a parental domicile requirement. In fact, under English common law and the decisions of United States courts that

followed it, the right to citizenship by birth included children of non-citizen parents not domiciled in the country. *Wong Kim Ark*, 169 U.S. at 657 (noting the English common law rule that "every person born within the dominions of the crown" was an English subject—"no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country"); *Calvin's Case*, 77 Eng. Rep. 377, 384 (1608) ("[L]ocal obedience being but momentary and uncertain, is yet strong enough to make a natural subject, for if he hath issue here, that issue is . . . a natural born subject . . . ."); *Lynch v. Clarke*, 1 Sand. Ch. 583, 683 (N.Y. Ch. 1844) (applying English common law and holding plaintiff was an American citizen because she was born in the United States even though her parents were only temporarily sojourning in the United States when she was born). These cases were part of the common law that the Fourteenth Amendment affirmed. *Wong Kim Ark*, 169 U.S. at 693. To be a "person[] born . . . in the United States" and "subject to the jurisdiction thereof" does not require the person's parents to be domiciled in the United States at the time of birth.[4]

Next, the government argues that, under *Wong Kim Ark*, a person born in the United States is "subject to the jurisdiction" of the United States only if he is "born 'in the allegiance and under the protection of this country,'" ECF 40, at 13 (quoting *Wong Kim Ark*, 169 U.S. at 693), and his allegiance is "unqualified by 'allegiance to any alien power,'" *id.* (quoting *Elk*, 112 U.S. at 101–02). The government misconstrues the language in *Wong Kim Ark*. As the Court explained: "The fundamental principle of the common law with regard to English nationality was *birth within the*

---

[4] The government cites *Benny v. O'Brien*, which suggested that the Fourteenth Amendment exempted from citizenship "those born in this country of foreign parents who are temporarily traveling here, and children born of persons resident here in the diplomatic service of foreign governments." 32 A. 696, 698 (N.J. Sup. Ct. 1895). *Benny*, a decision from an intermediary New Jersey court that came down before *Wong Kim Ark*, has no precedential value.

*allegiance*—also called 'ligealty,' 'obedience,' 'faith,' or 'power'—*of the king*. The principle embraced all persons *born within the king's allegiance . . . .*" 169 U.S. at 655 (emphasis added). Put differently, "[a]ll persons born in the allegiance of the king are natural-born subjects, and all persons born in the allegiance of the United States are natural-born citizens." *Id.* at 662 (quoting *Rhodes*, 27 F. Cas. at 790). That is to say, "every man born within its jurisdiction is a subject of the sovereign of the country where he is born." *Id.* at 663 (quoting *Kilham*, 2 Mass. at 265). "[A]llegiance is not personal to the sovereign in the extent that it has been contended for; it is due to him in his political capacity of sovereign of the territory where the person owing the allegiance was born." *Id.* (quoting *Kilham*, 2 Mass. at 265). At common law, the only people born within the kingdom without allegiance to the king were children of diplomatic representatives or hostile occupiers. *Id.* at 659–60. That is because they were not entitled to the king's protection under common law. Children of diplomatic representatives were "born under the actual protection and in the dominions of a foreign prince." *Id.* at 660 (quoting *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. 99, 155 (1830) (opinion of Story, J.)). Children of hostile occupiers certainly were not entitled to any protection of the sovereign. *Id.* All this is to say: if a person is born in the United States and does not belong to one of the traditional classes of excepted persons, the person is born "within the allegiance" of the United States and "subject to the jurisdiction" of the United States. *Wong Kim Ark* did not hold, as the government maintains, that a person born in the United States is only "subject to the jurisdiction of" the United States if the person bears exclusive allegiance to the United States at the time of birth.

Contrary to the government's positions, *Wong Kim Ark* did not interpret "subject to the jurisdiction thereof" in the Citizenship Clause of the Fourteenth Amendment to exclude persons

born in the United States whose parents are not domiciled in the United States or persons who hold

allegiance to another country.

