# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

CASA, INC., et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, In his official capacity as President
of the United States, c/o Attorney General of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

## BRIEF FOR APPELLANTS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................ 1

STATEMENT OF JURISDICTION ...................................... 3

STATEMENT OF ISSUES ..................................................... 3

CONSTITUTIONAL AND STATUTORY PROVISIONS ................. 3

STATEMENT OF THE CASE .................................................. 3

    A.    Constitutional and Statutory Background ...................... 3

    B.    Factual Background ...................................................... 4

    C.    Prior Proceedings ........................................................ 6

SUMMARY OF ARGUMENT ................................................. 9

STANDARD OF REVIEW ..................................................... 12

ARGUMENT ...................................................................... 13

I.    Plaintiffs Are Not Likely to Succeed on the Merits. ............. 13

    A.    The Executive Order Is Consistent with the Original
          Meaning of the Citizenship Clause ............................. 14

          1.    Persons Are "Subject to the Jurisdiction" of the
              United States if They Owe Primary Allegiance to
              the United States. .................................................. 14

          2.    Persons Temporarily or Unlawfully Present Do Not
              Owe the Requisite Allegiance to the United States. ......... 26

    B.    The District Court's Contrary Holding Is Mistaken. ............ 43

      C.     Plaintiffs' Statutory Claim Fails for the Same Reasons...............50

II.    The District Court's Injunctive Relief Is Substantially
       Overbroad. ................................................................................ 51

      A.     Members Who Lack Standing Are Not Entitled to Relief.........51

      B.     The Injunction Is Broader Than Necessary to Provide the
           Plaintiffs Complete Relief................................................................56

      C.     The Remaining Equitable Factors Do Not Support the
           Preliminary Injunction.....................................................................61

CONCLUSION ................................................................................. 63

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                         **Page(s)**

*Afroyim v. Rusk,*
387 U.S. 253 (1967) ............................................................49

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ..............................................59

*Benny v. O'Brien,*
32 A. 696 (N.J. 1895)..........................................................32

*Berenyi v. District Dir., INS,*
385 U.S. 630 (1967) ............................................................42

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ...................................................... 56, 58

*Carlson v. Reed,*
249 F.3d 876 (9th Cir. 2001)..............................................36

*CASA de Md., Inc. v. Trump,*
971 F.3d 220 (4th Cir.), *reh'g en banc granted,* 981 F.3d 311 (4th Cir. 2020),
*appeal dismissed* (4th Cir. Mar. 11, 2021) ........................52

*CASA, Inc. v. Trump,*
No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025) ...................................9

*Cherokee Nation v. Georgia,*
30 U.S. (5 Pet.) 1 (1831) ....................................................30

*Chin Bak Kan v. United States,*
186 U.S. 193 (1902) ............................................................46

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
587 U.S. 262 (2019) ............................................................50

*Consolidation Coal Co. v. Disabled Miners of S. W. Va.*,
  442 F.2d 1261 (4th Cir. 1971)...........................................................56

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) .....................................................................52

*DHS v. New York*,
  140 S. Ct. 599 (2020) ...................................................................59

*Doe v. Trump*,
  No. CV 25-10135-LTS, 2025 WL 485070 (D. Mass. Feb. 13, 2025) ................9

*Elk v. Wilkins*,
  112 U.S. 94 (1884) ..................................... 1, 10, 11, 16, 17, 19, 28, 29

*Fong Yue Ting v. United States*,
  149 U.S. 698 (1893) ............................................ 21, 28, 29, 35, 45, 46

*Franchise Tax Bd. of Cal. v. Hyatt*,
  587 U.S. 230 (2019) .....................................................................25

*General Bldg. Contractors Ass'n v. Pennsylvania*,
  458 U.S. 375 (1982) .....................................................................22

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................ 56, 58

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ............................................................... 18, 30

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) .....................................................................40

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir.), *vacated and remanded*, 583 U.S. 941 (2017) ........ 60-61

iv

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021)...............................................................58

*Hodgson v. De Beauchesne*
   [1858] 14 Eng. Rep. 920, 932 (Privy Council) ...................................28

*Hunt v. Washington State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ...........................................................................51

*Inglis v. Trustees of the Sailor's Snug Harbour in N.Y.C.*,
   28 U.S. (3 Pet.) 99 (1830) ..................................................................44

*INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*,
   510 U.S. 1301 (1993) ..........................................................................62

*International Union, United Auto., Aerospace & Agric. Implement Workers of
   Am. v. Brock*,
   477 U.S. 274 (1986) ..................................................................... 53, 55

*Kaplan v. Tod*,
   267 U.S. 228 (1925) ...........................................................................36

*Kawakita v. United States*,
   343 U.S. 717 (1952) ...........................................................................39

*Kemp v. United States*,
   596 U.S. 528 (2022) ...........................................................................50

*Kwock Jan Fat v. White*,
   253 U.S. 454 (1920) ...........................................................................46

*Labrador v. Poe ex rel. Poe*,
   144 S. Ct. 921 (2024) ..........................................................................57

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
   599 U.S. 382 (2023) ...........................................................................29

*Lamar v. Micou,*
112 U.S. 452 (1884) .................................................................. 22, 36

*Lau Ow Bew v. United States,*
144 U.S. 47 (1892) ................................................... 11, 20, 28, 45, 46

*Lem Moon Sing v. United States,*
158 U.S. 538 (1895) ................................................................... 45-46

*Lewis v. Casey,*
518 U.S. 343 (1996) .........................................................................56

*Lone Wolf v. Hitchcock,*
187 U.S. 553 (1903) .........................................................................18

*Lopez-Sorto v. Garland,*
103 F.4th 242 (4th Cir. 2024) .........................................................36

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803).........................................................15

*Martinez v. Bynum,*
461 U.S. 321 (1983) .........................................................................28

*Maryland v. King,*
567 U.S. 1301 (2012) .......................................................................63

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) .........................................................................22

*Mississippi Band of Choctaw Indians v. Holyfield,*
490 U.S. 30 (1989) ...........................................................................22

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ................................................................... 13, 38

*Murray v. Schooner Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804) ............................................................20

*N.H. Indonesian Cmty. Support v. Trump*,
   25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ........................9

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................61

*NYSRPA v. Bruen*,
   597 U.S. 1 (2022) ......................................................................48

*Park v. Barr*,
   946 F.3d 1096 (9th Cir. 2020).........................................................37

*Plyler v. Doe*,
   457 U.S. 202 (1982) ...................................................................35

*Quirin, Ex Parte*,
   317 U.S. 1 (1942) .....................................................................19

*Roe v. Department of Defense*,
   947 F.3d 207 (4th Cir. 2020)..........................................................58

*Rogers v. Bellei*,
   401 U.S. 815 (1971) .............................................................. 39, 40

*Sacerdote v. Cammack Larhette Advisors, LLC*,
   939 F.3d 498 (2d Cir. 2019)...........................................................55

*Savorgnan v. United States*,
   338 U.S. 491 (1950) ...................................................................39

*Schooner Exch. v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812)................................................... 15, 19

*Slaughter-House Cases,*
    83 U.S. (16 Wall.) 36 (1873) ..............................................16

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...........................................................15

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .........................................................53

*The Pizarro,*
    15 U.S. (2 Wheat.) 227 (1817) ..........................................20

*The Venus,*
    12 U.S. (8 Cranch) 253 (1814)..........................................20

*Tilghman v. Proctor,*
    125 U.S. 136 (1888) .........................................................37

*Toll v. Moreno,*
    458 U.S. 1 (1982) ...................................................... 29, 36

*Town of Chester v. Laroe Estates, Inc.,*
    581 U.S. 433 (2017) .........................................................52

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .........................................................52

*Trump v. Hawaii,*
    585 U.S. 667 (2018) .................................................. 40, 59

*United States v. Holliday,*
    70 U.S. (3 Wall.) 407 (1866) ............................................18

*United States v. Kagama,*
    118 U.S. 375 (1886) .........................................................18

*United States v. Manzi,*
   276 U.S. 463 (1928) ...............................................................42

*United States v. Mrs. Gue Lim,*
   176 U.S. 459 (1900) ...............................................................46

*United States v. M/V Sanctuary,*
   540 F.3d 295 (4th Cir. 2008)...............................................12

*United States v. Rogers,*
   45 U.S. (4 How.) 567 (1846)................................................18

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ...............................................................28

*United States v. Wong Kim Ark,*
   169 U.S. 649 (1898) ....................................1, 7, 8, 10, 11, 14, 17, 18-19,
   21, 24, 25, 27, 39, 44, 45, 47, 48

*Verlinden B.V. v. Central Bank of Nigeria,*
   461 U.S. 480 (1983) ...............................................................19

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...............................................................52

*Washington v. Trump,*
   No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025) ...................9

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008) ...................................................................12

*Winton v. Amos,*
   255 U.S. 373 (1921) ...............................................................18

**U.S. Constitution:**

Art. I, § 8, cl. 4 .........................................................................41

