# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

CASA, INC. et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Maryland, Case No. 8:25-cv-00201
Before the Honorable Deborah L. Boardman

## BRIEF OF PLAINTIFFS-APPELLEES

Nicholas Katz
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783

Conchita Cruz
Jessica Hanson
Zachary Manfredi
Dorothy Tegeler
Leidy Perez
ASYLUM SEEKER ADVOCACY
PROJECT
228 Park Ave. S., #84810
New York, NY 10003

William Powell
Mary B. McCord
Kelsi Brown Corkran
Rupa Bhattacharyya
Joseph W. Mead
Alexandra Lichtenstein
Gregory Briker
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY AND PROTECTION
GEORGETOWN LAW
600 New Jersey Ave. NW
Washington, D.C. 20001
whp25@georgetown.edu

*Counsel for Plaintiffs-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 25-1153        Caption: CASA, Inc. et al. v. Donald J. Trump et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

CASA, Inc.; Asylum Seeker Advocacy Project, Inc.; Maribel; Juana; Trinidad Garcia; Monica; Liza
(name of party/amicus)

_____

 who is _____Appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                            ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                               ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ William Powell          Date: 5/30/2025

Counsel for: Appellees

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION .............................................................................. 1

STATEMENT OF ISSUES .................................................................. 3

STATEMENT OF THE CASE .............................................................. 4

    I.    The Fourteenth Amendment and 8 U.S.C. § 1401(a) Guarantee Birthright Citizenship. ........................................ 4

    II.   The Executive Order Purports to Limit Birthright Citizenship. ................................................... 5

    III.  Plaintiffs Sue to Stop the Executive Order from Denying Citizenship to Newborn Children. ......................... 7

    IV.  The District Court Enjoins the Executive Order. ................. 9

    V.   Other Courts Enjoin the Executive Order. .......................... 11

STANDARD OF REVIEW .................................................................. 12

SUMMARY OF ARGUMENT ............................................................. 13

ARGUMENT .................................................................................. 15

    I.    Plaintiffs Are Likely to Succeed on the Merits .................... 15

        A.  The Executive Order Violates the Citizenship Clause. ....................................................... 15

        B.  The Executive Order Independently Violates the Immigration and Nationality Act ............................. 46

    II.   Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction. .................................................. 53

    III.  The Balance of Equities and Public Interest Favor Plaintiffs. ......................................................................... 56

    IV.  The Scope of the District Court's Injunction Is Appropriate. ................................................................. 58

        A.  The Injunction Properly Covers All Members of CASA and ASAP. ....................................................... 59

i

B. A Universal Injunction Is Necessary for Complete Relief. .......................................... 62

C. The District Court Properly Enjoined Both Implementation and Enforcement. ................................. 65

CONCLUSION ........................................................................ 67

STATEMENT REGARDING ORAL ARGUMENT ................................ 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ah How v. United States*,
193 U.S. 65 (1904) ............................................................ 34

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .................................................... 47, 53

*Calvin's Case*
(1608) 77 Eng. Rep. 377 (KB) ........................................ 21

*Centro Tepeyac v. Montgomery County*,
722 F.3d 184 (4th Cir. 2013) (en banc) .............. 12, 13, 56, 58

*Cherokee Nation v. Georgia*,
30 U.S. 1 (1831) ............................................................ 26

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) .......................................... 63

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) .......................................... 12

*Doe v. Trump*,
766 F. Supp. 3d 266 (D. Mass. 2025) ........................... 11, 12

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) ........................................ 63

*Dred Scott v. Sandford*,
60 U.S. (19 How.) 393 (1857) ..................................... 1, 28

*Elk v. Wilkins*,
112 U.S. 94 (1884) .................................................... 37, 38

*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) ....................................... 63

*George v. McDonough*,
596 U.S. 740 (2022) ...................................................... 47

*Goodell v. Jackson*,
20 Johns. Ch. 693 (N.Y. Ch. 1823) ................................ 27

iii

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ................................................................ 34

*Hengle v. Treppa,*
19 F.4th 324 (4th Cir. 2021) ................................................ 37

*Herrera v. Finan,*
709 F. App'x 741 (4th Cir. 2017) ........................................ 35

*HIAS, Inc. v. Trump,*
985 F.3d 309 (4th Cir. 2021) ........................................ 62, 64

*Hosp. Council of W. Pa. v. City of Pittsburgh,*
949 F.2d 83 (3d Cir. 1991) .................................................. 61

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ............................................................ 60

*Inglis v. Sailor's Snug Harbor,*
28 U.S. 99 (1830) ........................................................ 23, 25, 36

*INS v. Errico,*
385 U.S. 214 (1966) ............................................................ 34

*INS v. Rios-Pineda,*
471 U.S. 444 (1985) ............................................................ 34

*Int'l Union, United Auto., Aerospace & Agr. Implement
Workers of Am. v. Brock,*
477 U.S. 274 (1986) ............................................................ 60

*Kennedy v. Mendoza-Martinez,*
372 U.S. 144 (1963) ........................................................ 1, 54

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) ............................................................ 57

*Lamar, Archer & Cofrin, LLP v. Appling,*
584 U.S. 709 (2018) ............................................................ 47

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
2 F.4th 330 (4th Cir. 2021) (en banc) ............................ 54, 56

*Lynch v. Clarke,*
1 Sand. Ch. 583 (N.Y. Ch. 1844) ........................................ 24

*Marbury v. Madison,*
   5 U.S. (1 Cranch.) 137 (1803) ............................................ 57

*McGirt v. Oklahoma,*
   591 U.S. 894 (2020) ........................................................... 26

*Morissette v. United States,*
   342 U.S. 246 (1952) ........................................................... 47

*Morrison v. California,*
   291 U.S. 82 (1934) ............................................................. 34

*Murray v. The Schooner Charming Betsy,*
   6 U.S. (2 Cranch.) 64 (1804) .............................................. 23

*NAACP v. State of Ala. ex rel. Patterson,*
   357 U.S. 449 (1958) ........................................................... 64

*Nebraska v. Biden,*
   52 F.4th 1044 (8th Cir. 2022) ............................................. 63

*New Jersey v. Trump,*
   131 F.4th 27 (1st Cir. 2025) ............................................... 12

*N.H. Indonesian Cmty. Support v. Trump,*
   765 F. Supp. 3d 102 (D.N.H. 2025) .................................... 11

*Nishikawa v. Dulles,*
   356 U.S. 129 (1958) ........................................................... 34

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................... 56

*Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.,*
   983 F.3d 671 (4th Cir. 2020) .............................................. 61

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) ........................................................... 61

*Payne v. Taslimi,*
   998 F.3d 648 (4th Cir. 2021) .............................................. 37

*Perkins v. Elg,*
   307 U.S. 325 (1939) ........................................................... 34

*Plyler v. Doe,*
   457 U.S. 202 (1982) ........................................................... 46

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel,*
    872 F.2d 75 (4th Cir. 1989) ................................................. 12

*Retail Indus. Leaders Ass'n v. Fielder,*
    475 F.3d 180 (4th Cir. 2007) .............................................. 61

*Roe v. Dep't of Def.,*
    947 F.3d 207 (4th Cir. 2020) ........................................ 58, 62

*Rogers v. Bellei,*
    401 U.S. 815 (1971) ............................................................ 34

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) .............................................................. 36

*Students for Fair Admissions, Inc. v. President & Fellows*
    *of Harvard Coll.,*
    600 U.S. 181 (2023) ...................................................... 59, 60

*The Schooner Exch. v. McFaddon,*
    11 U.S. (7 Cranch.) 116 (1812) ................... 18, 19, 20, 25, 39

*The Slaughter-House Cases,*
    83 U.S. (16 Wall.) 36 (1873) ......................................... 37, 38

*The Venus,*
    12 U.S. (8 Cranch) 253 (1814) ........................................... 46

*Trop v. Dulles,*
    356 U.S. 86 (1958) ................................................... 2, 54, 55

*United States ex rel. Hintopoulos v. Shaughnessy,*
    353 U.S. 72 (1957) ......................................................... 33, 34

*United States v. Carvalho,*
    742 F.2d 146 (4th Cir. 1984) .............................................. 35

*United States v. Rice,*
    17 U.S. 246 (1819) ....................................................... 25, 39

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) ................................................... passim

*Vance v. Terrazas,*
    444 U.S. 252 (1980) ........................................................... 34

*Warth v. Seldin*,
  422 U.S. 490 (1975) ....................................................... 59, 60

*Washington v. Trump*,
  765 F. Supp. 3d 1142 (W.D. Wash. 2025) ............................ 11

*Washington v. Trump*,
  No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025) ........................ 12

*Weedin v. Chin Bow*,
  274 U.S. 657 (1927) ........................................................ 34

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008). ......................................................... 12

*Worcester v. Georgia*,
  31 U.S. 515 (1832) ......................................................... 26

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ............................................... 1, 4, 17

**Statutes**

8 U.S.C. § 1401(a) ........................................................... 4, 48

Alien Registration Act of 1940,
  Pub. L. No. 76-670, 54 Stat. 670 ......................................... 51

Civil Rights Act of 1866,
  14 Stat. 27 ................................................................ 43

Immigration and Nationality Act of 1952,
  Pub. L. 82-414, 66 Stat. 163 .............................................. 48

Nationality Act of 1940,
  Pub. L. No. 76-853, 54 Stat. 1137 ........................................ 48

