# No. 25-1153

# United States Court of Appeals
### *for the*
# Fourth Circuit

—————

CASA, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants*.

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
CASE NO. 8:25-cv-201-DLB

—————

## BRIEF OF NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION, ET AL. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

—————

WENDY M. FENG
SEYFARTH SHAW LLP
999 Third Avenue, Suite 4700
Seattle, Washington 98104
Telephone: (206) 946-4910
Facsimile: (206) 946-4901
wfeng@seyfarth.com

RAHAT N. BABAR*
EDGAR CHEN*
CHRIS M. KWOK*
NATIONAL ASIAN PACIFIC
AMERICAN BAR ASSOCIATION
1612 K Street NW, Suite 300
Washington, D.C. 20006
(202) 775-9555
*Not admitted in the Fourth Circuit*

LORI CHEN
SEYFARTH SHAW LLP
975 F Street, NW
Washington, DC 20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5393
lochen@seyfarth.com

OWEN R. WOLFE
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-3389
Facsimile: (212) 218-5526
owolfe@seyfarth.com

*Attorneys for Amici Curiae*

# LIST OF *AMICI CURIAE*

Alabama Asian Pacific American Bar Association

Arizona Asian American Bar Association

Asian American Bar Association of Greater Chicago

Asian American Bar Association of the Greater Bay Area

Asian American Bar Association of Houston

Asian American Bar Association of New York

Asian American Bar Association of Ohio

Asian American Criminal Trial Lawyers Association

Asian American Lawyers Association of Massachusetts

Asian Bar Association of Washington

Asian Pacific American Bar Association of Central Ohio

Asian Pacific American Bar Association of Colorado

Asian Pacific American Bar Association of the Greater Washington, D.C. Area

Asian Pacific American Bar Association of Los Angeles County

Asian Pacific American Bar Association of Maryland

Asian Pacific American Bar Association of Pennsylvania

Asian Pacific American Bar Association of Silicon Valley

Asian Pacific American Bar Association of South Florida

Asian Pacific American Bar Association of Tampa Bay

Asian Pacific American Lawyers Association of New Jersey

Asian Pacific American Women Lawyers Alliance

Asian/Pacific Bar Association of Sacramento

California Asian Pacific American Bar Association

Connecticut Asian Pacific American Bar Association

Dallas Asian American Bar Association

Filipino American Lawyers Association of Chicago

Filipino American Lawyers Association of New York

Filipino American Lawyers of San Diego

Filipino Bar Association of Northern California

Filipino Lawyers of Washington

Filipino-American Lawyers of Orange County

Greater Orlando Asian American Bar Association

Guam Bar Association

Korean American Bar Association of San Diego

Korean American Bar Association of Southern California

Korean American Bar Association of Washington, DC

Minnesota Asian Pacific American Bar Association

Missouri Asian American Bar Association

National Asian Pacific American Bar Association

National Asian Pacific American Bar Association Hawaii

National Asian Pacific Islander Prosecutors Association

National Filipino American Lawyers Association

National Conference of Vietnamese American Attorneys

Orange County Korean American Bar Association

Pan Asian Lawyers of San Diego

Philippine American Bar Association

Sacramento Filipino American Lawyers Association

Southern California Chinese Lawyers Association

Vietnamese American Bar Association of Northern California

Vietnamese American Bar Association of Washington

## DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), each of the above-listed *Amicus Curiae* organizations states that it has no parent corporation and that no publicly held companies hold 10% or more of its stock.

# TABLE OF CONTENTS

LIST OF *AMICI CURIAE* ........................................................................... i

DISCLOSURE STATEMENT ................................................................... iv

TABLE OF AUTHORITIES ..................................................................... vi

IDENTITY AND INTERESTS OF *AMICUS CURIAE* ...........................1

SUMMARY OF ARGUMENT ....................................................................2

ARGUMENT ...............................................................................................3

    I.    A brief background on *Wong Kim Ark* ....................................3

    II.    The social and legal landscape of Wong Kim Ark's day .....................5

        A.    States and Congress began to enact laws seeking to bar Chinese migrants around the time of Wong Kim Ark's birth ........................................................................6

        B.    Chinese migrants faced widespread violence due to the anti-immigrant sentiments of the time ........................9

    III.    Wong Kim Ark's parents are not analogous to present-day immigrants ...............................................................10

    IV.    EO 14160 would have devastating effects on Asian American communities .....................................................15

CONCLUSION ..........................................................................................16

CERTIFICATE OF COMPLIANCE........................................................18

CERTIFICATE OF SERVICE .................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chae Chan Ping v. U.S.*,
   130 U.S. 581 (1889)............................................................6, 13