The Executive Order directly conflicts with *Wong Kim Ark*. Under *Wong Kim Ark*, a person

"born in the United States" and "subject to the jurisdiction thereof" encompasses every person

born in this country save specific classes of people. The Executive Order purports to expand the

classes of people that are not "subject to the jurisdiction thereof" and thus to deny citizenship by

birth to people who are entitled to it under the Constitution. The children targeted by the Executive

Order do not fit within any of the limited exceptions to citizenship by birth identified in *Wong Kim*

*Ark*. They are not children of ambassadors, children of enemies in the country during a hostile

occupation, children born on foreign seas, or children born into Indian tribes.[5] They are children

whose citizenship by birth has been recognized in this country since the ratification of the

Fourteenth Amendment. When the children described in the Executive Order are born, they will

be United States citizens under the Fourteenth Amendment and long-standing Supreme Court

---

[5] On the same day the President issued the Executive Order at issue here, he issued another Executive Order that describes "an unprecedented flood of illegal immigration" in which "millions of illegal aliens" who "present significant threats to national security and public safety" have entered the country illegally. Exec. Order § 1 (quoting Exec. Order No. 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025)). In its briefing, the government suggests that a broad, inclusive reading of the Citizenship Clause's "subject to the jurisdiction thereof" will result in citizenship by birth "to the children of individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile threats." ECF 40, at 21. The government seems to advocate for a broader reading of one of the exceptions to citizenship by birth—"children born of alien enemies in hostile occupation"—to include the children described in the Executive Order. *See id.* (quoting *Wong Kim Ark*, 169 U.S. at 682). The meaning of the clause "subject to the jurisdiction thereof" was explained clearly in *Wong Kim Ark*. It is meant to be expansive. *See Wong Kim Ark*, 169 U.S. at 682. The exception for "children born of alien enemies in hostile occupation" applies during a hostile occupation "of part of the king's dominions." *Id*. A "hostile occupation" entails the "firm possession" of a territory that enables the occupier "to exercise the fullest rights of sovereignty over that place." *United States v. Rice*, 17 U.S. (4 Wheat.) 246, 254 (1819). This exception to citizenship by birth plainly does not apply to the children described in the Executive Order.

precedent. The President does not have the authority to strip them of their constitutional right to citizenship by birth.

The government cites no case decided after *Wong Kim Ark* that supports the President's interpretation of the Fourteenth Amendment. And there is none. Instead, the government relies principally on two cases decided before *Wong Kim Ark*: *Elk v. Wilkins*, 112 U.S. 94 (1884), and *The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872). *Elk* and the *The Slaughter-House Cases* are no help to the government. *Wong Kim Ark* discussed both cases at length and distinguished them. *See* 169 U.S. at 676–82. It found that *Elk*'s interpretation of "subject to the jurisdiction thereof" did not apply outside the context of Indian tribes because *Elk* "concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not in the diplomatic service of a foreign country." *Id.* at 682. Thus, *Elk*'s holding is confined to members of Indian tribes. The children identified in the Executive Order are not akin to members of Indian tribes, who, in the nineteenth century, enjoyed a unique political status and quasi-sovereignty.[6] *See Elk*, 112 U.S. at 119–20 (Harlan, J., dissenting) ("[I]t would be obviously inconsistent with the semi-independent character of such a tribe, and with the obedience they are expected to render to their tribal head, that they should be vested with the complete rights—or, on the other, subjected to the full responsibilities—of American citizens."). *Elk* does not apply to this case. Nor do *The Slaughter-House Cases*. The government relies on the following language from *The Slaughter-House Cases*: "The phrase 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states, born within the United States." 83 U.S. at 73. The government argues "subjects of foreign states" includes the children

---

[6] Congress gave members of Indian tribes citizenship by birth in 1924. 8 U.S.C. § 1401(b).

described in the Executive Order. ECF 40, at 18. The problem for the government is that *Wong Kim Ark* repudiated this language from *The Slaughter-House Cases* because it was "wholly aside from the question in judgment, and from the course of reasoning bearing upon that case," and "[i]t was unsupported by any argument, or by any reference to authorities." *Id.* at 678.[7] The government has not identified any case that supports the President's interpretation of the Fourteenth Amendment.