Art. II, § 2, cl. 1 ..........................................................61

Amend. XIV, § 1 ........................................ 1, 4, 13, 15, 24, 25

**Statutes:**

Civil Rights Act of 1866,
   ch. 31, § 1, 14 Stat. 27, 27 ...............................................4, 22

Civil Rights Act of 1870,
   ch. 114, § 18, 16 Stat. 140, 144 ..........................................22

Expatriation Act of 1868,
   ch. 249, 15 Stat. 223 .......................................................40

Immigration and Nationality Act,
   ch. 477, § 301, 66 Stat. 163, 235-36 (1952) ..........................4

Nationality Act of 1940,
   ch. 876, § 201(a), 54 Stat. 1137, 1138............................4, 22

Naturalization Act of 1790,
   ch. 3, 1 Stat. 103, 104 .....................................................39

8 U.S.C. § 1101(a)(15)(B) ......................................................29

8 U.S.C. § 1101(a)(15)(F)(i) ...................................................29

8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b) .......................................29

8 U.S.C. § 1101(a)(15)(H)(iii) ................................................29

8 U.S.C. § 1101(a)(15)(J) .......................................................29

8 U.S.C. § 1101(a)(15)(M)(i) ..................................................29

8 U.S.C. § 1101(a)(15)(M)(iii)......................................................29

8 U.S.C. § 1101(a)(15)(O)(ii)(IV) ..............................................29

8 U.S.C. § 1101(a)(15)(P) .............................................................29

8 U.S.C. § 1101(a)(15)(Q) ............................................................29

8 U.S.C. § 1158(c)(2) .....................................................................38

8 U.S.C. § 1401(a) ..................................................................4, 50

8 U.S.C. § 1401(b) ........................................................................17

8 U.S.C. § 1401(c) .........................................................................39

28 U.S.C. § 1292(a)(1) ...................................................................3

28 U.S.C. § 1331............................................................................3

**Regulatory Materials:**

Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025) ...................5, 42, 62

Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) .....................5, 6, 61

Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025) ..........................5, 62

Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025) ......................5, 62

**Legislative Materials:**

Cong. Globe, 39th Cong., 1st Sess. 572 (1866) ..........................23, 24, 30-31, 31

Cong. Globe, 40th Cong., 2nd Sess. 868, 967, 1130-31 (1868).........................49

2 Cong. Rec. 3279 (1874) ...................................................................33

*Report of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th Cong., 2nd Sess. app. at 94, 95 (1868) ............................................................................49


**Other Authorities:**

2 *A Digest of the International Law of the United States* (Francis Wharton ed., 2d. ed. 1887) ................................................. 34

Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* (1912) ......................................... 46, 50

Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* (1901).......... 32

Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* (1869) ................................................................................... 21, 40

A. V. Dicey, *A Digest of the Law of England* (1896) ............................................27

Dig. 50.1.31 (Marcellus, Digest 1) ......................................................37

85 Fed. Reg. 4219 (Jan. 24, 2020) ........................................................42

1 William Edward Hall, *A Treatise on International Law* (4th ed. 1895) .........30

M.W. Jacobs, *A Treatise on the Law of Domicile* (1887).................... 35-36, 38, 49

Sidney Kansas, *Immigration and Nationality Act Annotated* (4th ed. 1953).....50

2 James Kent, *Commentaries on American Law* (6th ed. 1848)...........................24

Letter from Sen. Lyman Trumbull to President Andrew Johnson

(in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of
Congress) ..........................................................................................23

Letter from William Marcy to Austrian Charge d'Affaires at Washington
(reprinted in 44 *British and Foreign State Papers* 997 (1865))........................21

Justin Lollman, Note, *The Significance of Parental Domicile Under the
Citizenship Clause*, 101 Va. L. Rev. 455 (2015)..................................................33
Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its
Meaning in the Citizenship Clause of the Fourteenth Amendment*,
32 St. Louis U. Pub. L. Rev. 329 (2013)............................................................40

Samuel Freeman Miller, *Lectures on the Constitution of the United States*
(1891)................................................................................................ 32

Minority Staff of S. Comm. on Homeland Sec. & Governmental Affairs,
*Report on Birth Tourism in the United States* (2015),
https://perma.cc/C8SA-ZG8X ............................................................... 41, 42

Alexander Porter Morse, *A Treatise on Citizenship* (1881)................................32

Robert Phillimore, *The Law of Domicil* (1847) ............................................. 37, 38

*Regulations Governing the Admission of Chinese* (Feb. 26, 1907), *in* Bureau of
Immigration & Naturalization, Dep't of Commerce & Labor, Doc. No. 54,
*Treaty, Laws, and Regulations Governing the Admission of Chinese*
(June 1908)........................................................................................47

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's
Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ......................................23

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of
William Wallace Brown, Assistant Attorney-General* (1910) .................... 34, 47

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic*
(1834)...................................................................................... 26, 28-29

Hannis Taylor, *A Treatise on International Public Law* (1901) ......................... 32

4 *The Digest of Justinian* 906a (Alan Watson trans., 1985) ................................37

Emmerich de Vattel, *The Law of Nations* (1797 ed.) ............................ 25, 26, 37

John Westlake, *International Law* (1904) ............................................................. 32

J.J.S. Wharton, *Law Lexicon, or Dictionary of Jurisprudence* (Edward Hopper ed., 2d ed. 1860) .......................................................... 35, 49

**INTRODUCTION**

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof," are citizens. U.S. Const. amend. XIV, § 1. To be "subject to the jurisdiction," the Clause requires the person be "not merely subject in some respect or degree … but completely subject to" the "political jurisdiction" of the United States. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). A country has political jurisdiction over those persons who owe it "direct and immediate allegiance," *id.*, and to whom the country owes the "reciprocal obligatio[n]" of "protection," *United States v. Wong Kim Ark*, 169 U.S. 649, 679 (1898) (quotation marks omitted). Citizens, of course, have this reciprocal relationship of allegiance and protection. So too, the Supreme Court has recognized that aliens "domiciled here" are "within the allegiance and the protection … of the United States" such that their children are subject to its jurisdiction for purposes of the Citizenship Clause. *Id.* at 693.

But these principles—and the text, history, and precedent from which they derive—demonstrate that children born to aliens in the United States temporarily or illegally do not come within the Clause. Such children lack

the reciprocal relationship of allegiance and protection that would bring them within the political jurisdiction of the United States.  To conclude otherwise, the district court refrained from attributing any coherent meaning to the phrase "subject to the jurisdiction thereof," instead concluding that all people born in the United States were subject to its jurisdiction unless they came within one of the "rare instances" listed in *United States v. Wong Kim Ark*.  JA107, JA109.  But *Wong Kim Ark*'s list of exceptions does not foreclose other exceptions that were neither presented to nor considered by the Court.  The question here—which the district court avoided—is whether the reason that children born to parents within the exceptions listed in *Wong Kim Ark* are not subject to the United States's jurisdiction also applies to children born to aliens here temporarily or illegally.  And the district court's mistaken understanding leaves Congress and the Executive Branch powerless to address concerns about individuals manipulating or flouting the nation's immigration laws to obtain the privileges of citizenship for their children.  The Executive Order's interpretation of the Citizenship Clause is correct, and the preliminary injunction should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  It entered a preliminary injunction on February 5, 2025.  JA92-126.  The United States filed a notice of appeal on February 11, 2025.  JA127.  This court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.      Whether the district court erred in holding that plaintiffs are likely to succeed on their claims that the Citizenship Clause and 8 U.S.C. § 1401(a) confer birthright citizenship on the children of aliens who are temporarily or unlawfully present in the United States.

2.      Whether the district court erred in issuing an overbroad, nationwide injunction when only sixteen individuals established standing.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Pertinent constitutional and statutory provisions and the Executive Order are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Constitutional and Statutory Background

Until 1866, federal law did not expressly provide for citizenship by birth in the United States.  In the Civil Rights Act of 1866, Congress

provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States."  ch. 31, § 1, 14 Stat. 27, 27.

Months later, that same Congress proposed the Citizenship Clause of the Fourteenth Amendment.  The Clause, as ratified in 1868, provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.

The 1866 Act's statutory definition of citizenship by birth remained in place until 1940, when Congress replaced it with a statute copying the text of the Citizenship Clause.  That statute provided that any "person born in the United States, and subject to the jurisdiction thereof," is a citizen.  *See* Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138.  That provision was reenacted in the Immigration and Nationality Act, ch. 477, § 301, 66 Stat. 163, 235-36 (1952), and remains the governing statute, *see* 8 U.S.C. § 1401(a).

## B. Factual Background

On January 20, 2025, President Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United

States.  *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) (Exec.

Order); *see* Add. 4-6.  The order is an integral part of President Trump's

broader effort to repair the United States' immigration system and to

address the ongoing crisis at the southern border.  *See, e.g.*, Exec. Order No.

14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025); Proclamation No. 10,886, 90 Fed.

Reg. 8327 (Jan. 29, 2025); Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29,

2025).