**Other Authorities**

1 Annals of Cong. (1789) (Joseph Gales ed., 1834) .................................. 23

1 William Blackstone,
  *Commentaries on the Laws of England* (1st ed. 1765) ........................ 22

2 James Gillespie Blaine,
  *Twenty Years of Congress* (1886) ......................................... 20

3 Green Haywood Hackworth,
*Digest of International Law* (1942) .......................................52

10 U.S. Op. Atty. Gen. 328 (1862)............................................33

86 Cong. Rec. 11944 (1940) ...................................................50

Clement L. Bouvé,
*A Treatise on the Laws Governing the Exclusion
and Expulsion of Aliens in the United States* (1912) ...........45

Cong. Globe, 39th Cong.,
1st Sess. (1866) ...................................... 25, 29, 30, 31, 32, 43

*Enforce*, Merriam-Webster's Online Dictionary....................65

Garrett Epps,
*The Citizenship Clause: A "Legislative History,"*
60 Am. U. L. Rev. 331 (2010) ...................................27, 29, 40

Exec. Order No. 6,115, Revision and Codification of
the Nationality Laws of the United States (Apr. 25, 1933)................48

Exec. Order No. 14,160, Protecting the Meaning and
Value of American Citizenship,
90 Fed. Reg. 8449 (Jan. 20, 2025).............................5, 6, 65

Richard W. Flournoy, Jr.,
*Dual Nationality and Election*, 30 Yale L.J. 545 (1921).....................50

H. Comm. on Immigr. and Naturalization,
Nationality Laws of the United States: Message from
the President of the United States, 76th Cong. 418
(Comm. Print 1939) .............................................................49

H.R. Rep. No. 82-1365 (1952)..................................................50

*Implement*, Merriam-Webster's Online Dictionary................65

*Legislation Denying Citizenship at Birth to Certain
Children Born in the United States,*
19 Op. O.L.C. 340 (1995) ....................................................33

Polly J. Price,
*Natural Law and Birthright Citizenship in* Calvin's Case *(1608)*,
9 Yale J.L. & Humans. 73 (1997).......................................21

Michael D. Ramsey,
  *Originalism and Birthright Citizenship*,
  109 Geo. L. J. 405 (2020) ......................................... 18, 22, 40

William Rawle,
  *A View of the Constitution of the United States of America*
  (Portage Publications, Inc. 2d ed. 2011) (1829) .................... 23

S. Rep. No. 41-268 (1870) ......................................... 27

Joseph Story,
  *Commentaries on the Conflict of Laws* (1834) ................. 42, 46

Emmerich de Vattel,
  *The Law of Nations* (1797 ed.) ................................. 42

Noah Webster,
  *An American Dictionary of the English Language*
  (Chauncey A. Goodrich & Noah Porter eds., 1865) ............... 18

**INTRODUCTION**

Citizenship "is a most precious right." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963). From the time of the Founding, citizenship has been the birthright of nearly everyone born in the United States, and a core part of our country's commitment that all people are created equal. In one of this Nation's darkest hours, the Supreme Court in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 404-05 (1857), denied citizenship to enslaved people based on the view that they were "an inferior class of beings." Following the Civil War, Congress passed, and the states ratified, the Citizenship Clause of the Fourteenth Amendment to ensure that never again could birthright citizenship be denied based on such prejudices. By providing citizenship to all people born in the United States and "subject to the jurisdiction thereof," U.S. Const. amend. XIV, § 1, the Fourteenth Amendment aimed to "remove[] all doubt as to what persons are or are not citizens of the United States," Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (statement of Sen. Howard).

In 1898, the Supreme Court held in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), that the Fourteenth Amendment guarantees

citizenship to all children born in the United States, regardless of their parents' immigration status, with only narrow, historically grounded exceptions for the children of ambassadors, occupying armies, or Indian tribes. All three branches of government have operated on that understanding for more than a century.

On January 20, however, the President issued an Executive Order purporting to upend our Nation's tradition of birthright citizenship. Under the Executive Order, only the children of citizens and lawful permanent residents can become citizens by birth, while citizenship will be denied to children whose parents are undocumented or in the country lawfully but temporarily. The Executive Order flagrantly violates the Citizenship Clause, the Supreme Court's decision in *Wong Kim Ark*, the common-law history on which that decision was based, an unbroken line of subsequent precedent, and a federal statute codifying the accepted understanding of birthright citizenship.

If the Order were to go into effect, it would cause immediate irreparable harm. Loss of citizenship represents "the total destruction of the individual's status in organized society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). Without citizenship, babies may face

statelessness, removal from the country, and deprivation of benefits providing nutrition and healthcare. Pregnant moms facing those possibilities are sick with fear, and allowing the Executive Order to go into effect would cause them and their babies serious physical and psychological harm.

The district court therefore correctly entered a preliminary injunction to safeguard the Citizenship Clause and to prevent irreparable harm to newborn babies and their parents. This Court should affirm.

## STATEMENT OF ISSUES

1.     Whether Plaintiffs are likely to succeed on the merits of their claim that the Executive Order violates the Citizenship Clause of the Fourteenth Amendment by denying citizenship to children born in the United States, based solely on the immigration status of their parents.

2.     Whether Plaintiffs are likely to succeed on the merits of their claim that the Executive Order violates 8 U.S.C. § 1401(a) by denying citizenship to children born in the United States, based solely on the immigration status of their parents.

3.     Whether a preliminary injunction is necessary to prevent irreparable harm, protect the public interest, and preserve the status

quo, in light of the uncontested evidence of the injuries that the Executive Order will cause to pregnant moms, newborn children, and the public.

4.     Whether the district court properly issued a universal injunction to provide complete relief to Plaintiffs and to ensure the nationwide uniformity of U.S. citizenship.

## STATEMENT OF THE CASE

### I.     The Fourteenth Amendment and 8 U.S.C. § 1401(a) Guarantee Birthright Citizenship.

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. As interpreted by the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), the Fourteenth Amendment guarantees citizenship to all children born in the United States, regardless of their parents' immigration status, except for children born to ambassadors, occupying armies, or Indian tribes. Congress codified that understanding of the Citizenship Clause in 8 U.S.C. § 1401(a), which provides that "a person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth."

## II. The Executive Order Purports to Limit Birthright Citizenship.

On his first day in office, President Trump issued an Executive Order titled "Protecting the Meaning and Value of American Citizenship." *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ("Order"). Rather than announcing a new Executive Branch policy and then explaining how that policy is consistent with existing law, the Order purports to redefine existing law.

Section 1 identifies "categories of individuals born in the United States" that the Order claims "ha[ve] always [been] excluded from birthright citizenship" under the Fourteenth Amendment. Order § 1. Specifically, the Order says that "the privilege of United States citizenship does not automatically extend to persons born in the United States" (1) whose mothers are unlawfully present in the United States and whose fathers are neither lawful permanent residents nor citizens, and (2) whose mothers are lawfully but temporarily present in the United States and whose fathers are neither lawful permanent residents nor citizens.[1] *Id.* Section 1 sets no effective date for its new interpretation of

---

[1] It is unclear whether the Order applies to classes of immigrants, like asylees and refugees, who are in the United States permanently but who

the Citizenship Clause. As a result, it is unclear whether Defendants would give this section only prospective effect.

Section 2 directs departments and agencies of the United States to stop "issu[ing] documents recognizing United States citizenship" or "accept[ing] documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to people covered by Section 1. *Id.* § 2(a). The directives in Section 2 apply only to babies born after February 19, 2025. *Id.* § 2(b).

Section 3 is titled "Enforcement." It directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order." *Id.* § 3(a). Section 3 also directs the heads of "all executive departments and agencies" to issue public guidance within 30 days "regarding [the] order's implementation with respect to their operations and activities." *Id.* § 3(b). Section 3

---

are not citizens or "lawful permanent residents," as that term is used in immigration law.

includes no effective date, and it is unclear whether the agency actions it directs would apply only prospectively.

### III. Plaintiffs Sue to Stop the Executive Order from Denying Citizenship to Newborn Children.

On January 21, CASA, Inc., the Asylum Seeker Advocacy Project ("ASAP"), and five pregnant mothers filed this lawsuit and moved for a preliminary injunction to prevent implementation and enforcement of the Executive Order. Associational Plaintiffs CASA and ASAP are membership organizations serving immigrant communities. JA57-58, JA69. Headquartered in Maryland, CASA is a membership-based immigrant-rights organization with more than 175,000 members. JA57-58. ASAP is the largest membership organization of asylum seekers in the United States, with over 680,000 members at the time the lawsuit was filed. JA69. ASAP's members come from 175 countries and reside in all 50 states. JA69.

Among the members of CASA and ASAP are thousands of people, in all 50 states, who fall into the categories of parents covered by the Executive Order and who are likely to give birth to a child in the United States in the near future. *See* JA72. Many of the CASA and ASAP members harmed by the Order are in the country legally, including those

who have pending asylum claims, pending applications for permanent residency, Temporary Protected Status, or student or work visas. Others are undocumented people who have lived in the United States for years. Many have older children who are U.S. citizens. But now the Executive Order threatens to deny their future children the birthright citizenship that the Constitution guarantees. *See* JA65-67 (CASA members); JA75-80 (ASAP members).

Individual Plaintiffs are Maribel, Juana, Trinidad Garcia, Monica, and Liza.[2] *See* JA81-91 (Individual Plaintiff declarations). At the time the complaint was filed, all five were pregnant. Liza has given birth during the pendency of this appeal, while the other four are due in the coming months. They reside in this country and want their babies born here to be U.S. citizens. But they fear that their children will be denied U.S. citizenship under the Executive Order based on their immigration status and that of their partners.