*Chy Lung v. Freeman*,
   92 U.S. 275 (1875)...................................................................7

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893)................................................................13

*Ho Ah Kow v. Nunan*,
   12 F. Cas. 252; 1879 U.S. App. LEXIS 1629; 5 Sawy. 552; 13
   West. Jur. 409; 20 Alb. Law J. 250; 25 Int. Rev. Rec. 312 ..................6

*Lem Moon Sing v. United States*,
   158 U.S. 538 (1895)................................................................13

*Ozawa v. United States*,
   260 U.S. 178 (1922)................................................................12

*People v. Hall*,
   4 Cal. 399 (1854) ....................................................................9

*Tape v. Hurley*,
   66 Cal. 473, 9 P. 129 (1885) ......................................................6

*Thind v. United States*,
   261 U.S. 204 (1923)................................................................12

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898)..........................................................*passim*

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)................................................................6

**Statutes**

8 U.S.C. § 1153(a)(2).................................................................14

vi

8 U.S.C. § 1427 ............................................................................12

Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58 ........................8, 12

Geary Act, ch. 60, 27 Stat. 25 (1892) ............................................8

Immigration Act of 1917, ch. 29, 39 Stat. 874 ................................8

Immigration Act of 1924, ch. 190, 43 Stat. 153 ..............................11

Naturalization Act of 1790, ch. 3, 1 Stat. 103 ............................10, 12

Page Act of 1875, ch. 141, 18 Stat. 477 (repealed 1974) ...................7, 8

Scott Act, ch. 1064, 25 Stat. 504 (1888)......................................8, 13

**Other Authorities**

Amanda Frost, *"By Accident of Birth": The Battle over Birthright
    Citizenship After* United States v. Wong Kim Ark, 32 Yale J.L. &
    Human. 38-76 (2021) ..........................................................10

Angell Treaty, China-U.S., Nov. 17, 1880, 22 Stat. 826, *available at*
    https://tile.loc.gov/storage-services/service/ll/lltreaties/lltreaties-
    ustbv006/lltreaties-ustbv006.pdf ..........................................8

Beth Lew-Williams, The Chinese Must Go (2021)........................9

Burlingame-Seward Treaty, China-U.S., July 28, 1868, 18 Stat. 147,
    *available at* https://www.loc.gov/resource/rbpe.23602400/ ...........8, 11, 12

CAL. CONST. of 1879, art. XIX ..................................................6

*Characteristics of H-1B Specialty Occupation Workers, Fiscal Year
    2023 Annual Report to Congress October 1, 2022.September 30,
    2023*, US Citizenship and Immigration Services,
    https://www.uscis.gov/sites/default/files/document/reports/OLA_Si
    gned_H-1B_Characteristics_Congressional_Report_FY2023.pdf
    (March 6, 2024) ...............................................................16

Chinese Labor and the Iron Road, National Park Services,
    https://www.nps.gov/gosp/learn/historyculture/chinese-labor-and-
    the-iron-road.htm (last updated Aug. 13, 2023) .........................5

Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ...........................*passim*

*Green Card Processes and Procedures,* US Citizenship and
    Immigration Services, https://www.uscis.gov/green-card/green-
    card-processes-and-procedures (last updated Oct. 19, 2022) ...........................14

*I am a Lawful Permanent Resident of 5 Years*, US Citizenship and
    Immigration Services, https://www.uscis.gov/citizenship/learn-
    about-citizenship/citizenship-and-naturalization/i-am-a-lawful-
    permanent-resident-of-5-years (last updated Jan. 24, 2025) ...........................12

*International Travel as a Permanent Resident*, US Citizenship and
    Immigration Services, https://www.uscis.gov/green-card/after-we-
    grant-your-green-card/international-travel-as-a-permanent-resident
    (last updated Oct. 11, 2024) ...........................12

Janet Lau, *Stanley Hom Lau: Paper Son,* Prized Writing,
    https://prizedwriting.ucdavis.edu/stanley-hom-lau-paper-son (last
    visited April 16, 2025) ...........................14

Karthick Ramakrishnan et al., By The Numbers: Immigration, AAPI
    Data https://aapidata.com/featured/by-the-numbers-immigration/
    (Jan. 9, 2025) ...........................15

Kelly Wallace, Forgotten Los Angeles History: The Chinese Massacre
    of 1871, Los Angeles Public Library (May 19, 2017),
    https://www.lapl.org/collections-resources/blogs/lapl/chinese-
    massacre-1871 ...........................9

Kevin Waite, *The Bloody History of Anti-Asian Violence in the West,
    National Geographic* (May 10, 2021),
    https://www.nationalgeographic.com/history/article/the-bloody-
    history-of-anti-asian-violence-in-the-west ...........................9