In the 125 years since *Wong Kim Ark*, the Supreme Court has never questioned whether a child born in the United States—whose parents did not have lawful status or were in the country temporarily—was an American citizen. In *United States ex rel. Hintopoulos v. Shaughnessy*, the petitioners, who were married to each other, worked as crew members on foreign ships that came into port in the United States. 353 U.S. 72, 73 (1957). They entered the United States lawfully and remained in the country after their 29-day visas expired. *Id.* at 73. The wife gave birth three months after her permission to stay expired and two months after her husband's permission to stay expired. *Id.* Half a year later, deportation proceedings were instituted against both parents, and they asked to suspend deportation "on the ground of the economic detriment that would befall their minor son in the event they were deported." *Id.* at 74. The Court remarked that their child was, "of course, an

---

[7] The only other cases the government says support its position that parental domicile is necessary to be "subject to the jurisdiction" of the United States are *Chin Bak Kan v. United States*, 186 U.S. 193 (1902), and *Kwock Jan Fat v. White*, 253 U.S. 454 (1920). In *Chin Bak Kan*, the Court stated the ruling in *Wong Kim Ark* and included the fact that Wong Kim Ark's parents "ha[d] a permanent domicil[e] and residence in the United States." 186 U.S. at 200 (quoting *Wong Kim Ark*, 169 U.S. at 649). In *Kwock Jan Fat*, the petitioner claimed to be a U.S. citizen by birth, but a government investigation concluded that he was born in China and entered the United States as a minor. 253 U.S. at 455–56. The parties did not dispute that if the petitioner's parents were who he said they were, he would have been born to them "when they were permanently domiciled in the United States" and would be a U.S. citizen. *Id.* at 457 (citing *Wong Kim Ark*). Both cases reference *Wong Kim Ark* only in passing. Neither case held that a person's parents must be domiciled in the United States for their U.S.-born children to be "subject to the jurisdiction" of the United States.

American citizen by birth." *Id.* at 73; *see also id.* at 79 (Douglas, J., dissenting) ("The citizen is a five-year-old boy who was born here and who, therefore, is entitled to all the rights, privileges, and immunities which the Fourteenth Amendment bestows on every citizen."). Similarly, in *INS v. Errico*, the Supreme Court considered two appeals of deportation orders. 385 U.S. 214, 214 (1966). Both petitioners entered the United States by making fraudulent misrepresentations to immigration officials, and after entry, each had a child in the United States. *Id.* at 215–16. Even though the children's parents had procured entry into the country by fraud, the Court did not question that the children were American citizens by virtue of their birth in the United States. *See id.* (stating first petitioner's child "acquired United States citizenship at birth" and second petitioner's child "became an American citizen at birth"). And in *Hamdi v. Rumsfeld*, the Supreme Court "consider[ed] the legality of the Government's detention of a United States citizen on United States soil as an 'enemy combatant.'" 542 U.S. 507, 509 (2004) (plurality). An amicus brief urged the Court to find that the enemy combatant was not a citizen because his parents were in the United States on temporary visas when he was born. *See* Br. for The Claremont Inst. Ctr. for Constitutional Jurisprudence as Amicus Curiae Supporting Respondents, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (No. 03-6696), 2004 WL 871165. Despite this urging, the Court recognized that the person detained was an American citizen because he was born in the United States. 542 U.S. at 509–10.

In other cases, the Supreme Court never has intimated that the immigration status of parents might affect whether their U.S.-born children are citizens at birth. *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (noting that the undocumented respondent—who had entered the country without permission—"had given birth to a child, who, born in the United States, was a citizen of this country"); *Vance v. Terrazas*, 444 U.S. 252, 255 (1980) ("Appellee . . . was born in this country, the son of a Mexican citizen. He thus acquired at birth both United States and Mexican

citizenship."); *Rogers v. Bellei*, 401 U.S. 815, 828 (1971) (acknowledging that American citizenship law "follows English concepts with an acceptance of the jus soli"); *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958) ("Petitioner was born in Artesia, California, in 1916. By reason of that fact, he was a citizen of the United States, and because of the citizenship of his parents, he was also considered by Japan to be a citizen of that country."); *Kawakita v. United States*, 343 U.S. 717, 720 (1952) (noting that petitioner was born in the United States to Japanese citizen parents and "was thus a citizen of the United States by birth"); *Hirabayashi v. United States*, 320 U.S. 81, 96 (1943) (confirming that people of Japanese descent were citizens because they were "born in the United States"); *Perkins v. Elg*, 307 U.S. 325, 327, 329 (1939) (citing *Wong Kim Ark* and finding that the plaintiff was still an American citizen because of her birth in the United States, even though she had moved abroad as a minor and acquired Swedish citizenship); *Morrison v. California*, 291 U.S. 82, 85 (1934) ("A person of Japanese race is a citizen of the United States if he was born within the United States."); *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927) (discussing *Wong Kim Ark* and noting that a child born in the United States "was nevertheless, under the language of the Fourteenth Amendment, a citizen of the United States by virtue of the jus soli embodied in the amendment"); *Ah How v. United States*, 193 U.S. 65, 65 (1904) (stating petitioners offered evidence that they were born in the United States "and therefore each was a citizen").