The Executive Order recognizes that the Constitution and

corresponding statutory provision extend citizenship at birth to most

people born in the United States but do not extend the privilege of U.S.

citizenship where neither parent has a sufficient relationship with the

United States, specifically when the father was not a citizen or lawful

permanent resident and the mother was either: (1) unlawfully present or

(2) lawfully but temporarily present (such as visiting through the Visa

Waiver Program or on a student, work, or tourist visa).  Exec. Order § 1.

The Executive Order directs the federal Executive Branch (1) not to

issue documents recognizing U.S. citizenship to persons in these two

categories and (2) not to accept documents issued by state, local, or other

governments purporting to recognize the U.S. citizenship of such persons.

*Id.* § 2(a).  The order specifies, however, that those directives "apply only to persons who are born within the United States after" February 19.  *Id.* § 2(b).

The Executive Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and not to "act, or forbear from acting, in any manner inconsistent with this order."  *Id.* § 3(a).  It further directs the heads of all federal agencies to issue public guidance "regarding this order's implementation with respect to their operations and activities."  *Id.* § 3(b).

### C. Prior Proceedings

**1.**  CASA, Inc., identifying five of its allegedly injured members; Asylum Seeker Advocacy Project, Inc. (ASAP), identifying six of its members; and five individual plaintiffs (who are also members of CASA or ASAP) filed suit challenging the Executive Order.  *See* JA19-36.  The associations' members were identified pseudonymously.  JA27, JA31.  The five individuals moved to proceed pseudonymously.  JA96.  The government did not oppose the motion, provided the individuals disclosed

6

their identities if it became necessary.  JA96.  The district court granted the motion.  JA96.

CASA asserts that it has more than 175,000 members, and ASAP asserts that it has more than 680,000 members.  JA26, JA29.  In addition to the sixteen specific, pregnant members identified in the complaint, the organizations alleged that their "membership includes many individuals who are pregnant or planning to give birth, and whose U.S.-born children" would be affected by the Executive Order.  JA27; *see* JA30-31.  Of its more than 680,000 members, ASAP "know[s] of at least 629 ASAP members who are currently expecting to have children born in the United States in 2025."  JA75.  The two organizations sought a nationwide, universal injunction because, they claimed, it was an efficient way to grant relief to their hundreds of thousands of members, who were distributed throughout the country.  *See* JA29.

**2.**  The district court granted a nationwide preliminary injunction.  JA124-126.  It construed the suit as a "facial constitutional challenge."  JA99-100.  On the merits, the court concluded that the "President's … interpretation of the Citizenship Clause" "conflicts with" *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).  JA102.  The court read *Wong Kim Ark*'s

list of "recognized exceptions" to jurisdiction under the Citizenship

Clause—"'children of members of the Indian tribes'" and "English

common law" exceptions for "children of hostile occupiers or diplomats"—

as a holding (or at least binding dicta) that no other exceptions existed.

JA109-111 (quoting *Wong Kim Ark*, 169 U.S. at 682, 693). "[T]he word

'domicile,'" the court said, "does not appear in the text of the Fourteenth

Amendment." JA111. The district court pointed to later cases treating

individuals born here as citizens, without inquiring into domicile. JA116-

118.

Because of its view of the merits, the court concluded the plaintiffs'

children faced irreparable harm from the denial of the rights and benefits

of citizenship while this suit was pending. JA119-120. It thought the

federal "government will not be harmed if enforcement of the Executive

Order is enjoined," JA121, and so the "balance of the equities and the

public interest" favored an injunction, JA122.

For the scope of relief, the court reasoned that "[o]nly a nationwide

injunction will provide complete relief to the plaintiffs" because the

organizations' hundreds of thousands of members "'reside in all 50 U.S.

states and several U.S. territories.'" JA123 (quoting JA29). "Further," the

court continued, a nationwide injunction "may be appropriate when the government relies on a categorical policy," like the Executive Order. JA123 (quotation marks omitted). Nationwide relief also was appropriate, the district court said, because "the policy concerns citizenship—a national concern that demands a uniform policy." JA123.

**3.** The government appealed and sought a partial stay pending appeal of the nationwide scope of the injunction. The district court denied the motion. JA129-133. A divided panel of this Court also denied a stay pending appeal. *CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *2 (4th Cir. Feb. 28, 2025). The government has since sought a partial stay from the Supreme Court, which remains pending.[1]

## SUMMARY OF ARGUMENT

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the

---

[1] Three other courts have enjoined enforcement of the Executive Order. *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025); *Doe v. Trump*, No. CV 25-10135-LTS, 2025 WL 485070 (D. Mass. Feb. 13, 2025); *N.H. Indonesian Cmty. Support v. Trump*, No. 25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025). The government has likewise sought stays or partial stays from the Supreme Court of two of those injunctions.

jurisdiction thereof, are citizens of the United States and of the State wherein they reside." As was apparent from the time of its enactment, the Clause's use of the phrase "subject to the jurisdiction" of the United States contemplates something more than being subject to regulatory power. It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, they must have a "direct and immediate allegiance" to this country. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for certain Tribal Indians, diplomats, or occupying enemies, it similarly does not hold for foreigners here temporarily or illegally. "[N]o one can become a citizen of a nation without its consent …." *Id.* at 103. And if the United States has not consented to someone's enduring presence, it follows that it has not consented to making citizens of that person's children.

The district court construed *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), to hold that the phrase "subject to the jurisdiction thereof" adopted the traditional English common-law exceptions from citizenship at birth for children of diplomats and occupying enemies while adding one—and only one—new exception for Tribal Indians. Such a reading conflicts with the interpretation of the Citizenship Clause that prevailed in Supreme

Court decisions, Executive Branch practice, and the legal community's understanding in the decades following the decision in *Wong Kim Ark*. It also ignores how the Court carefully cabined its holding to the children of those with a "permanent domicil[e] and residence in the United States," *id.* at 652-53, a limitation that made sense in light of the Court's contemporaneous cases explaining the close relationship between domicile and the rights and duties of citizenship. *See, e.g.*, *Lau Ow Bew v. United States*, 144 U.S. 47, 61 (1892).

The understandings of "subject to the jurisdiction" adopted by the district court and plaintiffs leave "jurisdiction" without a coherent meaning. The district court offered no definition at all, while plaintiffs' argument that "subject to the jurisdiction" encompasses anyone within the United States's regulatory jurisdiction reads that language out of the Citizenship Clause, since everyone born or present on U.S. soil is subject to U.S. regulatory jurisdiction. That interpretation cannot explain the exclusion of children born to Tribal Indians, *see Elk*, 112 U.S. at 102, or the other exclusions the Supreme Court has recognized. It also would have made the Civil Rights Act of 1866—which served as the blueprint for the Citizenship Clause and defined citizenship by birth as including persons

11

"not subject to any foreign power"—inconsistent with the Clause, even though it was enacted just months before the same Congress proposed the Fourteenth Amendment, was reenacted just two years after ratification, and was the statutory counterpart to the Citizenship Clause for over 70 years.

In any event, the district court's injunction is inappropriate and vastly overbroad. Nationwide relief at the behest of sixteen individuals with standing misconceives associational standing, disregards limits on Article III standing, and confers overbroad relief unnecessary to remedy any members' alleged injuries.

## STANDARD OF REVIEW

This Court reviews a preliminary injunction "for abuse of discretion, with factual determinations considered for clear error and legal conclusions considered de novo." *United States v. M/V Sanctuary*, 540 F.3d 295, 302 (4th Cir. 2008). "A plaintiff seeking a preliminary injunction must establish" by a "clear showing" "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 22 (2008).

For a facial challenge to succeed, plaintiffs must "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid, or … sho[w] that the [Executive Order] lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation marks omitted).

## ARGUMENT

### I. Plaintiffs Are Not Likely to Succeed on the Merits.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  Section 1401(a) of Title 8 similarly grants citizenship to any "person born in the United States, and subject to the jurisdiction thereof."  Text, history, and precedent show that "subject to the jurisdiction" of the United States means *political* jurisdiction (a concept rooted in allegiance and protection), not—as the plaintiffs argue—*regulatory* jurisdiction (to which all persons in the United States are subject).

The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not "subject to the jurisdiction" of the United

States: children of foreign sovereigns or their diplomats, children of alien enemies in hostile occupation, children born on foreign public ships, and children of certain members of Indian tribes. *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898). Individuals in these categories all lack the requisite allegiance to the United States because of their primary allegiance to another sovereign. The Executive Order identifies two additional categories of persons that similarly lack the requisite allegiance: children born to aliens present temporarily and children born to aliens illegally in the United States. Because this is a facial challenge, plaintiffs bear the especially heavy burden of demonstrating that the Executive Order would be unlawful in *all* its applications. Plaintiffs cannot demonstrate any unlawful application, much less meet that imposing standard.

### A. The Executive Order Is Consistent with the Original Meaning of the Citizenship Clause.

#### 1. Persons Are "Subject to the Jurisdiction" of the United States if They Owe Primary Allegiance to the United States.