For instance, Maribel is an undocumented CASA member who has lived in the United States for 18 years. JA85. She fears her "unborn child

---

[2] The district court granted Individual Plaintiffs' motion to proceed using pseudonyms.

will not have the same rights to citizenship as the future child's older sisters," who are U.S. citizens, "and could even be subject to deportation, separating [her] family." JA85. She believes "it is deeply wrong to subject an innocent newborn to such cruelty." JA86. Monica is an ASAP member from Venezuela, and she and her partner both have pending asylum applications. JA87. She worries that the Executive Order will render her child stateless at birth. JA88. Juana, Trinidad Garcia, and Liza are all in similar circumstances and have similar fears about their children losing their rights and access to essential benefits. JA81-84, JA89-91.

## IV. The District Court Enjoins the Executive Order.

On February 5, the district court granted Plaintiffs' motion for a preliminary injunction. JA92-123. The district court held that Plaintiffs "easily have met the standard for a preliminary injunction." JA93. First, the court held that there is "a very strong likelihood of success on the merits." JA93. The Executive Order's attempt to reinterpret the Citizenship Clause "contradicts the plain language of the Fourteenth Amendment and conflicts with 125-year-old binding Supreme Court precedent." JA102. The district court concluded that "[t]he Executive Order directly conflicts with" the Supreme Court's decision in *Wong Kim*

*Ark*, which held that "the Fourteenth Amendment guarantees U.S. citizenship to any child born on U.S. soil," with only "rare" and "specific" exceptions for children born to foreign ministers, occupying armies, and Indian tribes. JA107, JA114.

The court also concluded that Plaintiffs demonstrated significant irreparable harm. Absent an injunction, parents covered by the Executive Order "will face instability and uncertainty about the citizenship status of their newborn babies, and their children born on U.S. soil will be denied the rights and benefits of U.S. citizenship." JA120-121. Newborns deprived of citizenship could lose "the right to live in the United States lawfully and without fear of deportation," "access to certain government public benefit programs," and may be rendered stateless. JA120. The district court thus concluded that "[t]he denial of the precious right to citizenship for any period of time will cause [Plaintiffs] irreparable harm." JA119. Finally, the court determined that the balance of equities and the public interest likewise "weigh very strongly" in Plaintiffs' favor. JA121.

The district court therefore issued a universal injunction against implementation or enforcement of the Executive Order. JA122-123. As to

the scope of the injunction, the district court reasoned that "[o]nly a nationwide injunction will provide complete relief" to Plaintiffs, given that "ASAP's members reside in every state and hundreds of them expect to give birth soon." JA123. A universal injunction was also appropriate to maintain the uniformity of U.S. citizenship. JA123.

Defendants appealed. JA127. At the same time, they filed a stay motion asking the district court to narrow the preliminary injunction (but not contesting the district court's merits assessment), which the district court denied. JA129-133. This Court also denied a stay, with Judge Niemeyer dissenting. ECF 29. Defendants then filed a stay application in the Supreme Court. The Supreme Court held oral argument on the application on May 15. The application remains pending.

## V.    Other Courts Enjoin the Executive Order.

Three other district courts have also preliminarily enjoined the Executive Order. *See Washington v. Trump*, 765 F. Supp. 3d 1142 (W.D. Wash. 2025); *N.H. Indonesian Cmty. Support v. Trump*, 765 F. Supp. 3d 102 (D.N.H. 2025); *Doe v. Trump*, 766 F. Supp. 3d 266 (D. Mass. 2025). Each court found an overwhelming likelihood that the Order will ultimately be held unconstitutional. One court observed that challenges

to the Executive Order "are nearly certain to prevail." *Doe*, 766 F. Supp. 3d at 278.

Like this Court, the First and Ninth Circuits denied motions seeking to stay the preliminary injunctions pending appeal. *See Washington v. Trump*, No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025); *New Jersey v. Trump*, 131 F.4th 27 (1st Cir. 2025).

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"[T]he decision to issue or deny a preliminary injunction is committed to the sound discretion of the trial court." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (quoting *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 78 (4th

Cir. 1989)). "That decision will not be disturbed on appeal unless the record shows an abuse of that discretion, regardless of whether the appellate court would, in the first instance, have decided the matter differently." *Id.* The Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *Id.*

## SUMMARY OF ARGUMENT

The Court should affirm the district court's preliminary injunction. Plaintiffs are likely to succeed on their claim that the Executive Order violates the Citizenship Clause, which guarantees citizenship to all children born in the United States and "subject to the jurisdiction thereof." In *Wong Kim Ark*, the Supreme Court held that citizenship by birth in the United States does not depend on the immigration status of a child's parents. Nearly everyone within the United States is subject to the Nation's jurisdiction, with only narrow, historically rooted exceptions for ambassadors, occupying armies, and Indian tribes. That binding Supreme Court precedent forecloses Defendants' novel theories about allegiance and domicile.

Plaintiffs are also likely to succeed on their statutory claim. In 1940 and 1952, Congress codified *Wong Kim Ark*'s interpretation of the

Citizenship Clause in 8 U.S.C. § 1401(a). Congress embedded the then-prevailing interpretation of the Citizenship Clause in the statute, and the Court must respect Congress's intent. Plaintiffs' statutory claim thus provides an independent basis for affirming the district court's decision.

If not enjoined, the Executive Order will cause irreparable harm. Babies denied citizenship may be rendered stateless, subjected to removal from the country, and deprived of benefits providing nutrition and healthcare. Those possibilities are causing pregnant mothers incredible stress and anxiety, which can lead to preterm delivery, lower infant birthweights, and poorer long-term health outcomes for mothers and their children.

The public interest also supports the preliminary injunction. Today, a birth certificate serves as the default proof of citizenship. But if the Executive Order goes into effect, no one—regardless of their immigration status—will be able to prove the citizenship of their children using a birth certificate alone. That will cause chaos on the ground for all expecting parents, as local governments and hospitals scramble to create new systems for proving citizenship.

Because all four preliminary injunction factors are satisfied, the district court correctly enjoined the Executive Order. And the district court appropriately granted a universal injunction based on the extraordinary circumstances of this case.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

#### A. The Executive Order Violates the Citizenship Clause.

The Executive Order purports to deny citizenship to children born in the United States whose mothers are undocumented or present in the United States lawfully but temporarily and whose fathers are neither citizens nor lawful permanent residents. That policy violates the Citizenship Clause of the Fourteenth Amendment, which confers citizenship on children born in the United States regardless of their parents' immigration status. Because the Fourteenth Amendment guarantees citizenship to the babies covered by the Executive Order, the district court correctly held that Plaintiffs are likely to succeed on their claim that the Order is facially unconstitutional.

### *1. Wong Kim Ark controls this case.*

The Supreme Court's decision in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), resolves the constitutional question presented in this appeal. Wong Kim Ark was born in 1873 in San Francisco to parents who were "subjects of the Emperor of China." *Id.* at 652. The question was whether Wong Kim Ark was a citizen of the United States even though his parents were not. The Supreme Court held that he was a citizen by virtue of his birth within the United States.

The Supreme Court meticulously surveyed the traditional indicators of original constitutional meaning: text, history, the Framers' views, executive practice, and judicial precedent. Based on its thorough review, the Supreme Court concluded that the Fourteenth Amendment, "in clear words and in manifest intent," "affirms the ancient and fundamental rule of citizenship by birth within the territory, … including all children here born of resident aliens," save for the two common-law exceptions for those born to foreign ministers or occupying armies, "and with the single additional exception" of children born to members of Indian tribes. *Id.* at 693. The Supreme Court emphatically rejected the notion that "the Fourteenth Amendment of the Constitution excludes

from citizenship the children born in the United States of citizens or subjects of other countries." *Id.* at 694. Instead, through the Fourteenth Amendment, "the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms." *Id.* at 675.

By purporting to deny birthright citizenship to children born in the United States based on their parents' immigration status, the Executive Order violates that binding precedent. This Court's analysis of the merits could stop there. But any fresh examination of the sources discussed in *Wong Kim Ark*—or the law as it has developed in the ensuing 127 years— will lead to the same conclusion: the Executive Order is unconstitutional.

***Text.*** The Fourteenth Amendment guarantees citizenship to "[a]ll persons born … in the United States, and subject to the jurisdiction thereof." U.S. Const. amend. XIV, § 1. That text creates only two requirements for birthright citizenship: first, the child must be born in the United States, and second, the child must be subject to the jurisdiction of the United States. There is no dispute that the children covered by the Executive Order are born in the United States. The only question then is whether they are subject to our Nation's jurisdiction.

At the time the Fourteenth Amendment was ratified, the "jurisdiction" of a nation was understood to refer to its sovereign authority. Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405, 437-40 (2020). Webster's dictionary from that era defined a nation's "jurisdiction" as "[p]ower of governing or legislating," "power or right of exercising authority," the "limit within which power may be exercised," or "extent of power or authority." Noah Webster, *An American Dictionary of the English Language* 732 (Chauncey A. Goodrich & Noah Porter eds., 1865).

That ordinary meaning is consistent with Chief Justice Marshall's famous opinion in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch.) 116, 144 (1812), which "covered the whole question of what persons within the territory of the United States are subject to the jurisdiction thereof." *Wong Kim Ark*, 169 U.S. at 683. The Supreme Court in *Schooner Exchange* explained that "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." 11 U.S. at 136. Accordingly, "[a]ll exceptions … to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself." *Id.*

As an example of an exemption from the jurisdiction of the United States, *Schooner Exchange* referred to "the immunity which all civilized nations allow to foreign ministers." *Id.* at 138. The Court noted that, under a "fiction of extraterritoriality" prevailing in the 19th Century, it was sometimes supposed that a foreign minister was not within the country at all. *Id.* But even so, "still the immunity itself is granted by the governing power of the nation to which the minister is deputed." *Id.* It was thus understood that foreign ministers were not subject to the jurisdiction of the United States based on its sovereign decision to exempt them from regulatory authority.