*Rights and Responsibilities of a Green Card Holder (Permanent
    Resident)*, US Citizenship and Immigration Services,
    https://www.uscis.gov/green-card/after-we-grant-your-green-
    card/rights-and-responsibilities-of-a-green-card-holder-permanent-
    resident (last updated Oct. 11, 2024) ...........................15

*Tax information and responsibilities for new immigrants to the United Stat*es, IRS, https://www.irs.gov/individuals/international-taxpayers/tax-information-and-responsibilities-for-new-immigrants-to-the-united-states (last updated Oct 3, 2024) ..............................14

Tom Rea, The Rock Springs Massacre, WYO HISTORY (November 8, 2014), *available at* https://www.wyohistory.org/encyclopedia/rock-springs-massacre.....................9

Tracy Lachica Buenavista, *Deferred Action for Childhood Arrivals (DACA) and Undocumented Asian Americans and Pacific Islanders*, Asian American and Pacific Islander Research Coalition, https://www.higheredimmigrationportal.org/wp-content/uploads/formidable/13/Buenavista-ARC-AAPI-DACA-Brief-1.pdf (2014). ............................................................................16

U.S. CONST. amend. XIV ...............................................................2, 3, 16

U.S. Dep't of State, Foreign Affairs Manual, 9 FAM 402.10-10(A)(U)................12

Who Needs to Register, Selective Service System, https://www.sss.gov/register/who-needs-to-register/ (last visited April 16, 2025)...................................................................................14

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*

The National Asian Pacific American Bar Association (NAPABA) and 49 of its affiliate bar associations respectfully submit this *amicus curiae* brief in support of Plaintiffs-Appellees' position and affirmance of the district court's preliminary injunction order regarding Executive Order 14160, 90 Fed. Reg. 8449 (January 20, 2025), titled "Protecting the Meaning and Value of American Citizenship" (hereinafter, "EO 14160").[1]

The above-listed *amici curiae* are non-profit legal professional organizations representing the interests of over 80,000 Asian American, Native Hawaiian, and Pacific Islander (AANHPI) attorneys, judges, law professors, and law students. NAPABA's mission is to raise the visibility of, and advocate for, AANHPI legal professionals and the communities they represent, including but not limited to the AANHPI affinity bar organizations submitting this brief as *amici curiae*. Since its inception in 1988, NAPABA has served as the national voice for AANHPIs in the legal profession, promoting justice, equity, and opportunity for Asian Pacific Americans.

---

[1] Counsel for the parties did not author this brief in whole or in part. No party contributed financial support intended to fund the preparation or submission of this brief. No other individual(s) or organization(s) contributed financial support intended to fund the preparation or submission of this brief. All parties consent to the filing of this *amicus* brief.

As set forth below, EO 14160 will disproportionately harm Asian Americans, who make up a large share of the U.S. immigrant population. Accordingly, NAPABA has a strong interest in educating the profession and the broader public about the legal history relating to Asian migration to the United States and how those experiences and the resulting caselaw have uniquely shaped modern-day immigration and civil rights law. NAPABA has a strong interest in assisting the Court to understand this history and ensure that the promises of the Fourteenth Amendment are not unfairly denied to Asian Americans and other communities.

## SUMMARY OF ARGUMENT

The plain text of the Fourteenth Amendment and longstanding historical precedent should lead to the inevitable conclusion that EO 14160 is patently unconstitutional. Nonetheless, in an attempt to justify depriving millions of Americans of birthright citizenship, Defendants-Appellants distort the holding of *United States v. Wong Kim Ark*, relying upon the fact that Wong was born to parents who "were at the time of his birth domiciled residents of the United States, having previously established and still enjoying a permanent domicil[sic] and residence therein at San Francisco." 169 U.S. 649, 652 (1898). Based on the Court's dicta, Appellants assert that the Supreme Court's holding was limited "to the children of those with a 'permanent domicil[e] and residence in the United States'" and argue by analogy that only children of U.S. citizens or lawful permanent residents are

2

eligible for birthright citizenship under the Fourteenth Amendment of the Constitution. *See* Appellants' Br. at 11 (*quoting Wong Kim Ark*, 169 U.S. at 652-53).

Appellants' flawed conclusion relies upon a historically and legally inaccurate characterization of Wong Kim Ark's parents' circumstances to suggest that they were the equivalent of today's lawful permanent residents.[2] Nothing could be further from reality. As set forth below: (1) Chinese migrants during Wong Kim Ark's time suffered severe mistreatment and systematic exclusion, making the concept of permanent residency illusory; (2) Wong Kim Ark's parents possessed few of the rights enjoyed by today's immigrants and permanent residents; and (3) this history illustrates the disproportionately catastrophic harm that EO 14160 may impose on the AANHPI community.