The government's only response to these Supreme Court cases: "[I]t is not unusual for the Supreme Court, after fully exploring a legal issue, to reach a conclusion that conflicts with earlier assumptions." ECF 40, at 28. That is no response at all.

The Executive Order flouts the plain language of the Fourteenth Amendment to the United States Constitution, conflicts with binding Supreme Court precedent, and runs counter to our

nation's 250-year history of citizenship by birth. The plaintiffs have shown an extremely strong

likelihood that they will succeed on the merits of their constitutional claim.

### 2.  Irreparable Harm

"Citizenship is a most precious right[,] . . . expressly guaranteed by the Fourteenth

Amendment to the Constitution . . . ." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963);

*see also Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, J., dissenting) ("Citizenship is man's

basic right for it is nothing less than the right to have rights."). The right to American citizenship

is "a right no less precious than life or liberty." *Klapprott v. United States*, 335 U.S. 601, 616

(1949) (Rutledge, J., concurring in result). The "deprivation of a constitutional right, 'for even

minimal periods of time, unquestionably constitutes irreparable injury.'" *Miranda v. Garland*, 34

F.4th 338, 365 (4th Cir. 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *accord Leaders

of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("Because

there is a likely constitutional violation, the irreparable harm factor is satisfied."); *Ross v. Meese*,

818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right . . . constitutes

irreparable harm for purposes of equitable jurisdiction").

Here, the plaintiffs have established a strong likelihood of success of the merits on their

claim that the Executive Order violates the Fourteenth Amendment. The denial of the precious

right to citizenship for any period of time will cause them irreparable harm.

The government argues that any harm is "speculative" because the plaintiffs' children will

have "other routes of obtaining status," such as seeking asylum. ECF 40, at 29. This argument is

callous and wrong. The irreparable harm to the plaintiffs and their unborn children is concrete and

imminent. If the Court does not enjoin enforcement of the Executive Order, children born in the

United States who are subject to the Order immediately will be denied the benefits and rights of

U.S. citizenship. The benefits of citizenship include access to certain government public benefit programs such as health care through the Children's Health Insurance Program and food assistance through the Supplemental Nutrition Assistance Program. *See* ECF 37, at 10. The rights of citizenship include the right to live in the United States lawfully and without fear of deportation. Without an injunction, all U.S.-born children subject to the Executive Order will have no legal status in this country when they are born. Without legal status at birth, children could be placed in removal proceedings and deported. Many of the plaintiffs have pending asylum applications or temporary legal status and are not subject to removal. If the Order goes into effect, their children will be without legal status and may be subject to removal even if they are not. The Order may cause some plaintiffs to be separated from their children. *See Wanrong Lin v. Nielsen*, 377 F. Supp. 3d 556, 564–65 (D. Md. 2019) (finding plaintiff would be irreparably harmed if deported and separated from his wife and children in the United States).

Additionally, some of the children of the plaintiffs will be stateless if the Order goes into effect. *See* ECF 2-5, ¶ 4 (statement of plaintiff Liza that her child would be stateless without American citizenship as she and her husband cannot safely apply for Russian citizenship for their child); ECF 2-7, ¶¶ 7–9 (statement of plaintiff Monica that her child would be stateless without American citizenship because there is no Venezuelan consulate in the United States where she could apply for her child's Venezuelan citizenship). For stateless newborns, their "very existence [will be] at the sufferance of the country in which [they] happen[] to find [themselves]." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

Without an injunction, the plaintiffs will face instability and uncertainty about the citizenship status of their newborn babies, and their children born on U.S. soil will be denied the

rights and benefits of U.S. citizenship. The Executive Order, if not enjoined, will cause the plaintiffs and their children grave, irreparable harm.

### 3.   Balance of Equities and Public Interest

The final two factors are the balance of the equities and the public interest. The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda*, 34 F.4th at 365 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). To balance the equities, the Court considers "the relative harms to the applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)). The equities and the public interest weigh very strongly in the plaintiffs' favor.