The text and structure of the Fourteenth Amendment, as well as its drafting history and background principles of law, demonstrate that "subject to the jurisdiction" refers to persons who owe primary allegiance

to the United States.  The text imposes two requirements for citizenship by birth: a person must be "born … in the United States" and must separately be "subject to the jurisdiction thereof."  U.S. Const. amend. XIV, § 1.  The Clause's separate requirements make clear that some persons born "in the United States" are not "subject to" its "jurisdiction."  This "jurisdiction," therefore, cannot simply be the power to regulate.  The Supreme Court has explained that the regulatory "jurisdiction of the nation within its own territory is necessarily exclusive and absolute."  *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812).  As explained in detail below, that regulatory power extends to all persons born on U.S. soil, even to classes of persons—such as members of Indian tribes—that have always been understood to fall outside the Citizenship Clause.  If "jurisdiction" means regulatory power, then the Clause's independent textual requirement would be redundant.  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the [C]onstitution is intended to be without effect …."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) ("Jurisdiction, it has been observed, is a word of many, too many, meanings." (quotation marks omitted)).

The Supreme Court's cases identifying categories of persons not "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause thus have not turned on the general power to regulate those persons. Instead, the Court has emphasized whether those persons owe allegiance to a different sovereign and thus are not regarded as owing the requisite allegiance to—or being entitled to protection from other sovereigns by—the United States.

That was the interpretation the Supreme Court adopted in its first encounter with the Citizenship Clause. In the *Slaughter-House Cases*, the Court explained that "[t]he phrase, 'subject to its jurisdiction,'" operated to "exclude" from the Citizenship Clause "children of ministers, consuls, and citizens or subjects of foreign States born within the United States." 83 U.S. (16 Wall.) 36, 73 (1873).

Subsequently, in *Elk v. Wilkins*, 112 U.S. 94 (1884), the Supreme Court addressed whether children of members of Indian tribes acquire citizenship at birth under the Citizenship Clause. The Court explained that the "evident meaning" of "subject to the jurisdiction" "is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct

and immediate allegiance." *Id.* at 102. This political jurisdiction is a "reciprocal" relationship: the United States receives allegiance from the individual and provides that individual protection from other sovereigns. *Wong Kim Ark*, 169 U.S. at 679 (quotation marks omitted). Indian tribes did not meet this definition, the Court held, because the tribes were "alien nations" and "distinct political communities," and "[t]he members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States." *Elk*, 112 U.S. at 99.[2]

Notably, the Supreme Court in *Elk* reached this conclusion even as it acknowledged that Indian tribes within U.S. territory are subject to the regulatory power of the United States. *Elk* noted that Indian tribes were "within the territorial limits of the United States" and that Congress could deal with such tribes "either through treaties made by the president and senate, or through acts of congress." 112 U.S. at 99. More than two decades before the Citizenship Clause was adopted, the Supreme Court had thought:

---

[2] Congress has since by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe." 8 U.S.C. § 1401(b).

it too firmly and clearly established to admit of dispute, that the Indian tribes residing within the territorial limits of the United States are subject to [the United States'] authority, and where the country occupied by them is not within the limits of one of the States, Congress may by law punish any offen[s]e committed there, no matter whether the offender be a white man or an Indian.

*United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846). And in the years before and after *Elk*, the Court "thoroughly established that Congress has plenary authority over the Indians and all their tribal relations," *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023), as Congress may regulate Indian commercial activities, *see United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866), Indian property; *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903), and Indian adoptions, *see Brackeen*, 599 U.S. at 276-80; while punishing Indians for crimes, *see United States v. Kagama*, 118 U.S. 375, 379-85 (1886).

The same is true of other categories of persons the Supreme Court has identified as outside the scope of the Citizenship Clause. In particular, the Supreme Court has observed that "children of diplomatic representatives of a foreign state," "children born of alien enemies in hostile occupation," and children born "on foreign public ships" in our ports are not "subject to the jurisdiction" of the United States. *Wong Kim*

*Ark*, 169 U.S. at 682, 693.  Here, too, the issue is not a lack of regulatory jurisdiction.  The immunity diplomatic officials enjoy from state and federal law, for example, was historically a product of "the consent of the nation itself," *Schooner Exch.*, 11 U.S. (7 Cranch) at 136, not some inherent inability to exercise regulatory jurisdiction over such individuals.  *See id.* at 146 (explaining that the immunity granted to foreign public ships could be "destroy[ed]" if the sovereign wished to "claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals"); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983) ("[F]oreign sovereign immunity is a matter of grace and comity …."). Invading forces illustrate the same point: though the United States may exercise jurisdiction to punish "enemy invaders" for violations of the laws of war, *Ex parte Quirin*, 317 U.S. 1, 47 (1942), their children are not citizens by birth.  Instead, the central point is that such individuals—and their children—owe primary allegiance to a foreign sovereign.  That makes them not "completely subject" to the "political jurisdiction" of the United States because they do not owe "direct and immediate allegiance."  *Elk*, 112 U.S. at 102.

The children of citizens born in the United States, by contrast, plainly owe "direct and immediate allegiance" to the United States and are undoubtedly subject to its political jurisdiction. And the Supreme Court has made clear that under some circumstances aliens may establish sufficient ties of allegiance so as to come within the Citizenship Clause's scope. In particular, a person "owes allegiance" to the country in which he is "domiciled." *The Pizarro*, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.). Such an individual "places him[self] out of the protection" of his former country, *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 120 (1804), and "becomes a member of the new society, at least as a permanent inhabitant, and is a kind of citizen of an inferior order … but is, nevertheless, united and subject to the society." *The Venus*, 12 U.S. (8 Cranch) 253, 278 (1814).

Thus, "foreigners who have become domiciled in a country other than their own acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 61-62 (1892). As the Supreme Court explained, "aliens residing in a country, with the intention of making it a permanent place of abode, acquire, in one sense, a domicil there, and,

while they are permitted by the nation to retain such a residence and domicil, are subject to its laws, and may invoke its protection against other nations." *Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893); *accord id.* at 734 (Brewer, J., dissenting). For example, in 1853, the United States intervened to protect an unnaturalized U.S. domiciliary who had been seized by Austrian government officials while travelling in Turkey. *See* Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* 118-22 (1869). As Secretary of State William Marcy protested, "[t]he establishment of his domicil" in America "invested him with the national character of this country, and with that character he acquired the right to claim protection from the United States." Letter from William Marcy to Austrian Charge d'Affaires at Washington (reprinted in 44 *British and Foreign State Papers* 997 (1865)).

The Supreme Court has thus explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance … of the United States" and subject to its political jurisdiction. *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). Their children are therefore born "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause: the Supreme Court has repeatedly explained that a child's domicile

"follow[s] the independent domicil of his parent."  *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *accord Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Other interpretive principles confirm that the Citizenship Clause's reference to "jurisdiction" refers to political jurisdiction and obligations of allegiance.  Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866.  That Act served as the "initial blueprint" for the Amendment, *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010).  The Act stated that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States."  Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. at 27 (emphasis added).  Congress "reenacted" the Civil Rights Act of 1866 shortly after ratification of the Fourteenth Amendment, Civil Rights Act of 1870, ch. 114, § 18, 16 Stat. 140, 144, and its citizenship language remained unchanged until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. at 1138.  As this illustrates, Congress in the immediate wake of the Fourteenth

Amendment regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction thereof" requirement.

Debates and correspondence about the Act and the Amendment show that members of Congress shared that understanding. Senator Lyman Trumbull, the Act's principal sponsor in the Senate, explained that its purpose was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States." Cong. Globe, 39th Cong., 1st Sess. 572 (1866). He summarized the Act to President Johnson as making citizens of "'all persons' born of parents domiciled in the United States, except untaxed Indians."[3] Representative John Broomall explained that the freed slaves were properly regarded as U.S. citizens by birth because they owed no allegiance to any foreign sovereign: "[U]ntil the opponents of this measure can point to the foreign Power to which he is subject, the African potentate to whom after five generations of absence he still owes

---

[3] Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352-53 (2010) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress)).

allegiance, I will assume him to be, what the bill calls him, a citizen of the country in which he was born." *Id.* at 1262. Similarly, during debates on the Amendment, Trumbull explained: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. … It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is 'subject to the jurisdiction of the United States.'" *Id.* at 2893. Trumbull went on to equate being "subject to our jurisdiction" with "owing allegiance solely to the United States." *Id.* at 2894. Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power … shall be considered as citizens." *Id.* at 2893.

Common-law and other sources reflected the same understanding. Under the common law, "[t]wo things usually concur to create citizenship: [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth … within the ligeance of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (quotation marks omitted); *see also* 2 James Kent, *Commentaries on American Law* 42 (6th ed. 1848). The phrase "born … in the United States," U.S. Const. amend. XIV, § 1, corresponds to the traditional requirement of

"birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, and the phrase

"subject to the jurisdiction thereof," U.S. Const. amend. XIV, § 1,

corresponds to the traditional requirement of birth "in the allegiance" of

the country, *Wong Kim Ark*, 169 U.S. at 693.