To illustrate who is in fact subject to the jurisdiction of the United States, the Supreme Court referred to noncitizens much like the parents covered by the Executive Order: "When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and

were not amenable to the jurisdiction of the country." *Id.* at 144. The Supreme Court thus drew a direct connection between "jurisdiction" and the exercise of sovereign authority, and it concluded that noncitizens within a country are subject to that authority.

The Framers of the Fourteenth Amendment would have been aware of "the great case of *The Exchange*" and the "incontrovertible principles" it announced about the nature of a nation's jurisdiction. *Wong Kim Ark*, 169 U.S. at 683, 686. And they intended to give the word "jurisdiction" that accepted meaning, not some special secret one. Following the Civil War, it was paramount "that citizenship should be placed on unquestionable ground—on ground so plain that the humblest man who should inherit its protections would comprehend the extent and significance of his title." 2 James Gillespie Blaine, *Twenty Years of Congress* 189 (1886).

**Common-Law History.** The Supreme Court in *Wong Kim Ark* recognized that the phrase "subject to the jurisdiction thereof" carries with it the English common-law principle of *jus soli*, or right of the soil. Under that doctrine, "every person born within the dominions of the Crown, no matter whether of English or of foreign parents, and, in the

latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject." *Wong Kim Ark*, 169 U.S. at 657 (internal quotation marks omitted).

The "roots" of this common-law tradition "lie deep in England's medieval past." Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case *(1608)*, 9 Yale J.L. & Humans. 73, 73 (1997). The doctrine of *jus soli* traces to *Calvin's Case* (1608) 77 Eng. Rep. 377 (KB), in which the court held that after unification of the Scottish and English crowns, children born in Scotland would be citizens by birth within the King's dominion, even though their parents were not citizens. The court explained that "local obedience being but momentary and uncertain, is yet strong enough to make a natural subject, for if he hath issue here, that issue is … a natural born subject." *Id.* at 384. *Calvin's Case* is thus "the earliest, most influential theoretical articulation by an English court of what came to be the common-law rule that a person's status was vested at birth, and based upon place of birth." Price, *supra*, at 74.

The English version of the *jus soli* principle was sometimes described as applying to "all persons born within the King's allegiance, and subject to his protection." *Wong Kim Ark*, 169 U.S. at 655. But to the

extent "allegiance" was required, it was only "such as is due from all men born within the king's dominions immediately upon their birth." 1 William Blackstone, *Commentaries on the Laws of England* 357 (1st ed. 1765). It was thus the law of England, dating back hundreds of years, that "aliens, while residing in the dominions possessed by the Crown of England, were within the allegiance, the obedience, the faith or loyalty, the protection, the power, the jurisdiction of the English Sovereign; and therefore every child born in England of alien parents was a natural-born subject." *Wong Kim Ark*, 169 U.S. at 658. The common law of England recognized only two exceptions, for children born to "an ambassador or other diplomatic agent of a foreign state" or "an alien enemy in hostile occupation of the place where the child was born." *Id.*

The same common-law rule of *jus soli* "was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established." *Id.* Numerous sources from the Founding era confirm that the United States adopted the English common-law rule of citizenship by birth within the sovereign's dominion. *See* Ramsey, *supra*, at 413 (collecting sources).

James Madison, for instance, described the concept that "birth is a criterion of allegiance" as an "established maxim" that "applies in the United States." 1 Annals of Cong. 420 (1789) (Joseph Gales ed., 1834). William Rawle wrote in 1829 that "every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution." William Rawle, *A View of the Constitution of the United States of America* 86 (Portage Publications, Inc. 2d ed. 2011) (1829).

In *Inglis v. Sailor's Snug Harbor*, 28 U.S. 99 (1830), all members of the Court agreed that the rule of *jus soli* applied during the colonial period. Writing for the majority, Justice Thompson explained that "all persons born within the colonies of North America, while subject to the crown of Great Britain, were natural-born British subjects." *Id.* at 120. Justice Story, though dissenting on other grounds, agreed on this point: "Nothing is better settled at the common law than the doctrine that the children even of aliens born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth." *Id.* at 164 (Story, J., dissenting). In the early case of *Murray v. The Schooner Charming Betsy*, 6 U.S. (2

Cranch.) 64, 119-20 (1804), the Supreme Court assumed that the same rule carried forward after the Revolution, taking as a given that all persons born in the United States were citizens thereof.

Summarizing this history, the Supreme Court in *Wong Kim Ark* observed that it "does not appear to have been contested or doubted until more than fifty years after the adoption of the Constitution" that "all children, born within the dominion of the United States, of foreign parents holding no diplomatic office, became citizens at the time of their birth." 169 U.S. at 664. The first significant case in which the point was contested resulted in a decisive win for *jus soli*. The Chancery Court of New York held that a child "born in this state, of alien parents, during their temporary sojourn" was a natural-born citizen. *Lynch v. Clarke*, 1 Sand. Ch. 583, 638, 683 (N.Y. Ch. 1844). The chancellor noted that the child's parents "came here as an experiment, without any settled intention of abandoning their native country, or of making the United States their permanent abode." *Id.* at 638. The chancellor nevertheless concluded that he "entertain[ed] no doubt but that [the U.S.-born child] was a citizen of the United States." *Id.* at 683. That case was well-known

to the Congress that passed the Fourteenth Amendment. *See* Cong. Globe, 39th Cong., 1st Sess. 1832 (1866).

The two common-law exceptions for ambassadors and occupying armies also carried over after the Revolution and were incorporated in U.S. law. *See Inglis*, 28 U.S. at 155-56 (Story, J., dissenting). Both were based on immunity to the operation of domestic law. The exception for the children of diplomats rested on their traditional immunity from sovereign jurisdiction, which Chief Justice Marshall had explained in *Schooner Exchange*, 11 U.S. at 138. The exception for occupying armies recognized a more literal inability of a sovereign to exercise authority, as illustrated in the Supreme Court's decision in *United States v. Rice*, 17 U.S. 246 (1819). That case concerned the British occupation of Castine, Maine, during the War of 1812. "The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors." *Id.* at 254. A child born to a British soldier in that circumstance would not be a U.S. citizen.

The exception for tribal Indians, which was an American invention unknown to English common law, also traces its roots to the period before ratification of the Fourteenth Amendment. Indian tribes were "distinct, independent political communities," *Worcester v. Georgia*, 31 U.S. 515, 519 (1832), and "the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else," *Cherokee Nation v. Georgia*, 30 U.S. 1, 16 (1831). Between the Founding and 1871, the government's relationship with tribes was governed principally by treaties. *See, e.g.*, *McGirt v. Oklahoma*, 591 U.S. 894, 900-02 (2020) (describing a series of treaties guaranteeing the Creek Nation sovereignty, including "full jurisdiction" over its members). The use of treaties rather than statutes to govern relations with tribes showed their status as "a nation claiming and receiving the protection of one more powerful"—"not that of individuals abandoning their national character" or "submitting as subjects to the laws of a master." *Worcester*, 31 U.S. at 555.

By the time of the Fourteenth Amendment, "[v]olumes of treaties, acts of Congress almost without number, the solemn adjudications of the highest judicial tribunal of the republic, and the universal opinion of our

statesmen and people, ha[d] united to exempt the Indian, being a member of a tribe recognized by, and having treaty relations with, the United States from the operation of our laws, and the jurisdiction of our courts." S. Rep. No. 41-268, at 10 (1870); *see also id.* at 9 ("Congress has never regarded the Indian tribes as subject to the municipal jurisdiction of the United States."). And, although the point was contested, "both state and federal courts sustained the general view that individual Indians born within tribal society did not qualify as citizens by birth." *See* Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. U. L. Rev. 331, 366 (2010); *see also, e.g.*, *Goodell v. Jackson*, 20 Johns. Ch. 693, 712, 734 (N.Y. Ch. 1823) (denying state citizenship on the grounds that "Indians are considered as born under the dominion of their tribes" and are not "born within the purview of the law").

In light of this history, the Supreme Court in *Wong Kim Ark* interpreted "subject to the jurisdiction thereof" in the Citizenship Clause as a term of art intended only "to exclude, by the fewest and fittest words" the common-law exceptions for "hostile occupation" and "diplomatic representatives," with the single additional exception of "children of members of the Indian tribes, standing in a peculiar relation to the

National Government, unknown to the common law." 169 U.S. at 682. The children of all other persons were citizens by birth, regardless of parental immigration status: "[I]t is beyond doubt that, before the enactment of the Civil Rights Act of 1866 or the adoption of the Constitutional Amendment, all white persons, at least, born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States." *Id.* at 674-75.

**Framers' Views.** The Supreme Court shamefully departed from the common-law tradition in *Dred Scott*, concluding that people of African descent were ineligible to become citizens. *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 404-05 (1857). Following the Civil War, Congress made it a priority to overturn *Dred Scott* and enshrine birthright citizenship in the Constitution, where political winds could not erode its guarantee.

As the Supreme Court aptly observed in *Wong Kim Ark*, "the intention of the Congress which framed, and of the states which adopted" the Citizenship Clause "must be sought in the words of the Amendment;

and the debates in Congress are not admissible as evidence to control the meaning of those words." 169 U.S. at 699. But the debates are nevertheless "interesting" as "contemporaneous opinions" of "statesmen upon the legal meaning of the words themselves." *Id.*

Like many congressional debates, the discussion of the Fourteenth Amendment included opposing viewpoints. But while lawmakers disagreed about whether the Citizenship Clause was a good idea, there was broad consensus that "subject to the jurisdiction thereof" meant subject to the sovereign's authority and that private citizens of other countries present in the United States were subject to that authority, such that their children born here would be citizens. *See* Epps, *supra*, at 354-61 (surveying the debates).