## ARGUMENT

### I.    A brief background on *Wong Kim Ark*.

Wong Kim Ark was a California-born U.S. citizen whose return from an overseas trip to visit family in China resulted in months-long detention and a drawn-out legal battle for his right to remain and live in the only country he had ever called home. His case established a landmark precedent, affirming that the Citizenship

---

[2] While Appellants' interpretation of, and reliance on, the Supreme Court's dicta is inappropriate for numerous other reasons, this amicus brief addresses only the factually inaccurate historical context forming the basis of Appellants' comparison.

Clause of the Fourteenth Amendment applied to children born to non-citizens in the United States. *Wong Kim Ark*, 169 U.S. at 652–705. Wong Kim Ark was born in California in 1873 to Chinese parents who lived in and operated a business in San Francisco's Chinatown.[3] *Id.* at 652. As recounted by the Court, Wong's parents "continued to reside and remain in the United States until the year 1890, when they departed for China." *Wong Kim Ark*, 169 U.S. at 652.

In 1890, the then-17-year-old Wong "departed for China upon a temporary visit," returning home to the United States later that year without incident. *Id.* at 653. Wong continued to live in California into his 20s, reportedly working as a cook in San Francisco. In 1894, at the age of 21, Wong again made what the Court described as a "temporary visit" to China to see his family "with the intention of returning to the United States." *Id.* But when he attempted to re-enter the United States one year later, he was denied entry and detained with a threat of deportation "upon the sole ground that he was not a citizen of the United States." *Id.*

Although Wong's parents were described as "subjects of the Emperor of China," the Supreme Court found that Wong himself had always held "allegiance" to the United States. *Id.* at 652. In recounting the stipulated facts of the case, the Supreme Court noted:

---

[3] Although subsequent historical analyses and popular accounts have varied on different details, the facts of the case are recounted herein as they were described in the Supreme Court's recitation of the parties' agreed facts.

> Wong Kim Ark, ever since his birth, has had but one residence, to wit, in California, within the United States and has there resided, claiming to be a citizen of the United States, and has never lost or changed that residence, or gained or acquired another residence; and neither he, nor his parents acting for him, ever renounced his allegiance to the United States, or did or committed any act or thing to exclude him therefrom.

*Id.* at 652-53. Despite the numerous laws passed during Wong's life denying Chinese persons a pathway to U.S. citizenship, the 1898 Supreme Court held that "acts of Congress or treaties [excluding Chinese persons from naturalization] cannot exclude Chinese persons born in this country from the operation of the broad and clear words of the Constitution, 'All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States.'" *Id.* at 704.

## II.     The social and legal landscape of Wong Kim Ark's day.

Chinese migrants first arrived in the United States in large numbers beginning in 1849, contributing grueling—and often deadly—labor to the building of the transcontinental railway.[4] However, the influx of these laborers from China, and the early immigrant communities they established, were met by strong xenophobic sentiment and racial tensions. The prevailing hostile sentiments at the time are recounted in this summary of California politicians' grievances by the U.S. Supreme Court in 1889:

---

[4]  *See* Chinese Labor and the Iron Road, National Park Services, https://www.nps.gov/gosp/learn/historyculture/chinese-labor-and-the-iron-road.htm (last updated Aug. 13, 2023).

> [T]he presence of Chinese laborers had a baneful effect upon
> the material interests of the State, and upon public morals; that
> their immigration was in numbers approaching the character of
> an Oriental invasion, and was a menace to our civilization . . . .

*Chae Chan Ping v. U.S.*, 130 U.S. 581, 595-96 (1889). The Supreme Court noted

that politicians at the time were being asked "to take measures to prevent [the

Chinese migrants'] further immigration." *Id.* Thus, by the time Wong Kim Ark was

born in the late 1800s, the social and political sentiments were culminating in legal—

and illegal—efforts to prevent people like his parents from living, working, and

raising their families in American society.