Today, virtually every baby born on U.S. soil is a U.S. citizen upon birth. That is the law and tradition of our country. That law and tradition will remain the status quo pending the resolution of this case. The government will not be harmed if enforcement of the Executive Order is enjoined. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). And "upholding constitutional rights surely serves the public interest." *Id.* (quoting *Giovani*, 303 F.3d at 521); *accord Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest."). If the Executive Order is not enjoined, local governments will face significant harm. Local governments are responsible for issuing birth certificates, which, under the Order, will no longer automatically prove citizenship. *See* ECF 37,

at 14. The Order would require local governments to either change the information provided on birth certificates or develop an entirely new process to verify citizenship. *Id.* at 15. Additionally, localities will bear a financial burden if the Order takes effect. Currently, local governments receive federal funding for foster care expenses and health care for children who "qualif[y]" for assistance. 8 U.S.C. § 1641(b)–(c). A noncitizen "qualifie[s]" if they are a lawful permanent resident or have received one of several forms of humanitarian relief, such as asylum or refugee status. *Id.* People with only temporary legal status, such as student or work visas, or people without any legal status are generally not considered "qualified" for these programs. *See* 8 U.S.C. § 1611(a). If children born in the U.S. are not citizens upon birth, they will not be entitled to federal benefits, and local governments will bear the financial burden for public services. ECF 37, at 9–12. These collateral consequences on local municipalities and taxpayers surely do not serve the public interest.

The balance of the equities and the public interest strongly weigh in favor of a preliminary injunction that maintains the status quo during litigation.

All four factors weigh in favor of a preliminary injunction.

### 4. Nationwide Injunction

"District courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that 'a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020)). Indeed, "[a] district court may issue a nationwide injunction so long as the court 'mold[s] its decree to meet the exigencies of the particular case.'" *Id.* (alteration in original) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

Only a nationwide injunction will provide complete relief to the plaintiffs. ASAP has "over 680,000 members . . . who reside in all 50 U.S. states and several U.S. territories." ECF 1, ¶ 31. ASAP expects that "[h]undreds or even thousands of ASAP members will give birth to children in the United States over the coming weeks and months." *Id.* ¶ 38. Because ASAP's members reside in every state and hundreds of them expect to give birth soon, a nationwide injunction is the only way "to provide complete relief" to them. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Further, "a nationwide injunction may be appropriate when the government relies on a 'categorical policy.'" *See HIAS*, 985 F.3d at 326. The Executive Order is a categorical policy. A nationwide injunction against the categorical policy in the Executive Order is appropriate. It also is necessary because the policy concerns citizenship—a national concern that demands a uniform policy. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (noting that the federal government has "constitutional power to 'establish an *uniform* Rule of Naturalization'" (emphasis added) (quoting U.S. Const. art. 1, § 8, cl. 4)). A nationwide injunction is appropriate and necessary.

### III.    Conclusion

For the foregoing reasons, the motion for a preliminary injunction is granted. The Court enjoins the implementation and enforcement of the January 20, 2025 Executive Order 14160, "Protecting the Meaning and Value of American Citizenship." A separate order follows.

Date: February 5, 2025

Deborah L. Boardman
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CASA, INC.,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-25-201** |
| **DONALD J. TRUMP,** *et al.*, | * | |
| **Defendants.** | * | |

### ORDER

On January 20, 2025, President Donald J. Trump signed Executive Order 14160, "Protecting the Meaning and Value of American Citizenship" ("Executive Order"). CASA, Inc., Asylum Seeker Advocacy Project, and five individuals proceeding under the pseudonyms Maribel, Juana, Trinidad Garcia, Monica, and Liza filed a lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. The plaintiffs allege that the Executive Order violates the Citizenship Clause of the Fourteenth Amendment to the Constitution and the Immigration and Nationality Act. The plaintiffs moved for a preliminary injunction that enjoins the defendants from implementing and enforcing the Executive Order. Upon consideration of the plaintiffs' motion for a preliminary injunction, the defendants' opposition, the plaintiffs' reply, and the briefs filed by three amici, the Court finds that the plaintiffs have shown they are entitled to a preliminary injunction.

The plaintiffs have established that they are likely to succeed on the merits of their claim that the Executive Order violates the Fourteenth Amendment. The Executive Order contradicts the

plain language of the Citizenship Clause of the Fourteenth Amendment and conflicts with binding
Supreme Court precedent, *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

The plaintiffs also have shown that they will suffer irreparable harm without injunctive
relief. The unborn children of the individual plaintiffs and the organizational plaintiffs' members
will be denied the rights and privileges of U.S. citizenship. The plaintiffs will face uncertainty
about their children's citizenship status, and some of their children may be stateless.