Similarly, Emmerich de Vattel—"the founding era's foremost expert

on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239

(2019)—explained that citizenship under the law of nations depended not

only on the child's place of birth, but also on the parents' political status.

"[N]atural-born citizens," Vattel wrote, include "those born in the country,

of parents who are citizens." Emmerich de Vattel, *The Law of Nations* § 212,

at 101 (1797 ed.). Citizenship by virtue of birth in the country also extends

to the children of "perpetual inhabitants," whom Vattel regarded as "a

kind of citize[n]." *Id.* § 213, at 102; *see id.* § 215, at 102. Citizenship does not

extend, however, to children of foreigners who lack "the right of perpetual

residence" in the country. *Id.* § 213, at 102. Such persons would instead

owe allegiance to their parents' home countries, in accord with the

principle that "children follow the condition of their fathers." *Id.* § 215, at

102. Vattel then identified several additional exceptions to citizenship by

birth in a country—children born "in the armies of the state," "in the house

25

of its minister at a foreign court," or "in [its] vessels"—that track exceptions already recognized by the Supreme Court. *Id.* §§ 216-217, at 102-03.

American jurists acknowledged a similar distinction. As Justice Story explained, citizenship at birth required more than temporary physical presence:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (1834).

## 2. Persons Temporarily or Unlawfully Present Do Not Owe the Requisite Allegiance to the United States.

As discussed, the text and structure of the Citizenship Clause, its history, and Supreme Court precedent all make clear that a person is "subject to the jurisdiction" of the United States only if they owe primary allegiance to the United States and not some other power. To determine whether a person is within the political jurisdiction of the United States, the Supreme Court has looked to the relationship between the person and the country, and the degree of allegiance and protection exchanged, under the

background principles of the common law and the law of nations at the time of ratification of the Fourteenth Amendment. Under those principles, both classes of persons covered by the Executive Order are not subject to the complete political jurisdiction of the United States. A child born of parents here temporarily is domiciled in, and owes primary allegiance to, his parents' home country. A child born to parents here unlawfully, who lack primary allegiance to the United States, similarly owes primary allegiance to his parents' home country. Neither child is subject to the jurisdiction of the United States within the meaning of the Citizenship Clause.

**a.** Persons lawfully but temporarily present in the United States retain their primary allegiance to their home countries. While they must respect U.S. law and are protected by U.S. law while temporarily present here, they have not established the requisite allegiance to the United States or received the necessary protection to come within the complete political jurisdiction of the United States. Although English and international law sources sometimes referred to all aliens as owing a "'temporary' allegiance," *Wong Kim Ark*, 169 U.S. at 657 (quoting A. V. Dicey, *A Digest of the Law of England* (1896)), those sources also understood that "[a] settled

domicile in a country, imports an allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council). "[T]he law of nations" "recognized" "[t]hat those who have become domiciled in a country are entitled to a more distinct and larger measure of protection than those who are simply passing through, or temporarily in, it." *Fong Yue Ting*, 149 U.S. at 734 (Brewer, J., dissenting) (collecting sources). Because aliens present temporarily have not established domicile, they have not accepted those "rights and … duties" similar to "citizens," *Lau Ow Bew*, 144 U.S. at 61-62, which would form the necessary "direct and immediate allegiance" to make them "completely subject to [the] political jurisdiction" of the United States, *Elk*, 112 U.S. at 102. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (explaining how constitutional rights often attach to people who "develo[p] sufficient connection with this country to be considered part of that community.")

Domicile is, "[i]n general," an individual's "true, fixed and permanent home," *Martinez v. Bynum*, 461 U.S. 321, 331 (1983) (quotation marks omitted), and formed when "[t]wo things … concur": "residence" in a place and the "intention of making it the home of the party." Story, *supra*,

§ 44.  Temporarily present aliens plainly do not establish domicile; indeed, under the immigration laws, many classes of aliens—including tourists, students, and temporary workers—are admitted only on the express requirement that they have "a residence in a foreign country" they have "no intention of abandoning."  8 U.S.C. § 1101(a)(15)(B), (F)(i), (H)(ii)(a)-(b), (H)(iii), (J), (M)(i), (M)(iii), (O)(ii)(IV), (P), (Q); *see Toll v. Moreno*, 458 U.S. 1, 14 (1982) (describing how "Congress has precluded" aliens covered by provisions of this type "from establishing domicile in the United States").  And such individuals are not entitled to diplomatic protection from the United States when they travel abroad.  *Cf. Fong Yue Ting*, 149 U.S. at 724 (explaining that domiciliaries "may invoke" diplomatic protection).

The United States' political connection to children of aliens present temporarily is far weaker than its relationship with children of "members of the Indian tribes," who fall outside the "jurisdiction" necessary under the Citizenship Clause.  *Elk*, 112 U.S. at 99, 101-02.  Indian tribes form "an intermediate category between foreign and domestic states."  *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (quotation marks omitted).  The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing

them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.). Despite the "enduring place" the Constitution "reserves for the Tribes … in the structure of American life," *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring), that link does not suffice as a constitutional matter for citizenship at birth, and the weaker link of aliens present temporarily even more obviously does not establish political jurisdiction or sufficient allegiance. *See, e.g.*, 1 William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

Here, too, the Fourteenth Amendment's historical background supports the conclusion that children born of parents temporarily present in the United States are not "subject to the jurisdiction" under the Citizenship Clause. Congressional debates over the Civil Rights Act and Fourteenth Amendment specifically addressed temporarily present foreigners. For instance, Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen." Cong. Globe, 39th

Cong., 1st Sess. at 1117. But he recognized "except[ions]" for "children born on our soil to temporary sojourners or representatives of foreign Governments." *Id.* And during a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the qualification of being "subject to" its "jurisdiction"). *Id.* at 2768-69. One of his colleagues objected that "person[s] may be born in the United States and yet not be … citizen[s]," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. Wade's broader version of the Citizenship Clause did not carry the day.

Similarly, the legal community's understanding following ratification accords with that understanding of the Fourteenth Amendment. In a passage later quoted in *Wong Kim Ark*, the Supreme Court of New Jersey interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right to citizenship."

*Benny v. O'Brien*, 32 A. 696, 698 (N.J. 1895) (emphasis added).  And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign."  *Id.*

Commentators likewise regularly recognized that the children of temporarily present aliens were not citizens.  *See, e.g.*, Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ("The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States … ."); Samuel Freeman Miller, *Lectures on the Constitution of the United States* 279 (1891) (similar); Hannis Taylor, *A Treatise on International Public Law* 220 (1901) ("[C]hildren born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'"); Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* 25 (1901) (recognizing an exception to American citizenship at birth for "children of aliens born here while their parents are traveling or only temporarily resident"); John Westlake, *International Law* 220 (1904)

("[W]hen the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality ….").

The political branches operated from the same understanding following the Fourteenth Amendment's enactment.  Six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment … concerning citizenship."  2 Cong. Rec. 3279 (1874).  The bill would have provided that "a child born within the United States of parents who are not citizens, and who do not reside within the United States, … shall not be regarded as a citizen thereof."  *Id.*  Although the bill ultimately failed because of "opposition to its expatriation provisions," its "parental domicile requirement" generated little meaningful "debate or controversy."  Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015).  It thus appears that members of Congress accepted that children born of non-resident alien parents were not subject to the United States' jurisdiction under the Citizenship Clause.

The Executive Branch, too, has taken the position at times that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents.  In 1885, Secretary of State

33

Frederick T. Frelinghuysen denied a passport to an applicant who was "born of Saxon subjects, temporarily in the United States" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship." 2 *A Digest of the International Law of the United States* § 183, at 397-98 (Francis Wharton ed., 2d. ed. 1887) (Wharton's Digest). Later the same year, Secretary Frelinghuysen's successor, Thomas F. Bayard, denied a passport to an applicant born "in the State of Ohio" to "a German subject" "domiciled in Germany," explaining that the applicant "was on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'" *Id.* at 399-400. And in 1910, a Department of Justice report explained that "it has never been held, and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* 124 (1910).

**b.** The same principles apply to aliens illegally present in the United States—like aliens whose presence is temporary, they lack both the

34

requisite allegiance to the United States and the legal capacity to establish domicile here. Illegal aliens have never renounced their allegiance to a foreign power and are by definition within the United States in defiance of U.S. law. That defiance is inconsistent with establishing the requisite "allegiance" to the United States necessary to be completely subject to its political jurisdiction. *See* J.J.S. Wharton, *Law Lexicon, or Dictionary of Jurisprudence* 40 (Edward Hopper ed., 2d ed. 1860) (defining "allegiance" as "natural, lawful, and faithful obedience"). Nor are such aliens entitled to the reciprocal benefits of allegiance. As noted, for those within its complete political jurisdiction, the government may offer its "protection against other nations." *Fong Yue Ting*, 149 U.S. at 724. Illegally present aliens can make no comparable claim to the diplomatic protection of the United States when they travel abroad.