Those who opposed the Amendment objected that it would confer citizenship on the children of Chinese immigrants and "Gypsies," whom they believed "settle as trespassers where ever they go." Cong. Globe, 39th Cong., 1st Sess. 2890-91 (1866) (statement of Sen. Cowan). "The 'Gypsies' … were the closest thing the United States had at that time to 'illegal' immigrants—a shadow population that was considered to be living in defiance of American law." Epps, *supra*, at 351. And yet, the

response of the Amendment's proponents was unequivocal: the Citizenship Clause would "declare that the children of all parentage whatever, born in [the United States], should be regarded and treated as citizens of the United States." Cong. Globe, 39th Cong., 1st Sess. 2891 (1866) (statement of Sen. Conness). They wanted a clear rule that would "settle[] the great question of citizenship and remove[] all doubt as to what persons are or are not citizens of the United States," not a complex analysis based on allegiance or domicile. *Id.* at 2890 (statement of Sen. Howard).

The debate over which groups of people would be excluded from citizenship by birth is also instructive. It reveals an understanding that the phrase "subject to the jurisdiction" referred to sovereign authority and served only to preserve the narrow English common-law exceptions to birthright citizenship, plus the additional American exception for Indian tribes, based on their *sui generis* position as independent political communities within the territory of the United States. For instance, Senators repeatedly referenced the immunity of ambassadors from U.S. law. *See, e.g.*, *id.* at 2769 (statement of Sen. Wade) (identifying "the case of the children of foreign ministers" as the "one instance" in which "a

person may be born here and not be a citizen"); *id.* at 2897 (statement of Sen. Williams) (noting that the "child of an ambassador" is not fully subject to U.S. jurisdiction and thus would be excluded from citizenship by the Clause); *id.* at 572 (statement of Sen. Trumbull) ("We cannot make a citizen of the child of a foreign minister."). It is hard to see why they would have been so focused on ambassadors if all foreign visitors were exempt from the clause.

There was more disagreement over the status of tribal Indians. The majority of Senators believed that children born to the tribes should not be citizens by birth, but views differed as to whether the phrase "subject to the jurisdiction" was sufficient to exclude them, or whether an explicit exception was required. This was a contentious point because in 1866 the legal status of tribes was in a state of flux.

Ultimately, it was decided that Indians were not subject to the jurisdiction of the United States based on the inability of the federal government, at that time, to practically exercise authority over them, in light of their separate (if dependent) sovereignty. Notably, this debate focused on regulatory authority, not allegiance. In famous comments, Senator Trumbull spoke about the government's inability to "control the

Navajoes" and emphasized that the federal government at that time dealt with tribes primarily by treaty, as with foreign nations. *Id.* at 2893 (statement of Sen. Trumbull). He went on to describe "a large region of country within the territorial limits of the United States, unorganized, over which we do not pretend to exercise any civil or criminal jurisdiction, where wild tribes of Indians roam at pleasure, subject to their own laws and regulations, and we do not pretend to interfere with them." *Id.* at 2894. It was in this regulatory sense that the tribes were not subject to the jurisdiction of the United States. *Id.*

At no time in this discussion was it suggested that immigrants were generally exempt from the jurisdiction of the United States or that they would be denied citizenship under the Clause. To the contrary, critics of the Citizenship Clause opposed it precisely because disfavored groups of immigrants would be given citizenship. *E.g.*, *id.* at 2890-91 (statement of Sen. Cowan).

***Executive Practice.*** The "doctrine" of *jus soli* "was repeatedly affirmed in the executive departments" in the years surrounding ratification of the Fourteenth Amendment. *Wong Kim Ark*, 169 U.S. at 664. In 1862, Attorney General Bates expressed his "quite clear" formal

opinion that "children born in the United States of alien parents, who have never been naturalized, are native-born citizens of the United States." 10 U.S. Op. Atty. Gen. 328 (1862). Defendants seek to contest this history with citations to a couple of passport decisions that featured prominently in the *Wong Kim Ark* dissent. *Compare* U.S. Br. 33-34, *with Wong Kim Ark*, 169 U.S. at 719 (Fuller, J., dissenting). But Defendants cannot contest that "for over a century," the prevailing position within the Executive Branch has been to recognize "[t]he constitutional guarantee of citizenship to children born in the United States to alien parents." *See Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 344 (1995); *see also id.* at 340 ("Throughout this country's history, the fundamental legal principle governing citizenship has been that birth within the territorial limits of the United States confers United States citizenship.").

**Subsequent Precedent.** *Wong Kim Ark* held that citizenship by birth in the United States does not depend on parents' immigration status. That is confirmed by many decades of subsequent Supreme Court precedent that has treated the question as settled. For instance, in *United States ex rel. Hintopoulos v. Shaughnessy*, the Supreme Court

said that a child born in the United States was "an American citizen by birth," despite his parents' "illegal presence." 353 U.S. 72, 73 (1957). And even though both sets of respondents in *INS v. Errico* had obtained admission through fraud, the Court acknowledged that their U.S.-born children became U.S. citizens at birth. 385 U.S. 214, 215-16 (1966). The Supreme Court's decision in *INS v. Rios-Pineda* similarly involved noncitizen parents whose child became "a citizen of this country" at birth, even though they had "enter[ed] … without inspection." 471 U.S. 444, 446 (1985).

There are many other decisions to the same effect. The principle that "one born in the United States" becomes "a citizen of the United States by virtue of the *jus soli* embodied in the [Fourteenth] Amendment" pervades Supreme Court precedent. *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927); *see also, e.g., Ah How v. United States*, 193 U.S. 65, 75 (1904); *Morrison v. California*, 291 U.S. 82, 85 (1934); *Perkins v. Elg*, 307 U.S. 325, 328-29 (1939); *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958); *Rogers v. Bellei*, 401 U.S. 815, 829-30 (1971); *Vance v. Terrazas*, 444 U.S. 252, 255 (1980); *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004) (plurality opinion).

This Court has likewise operated on this understanding of the Fourteenth Amendment. *See United States v. Carvalho*, 742 F.2d 146, 148 (4th Cir. 1984) (describing a child born to removable noncitizens as "a United States citizen by virtue of her birth in the United States"); *Herrera v. Finan*, 709 F. App'x 741, 743 (4th Cir. 2017) (explaining that the plaintiff "was born in the United States and, thus, is a United States citizen").

Binding precedent, text, history, and more than a century of practice thus all point in the same direction: the Executive Order violates the Citizenship Clause.

### 2. Defendants' alternative theories fail.

Defendants contend that "subject to the jurisdiction" means "owe primary allegiance." U.S. Br. 14. And they say that the test for owing allegiance is where someone is "domiciled." *Id.* at 20. Defendants cite no case decided since *Wong Kim Ark* that supports their reading of the Citizenship Clause. This Court should not be the first to embrace their novel theories.

***Text.*** Defendants' interpretation has no basis in the text of the Citizenship Clause. The Clause says nothing about allegiance or

domicile. "Jurisdiction" may be "a word of many, too many, meanings," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998), but the definition that Defendants suggest is not on the menu. In addition, whereas Defendants' rule focuses exclusively on whether a child's *parents* are subject to the jurisdiction of the United States, the text of the clause asks whether the *child* is subject to the jurisdiction. And a child born within the United States obtains "allegiance by birth." *Wong Kim Ark*, 169 U.S. at 659 (quoting *Inglis*, 28 U.S. at 155 (Story, J., dissenting)).

**Precedent.** Defendants' theory is directly contrary to the holding of *Wong Kim Ark*. Wong Kim Ark's parents were subjects of the emperor of China and owed primary allegiance to that nation. Although they were "enjoying a permanent domicile and residence" in the United States at the time of Wong Kim Ark's birth, they were barred from ever becoming naturalized citizens under the Chinese Exclusion Acts and they eventually moved back to China. *Id.* at 652. Under a test based on parents' primary allegiance, Wong Kim Ark could not have been a citizen.

Even aside from the precise holding of *Wong Kim Ark*, Defendants' position conflicts with the Supreme Court's careful reasoning and rests on a chain of backwards logic. They first submit that all of *Wong Kim Ark*

was dicta, except for its final sentence, such that the reasoning of the opinion must be ignored. U.S. Br. 7-8, 43-47. With the reasoning of the decision cast aside, Defendants then attempt to fill the void by reverse engineering new exceptions to birthright citizenship. They posit false commonalities between the existing exceptions to birthright citizenship and their invented allegiance and domicile requirements. Every step in Defendants' argument is wrong.

To start, *Wong Kim Ark*'s reasoning is binding on this Court. A court's reasoning that directly supports its holding is not dicta, *Payne v. Taslimi*, 998 F.3d 648, 654-55 (4th Cir. 2021), and a lower federal court "cannot ignore the Supreme Court's explicit guidance simply by labeling it 'dicta,'" *Hengle v. Treppa*, 19 F.4th 324, 346 (4th Cir. 2021).

Once *Wong Kim Ark*'s reasoning is considered, Defendants' attempt to rewrite the Citizenship Clause falls apart. The *Wong Kim Ark* majority considered and rejected many of Defendants' arguments. Significantly, the two Supreme Court cases on which Defendants principally rely—*The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), and *Elk v. Wilkins*, 112 U.S. 94 (1884)—were decided before *Wong Kim Ark* and were dismissed as irrelevant by the *Wong Kim Ark* majority.