### A. States and Congress began to enact laws seeking to bar Chinese migrants around the time of Wong Kim Ark's birth.

The mounting anti-Chinese sentiment was, predictably, accompanied by

aggressive efforts by lawmakers of the day to exclude Chinese migrants from living

and working in American society. California, where a significant portion of the

Chinese immigrant community lived, systematically imposed draconian measures

on persons of Chinese ancestry, including a constitutional ban on the employment

of "any Chinese or Mongolian" by any California company or government agency

6

and the exclusion of Chinese children from schools.[5] Other laws that were facially neutral were ultimately found to be discriminatory in intent and application.[6]

Laws were also enacted seeking, either directly or indirectly, to prevent the arrival of new immigrants. For example, a California law empowered the State's Commissioner of Immigration to, at his discretion, bar the arrival of any passenger deemed to be "lunatic, idiotic, deaf, dumb, blind, crippled . . . a convicted criminal, or a lewd or debauched woman." *See Chy Lung v. Freeman*, 92 U.S. 275, 276-77 (1875). As exemplified in *Chy Lung v. Freeman*, in which California's Commissioner of Immigration had ordered the detention and deportation of over 20 female passengers on a vessel from China, the statute (and many other similar laws) served to bar women of Asian descent from entering the United States under the gendered pretext of immorality. *See id.* After the Supreme Court struck down the California law in 1875,[7] the regulation of immigration largely shifted from state to federal jurisprudence.

---

[5] *See* CAL. CONST. of 1879, art. XIX; *Tape v. Hurley,* 66 Cal. 473, 9 P. 129 (1885) (upholding law permitting the exclusion of a San Francisco-born child of Chinese descent from attending California public school).

[6] *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886) (finding that law requiring permits for laundries targeted Chinese businesses in application); *Ho Ah Kow v. Nunan*, 12 F. Cas. 252 (No. 6546) (C.C.D. Cal. 1879) (ordinance permitting shearing of culturally-significant braided hair worn in queues by Chinese men was intended only for Chinese men and constituted cruel and unusual punishment).

[7] The California statute was found to be in violation of the Constitution, as State regulation of immigration conflicted with the exclusive authority of Congress to

The Page Act of 1875 was the first federal law designed to restrict immigration into the United States, barring "any importation . . . of women into the United States for the purposes of prostitution" and singling out those from "China, Japan, or any Oriental country."[8] The Angell Treaty of 1880 amended an earlier treaty between the United States and China (the Burlingame Treaty) to permit the United States to regulate, limit, or suspend the entrance or residence of Chinese immigrants.[9] These were followed by the Chinese Exclusion Act of 1882 (suspending the immigration of all Chinese laborers for 10 years), the Scott Act of 1888 (providing that any Chinese laborer previously residing in the United States who had left and not returned by the effective date of the Act could not return to or remain in the United States, including those holding reentry certificates who remained overseas), and the Geary Act of 1892 (extending the 1882 Chinese Exclusion for another decade and expanding its prohibitions).[10] Subsequent laws, such as the Immigration Act of 1917, more broadly banned immigrants from other parts of Asia.[11]

---

make laws governing foreign relations and international commerce. *See Chy Lung*, 92 U.S. at 281.

[8] Page Act of 1875, ch. 141, 18 Stat. 477 (repealed 1974).

[9] Angell Treaty, China-U.S., Nov. 17, 1880, 22 Stat. 826, *available at* https://tile.loc.gov/storage-services/service/ll/lltreaties/lltreaties-ustbv006/lltreaties-ustbv006.pdf.

[10] *See* Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58; Scott Act, ch. 1064, 25 Stat. 504 (1888); Geary Act, ch. 60, 27 Stat. 25 (1892).

[11] Immigration Act of 1917, ch. 29, 39 Stat. 874.

**B.    Chinese migrants faced widespread violence due to the anti-immigrant sentiments of the time.**

Throughout the years of Wong Kim Ark's childhood, Chinese migrants were faced with the threat of widespread violent attacks, expulsions, and lynchings.[12] Historians recount a systematic wave of anti-Chinese violence and expulsions that many would consider incomprehensible today:[13] In October 1871, a mob of over 500 swarmed the tiny Chinatown in Los Angeles, looting and gruesomely murdering 18 Chinese men in one of the largest lynchings in American history.[14] Nearly 30 Chinese persons were murdered in the 1885 Rock Springs massacre in Wyoming.[15] In the same year, between 150-200 Chinese persons were expelled at gunpoint in Tacoma, Washington, with their homes burned to the ground.[16] And in Wong Kim Ark's own hometown of San Francisco, when he was only about 4 years old, the deadly 1877 riot in San Francisco's Chinatown lasted for two days, with the mob of

---

[12] Kevin Waite, *The Bloody History of Anti-Asian Violence in the West, National Geographic* (May 10, 2021), https://www.nationalgeographic.com/history/article/the-bloody-history-of-anti-asian-violence-in-the-west.

[13] Laws at the time often protected the perpetrators of violence by prohibiting the testimony of non-Caucasian witnesses testifying against a "free white citizen." *See People v. Hall*, 4 Cal. 399 (1854) (reversing the murder conviction of a "free white citizen" upon the exclusion of testimony from Chinese eyewitnesses).