The balance of the equities and the public interest weigh in favor of a preliminary
injunction. The government will not be harmed because a preliminary injunction will maintain the
status quo. Enjoining implementation and enforcement of the Executive Order during litigation
will preserve constitutional rights and prevent administrative and financial burdens on local
governments.

For the reasons state above and those stated in the memorandum opinion issued today, it is
this 5th day of February, 2025 hereby ORDERED that

1.  The plaintiffs' motion for a preliminary injunction and temporary restraining order,
    ECF 2, is GRANTED in part and DENIED in part as follows:

    a.  The motion for a preliminary injunction is GRANTED; and

    b.  The motion for a temporary restraining order is DENIED as moot;

2.  The Secretary of the U.S. Department of State, the U.S. Attorney General, the
    Secretary of the U.S. Department of Homeland Security, the Director of U.S.
    Citizenship and Immigration Services, the Commissioner of the Social Security
    Administration, and their officers, agents, servants, employees, and attorneys, and
    any other persons who are in active concert or participation with them are

ENJOINED throughout these United States from implementing and enforcing the Executive Order until further order of this Court; and

3.   The security requirement is hereby waived because the defendants will not suffer any costs from the preliminary injunction and imposing a security requirement would pose a hardship on the plaintiffs. *See* Fed. R. Civ. P. 65(c).

Deborah L. Boardman
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Case No. 8:25-cv-00201-DLB |

## <u>NOTICE OF APPEAL OF PRELIMINARY INJUNCTION</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of

Appeal for the Fourth Circuit from the Court's February 5, 2025 Memorandum Opinion (ECF No.

65) and Order (ECF No. 66) granting Plaintiffs' motion for preliminary injunction.


Dated: February 11, 2025

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

EREK L. BARRON
United States Attorney

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

*s/ Yuri S. Fuchs*
R. CHARLIE MERRITT
YURI S. FUCHS (CA Bar No. 300379)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

Phone:  202-598-3869
Fax: 202-616-8460
Email: yuri.s.fuchs@usdoj.gov

MELISSA E. GOLDMEIER (Bar number: 18769)
Assistant U.S. Attorney, District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
melissa.goldmeier@usdoj.gov
(410) 209-4855

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CASA, INC.,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-25-0201** |
| **DONALD J. TRUMP,** *et al.*, | * | |
| **Defendants.** | * | |

## ORDER

On February 5, 2025, the Court granted a nationwide preliminary injunction enjoining the enforcement and implementation of Executive Order 14160, titled "Protecting the Meaning and Value of American Citizenship" (the "Executive Order"). ECF 66. The defendants appealed the preliminary injunction order to the United States Court of Appeals for the Fourth Circuit. They now move for a partial stay of the order pending appeal, ECF 70. Specifically, they ask the Court to "stay the injunction's nationwide application so the injunction provides relief only to the individual plaintiffs and the members of the organizational plaintiffs who have been identified in Plaintiffs' complaint or preliminary injunction papers." ECF 70-1, at 2. They also ask the Court to enjoin only the enforcement of the Executive Order, not the implementation of it. *Id.* at 7. The plaintiffs oppose the motion. ECF 74. The Court declines to narrow the scope of the preliminary injunction pending appeal. The defendants' motion for a partial stay is denied.

"A request for a stay pending appeal is committed to the exercise of judicial discretion." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (citing *Virginian Ry. v. United States*, 272 U.S. 658, 672 (1926)). Courts consider four factors when determining whether to stay an order pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)

JA129

whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). Of these factors, "[t]he first two . . . are the most critical." *Id.* The party seeking the stay bears the burden of showing that the circumstances justify an exercise of judicial discretion. *Id.* at 433–34.