Nor are illegal aliens capable of establishing allegiance through domicile in the United States. Domicile, recall, requires residence and an intent to remain indefinitely. Even if some illegal aliens may meet those requirements factually for purposes of state law, *see Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982), domicile, "being a creation of the law, contains within it certain legal fictions." M.W. Jacobs, *A Treatise on the Law of Domicile* § 71,

at 119 (1887). Two such rules have already been discussed. One is that a child's domicile follows its parents. *E.g.*, *Lamar*, 112 U.S. at 470. Second, and equally relevant, is that Congress may "preclud[e]" classes of aliens "from establishing domicile in the United States." *Toll*, 458 U.S. at 14. Provisions of the immigration laws that bar individuals from relinquishing their former domicile leave them without "the legal capacity to establish domicile in the United States," by precluding, as a legal matter, the intent necessary to establish domicile, regardless of the subjective desires or intentions of the alien. *Carlson v. Reed*, 249 F.3d 876, 881 (9th Cir. 2001); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (holding statute prohibiting entry legally precluded immigrant from "dwel[ling] within the United States" even while physically present); *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024) (holding an alien allowed entry on parole was legally precluded from "'dwell[ing]'" or "'resid[ing]' within the United States").

Individuals whose very presence in the United States is unlawful have even less claim to allegiance established by domicile. They have no lawful basis to establish a residence in the United States, much less to assert an intent to remain indefinitely in defiance of immigration laws. "It would be inconsistent to conclude that Congress sought to preclude [those] who

*comply* with federal immigration law" from establishing domicile while "permitting [those] who *violate*" it to do so. *Park v. Barr*, 946 F.3d 1096, 1099 (9th Cir. 2020) (per curiam).

Their unlawful presence cannot be a basis on which to claim allegiance to the United States. That, too, has a pedigree in the law of domicile. *See* Robert Phillimore, *The Law of Domicil* 63 (1847) (explaining that persons could not form a domicile in a place from which they were exiled); Dig. 50.1.31 (Marcellus, Digest 1) (4 *The Digest of Justinian* 906a (Alan Watson trans., 1985)) (stating that a person could not establish domicile somewhere "forbidden to him"); *cf.* Vattel, *supra*, § 213, at 102 (explaining that "inhabitants" are those "permitted to settle and stay in the country"). And it accords with the general equitable principle that no wrongdoer should "profit by his own wrong," *Tilghman v. Proctor*, 125 U.S. 136, 145 (1888), by allowing foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

In any event, even if some illegal aliens were capable of establishing allegiance through domicile in defiance of federal law, that would not support the facial claim here. Many illegal aliens do not intend to remain

here indefinitely and thus have not formed the intent necessary to establish domicile even as a factual matter. Plaintiffs cannot "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid." *NetChoice, LLC*, 603 U.S. at 723 (quotation marks omitted). Indeed, it is not even clear what category the identified plaintiffs here illegally fall into, as the complaint does not include allegations about their intent to remain here indefinitely, their continued connections to their home countries, and whether they would return if conditions in those countries changed. *See* JA31-36. Such allegations are particularly necessary here— where most identified plaintiffs allege they are seeking asylum status— because there is a presumption in domicile law that an individual "impelled by fear to flee" from their home intends to return rather than establish a new domicile. Jacobs, *supra*, § 279; *accord* Phillimore, *supra*, at 63; *see* 8 U.S.C. § 1158(c)(2) (providing that a grant of asylum "does not convey a right to remain permanently in the United States" and that asylum may be terminated if certain conditions change in the country of origin).

**c.** If any doubt remained about the proper application of the Citizenship Clause to children of aliens temporarily or unlawfully in the

United States, related principles of interpretation would compel resolving that doubt in favor of the Executive Order's construction.

Countries have for centuries extended citizenship to the foreign-born children of their citizens, *see, e.g.*, *Wong Kim Ark*, 169 U.S. at 668-71 (discussing English history); Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104; *cf.* 8 U.S.C. § 1401(c). The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971). The individual "who has a dual nationality will be subject to claims" of allegiance "from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952); *cf. Savorgnan v. United States*, 338 U.S. 491, 500 (1950) ("The United States has long recognized the general undesirability of dual allegiances.").

Recognizing citizenship for the children of temporarily and illegally present aliens—thereby imposing a duty of protection on the United States—could also conflict with the other nation's claims of allegiance,

creating "problems for the governments involved." *Bellei*, 401 U.S. at 832.

For instance, the War of 1812 resulted in part from the Royal Navy's impressment of sailors whom the United Kingdom viewed as British subjects, but whom the United States viewed as U.S. citizens. Cockburn, *supra*, at 70-79. In the 1860s, Congress and the Executive Branch were taking steps to reduce the frequency of dual allegiance, enacting the Expatriation Act of 1868, ch. 249, 15 Stat. 223, and entering into the Bancroft treaties to coordinate the rights of an immigrant's former and adopted country, *see* Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329, 376-79 (2013). The Citizenship Clause was ratified at a time when the focus was on avoiding dual nationality.

In addition, "any policy toward aliens is vitally and intricately interwoven with … the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (quotation marks omitted). Although Congress may not deny citizenship to those protected

by the Citizenship Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. art. I, § 8, cl. 4. Congress would retain the power to extend citizenship to the children of aliens present illegally or temporarily, just as it has extended citizenship to the children of members of Indian tribes. Reading the Citizenship Clause to compel that result, however, would deprive the political branches of the power to address serious problems caused by near-universal citizenship at birth.

Nor are these idle concerns. Technological advances have allowed foreigners to come to the United States and give birth on a scale without precedent in earlier centuries. A "birth tourism" industry has developed to help expectant mothers travel to the United States to secure U.S. citizenship for their children. *See* Minority Staff of S. Comm. on Homeland Sec. & Governmental Affairs, *Report on Birth Tourism in the United States* 1 (2015), https://perma.cc/C8SA-ZG8X. "[B]irth tourism companies" have even collected hefty fees to facilitate such travel. *Id.* at 25. One such company charged between $22,000 and $38,000 for a full package including assistance in securing a visa, airfare, and housing and healthcare in the United States. *Id.* at 26; *see id.* at 25-31. That practice "demeans the

naturalization process by monetizing the privilege of U.S. citizenship." *Id.* at 39. It also defies U.S. law, under which "obtaining United States citizenship for a child … is an impermissible basis" for a tourist visa. 85 Fed. Reg. 4219, 4223 (Jan. 24, 2020). The Constitution does not grant citizenship in such circumstances.

Similarly, some illegal aliens enter the United States to engage in "hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and these and other aliens "present significant threats to national security and public safety." Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443. On the district court's view, Congress and the Executive Branch are powerless to prevent the children of such individuals from becoming citizens. But again, the Constitution does not grant citizenship in such circumstances.

Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. District Dir., INS*, 385 U.S. 630, 637 (1967). While the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of aliens present temporarily or illegally, any

ambiguity should be resolved against extending citizenship. Congress may extend citizenship in such circumstances if it wishes to do so.

**B. The District Court's Contrary Holding Is Mistaken.**

The district court concluded that "'subject to the jurisdiction thereof' encompasses every person born in this country save specific classes of people." JA114. Those classes, it said, were only those specifically listed in *Wong Kim Ark*. JA109. This does not withstand scrutiny.

The district court failed to engage with the Constitutional and statutory text. It never attempted to provide a coherent meaning of the phrase "subject to the jurisdiction thereof" that would include the classes discussed in *Elk* and *Wong Kim Ark* but exclude the classes covered by the Executive Order. The court instead wrongly concluded, JA108-110, that *Wong Kim Ark* resolved whether the children of aliens present temporarily or illegally are citizens under the Citizenship Clause. To the contrary, the Court precisely identified the narrow question presented there:

> whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but *have a permanent domicil and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States.

169 U.S. at 653 (emphasis added).

In analyzing that question, the Supreme Court repeatedly relied on the parents' domicile and permanent residence. For example, it quoted an opinion in which Justice Story recognized that "the children, even of aliens, born in a country, *while the parents are resident there* under the protection of the government, … are subjects by birth." *Id.* at 660 (emphasis added) (quoting *Inglis v. Trustees of the Sailor's Snug Harbour in N.Y.C.*, 28 U.S. (3 Pet.) 99, 164 (1830) (Story, J., dissenting)). It quoted the New Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the general rule, that *when the parents are domiciled here* birth establishes the right to citizenship." *Id.* at 692 (emphasis added) (quotation marks omitted). It explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693 (emphasis added). And it noted that "persons … owe allegiance to the United States, *so long as they are permitted by the United States to reside here*; and are 'subject to the jurisdiction thereof,' in the same sense as *all other aliens residing in* the United States." *Id.* at 694 (emphases added).