*The Slaughter-House Cases* concerned the Privileges or Immunities Clause. In one sentence, the Supreme Court suggested that the Citizenship Clause, which was not directly at issue in the case, "was intended to exclude … citizens or subjects of foreign states." 83 U.S. at 73. *Wong Kim Ark* dismissed that language as an unconsidered detour: "This was wholly aside from the question in judgment, and from the course of reasoning bearing upon that question. It was unsupported by any argument, or by any reference to authorities." 169 U.S. at 678. The Supreme Court in *Wong Kim Ark* thus gave *The Slaughter-House Cases* no weight.

*Wong Kim Ark* distinguished *Elk* as well. In *Elk*, the Supreme Court had held that the Citizenship Clause does not apply to children born to members of Indian tribes. The Court based that decision on unique characteristics of the tribes, including that they "were alien nations" and "distinct political communities," although technically within the boundaries of the United States. *Elk*, 112 U.S. at 99. Accordingly, the Supreme Court in *Elk* compared the status of Indian children born on tribal lands to "the children of subjects of any foreign government born within the domain of that government." *Id.* at 102. In *Wong Kim Ark*, the

Supreme Court concluded that *Elk*'s reasoning did not translate outside the context of the tribes: "The decision in *Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of [other races], not in the diplomatic service of a foreign country." 169 U.S. at 682.

*Allegiance.* In any event, the inferences that Defendants draw from the traditional exceptions are wrong. Defendants claim that reading "jurisdiction" to mean "regulatory jurisdiction" "cannot explain the exclusion of children born to Tribal Indians" or the "other exclusions the Supreme Court has recognized." U.S. Br. 11. Defendants suggest that a test based on "primary allegiance" better explains those exceptions. *Id.* at 14. But the jurists and statesmen who developed those exceptions all understood them in terms of regulatory authority. The traditional exceptions either involve situations in which the United States literally cannot exercise authority or depend on a waiver of authority by the sovereign. The exception for occupying armies falls into the former category, *Rice*, 17 U.S. at 254-55, while the exception for foreign ministers falls into the latter one, *Schooner Exch.*, 11 U.S. at 136-38.

The status of Indian tribes in 1866 combined elements from both categories. There were many tribes at that time located in remote areas where the government physically could not regulate. *See* Ramsey, *supra*, at 444. Other tribes had treaties in which the United States "confirmed a degree of self-government and independence from U.S. interference in internal tribal matters." *Id.* at 443. It is true that soon after ratification of the Fourteenth Amendment, the relationship between the federal government and the tribes changed. Defendants cite cases discussing the greater regulation of Indian tribes in modern times, *see* U.S. Br. 17-18, but "[w]e must be careful not to allow legal concepts of Indian status current in the twenty-first century to mislead us into believing that Indian law at the time was analogous to Indian law today." Epps, *supra*, at 362. It is thus exemption from sovereign authority, not primary allegiance to another country, that ties the narrow historical exceptions together.

Several other aspects of Defendants' allegiance theory are inconsistent with *Wong Kim Ark*. Defendants argue that after the Revolution, U.S. law departed from English common law. *See, e.g.*, U.S. Br. 47-49. *Wong Kim Ark* expressly considered and rejected this

argument, explaining that the common-law rule "was in force in all the English Colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the Constitution as originally established." 169 U.S. at 658; *see also id.* at 705-06 (Fuller, J., dissenting) (describing the majority as holding that the Citizenship Clause "must be interpreted in the light of the English common law rule which made the place of birth the criterion of nationality").

Relatedly, throughout their brief, Defendants cite various international-law treatises. But *Wong Kim Ark* rejected the contention "that the rule of the Roman law, by which the citizenship of the child followed that of the parent, was the true rule of international law, as now recognized in most civilized countries." 169 U.S. at 666. And the Supreme Court concluded that, in any event, "modifications of the rule in Europe … have no important bearing upon the interpretation and effect of the Constitution of the United States," which had adopted "the ancient rule of citizenship by birth within the dominion." *Id.* at 667.

Defendants are thus wrong to rely on scholars of international law, such as the Swiss writer Emmerich de Vattel, who espoused adopting the

rule of *jus sanguinis*, or right of blood. *See* U.S. Br. 25-26. Although some other countries were adopting that alternative model around the time of the Founding, it was never the law in the United States. Vattel posited a rule that "in order to be of the country, it is necessary that a person be born of a father who is a citizen." Emmerich de Vattel, *The Law of Nations*, § 212, at 101 (1797 ed.). *Wong Kim Ark* expressly rejected that notion. Indeed, not even the Executive Order embraces Vattel's position that only citizen parents can have citizen children. If the Framers of the Fourteenth Amendment had wanted to limit citizenship to the children of citizens, it would have been easy to say so directly.

Defendants also cite one sentence from Justice Story's conflict of law treatise, which proposes denying citizenship to the children of temporary visitors. U.S. Br. 26-29. But in the very next sentence, Justice Story candidly concedes that "[i]t would be difficult, however, to assert, that in the present state of public law such a qualification is universally established." Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834). No matter what was happening abroad, U.S. law remained firmly rooted in *jus soli*.

Nor does Defendants' invocation of the Civil Rights Act of 1866 change the analysis. That legislation used different wording from the Citizenship Clause, requiring that a child be "not subject to any foreign power." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27. *Wong Kim Ark* read that language as simply a different formulation of the same common-law rule. The Act's locution was "not intended to exclude any children born in this country from the citizenship which would theretofore have been their birthright; or, for instance, for the first time in our history, to deny the right of citizenship to native-born children of foreign white parents not in the diplomatic service of their own country, nor in hostile occupation of part of our territory." *Wong Kim Ark*, 169 U.S. at 688. That reading is consistent with the understanding of Senator Trumbull, the Act's principal sponsor. When asked whether the Act would "have the effect of naturalizing the children of Chinese and Gypsies born in this country[,]" Senator Trumbull responded, "Undoubtedly." Cong. Globe, 39th Cong., 1st Sess. 498 (1866). In any event, the language of the Act "gave way" to the superior "affirmative words" of the Constitution, which removed "any possible doubt" about the scope of the rule. *Wong Kim Ark*, 169 U.S. at 688.

***Domicile.*** Defendants' arguments based on parental domicile are unpersuasive. Although the word "domicile" appears in *Wong Kim Ark*, the Supreme Court never suggested it was central—or even relevant—to the holding. In the sentence Defendants quote, U.S. Br. 45, the Court simply listed facts about the case, including not only that Wong Kim Ark's parents were domiciled but also that they were "of Chinese descent" and "carrying on business." *Wong Kim Ark*, 169 U.S. at 705. No one would argue that the Court's decision applies only to Chinese businessowners. Rather, the Court held that the Citizenship Clause incorporates, "by the fewest and fittest words," only the few narrow, historically grounded exceptions. *Id.* at 682.

In declaring its "irresistibl[e]" legal "conclusions," the Supreme Court emphasized that even "local and temporary" allegiance—lasting only so long as a noncitizen is present on U.S. soil—suffices to make someone "completely subject to the political jurisdiction of the country." *Id.* at 693. The Court rejected any requirement of permanent residence or domicile, emphasizing that noncitizens are subject to U.S. jurisdiction "[i]ndependently of a residence with intention to continue such residence"

and "independently of any domiciliation." *Id.* at 693 (internal quotation marks omitted).

Defendants' reliance on cases linking domicile and allegiance more generally, *see* U.S. Br. 20-21, 45-46, is misplaced. None of those cases address whether either domicile or allegiance is necessary for a nation to establish jurisdiction over a person or is a prerequisite for birthright citizenship. Defendants' treatise citations fare no better. Some of those treatises predate *Wong Kim Ark*, while others ignore it altogether. *See* U.S. Br. 32. Many are quoted out of context. For example, Defendants cite Clement L. Bouvé's treatise, *see* U.S. Br. 46, but when read in context, Bouvé's analysis contradicts their theory. The treatise asks whether parents' unlawful status or undesired allegiance affects the citizenship of a child born in the United States, and answers: "[o]bviously not." Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 425-26 (1912). Bouvé reasoned that even unlawfully present noncitizens are fully subject to U.S. jurisdiction because "[t]heir temporary allegiance to the United States was complete and gave rise to reciprocal protection," including the ability "to enjoy and exercise the rights and duties incident thereto." *Id.*

at 426. Accordingly, in *Plyler v. Doe*, the Supreme Court cited the same Bouvé treatise for the proposition that "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." 457 U.S. 202, 211 n.10 (1982).

Nor are Defendants even right about who has "the legal capacity to establish domicile" in the United States. U.S. Br. 34-35. Domicile is based simply on residence and the "intention of making it the home of the party." Story, *supra*, § 44, at 42; *see, e.g.*, *The Venus*, 12 U.S. (8 Cranch) 253, 279 (1814). Immigration status is not a component of the domicile test. *See, e.g.*, *Plyler*, 457 U.S. at 227 n.22 ("[I]llegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State.").

In sum, binding Supreme Court precedent forecloses Defendants' novel theories.

### B. The Executive Order Independently Violates the Immigration and Nationality Act.

Plaintiffs are also likely to succeed on their statutory claim, which Defendants all but ignore. *See* U.S. Br. 50. Although the district court did

not reach that claim, it is separate from Plaintiffs' constitutional claim and provides an independent basis for enjoining the Executive Order.

A statute must be "interpret[ed] … in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). When "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (internal quotation marks omitted). That old soil includes prior judicial interpretations of a term of art: courts presume that Congress is "aware of the longstanding judicial interpretation of [a] phrase and intend[s] for it to retain its established meaning." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018). "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952).