[14] Kelly Wallace, Forgotten Los Angeles History: The Chinese Massacre of 1871, LOS ANGELES PUBLIC LIBRARY (May 19, 2017), https://www.lapl.org/collections-resources/blogs/lapl/chinese-massacre-1871.

[15] Tom Rea, The Rock Springs Massacre, WYO HISTORY (November 8, 2014), *available at* https://www.wyohistory.org/encyclopedia/rock-springs-massacre.

[16] Beth Lew-Williams, The Chinese Must Go (2021).

hundreds looting and torching businesses in San Francisco's Chinatown and killing four Chinese immigrants.[17]

Possibly due to this widespread hostility and violence, Wong Kim Ark's parents—contrary to Appellants' attempted characterization of them as "permanent residents"—ultimately returned to China. As Professor Amanda Frost put it, Wong Kim Ark's parents "likely never considered America to be their permanent home, however, and for good reason. 'The Chinese must go,' was the slogan of one prominent labor leader—a message the family received daily in big ways and small.'"

## III.    Wong Kim Ark's parents are not analogous to present-day immigrants.

The immigration landscape of Wong Kim Ark differed dramatically from present-day immigration laws and regulations. When Wong Kim Ark was born, there was no concept of "illegal immigration" or "undocumented immigrants" as we understand it today. There was no Immigration and Customs Enforcement, Customs and Border Protection, Ellis Island, green cards, or visas. At the time, the only federal immigration law in place was the Naturalization Act of 1790, ch. 3, § 1, 1 Stat. 103. That statute limited *naturalization* to free, Caucasian persons, but *immigration* was, in theory, open to individuals of any race or nationality.[18] The only other federal

---

[17] Amanda Frost, *"By Accident of Birth": The Battle over Birthright Citizenship After* United States v. Wong Kim Ark, 32 Yale J.L. & Human. 38-76 (2021).
[18] *See, e.g., id.*

authority relating to "Chinese subjects visiting or residing in the United States" was the Burlingame Treaty of 1868, which permitted "Chinese subjects visiting or residing in the United States" to "enjoy the same privileges, immunities, and exemptions . . . as may there be enjoyed by the citizens or subjects of the most favored nation," while simultaneously providing that nothing in the treaty would "confer naturalization" upon them.[19] In other words, at the time of Wong Kim Ark's birth, the treaty conferred tourists with equal rights as so-called "residents"—the only categories of status available at the time.

Appellants' attempts to draw a fraught parallel between the lawful permanent residents of today (*i.e.*, "green card holders") and Wong Kim Ark's parents fail because the concepts of "lawful permanent residence" and visa-based legal residency simply did not exist in 1873.[20] At the time of Wong's birth, "permanent residence" for Chinese immigrants was an illusory concept that came under a withering barrage of legal attack. Besides having an unclear immigration status that was continuously and systematically derogated, Chinese migrants like Wong's

---

[19] Burlingame-Seward Treaty, China-U.S., July 28, 1868, 18 Stat. 147 art. VI, *available at* https://www.loc.gov/resource/rbpe.23602400/.

[20] It was not until the Immigration Act of 1924 that the concept of a lawful permanent resident as an immigration category was enshrined into statute. That law distinguished between "immigrants" (*i.e.*, those intending to stay permanently in the United States) and "non-immigrants" (*i.e.*, tourists and other temporary visitors). However, Asian immigrants were denied lawful permanent resident status at the time, as the Act extended a prior 1917 ban on immigration from most Asian countries to the entire continent of Asia.

parents did not have the same rights or responsibilities as modern-day immigrants and green card holders.

First and foremost, green card holders today have a pathway to U.S. Citizenship (8 U.S.C. § 1427)[21]—something expressly prohibited for Chinese migrants like Wong's parents. Similarly, H-1B visa holders may have "dual intent," permitting otherwise "temporary" nonimmigrant workers to seek lawful permanent residence.[22] Even holders of non-resident visas that do not carry a path to citizenship may potentially apply for a change of status to a resident visa or to a green card. Unlike today's legal immigrants, Wong's parents had no chance of ever gaining citizenship in the United States due to numerous legal barriers including the Naturalization Act of 1790, the Burlingame Treaty of 1868, the Chinese Exclusion Act of 1882, and later Supreme Court precedent.[23]

Second, holders of present-day immigration visas and green cards may freely travel overseas, on the condition that they return to the United States,[24] something

---

[21] *See I am a Lawful Permanent Resident of 5 Years*, US Citizenship and Immigration Services,       https://www.uscis.gov/citizenship/learn-about-citizenship/citizenship-and-naturalization/i-am-a-lawful-permanent-resident-of-5-years       (last       updated Jan. 24, 2025).