The defendants are not likely to prevail on their argument that the preliminary injunction should provide relief only to the individual plaintiffs and the members of the organizational plaintiffs identified in the complaint and the briefing. The Court issued a nationwide injunction for two reasons.[1] ECF 65, at 32. Both remain valid. First, the 680,000 members of the Asylum Seeker Advocacy Project ("ASAP"), a plaintiff organization, reside in all 50 states and several U.S. territories. Many of those members are pregnant, and their unborn children fall within the scope of the Executive Order. A nationwide injunction is appropriate to give ASAP's members effective relief. The fact that similarly situated people who are not members of ASAP also enjoy the benefit of nationwide injunctive relief is no reason to narrow the scope of the injunction. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (declining to stay nationwide injunction enjoining enforcement of immigration policy "with respect to respondents and those similarly situated"); *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (affirming nationwide injunction and noting "the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants"). Second, the Court found a nationwide injunction was necessary because the Executive Order is a "categorical policy"

---

[1] The plaintiffs asked the Court to characterize the injunction as "universal" rather than "nationwide." ECF 74, at 3 n.1. The Court's order granting a preliminary injunction applies "throughout these United States." ECF 66, at 2–3. The Court's intent is to enjoin enforcement and implementation of the Executive Order throughout the United States. The nationwide injunction in this case is a universal injunction.

that addresses the citizenship status of people born anywhere in the United States. *See* ECF 65, at 32 (quoting *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021)). Were the Court to limit the injunction to the plaintiffs and the members of the plaintiff organizations, a person's citizenship status during the pendency of this case would depend on their parents' decision to bring this lawsuit or their parents' membership in one of two voluntary, private organizations. That would make no sense.[2] Citizenship rules should be uniform and consistent across the country. Uniformity and consistency can be ensured only through a nationwide injunction. The Fourth Circuit and other courts of appeal have approved nationwide (or universal) injunctions when there is a need for a uniform national policy. *See, e.g.*, *HIAS*, 985 F.3d at 326–27 (affirming nationwide injunction because plaintiff refugee resettlement organizations resettled refugees "throughout the country" and a limited injunction would "undermine the very national consistency that the Refugee Act is designed to protect"); *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (granting preliminary injunction enjoining enforcement of student loan policy because "an injunction limited to the plaintiff States, or even more broadly to student loans affecting the States, would be impractical and would fail to provide complete relief to the plaintiffs" and because suspension of loan payments and interest was "universal"); *Doe #1*, 957 F.3d at 1069–70 (denying stay of nationwide injunction because the plaintiff class was nationwide, "a nationwide injunction [was] necessary to provide the class members with complete relief," and there is a need "for a 'comprehensive and unified' immigration policy" (quoting *Arizona v. United States*, 567 U.S. 387,

---

[2] If the Court limited the injunction as the defendants request, the result also would be impractical. *Cf. Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (granting nationwide preliminary injunction because injunction limited to plaintiff states would be impractical). If the defendants had their way, localities would have to determine whether a newborn's parent is a member of the plaintiff organizations before they issued a birth certificate or granted the child government benefits, and the federal government would have to make the same determination before it issued the child a social security card or passport.

401 (2012))); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."); *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (affirming nationwide injunction enjoining immigration policy because "the immigration laws of the United States should be enforced vigorously and *uniformly*" and "there is a substantial likelihood that a geographically-limited injunction would be ineffective" because beneficiaries of the policy "would be free to move among states" (citation omitted)).

The defendants also ask the Court to enjoin only the enforcement of the Order, not the implementation of it. While this case is on appeal, the defendants apparently want to "tak[e] internal, preparatory steps regarding the EO's application and formulat[e] relevant policies and guidance." ECF 70-1, at 6. This request, too, is denied. The Court has found that the plaintiffs established a strong likelihood of success on the merits of their claim that the Executive Order violates the Fourteenth Amendment to the Constitution. Surely, the government has no valid interest in taking internal, preparatory steps to formulate policies and guidance on an unconstitutional Executive Order.

The defendants have not made a strong showing that they are likely to succeed on their claim that the Court erred by granting a nationwide injunction that enjoins the enforcement and the implementation of the Executive Order.

The defendants also have not shown that they will be irreparably injured without a partial stay. They claim that "any injunction that prevents the President from exercising his core authorities is 'itself an irreparable injury.'" ECF 70-1, at 6–7 (quoting *Doe #1*, 957 F.3d at 1084 (Bress, J., dissenting)). The President certainly has the core authority to issue Executive Orders. But the President has no authority to issue an Executive Order that purports to rewrite the

Constitution and that ignores 125 years of Supreme Court precedent. The President may not overrule the Constitution "by executive fiat." *See E. Bay Sanctuary Covenant*, 932 F.3d at 779. The defendants have not shown that they will be irreparably harmed by a nationwide injunction that maintains the status quo of citizenship by birth.

The defendants' motion for a partial stay pending appeal, ECF 70, is DENIED.


Date: February 18, 2025

_____
Deborah L. Boardman
United States District Judge