After reviewing the relevant history, the Court concluded that the Amendment extends citizenship to "children born, within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States*." *Id.* (emphasis added). The Court then summed up its holding:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but *have a permanent domicil and residence in the United States*, … and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

That emphasis on domicile was not accidental. The Supreme Court in the years before and after *Wong Kim Ark* repeatedly addressed the rights of Chinese immigrants, which frequently turned on whether they were domiciled in the United States. Before *Wong Kim Ark*, the Court had held in *Lau Ow Bew* that "Chinese merchants domiciled in the United States" were exempt from the requirement to obtain a certificate of entry, 144 U.S. at 61, while in *Fong Yue Ting* it had noted that a domiciled Chinese resident could "invoke [America's] protection against other nations," 149 U.S. at 724. In *Lem Moon Sing v. United States*, the Court held that the domiciliary status of

45

a Chinese resident did not entitle him to judicial review of his exclusion. 158 U.S. 538, 546 (1895). After *Wong Kim Ark*, the Court continued to treat domiciled Chinese residents differently, *see, e.g.*, *United States v. Mrs. Gue Lim*, 176 U.S. 459, 468 (1900), and described and applied *Wong Kim Ark* as addressing domiciled permanent residents, *see Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902); *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920). The domiciliary status of Chinese residents was significant because of the relationship between domicile, allegiance, and protection in international law. *See, e.g.*, *Lau Ow Bew*, 144 U.S. at 61-62; *Fong Yue Ting*, 149 U.S. at 724; *accord id.* at 734 (Brewer, J., dissenting). This relationship and its implications for the Citizenship Clause was well understood at the time. *Cf.* Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 423 (1912) ("It is of interest to note the frequency [in *Wong Kim Ark*] with which the terms 'residence' and 'domicile' are used in connection with 'allegiance' and 'subject to the jurisdiction.'").

Executive Branch practice recognized the limitations of *Wong Kim Ark*'s holding. The official regulations governing the administration of the Chinese Exclusion Acts exempted any person who had "been born in the

United States, of parents who at the time of his birth have a permanent domicile and residence in the United States." *Regulations Governing the Admission of Chinese* r. 2 (Feb. 26, 1907), *in* Bureau of Immigration & Naturalization, Dep't of Commerce & Labor, Doc. No. 54, *Treaty, Laws, and Regulations Governing the Admission of Chinese* 34, 34 (June 1908). The Department of Justice, likewise, explained in 1910 that *Wong Kim Ark* "goes no further" than addressing children of foreigners "domiciled in the United States," and did not address the status of children of "parents who are accidentally or temporarily in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *supra*, at 121, 124; *see also supra* p. 32 (collecting post-*Wong Kim Ark* commentary).

In short, the only question presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicil and residence in the United States." 169 U.S. at 653; *see id.* at 705. The Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Id.* at 679 (quotation marks omitted).

More generally, *Wong Kim Ark*'s historical discussion of English common law *jus soli* principles—which undergird many of the district

court's broad statements—is not particularly instructive here. Children born to domiciled foreigners were treated identically under English common law and the Citizenship Clause because they were regarded as owing sufficient allegiance to the sovereign. But that does not mean that the Citizenship Clause matched the English common law in every detail. The Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *NYSRPA v. Bruen*, 597 U.S. 1, 39 (2022). That admonition holds particular force here. The Supreme Court had already held—and *Wong Kim Ark* acknowledged—that the Citizenship Clause departs in important respects from English common law. The Clause's exception for children of members of Indian tribes was "unknown to the [English] common law," *Wong Kim Ark*, 169 U.S. at 682.

The district court offered no definition of "subject to the jurisdiction," instead simply saying that Indians were the sole departure from the English common law. JA107-109. But the reasons undergirding that exception—like all others the Supreme Court has recognized—underscore that being subject to the political jurisdiction of the United States is the determining factor, and aliens here temporarily or unlawfully are similarly outside the operation of the Citizenship Clause.

48

Moreover, the English *jus soli* tradition was premised on unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, *Report of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th Cong., 2nd Sess. app. at 94, 95 (1868) (explaining that "the American Constitution is itself proof that Blackstone's [English] theory of allegiance was not accepted by the American governments"); Cong. Globe, 40th Cong., 2nd Sess. 868, 967, 1130-31 (1868) (statements objecting to English doctrine). The Citizenship Clause thus permits voluntary renunciation of citizenship, even though English common law did not. *See Afroyim v. Rusk*, 387 U.S. 253, 257-62 (1967). And more generally, "[n]o country ha[d] carried" the idea that establishing "domicil[e]" "stamp[ed]" an immigrant with his new home's "national character" "further than that of the United States." Wharton's Digest § 198, at 482 (quotation marks omitted); *see* Jacobs, *supra*, § 26, at 36 n.12 ("There has … from the first been a stronger disposition in the American cases to put national character upon the general principles of domicil than is apparent in the English cases.").

**C. Plaintiffs' Statutory Claim Fails for the Same Reasons.**

Plaintiffs also bring claims under 8 U.S.C. § 1401(a), which provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen. As the district court concluded, the constitutional and statutory claims "are essentially coterminous because the statute mirrors the Citizenship Clause." JA97 n.3. Absent a "well-settled" meaning to the contrary, *Kemp v. United States*, 596 U.S. 528, 539 (2022) (quotation marks omitted), texts adopting identical wording generally convey the same meaning. *Cf. Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019).

As discussed above, the Citizenship Clause does not cover the children of aliens temporarily or unlawfully present in the United States, and treatises and other sources continued to recognize the limitations on *Wong Kim Ark*'s holding and that citizenship at birth required more than a temporary presence. *See* Sidney Kansas, *Immigration and Nationality Act Annotated* 183 (4th ed. 1953) (describing the statute as excluding "children of alien diplomats and consuls," as well as "transients or visitors"); Bouvé, *supra*, at 423. Plaintiffs' statutory claim thus fails for the same reasons as their constitutional claim.

## II. The District Court's Injunctive Relief Is Substantially Overbroad.

The district court premised its nationwide injunction on concerns that the organizations' 800,000+ members lived nationwide, even though the complaint identified only 16 individuals with standing. That was improper in multiple respects. Because Article III courts cannot grant relief to members who lack standing, granting relief to *all* members instead of the *injured* members was an abuse of discretion. In addition, extending the injunction to nonmembers was improper because it was not necessary to provide complete relief to the plaintiffs. The injunction also forbids the government from taking internal steps to implement the policy, even though those preparations inflict no harm on any plaintiff.

### A. Members Who Lack Standing Are Not Entitled to Relief.

The associations here have no claims of their own; they instead bring suit to "assert the claims of [their] members." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Both Article III and traditional principles of equity required the district court to limit its relief to those identified claims for which the members' standing had been established.

**1.**  "[S]tanding is not dispensed in gross … ."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  A plaintiff must "demonstrate standing for each claim he seeks to press" because Article III requires courts to determine whether "the particular plaintiff is entitled to an adjudication of the *particular claims* asserted."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *cf. CASA de Md., Inc. v. Trump*, 971 F.3d 220, 258 (4th Cir.) ("[S]tanding is not a clown car into which all interested parties may pile, provided the driver-cum-plaintiff has met its requirements."), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020), *appeal dismissed* (4th Cir. Mar. 11, 2021).

These foundational Article III limits apply regardless of the representational or procedural device employed.  "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."  *TransUnion LLC*, 594 U.S. at 431 (quotation marks omitted). "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right."  *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). "[R]epresentational standing … does not eliminate or attenuate" this "constitutional requirement."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

Thus, organizations must identify a member or members with standing whose claims they press. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Courts can remedy only those claims for which the association has established Article III standing. *See International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (holding labor union had standing to represent "those of its members injured by the [challenged] policy").

The organizations satisfied that burden for the handful of identified members' claims by including the members' claims in the complaint and providing a declaration explaining the claims and alleging those members' standing.[4]  *See* JA27-29; JA31-36; JA65-67; JA75-80. Rather than granting relief for these specific claims, however, the district court granted relief to more than 800,000 members of these organizations, the overwhelming majority of whom lack Article III standing. There is no prospect that all or

_____

[4] In addition to its six members whose claims were identified in the complaint, ASAP included information about six more members in its declaration. *Compare* JA31-33, *with* JA75-80. Several of these appear duplicative with other individuals or appear to lack standing. One is married to one of the individual plaintiffs, with whom he would share a claim. JA76-77; JA36. Others may lack standing due to expected receipt of lawful permanent resident status, JA79, or ongoing deportation proceedings. JA79.

even most are pregnant or plan to become pregnant. ASAP's declaration estimated that fewer than 2% would have children in 2025. JA72. Even among that estimate, many may have no claim to assert because they are— or have spouses who are—lawful permanent residents or citizens, and thus, their children would not be affected by the Executive Order. Indeed, plaintiffs' allegations here put the problem in stark relief: while ASAP obtained relief for more than 680,000 members, its declaration states only that it "kn[e]w of at least 629 ASAP members who are expecting to have children born in the United States in 2025"— in other words, less than 0.1% of its claimed membership—and does not specify where those members are located or whether those members would be affected by the Executive Order. JA75. ASAP cannot obtain relief on behalf of more than 679,000 other members for whom it has made no claim of standing, and relief for all of CASA's membership suffers the same defect.