In language that mirrors the Fourteenth Amendment, Section 1401(a) provides that all those "born in the United States, and subject to the jurisdiction thereof," "shall be nationals and citizens of the United

States at birth." 8 U.S.C. § 1401(a). Congress first enacted that language as Section 201 of the Nationality Act of 1940, Pub. L. No. 76-853, 54 Stat. 1137, 1138, and then re-enacted it as Section 301 of the Immigration and Nationality Act of 1952 ("INA"), Pub. L. 82-414, 66 Stat. 163, 235. When Congress borrowed the Constitution's language for use in the statute, it intended to codify what was then the accepted interpretation of the Citizenship Clause. In the middle of the 20th Century, it was universally understood that the phrase "subject to the jurisdiction thereof" in the Citizenship Clause, as interpreted in *Wong Kim Ark*, conferred citizenship on nearly all children born in the United States, regardless of their parents' immigration status. The statutory language thus brings with it the "old soil" principle of *jus soli*, as delineated in *Wong Kim Ark*. Even if the Constitution could be reinterpreted, the statute cannot be, because Congress's intent controls.

The 1940 Act was drafted by a committee that President Franklin D. Roosevelt commissioned to create a comprehensive code governing nationality. *See* Exec. Order No. 6,115, Revision and Codification of the Nationality Laws of the United States (Apr. 25, 1933); *see also* Immigration Scholar Amicus Br. 8-10 (ECF 63) (detailing the drafting

history of the 1940 Act). The Committee's report, which President Roosevelt sent to Congress along with the proposed legislation, explains that the statute "is in effect a statement of the common-law rule, which has been in effect in the United States from the beginning of its existence as a sovereign state, having previously been in effect in the colonies." H. Comm. on Immigr. and Naturalization, Nationality Laws of the United States: Message from the President of the United States, 76th Cong. 418 (Comm. Print 1939). Citing both the Supreme Court's decision in *Wong Kim Ark* and the New York Chancery Court's decision in *Lynch v. Clarke*, the report stated that the statute, like the Fourteenth Amendment, guarantees citizenship to "a child born in the United States of parents residing therein temporarily." *Id.* The authors of the report understood *Wong Kim Ark* to stand for the proposition that "it is the fact of birth within the territory and jurisdiction, *and not the domicile of the parents*, which determines the nationality of the child." *Id.* (emphasis added).

The House sponsor of the Act and the chairman of the Committee on Immigration and Naturalization echoed that understanding. He explained that those "who[] through accident of birth and circumstances have been born in the United States of alien parents . . . can claim

citizenship." 86 Cong. Rec. 11944 (1940) (statement of Rep. Dickstein). Similarly, a State Department official and leading member of the President's committee that drafted the 1940 Act had previously written that the American conception of birthright citizenship was "taken from the common law of England" and thus "makes no distinction between persons born in the country of alien sojourners and those born of domiciled aliens." Richard W. Flournoy, Jr., *Dual Nationality and Election*, 30 Yale L.J. 545, 553 (1921).

Twelve years later, Congress re-enacted Section 1401(a) in the INA with the same understanding of who is subject to the jurisdiction of the United States. The House Judiciary Committee report on the INA explained the import of *Wong Kim Ark* as follows: "In sustaining Ark's citizenship the Court held that the fourteenth amendment … is but declaratory of the common-law principle unreservedly accepted in England since Calvin's case … and in the United States since the Declaration of Independence, that all persons, regardless of the nationality of their parents born within the territorial limits of a State are ipso facto citizens of that State." H.R. Rep. No. 82-1365, at 25 (1952).

Context confirms that Section 1401(a) confers citizenship on the classes of children covered by the Executive Order. The Alien Registration Act of 1940, enacted just a few months before the Nationality Act, included a "suspension of deportation" provision that permitted the Attorney General to suspend the deportation of a noncitizen "if he finds that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien." *See* Pub. L. No. 76-670, § 20, 54 Stat. 670, 672 (1940). The statute required the Attorney General to report suspensions to Congress, which had the power to veto them through a resolution of disapproval.

During the period between 1940 and 1952, Attorneys General regularly suspended deportation for parents who entered the country illegally and then had children who were born in the United States, on the grounds that the children were U.S. citizens. *See* Immigration Scholar Amicus Br. 27-29 (ECF 63) (collecting examples). Congress repeatedly allowed those suspensions, accepting the Attorney General's conclusion that U.S.-born children with undocumented parents are

citizens by birth. *Id.* at 29. That same understanding is embedded in Section 1401(a).

During this era, the Executive Branch consistently acknowledged that children born in the United States to undocumented parents were birthright citizens. For instance, in 1930, the State Department clarified that under *Wong Kim Ark*, even a child "born at Ellis Island" to an "alien mother [who] was never admitted into the United States" was a citizen at birth. 3 Green Haywood Hackworth, *Digest of International Law*, ch. 9, § 221, at 10 (1942); *see also* Brief for Respondent at 7, *U.S. ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72 (1957) (No. 56-205), 1957 WL 87025, at *7 (stating that a child born in 1951 to parents unlawfully present in the country "is a citizen of the United States").

The current version of the statute carries forward that traditional understanding of birthright citizenship. The INA creates a comprehensive scheme governing the citizenship and immigration status of every person within the United States. But if Defendants' argument is correct, the statute completely ignores millions of people who have been born in the United States to undocumented parents or parents who are lawfully but temporarily present. That is an implausible reading.

In short, there is no serious dispute that under "the ordinary public meaning of" Section 1401(a) "at the time of its enactment," *Bostock*, 590 U.S. at 654, the phrase "subject to the jurisdiction thereof" carved out only the narrow historical exceptions identified in *Wong Kim Ark*, with all other children born in the United States entitled to citizenship, regardless of their parentage. Indeed, in their briefing before the Supreme Court at the stay stage, Defendants conceded that was the accepted understanding of birthright citizenship during the 20th Century. *See* Application for Partial Stay at 10, *Trump v. CASA, Inc.*, No. 24A884 (U.S. Mar. 13, 2025), 2025 WL 817770, at *10. Plaintiffs are likely to succeed on their claim that the Executive Order violates that "old soil" principle as incorporated in the statute.

## II. Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction.

Defendants' brief does not challenge the district court's finding that the Executive Order is likely to inflict "grave, irreparable harm" on Plaintiffs, JA121, perhaps because Defendants know that it will. The denial of babies' constitutional right to citizenship is per se irreparable injury: "Because there is a likely constitutional violation, the irreparable

harm factor is satisfied." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).

Citizenship, in particular, "is a most precious right." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963). Loss of that right represents "the total destruction of the individual's status in organized society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). Stripping citizenship is "a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development." *Id.* "The denial of the precious right to citizenship for any period of time will cause [Plaintiffs] irreparable harm." JA119.

The practical consequences of denying citizenship are severe. Denial of U.S. citizenship under the Executive Order will leave many babies stateless. JA48. The risk of statelessness is especially high for children born to parents who are seeking asylum. JA48. Because many asylum seekers have been persecuted and tortured by the governments in their home countries, they cannot safely obtain citizenship for their children from those governments. JA88 (Monica's fears about statelessness); JA90 (Trinidad Garcia); JA83-84 (Liza); *see also* JA73-74

(ASAP declaration). Stateless newborns' "very existence" is subject to "the sufferance of the country in which [they] happen[] to find [themselves]." *Trop*, 356 U.S. at 101. Such children have "lost the right to have rights." *Id*. at 102.

The Executive Order may also subject babies born in the United States to removal. The Order threatens to tear families apart, leaving newborns without any legal status in this country even if their older siblings are citizens and their parents have a legal right to remain in the United States. JA120; *see also, e.g.*, JA85 (Maribel's fears about family separation). The Order thus leaves parents in the dark about "when and for what cause" their children's "existence in [their] native land may be terminated." *Trop*, 356 U.S. at 102.

And the Executive Order is causing overwhelming stress and anxiety to vulnerable pregnant moms. *See, e.g.*, JA82 (Juana expressing fears about the uncertainty surrounding her unborn baby's status); JA90 (Trinidad Garcia). Pregnant mothers are facing the threat that their babies may be born without citizenship, undermining their plans for those children and for their families more broadly. JA73-75. And without U.S. citizenship, newborns may immediately lose access to essential

government benefits, making it difficult for needy families to obtain nutrition and healthcare. JA120; *see also* JA61-63; JA74-75. This stress is already affecting maternal health, and if the Executive Order goes into effect, those harms will only intensify for pregnant mothers and their children. These life-altering consequences constitute irreparable harm.

## III. The Balance of Equities and Public Interest Favor Plaintiffs.

The district court correctly concluded that the final two preliminary injunction factors, which merge when the government is a party, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), also "weigh very strongly" in Plaintiffs' favor. JA121. As this Court has consistently recognized, upholding constitutional rights always serves the public interest. *See Centro Tepeyac*, 722 F.3d at 191; *Leaders of a Beautiful Struggle*, 2 F.4th at 346.

The injunction also serves the public interest by preventing the nationwide chaos that will result if the Executive Order goes into effect. As this Court previously explained, "[i]t is hard to overstate the confusion and upheaval that will accompany any implementation of the Executive Order." ECF 29 at 5-6. A birth certificate has long been sufficient proof of U.S. citizenship, but that will no longer be true if the Executive Order

goes into effect. "Existing administrative systems will fail, states and localities will bear the costs of developing new systems for issuing birth certificates and verifying citizenship, and anxious parents-to-be will be caught in the middle." *Id.* at 6.