[22] *See* U.S. Dep't of State, Foreign Affairs Manual, 9 FAM 402.10-10(A)(U).

[23] *See, e.g.*, *Ozawa v. United States*, 260 U.S. 178 (1922); *Thind v. United States*, 261 U.S. 204 (1923).

[24] *See International Travel as a Permanent Resident*, US Citizenship and Immigration       Services,       https://www.uscis.gov/green-card/after-we-grant-your-green-card/international-travel-as-a-permanent-resident (last updated Oct. 11, 2024).

that most Chinese migrants in the 1880s were not allowed to do. For example, in 1889, the Supreme Court upheld the exclusion of Chae Chan Ping, a Chinese laborer and decades-long U.S. resident, who left for a visit to China in 1887 while holding a valid certificate of return. *See Chae Chan Ping*, 130 U.S. at 582. On his way back, literally while at sea, Congress passed the Scott Act of 1888, which forbade his entry. *Id*. In denying his re-entry, the Court wrote of Chinese migrants:

> [T]hey remained strangers in the land, residing apart by themselves, and adhering to the customs and usages of their own country. It seemed impossible for them to assimilate with our people, or to make any change in their habits or modes of living.

*Id*. at 595. Similar exclusions were upheld by the Court in *Fong Yue Ting v. United States*, 149 U.S. 698 (1893), and *Lem Moon Sing v. United States*, 158 U.S. 538, 548 (1895),[25] which denied reentry of Chinese merchant with "permanent domicile" in San Francisco—exactly like Wong Kim Ark's parents. *See Lem Moon Sing*, 158 U.S. at 539. The Court stated that Lem "cannot, by reason merely of his domicile in the United States for purposes of business" demand to re-enter the country. *Id*. at 548. Chinese individuals who purportedly had "permanent domicile and residence" during this period lost that right as soon as they left the United States, distinguishing them from today's visa-holders and lawful permanent residents.

---

[25] *Lem Moon Sing* is superseded by *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 136 (2020) (stating that in early finality era cases, the Court took pains to note that it did not express any opinion on whether an alien was entitled to enter).

Further, today's green card holders may petition for their children and spouses residing overseas to join them permanently in the United States,[26] conferring upon those relatives their own pathway to citizenship. For Chinese migrants in the United States at the end of the 19th century, like Wong's parents, however, the *inability* to unite and live with their families was their legal and everyday reality.[27]

Finally, unlike Wong Kim Ark's parents, today's legal immigrants and lawful permanent residents must all demonstrate admissibility, which means they are carefully scrutinized on a variety of criteria including health-, national security-, and public safety- related grounds.[28] Holders of resident visas and green cards are required to pay federal income taxes, and men ages 18-26 must register for selective service.[29] Lawful permanent residents are further entitled to live permanently in the

---

[26] *See* 8 U.S.C. § 1153(a)(2).

[27] This anti-Chinese immigration regime even gave rise to the "paper son" phenomenon, where aspiring Chinese immigrants paid U.S.-born Chinese Americans to pretend to be their birth fathers in order to claim derivative U.S. citizenship. Indeed, these discriminatory anti-Chinese laws transformed today's so-called "model minorities" into our nation's first "illegal aliens." *See* Janet Lau, *Stanley Hom Lau: Paper Son,* Prized Writing, https://prizedwriting.ucdavis.edu/-stanley-hom-lau-paper-son (last visited April 16, 2025).

[28] *See Green Card Processes and Procedures,* US Citizenship and Immigration Services, https://www.uscis.gov/green-card/green-card-processes-and-procedures (last updated Oct. 19, 2022).

[29] *See Tax information and responsibilities for new immigrants to the United Stat*es, IRS, https://www.irs.gov/individuals/international-taxpayers/tax-information-and-responsibilities-for-new-immigrants-to-the-united-states (last updated Oct 3, 2024) and Who Needs to Register, Selective Service System, https://www.sss.gov/register-/who-needs-to-register/ (last visited April 16, 2025).

14

United States, work at any legal job of their choosing (with narrow national security exceptions), and be protected by all the laws of the federal, state, and local jurisdictions.[30] Lawful permanent residents and holders of many categories of visas are on a pathway to U.S. citizenship. The America that Wong Kim Ark's parents lived in was absolutely determined to send Chinese migrants like them on a pathway back to China.