Article III required the court to limit its remedy to what was necessary to provide relief to the claims for which Article III standing was established, rather than extending the injunction to hundreds of thousands of individuals who plainly lack standing. Here, the only claims for which plaintiffs alleged standing were the sixteen identified individuals.

**2.** Granting relief to a vast number of unidentified members is also fundamentally inequitable. It is impossible to tell whether these members are also members of other organizations suing over the Executive Order. *See* Complaint at 4, *New Hampshire Indonesian Cmty. Support v. Trump*, No. 1:25-cv-38 (D.N.H. Jan. 20, 2025) (three organizations with more than 355,000 members); Complaint at 4-5, *Doe v. Trump*, No. 1:25-cv-10135 (D. Mass. Jan. 20, 2025) (two organizations with an undisclosed number of members). Overlapping members may have their claims simultaneously litigated in two courts, despite the fundamental rule against duplicative litigation in multiple courts. *See, e.g.*, *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019).

Similarly, the government does not (and cannot) know to whom a judgment would run, rendering it unclear to whom *res judicata* would apply. *Cf. Brock*, 477 U.S. at 290 (explaining that preclusion "might not" apply to "subsequent claims by the association's members").

The associations here cannot forgo pleading or joining specific claims or available class-action procedures for litigating those claims; assert that they have large, dispersed, and anonymous memberships; claim only a tiny fraction have standing; but still demand relief for all members. Any relief

should be limited to those identified members whose standing is established and who undoubtedly would be bound by the judgment. That approach would respect both Article III principles and basic rules of equity.

## B. The Injunction Is Broader Than Necessary to Provide the Plaintiffs Complete Relief.

**1.** Regardless of which members' claims the court could properly remedy, extending injunctive relief to nonmembers was improper. Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration omitted); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (narrowing an injunction that improperly granted "a remedy beyond what was necessary to provide relief" to the injured parties). Similarly, traditional principles of equity require that an injunction be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This limit is "[p]articularly" important for "preliminary relief." *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971).

When plaintiffs challenge government action, the least burdensome way to provide complete relief is usually to enjoin the government from

taking that action against those specific plaintiffs.  *See, e.g.*, *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 921 (2024) (granting a stay "except as to" the plaintiffs).  A broader injunction imposes greater burdens on defendants and must be justified as "necessary," which can only be done when a plaintiff-specific injunction would fail to provide complete relief to the plaintiffs.

The district court advanced three rationales for its nationwide injunction: plaintiffs are geographically dispersed, nonparty relief is needed for uniformity, and nationwide relief may be easier for the defendants to implement.  None of these suggests that enjoining the federal officials from enforcing the Executive Order against the proper plaintiffs' children would fail to provide complete relief.

The district court said that nationwide relief was necessary because one plaintiff association has members "in every state."  JA123.  Putting aside that the association never alleged that they had *injured* members in every state, *see supra* pp. 51-56, the district court gave no explanation for why the injunction needed to cover certain states rather than certain people.  The point of equitable relief is to address injury to the plaintiffs, who have no cognizable interest in alleged injuries to nonparties.  *See*

*Yamasaki*, 442 U.S. at 702; *Gill*, 585 U.S. at 73.  The injunction could protect the proper plaintiffs, wherever they are, without extending to nonparties in those same states.

The court also thought an injunction was "necessary" to prevent disparate treatment of nonparties, JA130-131, and noted that the Executive Order was a "categorical policy." JA123.  But this Court's cases discussing categorical policies have still required that injunctions be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Department of Defense*, 947 F.3d 207, 231 (4th Cir. 2020)). And it is plain that a mere desire for uniform treatment of nonparties cannot justify an injunction that is more burdensome than necessary to provide complete relief to the plaintiffs; were it otherwise, every challenge to a uniform federal policy would automatically lend itself to nationwide relief.  And concerns about uniformity would have to be weighed against the well-known drawbacks of overbroad relief, including allowing one-sided litigation, circumventing the class-action mechanism and the rule against applying nonmutual collateral estoppel to the government, encouraging forum shopping, and impinging on the ability of other courts

to consider questions of law.  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. at 713

(Thomas, J., concurring); *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020)

(Gorsuch, J., concurring in the grant of stay); *Arizona v. Biden*, 40 F.4th 375,

396 (6th Cir. 2022) (Sutton, C.J., concurring).

Finally, in a footnote to the denial of the stay motion, the district

court for the first time suggested that a plaintiff-specific injunction would

be "impractical" because "the federal government would have to"

"determine whether a newborn's parent is a member of the plaintiff

organizations" "before it issued the child a social security card or

passport."  JA131 n.2.  The district court did not explain why it would be

impractical for plaintiffs to identify such children to defendants.  In

addition, to implement the Executive Order, federal agencies will need to

modify their processes to incorporate information about parents'

citizenship and immigration status, and it is unclear why these revised

processes could not also provide an avenue for parents to assert that their

children are covered by this litigation.[5]  And more generally, practical

---

[5] The district court also expressed concern for "localities" making a similar determination before "issu[ing] a birth certificate or grant[ing] the child government benefits."  JA131 n.2.  This concern is clearly misplaced:

*Continued on next page.*

challenges the government may face administering a plaintiff-specific injunction are unsupported by the record and are appropriately considered by the government. Those concerns may affect the government's conduct but do not make a broader injunction "necessary to provide complete relief to the plaintiffs."

**2.** The district court's injunction also exceeded its proper scope by enjoining the "implementation" of the Executive Order, including the Executive Branch's preparatory steps. Denying the stay motion, the district court concluded that "the government has no valid interest in taking internal, preparatory steps to formulate policies and guidance on an unconstitutional Executive Order." JA132. But a court may not issue an unnecessarily burdensome injunction simply because it believes that the government lacks a "valid interest" in performing the enjoined activity. Internal steps, by definition, "do not burden individuals outside of the executive branch of the federal government" and, therefore, do not impose harm on those individuals. *Hawaii v. Trump*, 859 F.3d 741, 786 (9th Cir.)

nothing in the Executive Order's directives to federal officials about issuing federal documents like passports dictates how local officials issue local documents like birth certificates.

(per curiam), *vacated and remanded*, 583 U.S. 941 (2017).  Enjoining those steps also improperly interferes with the President's Article II authority to supervise the Executive Branch, including his authority to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."  U.S. Const. art. II, § 2, cl. 1; *see* Exec. Order § 3(b) (directing the "heads of all executive departments and agencies" to develop and issue guidance).  The injunction should thus be narrowed so as not to bar officials from developing and publishing the regulations and guidance contemplated by Sections 2(a) and 3(b) of the Executive Order, so long as those regulations and guidance are not enforced against any individuals.

### C. The Remaining Equitable Factors Do Not Support the Preliminary Injunction.

Finally, the preliminary injunction inflicts irreparable injuries on the government and the public, whose interests "merge" in this context.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As discussed above, plaintiffs are unlikely to succeed on the merits, and the injunction should be reversed on that basis.  But the equities and public interest also favor denying preliminary injunctive relief.  An

injunction that prevents the President from carrying out his broad authority and constitutional responsibility is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). The challenged Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. That immigration policy is designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443; *see also* Exec. Order No. 14,165, 90 Fed. Reg. 8467; Proclamation No. 10,886, 90 Fed. Reg. 8327. Addressing the Executive Branch's prior misinterpretation of the Citizenship Clause is one component of that broader effort, removing incentives to unlawful immigration and closing exploitable loopholes.

Moreover, the equities are particularly lopsided given the breadth of the injunction, which applies nationwide to all implementation and enforcement of the Executive Order. As noted, the plaintiffs cannot plausibly claim any injury from internal Executive Branch action to

formulate policies and guidance, and delaying advance preparations for the policies of a democratically elected government imposes its own "form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed, or at a minimum narrowed.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

  *s/ Derek Weiss*
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *derek.l.weiss@usdoj.gov*

March 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,915 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss

# ADDENDUM

# TABLE OF CONTENTS

Fourteenth Amendment, Section 1 .................................................................... A1

8 U.S.C. § 1401 ................................................................................................ A2

Protecting the Meaning and Value of American Citizenship, Exec.
    Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) ............................ A4

## Fourteenth Amendment, Section 1

Section 1.  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**8 U.S.C. § 1401**

**§ 1401. Nationals and citizens of United States at birth**

The following shall be nationals and citizens of the United States at birth:

(a) a person born in the United States, and subject to the jurisdiction thereof;

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(c) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(d) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(e) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(f) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years: Provided, That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international

organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date; and

(h) a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

**Protecting the Meaning and Value of American Citizenship**

**Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025)**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The privilege of United States citizenship is a priceless and profound gift. The Fourteenth Amendment states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race.

But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States. The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof." Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text.

Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

**Sec. 2.** *Policy.* (a) It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons: (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b) Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c) Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

**Sec. 3.** *Enforcement.* (a) The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b) The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

**Sec. 4.** *Definitions.* As used in this order:

(a) "Mother" means the immediate female biological progenitor.

(b) "Father" means the immediate male biological progenitor.

**Sec. 5.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.