Defendants claim that the injunction harms the public interest by interfering with the President's efforts to secure the border. U.S. Br. 62. That argument is triply flawed. First, this is not a case about immigration. It concerns the rights of U.S. citizens by birth. Second, reinterpreting the Fourteenth Amendment in derogation of binding Supreme Court precedent is not among the President's powers over immigration. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 177 (1803). Third, it is Congress, not the President, that has "plenary power" to set immigration rules. *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). Through 8 U.S.C. § 1401(a), Congress adopted the Supreme Court's interpretation of the Citizenship Clause, and that statute binds the President.

In any event, Defendants cannot show that they will be harmed by an injunction that merely maintains the status quo of birthright

citizenship that has prevailed since the Civil War. As this Court explained in its order denying a stay, "[f]or well over a century, the federal government has recognized the birthright citizenship of children born in this country to undocumented or non-permanent immigrants, a practice that was unchallenged until last month." ECF 29 at 4. Defendants have shown no urgent need to depart from that settled understanding during the pendency of this litigation.

## IV. The Scope of the District Court's Injunction Is Appropriate.

This Court reviews the scope of a preliminary injunction only for an abuse of the district court's "wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (internal quotation marks omitted); *Centro Tepeyac*, 722 F.3d at 188. Here, the district court properly issued an injunction that covers all members of Associational Plaintiffs CASA and ASAP; that benefits similarly situated nonparties to ensure complete relief to

Plaintiffs; and that bars implementation and enforcement of the Executive Order.[3]

## A. The Injunction Properly Covers All Members of CASA and ASAP.

As an initial matter, Defendants' assertion that "[a]ny relief should be limited to those identified members whose standing is established," U.S. Br. 55-56, conflicts with decades of precedent on associational standing.

As the Supreme Court has recently reaffirmed, an association can "assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To do so, the association must demonstrate only (1) that one of its members would have standing to sue in her own right, (2) that the litigation is germane to the organization's purpose, and (3) that neither the claim asserted nor the relief requested requires the participation of individual members. *Id.*

---

[3] To the extent the Supreme Court's decision on Defendants' stay application alters the analysis on any of those points, Plaintiffs would be happy to provide supplemental briefing.

Defendants' novel proposal that each member of an association must establish individual standing before she can benefit from an injunction is inconsistent with the third prong of that test, which is premised on a court's ability to provide "the relief requested" without "the participation of individual members." *Id.* (internal quotation marks omitted). Under longstanding associational standing precedent, an organization may "invoke the court's remedial powers on behalf of its members" to obtain an injunction that "will inure to the benefit of those members of the association actually injured," without their individual appearance in the court. *Warth*, 422 U.S. at 515.

Accordingly, the Supreme Court has repeatedly found associational standing and approved broad injunctive relief without requiring that each injured member be specifically identified. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (affirming broad permanent injunction awarded to associational plaintiff and holding that "the request for declaratory and injunctive relief" did not require "individualized proof" and was "properly resolved in a group context"); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 280, 282-83 (1986) (finding associational standing to

seek injunction without requiring individual member participation where "a large number" of members were injured, even though other members "have no interest in this case and no standing to seek any judicial relief" (internal quotation marks omitted)); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718-19 (2007) (finding associational standing even though some members might not ultimately share in the injury).

Consistent with that Supreme Court precedent, lower courts likewise routinely find associational standing, and grant injunctions to associational plaintiffs, without requiring each member to come to court and prove their individual standing. *See, e.g.*, *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 683 (4th Cir. 2020) (finding associational standing where "at least some" of the association's members would have individual standing); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186-88 (4th Cir. 2007) (finding associational standing for trade association based on injury to only one member and affirming final judgment striking down state statute); *see also Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (Alito, J.) ("The Supreme Court has repeatedly held that requests by an association for declaratory

and injunctive relief do not require participation by individual association members.").

Plaintiffs satisfied the requirements for associational standing in the district court, as Defendants do not contest. They can therefore obtain relief for all members of CASA and ASAP without individual members' participation in the suit.

### B. A Universal Injunction Is Necessary for Complete Relief.

The injunction also properly benefits nonparties who are similarly situated to members of CASA and ASAP. This Court's precedent "affirm[s] the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants." *Roe*, 947 F.3d at 232; *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021). As the district court correctly explained, a court "may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case." JA122 (internal quotation marks and alterations omitted).

Contrary to Defendants' assertions, U.S. Br. 56-60, a broad injunction is appropriate given the extraordinary circumstances of this case. Most importantly, "[o]nly a nationwide injunction will provide

complete relief to the plaintiffs" because a narrower injunction would be unworkable. JA123. As many courts have recognized, a universal injunction can be necessary to remedy a plaintiff's own injuries, including when a narrower injunction "would be impractical." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022); *see also, e.g.*, *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021); *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020); *Doe #1 v. Trump*, 957 F.3d 1050, 1069-70 (9th Cir. 2020).

In this case, only a universal injunction will prevent irreparable harm to Plaintiffs. Between them, CASA and ASAP have more than 800,000 members residing in all 50 states. An injunction requiring Defendants to recognize only the citizenship of children born to those members would be unworkable. If the Executive Order goes into effect and birth certificates are no longer adequate proof of U.S. citizenship, that will put an enormous burden on local governments and hospitals to devise new systems for determining the citizenship of the thousands of babies born across the country each day. Layered on top of that chaos, a party-specific injunction would require those determining a baby's citizenship to also consider whether parents are members of CASA or

ASAP. For those members, a party-specific injunction would require them to reveal sensitive information about their association with CASA or ASAP, potentially exposing vulnerable parents to retaliation. That would raise serious constitutional concerns. *See NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958). Many CASA and ASAP members would likely fall through the cracks, with citizenship denied to their babies based on administrative errors. Defendants now say a party-specific injunction would be workable, U.S. Br. 59-60, but they offered no explanation to the district court of how it would actually work.

A universal injunction is also appropriate to preserve the equal treatment of newborns under the Citizenship Clause. Citizenship is a matter of special nationwide concern and requires nationwide consistency, as Congress recognized when crafting the Citizenship Clause after the Civil War. The injunction preserves the uniformity of this most fundamental right. *See HIAS*, 985 F.3d at 327. Absent a nationwide injunction, a baby's entitlement to citizenship would depend on whether her parents were part of this or another lawsuit. That cannot be the rule of citizenship in the United States.

## C. The District Court Properly Enjoined Both Implementation and Enforcement.

The district court enjoined the "implementation and enforcement" of the Executive Order. JA125. Defendants contend that by barring "implementation," the preliminary injunction improperly interferes with the Executive Branch's prerogatives. U.S. Br. 60. Defendants failed to raise this argument when opposing Plaintiffs' preliminary-injunction motion, so this Court should not consider it. In any event, the argument is unpersuasive.

There is no difference between "enforcement" and "implementation" under the Executive Order. In common parlance, the words "enforce" and "implement" both mean to put a law into practice. *See Enforce*, Merriam-Webster's Online Dictionary, perma.cc/8GJA-DXXX ("to give force to" or "to carry out effectively"); *Implement*, Merriam-Webster's Online Dictionary, perma.cc/Q9HQ-KZYC (to "carry out" or to "accomplish"). Accordingly, the Executive Order uses "enforcement" and "implementation" interchangeably. Section 3, which Defendants identify as concerning implementation, U.S. Br. 61, is titled "Enforcement." That enforcement provision directs agencies to "issue public guidance … regarding this order's *implementation*." Order § 3(b) (emphasis added).

In light of that structure, it is unclear how a court could distinguish between implementation and enforcement of the Order—or how it could enjoin one but not the other.

Defendants suggest that enforcement is public-facing whereas implementation is internal. U.S. Br. 61. But they muddy that distinction by classifying the "publishing" of "regulations and guidance" as somehow on the internal side of the line. *Id.* Public issuance of guidance announcing a policy of refusing to recognize the citizenship of babies born to parents covered by the Executive Order could itself impose irreparable harm. At best, such guidance would cause further confusion and fear among expecting parents, potentially affecting maternal health. At worst, the guidance itself could be used as a basis to deny the legal status of children born in the United States.

The district court properly enjoined both implementation and enforcement. If Defendants would like to take certain internal steps relating to the Executive Order and are uncertain whether those steps would qualify as implementation, they should seek clarification in the district court.

## CONCLUSION

The district court's preliminary injunction should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument.

Respectfully submitted this 30th day of May 2025.

Nicholas Katz, Esq.
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
(240) 491-5743
nkatz@wearecasa.org

Conchita Cruz
Jessica Hanson
Zachary Manfredi
Dorothy Tegeler
Leidy Perez
ASYLUM SEEKER ADVOCACY
PROJECT
228 Park Ave. S., #84810
New York, NY 10003
(646) 600-9910
conchita.cruz@asylumadvocacy.org

/s/ William Powell
William Powell
Mary B. McCord
Kelsi Brown Corkran
Rupa Bhattacharyya
Joseph W. Mead
Alexandra Lichtenstein
Gregory Briker
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY AND PROTECTION
GEORGETOWN LAW
600 New Jersey Ave. NW
Washington, D.C. 20001
Phone: (202) 661-6629
Fax: (202) 661-6730
whp25@georgetown.edu

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a). This brief contains 12,972 words, excluding the parts of the document exempted by Rule 32(f), and was prepared in 14-point Century Schoolbook font, a proportionally spaced typeface, using Microsoft Word.

/s/ William Powell
William Powell
Counsel for Plaintiffs-Appellees

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ William Powell
William Powell
Counsel for Plaintiffs-Appellees