## IV.  EO 14160 would have devastating effects on Asian American communities.

The long history of Asian-American immigration in this country demonstrates the disproportionate harm that would fall upon the Asian American community if EO 14160 is not enjoined. Today, 65% of Asian American adults in the United States are immigrants.[31] Asian immigrants of all legal statuses account for a substantial percentage of our overall immigrant population: they make up an estimated 17% of undocumented immigrants,[32] and more than 88% of individuals holding H-1B

---

[30] *See Rights and Responsibilities of a Green Card Holder (Permanent Resident)*, US Citizenship and Immigration Services, https://www.uscis.gov/green-card/after-we-grant-your-green-card/rights-and-responsibilities-of-a-green-card-holder-permanent-resident (last updated Oct. 11, 2024).

[31] Karthick Ramakrishnan et al., By The Numbers: Immigration, AAPI Data https://aapidata.com/featured/by-the-numbers-immigration/ (Jan. 9, 2025).

[32] *Id.*

visas.[33] Finally, over 108,000 Asian Americans were eligible for protections under the Deferred Action for Childhood Arrivals (DACA) program, instituted in 2012.[34]

Under EO 14160, children of these categories of immigrants would be excluded from citizenship, despite being born, raised, and educated in the United States, with strong familial and cultural ties to the United States, and despite knowing no other country of allegiance—exactly as the 1898 Supreme Court had described Wong Kim Ark.

## CONCLUSION

Appellants' reliance on a stray factual assertion in *Wong Kim Ark* is dubious at best, and it does not support the constitutionality of EO 14160. To the contrary, *Wong Kim Ark* affirms the fundamental principle that the right to citizenship enshrined in the Fourteenth Amendment *cannot* be revoked on a whim, regardless of the popularity of anti-immigrant sentiment or the determination of the Executive Branch at any particular point in history. *Wong Kim Ark* tested the strength of the Constitution at a time when strong anti-Asian immigrant sentiment resulted in a

---

[33] *Characteristics of H-1B Specialty Occupation Workers, Fiscal Year 2023 Annual Report to Congress October 1, 2022–September 30, 2023*, US Citizenship and Immigration Services, https://www.uscis.gov/sites/default/files/document/reports/-OLA_Signed_H-1B_Characteristics_Congressional_Report_FY2023.pdf (March 6, 2024).

[34] Tracy Lachica Buenavista, *Deferred Action for Childhood Arrivals (DACA) and Undocumented Asian Americans and Pacific Islanders*, Asian American and Pacific Islander Research Coalition, https://www.higheredimmigrationportal.org/wp-content/uploads/formidable/13/Buenavista-ARC-AAPI-DACA-Brief-1.pdf (2014).

systematic effort to drive the Chinese out of the United States. Even within the socio-political context of that time, when the "permanency" of his parents' "domicile and residence" was notional at best, the Supreme Court held in 1898 that Wong Kim Ark had a constitutional right to citizenship. The children of immigrants born in the United States today must have the same protections.

For the Asian American communities NAPABA and its affiliates represent, EO 14160 would once again visit upon them the same injustices leveled against Wong Kim Ark's generation. For the foregoing reasons, the undersigned amici respectfully request that this Court uphold the District Court's ruling enjoining EO 14160.

Dated:      June 5, 2025                    Respectfully submitted,

                                            /s/ Owen R. Wolfe

WENDY M. FENG                               LORI CHEN
SEYFARTH SHAW LLP                           SEYFARTH SHAW LLP
999 Third Avenue, Suite 4700                975 F Street, NW
Seattle, Washington 98104                   Washington, DC 20004
Telephone: (206) 946-4910                   Telephone: (202) 463-2400
Facsimile: (206) 946-4901                   Facsimile: (202) 828-5393
wfeng@seyfarth.com                          lochen@seyfarth.com

RAHAT N. BABAR*                             OWEN R. WOLFE
EDGAR CHEN*                                 SEYFARTH SHAW LLP
CHRIS M. KWOK*                              620 Eighth Avenue
NATIONAL ASIAN PACIFIC                      New York, New York 10018
AMERICAN BAR ASSOCIATION                    Telephone: (212) 218-3389
1612 K Street NW, Suite 300                 Facsimile: (212) 218-5526
Washington, D.C. 20006                      owolfe@seyfarth.com
(202) 775-9555
*Not admitted in the Fourth Circuit        *Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

**4th Cir. Case Number(s): <u>25-1153</u>**

I am the attorney or self-represented party.

**This brief contains 3,997 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5).

Dated: June 5, 2025

*/s/ Owen R. Wolfe* _____
Owen R. Wolfe

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2025, I electronically filed the foregoing Amicus Brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, which caused a copy of the same to be served on counsel of record by email.


*/s/ Owen R. Wolfe*
Owen R. Wolfe