No. 25-1153

# United States Court of Appeals
# for the Fourth Circuit

————————————

CASA, Inc., et al.,

*Plaintiffs-Appellees*,

v.

Donald J. Trump, et al.,

*Defendants-Appellants*.

————————————————

On Appeal from the United States District Court
for the District of Maryland
Case No. 8:25-cv-00201-DLB
Before the Honorable Deborah L. Boardman

————————————————

## AMICUS BRIEF OF FREE SPEECH FOR PEOPLE
## IN SUPPORT OF THE PLAINTIFFS-APPELLEES

Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Rachel A. Kitze Collins (#396555)
R. David Hahn (#0401262)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com
rdhahn@locklaw.com

*Counsel for Amicus Curiae*

Courtney Hostetler
John Bonifaz
Ben Clements
FREE SPEECH FOR PEOPLE
28 S. Main St., Suite 200
Sharon, MA 02067
(617) 244-0234
chostetlet@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(a), amicus curiae states that it does not have a parent corporation and that it has no stock.

# **TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ..........................................................................1

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................3

I.    THE CITIZENSHIP CLAUSE FOCUSES ON THE *CHILD* SEEKING
      CITIZENSHIP, NOT THE CHILD'S PARENT. ..........................................3

      A.    Text and history make clear that the right of citizenship attaches
            to nearly all persons born in the United States without regard to
            parentage. ......................................................................................3

            1.    The constitutional text refers only to the person whose
                  citizenship is being established....................................................3

                  a)    At common law, citizenship did not pass from
                        parent to child. ....................................................4

                  b)    The common-law right of citizenship by place of
                        birth prevailed in the United States both before and
                        after the Fourteenth Amendment's adoption...................7

            2.    The Government ignores or attempts to rewrite this text
                  and history to impose a new rule of citizenship by
                  descent.................................................................................10

      B.    The Citizenship Clause's protection of American-born persons
            from exclusionary limitations on their citizenship is intentional........13

            1.    Opponents of birthright citizenship articulated the same
                  objections that Defendants raise now. ......................................14

            2.    The Fourteenth Amendment intentionally prohibited
                  restrictive applications of birthright citizenship. ......................21

            3.    Empowering a temporary executive to erode birthright
                  citizenship poses the same risk to individual rights and
                  our democracy that it did in 1866. ...........................................23

CONCLUSION ..................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrego Garcia v. Noem*,
   No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025)..................................25

*Afroyim v. Rusk*,
   387 U.S. 253 (1967).....................................................................................2, 23

*Dred Scott v. Sandford*,
   60 U.S. 393 (1857)...............................................................................................15

*Gardner v. Ward*,
   2 Mass. 244 (1805) ...............................................................................................5

*Inglis v. Trs. of Sailors' Snug Harbor*,
   28 U.S. (3 Pet.) 99 (1830)....................................................................................5

*Lynch v. Clarke*,
   1 Sand. Ch. 583 (N.Y. Ch. 1844)......................................................................6, 8

*Murray v. The Charming Betsy*,
   6 U.S. (2 Cranch.) 64 (1804) .............................................................................14

*United States v. Rahimi*,
   602 U.S. 680 (2024)................................................................................................4

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898).....................................................................................*passim*

*Washington v. Trump*,
   765 F. Supp. 3d 1142 (W.D. Wash. 2025) ........................................................10

## Other Authorities

4 Charles Gordon et al., *Immigration Law and Procedure*
§ 92.03[2][e] (rev. ed. 1995)........................................................9

Alexander Cockburn, *Nationality: or the Law Relating to Subjects
and Aliens* (1869).....................................................................7

Amanda Frost, *"By Accident of Birth": The Battle over Birthright
Citizenship After United States v. Wong Kim Ark*,
32 Yale J.L. & Human. 38 (2021) ........................................25

Cong. Globe, 39th Cong., 1st Sess. (1866)........................................*passim*

Cristina M. Rodríguez, *The Citizenship Clause, Original Meaning,
and the Egalitarian Unity of the Fourteenth Amendment*,
11 J. Const. L. 1363 (2009) ................................................10

Exec. Order 14159 (Jan. 20, 2025) .........................................18

Exec. Order 14165 (Jan. 20, 2025) .........................................18

Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025)................10

Federal Rule of Appellate Procedure 29(a) .............................1

Garrett Epps, *The Citizenship Clause: A Legislative History*,
60 Am. U. L. Rev. 331 (2010).................................................8

James C. Ho, *Defining 'American': Birthright Citizenship and the
Original Understanding of the Fourteenth Amendment*,
9 Green Bag 2d 367 (2006).................................................20

*Legislation Denying Citizenship at Birth to Certain
Children Born in the United States*,
19 Op. O.L.C. 340 (1995).............................................9, 10, 13

Michael D. Ramsey, *Originalism and Birthright Citizenship*,
109 Geo. L.J. 405 (2020) .................................................5, 8

Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's
Case* (1608), 9 Yale J. L. & Human. 73 (1997) .....................5

U.S. Const. amend. XIV, § 1 ...................................................3

1 William Blackstone, *Commentaries on the Laws of England*
(Oxford, Clarendon Press 1765) ...........................................5, 6, 7, 11

## INTEREST OF AMICUS CURIAE[1]

Free Speech For People ("FSFP") is a national, non-partisan, nonprofit public interest organization dedicated to protecting our country's core democratic principles and our Constitution. It is a leading force for defending our Constitution and fulfilling the promise of political equality for all. Since its founding in January 2010, FSFP has worked to protect the opportunity for equal and meaningful civic participation by challenging big money in politics, confronting corruption in government, fighting for free and fair elections, and advancing a new jurisprudence grounded in the promises of political equality and democratic self-government.

Free Speech For People engages in legal advocacy, public education, and organizing in communities across the country. The organization has approximately 750,000 supporters nationwide.

## INTRODUCTION

The Fourteenth Amendment corrected a fundamental flaw in our democracy: the racist exclusion of certain groups from our body politic. And it plays a critical role in protecting the people from the Government's undemocratic encroachment on

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *amicus curiae* state that no counsel for a party authored the brief in whole or in part, and no counsel or a party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than the *amici curiae* or their counsel made a monetary contribution to its preparation or submission. Counsel for *amici curiae* contacted Counsel for all Parties, and all Parties consented to the filing of this brief.

1

their rights. Central to this effort—so necessary to its purpose that it is the first clause of this important Amendment—is the Citizenship Clause. Subject only to narrow, long-established exceptions, the Clause confers citizenship, in indisputably clear terms, on all persons born in this country regardless of their parentage. This includes American-born children of parents and communities the Government disfavors.

"In our country the people are sovereign[.]" *Afroyim v. Rusk*, 387 U.S. 253, 257 (1967). Nothing would so undermine this principle as allowing a temporary administration to deny our most vulnerable children the protection of citizenship the Constitution affords them. Luckily, the Constitution confers no such power upon this or any other administration. *See id.* at 257-58. Instead, the Amendment "settles the great question of citizenship," and "put[s] this question of citizenship and the rights of citizens . . . beyond the legislative power." Cong. Globe, 39th Cong., 1st Sess. 2890, 2896 (1866).

Defendants would have the Court adopt their reinterpretation of the Constitution because, they insist, the United States faces an unprecedented threat of unlawful immigration by undesirable people. But neither the plain meaning nor the history of the Fourteenth Amendment permits a president to eliminate the Amendment's protection of birthright citizenship for political—or any other— reasons. On the contrary, the framers understood that, without the Amendment's constraints, future governments would use precisely this excuse to limit the

individual rights of marginalized communities, beginning but certainly not ending with the erosion of American-born children's access to citizenship, and ultimately, undermining our democracy.

## ARGUMENT

## I. THE CITIZENSHIP CLAUSE FOCUSES ON THE *CHILD* SEEKING CITIZENSHIP, NOT THE CHILD'S PARENT.

The Citizenship Clause states that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The Clause codifies a long-established right of citizenship based on the place of an individual's birth, not based on that individual's parentage. The Government's proposed reinterpretation of the Clause—under which a person's citizenship would turn on the immigration status of their parents—ignores this basic feature of the Clause's text and history.

### A. <u>Text and history make clear that the right of citizenship attaches to nearly all persons born in the United States without regard to parentage.</u>

1. <u>The constitutional text refers only to the person whose citizenship is being established.</u>

In cases that raise important questions of constitutional law and involve extensive citation to historical sources, it can be easy to lose focus on the text of the

Constitution itself. But here, the text is all that is needed to reject the Government's position.

The Citizenship Clause recognizes citizenship for "persons born . . . in the United States" so long as *those* persons are "subject to the jurisdiction" of the United States. On its face, the Clause establishes an individual right belonging to "persons born." It does not examine whether a person's parents are subject to the jurisdiction of the United States, nor limit citizenship based on the parents' circumstances. Nothing in the text suggests that a person's parentage matters at all to the question of citizenship. Setting aside the other problems with the Government's interpretation of "jurisdiction"—and there are many—the Government's position that the United States' jurisdiction over a person turns on the immigration status of the person's parents is entirely atextual. *See United States v. Rahimi*, 602 U.S. 680, 715 (2024) (Kavanaugh, J. concurring) ("As a general matter, the text of the Constitution says what it means and means what it says. And unless and until it is amended, that text controls.").

a)    *At common law, citizenship did not pass from parent to child.*

History both pre-dating and post-dating the Fourteenth Amendment's adoption confirms that, in all but the narrowest circumstances, parentage plays no role in determining a person's right to citizenship by birth.

From their earliest decisions following independence, federal and state courts looked to English common law to resolve questions about citizenship under United States law. *See, e.g.*, *Inglis v. Trs. of Sailors' Snug Harbor*, 28 U.S. (3 Pet.) 99, 120-21, (1830); *id*. at 155 (Story, J., concurring in part and dissenting in part); *Gardner v. Ward*, 2 Mass. 244 (1805). That common law history will be discussed extensively in the other briefing in this litigation and will not be repeated at length here. It suffices to note that, for centuries leading up to the adoption of the Fourteenth Amendment, English courts applied the rule of *jus soli*, "under which nationality is acquired by the mere fact of birth within the territory of a state." Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's Case* (1608), 9 Yale J. L. & Human. 73, 77 (1997) (hereinafter "Price"); *see also Calvin's Case*, [1608] 77 Eng. Rep. 377, 384; Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 413 (2020) (hereinafter "Ramsey").

Under the *jus soli* rule, the primary inquiry is whether a person is born within the territory. If they are, then there exists a relationship between that person and the sovereign, regardless of whether the person's parent and the sovereign have that same relationship. Children born "within the dominions of the crown of England, that is, within . . . the allegiance of the king," were considered "[n]atural-born subjects." *Ramsey* at 413 (quoting 1 William Blackstone, *Commentaries on the Laws of England*, 354-55 (Oxford, Clarendon Press 1765) (hereinafter "Blackstone")).

Allegiance in this context referred to "mutual" duties that arose by virtue of a person's birth within the territorial jurisdiction of the sovereign. *United States v. Wong Kim Ark*, 169 U.S. 649, 655-56 (1898). Immediately upon birth, a person was considered "under the king's protection," and the person's "[n]atural allegiance" to the king therefore followed as a "debt of gratitude." Ramsey at 413 (quoting Blackstone at 357).

*Jus soli* contrasts with *jus sanguinis*, the "other great rule for assigning nationality at birth." Price at 77. Under that rule, "regardless of the place of birth, nationality is acquired by descent following the status of at least one parent (usually the father)." *Id*. Unlike *jus soli* citizenship, which arises based on the newborn child's natural relationship to the sovereign, the existence of *jus sanguinis* citizenship can only exist by virtue of the child's parentage. While many European countries have chosen the *jus sanguinis* rule, there can be no reasonable dispute that the *jus soli* rule prevailed at common law in England and was the governing rule until an act of Parliament changed the law in 1981. *Id*.; *see also*, *e.g.*, *Lynch v. Clarke*, 1 Sand. Ch. 583, 639 (N.Y. Ch. 1844) (stating that the common-law rule of citizenship by birth within the crown's dominion "was settled law in the time of Littleton, who died in 1482" and remained "uniform[] through the intervening centuries").

The characteristics and circumstances of a person's parents were largely irrelevant to application of the *jus soli* principle. Generally, "every person born within the dominions of the crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject." Alexander Cockburn, *Nationality: or the Law Relating to Subjects and Aliens* 7 (1869) (hereinafter "Cockburn"); Ramsey at 413 ("The children of aliens, born here in England, are, generally speaking, natural-born subjects, and entitled to all the privileges of such." (quoting Blackstone at 361-62). The only exceptions to this rule were "the children of foreign ambassadors" and children "born to a foreigner during the hostile occupation of any part of the territories of England." Cockburn at 7. These exceptions, which were "founded upon peculiar reasons," only serve to "illustrate and confirm the general doctrine." *Wong Kim Ark*, 169 U.S. at 659 (citation omitted). "*No effect* appears to have been given to descent as a source of nationality." Cockburn at 7 (emphasis added).

        b)     *The common-law right of citizenship by place of birth prevailed in the United States both before and after the Fourteenth Amendment's adoption.*

This "same rule," with the same limited exceptions, "was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under

the constitution as originally established"—at least, for white people. *Wong Kim Ark*, 169 U.S. at 658. In cases arising before the adoption of the Fourteenth Amendment, courts held that "every person born within the dominions and allegiance of the United States, *whatever were the situation of his parents*, [was] a natural born citizen." *Ramsey* at 415 (emphasis added) (quoting *Lynch*, 1 Sand. Ch. at 663). It was widely understood that citizenship did not depend on parentage; it was "incident to birth in the country" and "never descend[ed] in the legal sense." *Wong Kim Ark*, 169 U.S. at 665 (citation omitted).

The framers of the Fourteenth Amendment understood that the Clause would codify the *jus soli* rule in the Constitution. There was vigorous debate over whether certain persons *should* be recognized as citizens, based primarily on prejudicial attitudes toward their parents or countries of origin. But in the end it was decided, and all understood, that the Clause would broadly cover persons born on United States soil without regard to parentage. *See* Garrett Epps, *The Citizenship Clause: A Legislative History*, 60 Am. U. L. Rev. 331, 352-58 (2010) (summarizing the debate); *see also infra* Part B.

The Supreme Court quickly recognized that the Fourteenth Amendment "affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under protection of the country." *Wong Kim Ark*, 169 U.S. at 693. Under the Amendment, as under the common law, birth in this country

conferred citizenship for all persons, subject only to recognized exceptions for "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory," as well as "the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes." *Id*. The Court could not have been more clear that the Amendment essentially continued the centuries-long adherence to the *jus soli* principle. The Clause established that this country would no longer unequally grant citizenship on the basis of the *jus soli* rule; it was to be the rule for every child, regardless of that child's race, parents' status as freedmen, or parents' country of origin. It was "intended to allay doubts and to settle controversies which had arisen, and not to impose any new restrictions upon citizenship." *Id*. at 687-88.

In the years since *Wong Kim Ark*, it has been widely understood that "the constitutional rule of universal citizenship for all persons born in the United States is unaffected by the status of their parents, except in minimal situations." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 346 n.15 (1995) (quoting 4 Charles Gordon et al., *Immigration Law and Procedure* § 92.03[2][e] (rev. ed. 1995)). Indeed, the Fourteenth Amendment's direct conferral of citizenship upon "persons born," without regard to parentage, is an important feature of our national identity. "In America, a country that rejected

monarchy, each person is born equal, with no curse of infirmity, and with no exalted status, arising from the circumstance of his or her parentage." *Id*. at 349.

> 2. The Government ignores or attempts to rewrite this text and history to impose a new rule of citizenship by descent.

The Government's proposed reinterpretation of the Citizenship Clause ignores the basic principle that, in this country, citizenship is a right that belongs to persons born here without regard to parentage. The Government's position rests on the premise that a person's citizenship at birth should turn on whether the person's parents owe sufficient allegiance to the United States, which in turn supposedly depends on whether the parents have established domicile here. Appellants' Br. 34-43; Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025). Through this exclusive "preoccup[ation] with the legal status of the parents," the Government "conflates the position of the child with that of their parents." *Washington v. Trump*, 765 F. Supp. 3d 1142, 1152 (W.D. Wash. 2025).

The Government's interpretation is inconsistent with the plain text of the Citizenship Clause. The Clause recognizes citizenship for "persons born" who are "subject to the jurisdiction" of the United States. The Government would shift the focus from "persons born" to the parents of those persons, recognizing citizenship only when the parents are, according to the Government's understanding, "subject to the jurisdiction" of the United States. This exclusive focus on parentage finds no support in the language of the Amendment. *See* Cristina M. Rodríguez, *The*

*Citizenship Clause, Original Meaning, and the Egalitarian Unity of the Fourteenth Amendment*, 11 J. Const. L. 1363, 1365 (2009) (explaining that, in textual context, Citizenship Clause "represents our constitutional reset button" because it "places all people, regardless of ancestry, on equal terms at birth").

The Government ignores or attempts to rewrite the Clause's common-law foundation. Its argument proceeds in three basic steps: (1) a person is only "subject to the jurisdiction" of the United States if the person owes "direct and immediate allegiance" to the United States; (2) parents who are unlawfully or temporarily in the United States owe "direct and immediate allegiance" to some other nation; and (3) children of those parents cannot be subject to the jurisdiction of the United States and therefore are not citizens under the Clause. Nowhere does the Government persuasively explain why the so-called "allegiance" of parents should be imputed to their children born in the United States. And the common-law understanding of allegiance does not support this logical jump. "Allegiance" at common law described a "tie" between a child and a sovereign nation that arises "immediately upon [the child's] birth." Ramsey at 413 (quoting Blackstone at 354-55, 357). It does not pass from parent to child by descent. On the contrary, the common law recognized a distinction between the "local and temporary" allegiance owed by non-citizens traveling within England and the permanent allegiance owed by their children born

on English soil. *See Wong Kim Ark*, 169 U.S. at 474. The Government's position cannot be squared with this distinction.

The Government also makes the novel argument that the true measure of one's "allegiance" is the parents' domicile, and a child born in the United States is therefore not a citizen unless the child's parents are lawful permanent residents of the United States. Appellants' Br. 27-29. Putting aside the Government's significant misapprehension of the definition of domicile, its argument has no basis in the text of the Fourteenth Amendment, which offers no support for judging a person's citizenship claim via her parent's purported domicile. Indeed, questions of allegiance and naturalization are distinct from domicile. *See Wong Kim Ark*, 169 U.S. at 693-94 (explaining that an alien is "completely subject to the political jurisdiction" of the country in which he resides "[i]ndependently of any residence with intention to continue such residence" and "independently of any domiciliation" (citation omitted)).

All this dances around the bigger-picture problem with the Executive Order and the Government's position in this litigation. What the Government really wishes to do is not to interpret the Fourteenth Amendment but instead to replace the centuries-old tradition of *jus soli* embodied in that Amendment. Its objective is to impose a modified *jus sanguinis* regime, under which birthright citizenship would be limited to persons that the Government decides have the correct lineage.

The problem for the Government is that its proposal—to switch from a *jus soli* system to a modified *jus sanguinis* system—has repeatedly been considered and rejected. In *Wong Kim Ark*, the Government argued to the Supreme Court that "the rule of the Roman law, by which citizenship of the child followed that of the parent, was the true rule of international law . . . and had superseded the rule of the common law." *Wong Kim Ark*, 169 U.S. at 666. The Court rejected this argument, reasoning that there was "little ground for the theory that at the time of the adoption of the fourteenth amendment . . . there was any settled and definite rule of international law . . . inconsistent with the ancient rule of citizenship by birth within the dominion." *Id*. at 667. Time and again, legislators have introduced proposals to modify the rules of birthright citizenship, and those proposals have failed. *See* Alexandra M. Wyatt, Cong. Rsch. Serv., R44251, *Birthright Citizenship and Children Born in the United States to Alien Parents: An Overview of the Legal Debate* 17-19 (2015). And for good reason: the text of the Constitution does not allow it. The Government cannot "so fundamentally alter[] our republic," 19 Op. O.L.C. at 349—stripping established rights from persons born in the United States based on the Government's disfavor of their parents—by executive fiat.

### B.  The Citizenship Clause's protection of American-born persons from exclusionary limitations on their citizenship is intentional.

The Government's attempt to create a citizenship test for American-born persons that turns on the immigration status of their parents is unconstitutional under

13

the unambiguous language of the Fourteenth Amendment. The Government asks this Court to accept its atextual vision of the Citizenship Clause because, allegedly, certain immigrants pose such a never-before-encountered risk to our country that their children should be stripped of the birthright citizenship afforded to all other American-born persons.

Neither the purported threat nor the language used to describe the targeted immigrant groups are new. In debates before Congress, those opposed to the Citizenship Clause engaged in fearmongering about disfavored communities who had been denied the privilege of citizenship. Congress passed and the states ratified the Fourteenth Amendment not despite this opposition, but because of it. The Amendment's framers understood, first, that in the absence of the Citizenship Clause, government officials then and in the future would attempt to revert to a caste system in which certain persons are granted birthright citizenship and certain persons are not; and second, that such a system erodes the core rights upon which our democracy is built and without which it will not survive.

1.    Opponents of birthright citizenship articulated the same objections that Defendants raise now.

Prior to the Fourteenth Amendment, *jus soli* was law of the land only for people the government considered to be "white." White children born in the United States—including the children of immigrants—were citizens. *See Wong Kim Ark*, 169 U.S. at 658-59 (citing *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch.) 64,

119 (1804)). Black children were not. The Supreme Court in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), deprived all Black people of birthright citizenship, deprived states and the federal government of the power to naturalize them, and therefore deprived them of protection under the Privileges and Immunities Clause in Article IV, Section 2 of the Constitution. American-born Black children could not be citizens by birth because of their presumed ancestry (the court assuming all Black children were descended from slaves), *id*. at 404-05, or by naturalization because such powers were only available to aliens, *see id*. at 417, 420 ("The right of naturalization . . . is . . . confined to persons born in a foreign country, . . . . It is not a power to raise to the rank of a citizen any one born in the United States, who, from birth or parentage, by laws of the country, belongs to an inferior and subordinate class."). To the *Dred Scott* majority, the enslavement of millions of people created grounds to deny even freed Black people citizenship in the country of their birth.

Nine years later, after the Civil War and the abolition of slavery, Congress repudiated *Dred Scott*, first via statute and then via the Citizenship Clause. A minority of Congress vigorously opposed the extension of birthright citizenship to some or all non-white children. Some agreed to its extension to freedmen but not to non-European immigrants; others rejected even the extension of citizenship to Black Americans. Issuing dire warnings, they argued that for freedmen, their children, and

the American-born children of non-white immigrants, parentage and race must foreclose citizenship.

The opponents' rhetoric left little to the imagination. In opposing the birthright citizenship provision of the 1866 Civil Rights Act, Senator Van Winkle issued a warning of the floodgates that the provision would open: "I think it is one of the gravest subjects that ever could be submitted to the people of the United States, and it involves not only the negro race, but other inferior races . . . and perhaps involves a future immigration to this country of which we have no conception . . . . we may expect to have an influx here of all sorts of people from all countries. I need not pause to say that this would be detrimental to the best interests of our country." Cong. Globe, 39th Cong., 1st Sess. 497 (1866). Senator Cowan claimed that Chinese immigration posed a threat to California because Chinese people were "very much given to emigrating, very rapacious in their character, and very astute in their dealings," and that "if they are to be made citizens . . . then, sir, the day may not be very far distant when California, instead of belonging to the Indo-European race, may belong to the Mongolian, may belong to the Chinese . . ." *Id*. at 498. His colleague, Senator Davis insisted that "[T]his is a white man's Government . . . . I say that the negro is not a citizen," and that only white people participated in the American revolution, a falsehood challenged by New Hampshire Senator Clark, who

pointed out that "free negro[s]" were in fact citizens of New Hampshire before the Constitution. *Id*. at 528.

President Johnson echoed Cowan and Davis's sentiments in a statement issued with his veto of the law. He deplored the extension of birthright citizenship to non-white American-born children—and in particular argued that the conditions of slavery to which Black people had been subjected for generations disqualified their children from citizenship:

> This provision comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called Gypsies, as well as the entire race designated as blacks, people of color, negroes, mulattoes, and persons of African blood. Every individual of those races born in the United States, is by the bill made a citizen of the United States. . . . Four millions of them have just emerged from slavery into freedom. Can it be reasonably supposed that they possess the requisite qualifications to entitle them to all the privileges and immunities of citizens of the United States?"

*Id*. at 1679.

Congress overrode the veto, *id*. at 1809 (Senate vote), 1861 (House vote), and just months later returned to debate the Fourteenth Amendment and its Citizenship Clause, which constitutionally established birthright citizenship for nearly everyone except Native Americans.[2]   Once again, opponents of the Citizenship Clause,

---

[2] Much of the debates focused on whether to explicitly omit the phrase "Indians not taxed" from the Citizenship Clause, and the decision to exclude this language rested in part on the fact that the drafters of the Fourteenth Amendment presumed their

particularly Senator Cowan, warned of the purported risks of granting citizenship to the children of non-white immigrants.

From claims that immigration constitutes an invasion to claims that modern forms of transportation create unprecedented risks of transiency, the warnings advanced by opponents of the Clause should sound eerily familiar to the modern reader.[3] Senator Cowan asked whether "the people of California are to remain quiescent while they are overrun by a flood of immigration of the Mongol race? Are they to be immigrated out of house and home by Chinese?" Cong. Globe, 39th Cong., 1st Sess. 2890-91 (1866). He suggested that the Citizenship Clause would

---

exclusion. Though the rationale for why Native Americans are excluded is tortured, not terribly coherent (Senators could not agree to the extent of authority the government could wield over Native Americans), and rested on racist presumptions, *see*, *e.g.*, Cong. Globe, 39th Cong., 1st Sess. 2893-96 (1866), it demonstrates that the conclusion that Native Americans were not "subject to the jurisdiction" of the United States depended on the unique relationship between the U.S. government and tribal nations, and could not be imputed to any other class of potential citizens.

[3] *See, e.g.*, Exec. Order 14159 (Jan. 20, 2025) (titled "Protecting the American People Against Invasion"); Exec. Order 14165 (Jan. 20, 2025) ("Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level . . . including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organization, and other hostile actors with malicious intent."); Trip Gabriel, *Trump Escalates Anti-Immigrant Rhetoric with 'Poisoning the Blood' Comment*, N.Y. Times (Oct. 5, 2023), https://www.nytimes.com/2023/10/05/us/politics/trump-immigration-rhetoric.html ("Nobody has any idea where these people are coming from, and we know they come from prisons. We know they come from mental institutions and insane asylums. We know they're terrorists. Nobody has ever seen anything like we're witnessing right now. It is a very sad thing for our country. It's poisoning the blood of our country.").

open the door to California being "invaded by a flood of Australians or people from Borneo, man-eaters or cannibals . . . ." *Id*. at 2891. He claimed that "millions" of "the Mongol race" could pour into the country because "[d]istance is almost annihilated," technological advancements having "brought their coasts almost in immediate contact with our own." *Id*. And he issued a dire warning about the "invasion" of "Gypsies" in his state of Pennsylvania:

> I am unwilling, on the part of my State, to give up the right . . . of expelling a certain number of people who invade her borders; who owe to her no allegiance; who pretend to own none; who recognize no authority in her government; who have a distinct, independent government of their own . . . who do nothing, in fact, which becomes the citizen, and perform none of the duties which devolve upon him, but, on the other hand, have no homes, pretend to own no land, live nowhere, settle as trespassers where ever they go, and whose sole merit is a universal swindle . . . I mean the Gypsies. . . . They infest society. . . . If the mere fact of being born in the country confers that right, then they will have it; and I think it will be mischievous.

*Id*.

Supporters of the resolution were not persuaded by these histrionics. Senator Trumbull already had told his brethren that the clause's predecessor statute "[u]ndoubtedly" would naturalize "the children of Chinese and Gypsies born in this country." *Id*. at 498. Senator Howard, in defending the Clause, explained that it "is simply declaratory of what I regard as the law of the land already. . . . It settles the great question of citizenship and removes all doubt as to what persons are or are not

citizens of the United States." *Id*. at 2890; *see also id*. at 2891 (Sen. Conness) ("I voted for the proposition to declare that the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States."). But for the exclusion of Native Americans—a unique case without analogue—the other exclusions were intentionally modest, limited to the children of foreign diplomats and children of alien enemies during hostile occupation. *See id*. at 2890 (Sen. Howard) (excluding from birthright citizenship only "foreigners, aliens, who belong to the families of embassadors or foreign ministers");[4] *Wong Kim Ark*, 169 U.S. at 682. All other persons were granted citizenship, regardless of parentage or race.

Senator Conness did not merely support the resolution, Cong. Globe, 39th Cong., 1st Sess. 2891 (1866), he also challenged Senator Cowan's characterizations of his state and the immigrants who lived there: "I beg the honorable Senator from Pennsylvania, though it may be very good capital in an electioneering campaign to declaim against the Chinese, not to give himself any trouble about the Chinese." *Id*.

---

[4] It has been argued that Senator Howard's description should be taken as separate parts—that foreigners and aliens should be considered separate from those who belong to diplomatic families. This theory has been roundly discredited, *see Wong Kim Ark*, 169 U.S. at 682 (laying out the limited exceptions to the Clause), and would render the Clause and all subsequent debate by Congress nonsensical. Senator Howard and others clearly understood that the Clause would confer citizenship on the American-born children of non-diplomat foreigners. *See* James C. Ho, *Defining 'American': Birthright Citizenship and the Original Understanding of the Fourteenth Amendment*, 9 Green Bag 2d 367, 372 (2006). *Id*.

at 2892. He also rejected the idea that "Gypsies" had invaded Pennsylvania, and indeed reminded Congress that the greatest threats faced by either state had come from within: "The only invasion of Pennsylvania within my recollection was an invasion very much worse and more disastrous to the State, and more to be feared and more feared, than that of Gypsies. It was an invasion of rebels, which this amendment . . . is intended to guard against." *Id*.; *see also id*. (asserting that southern Americans "who I will not say invaded California, but who went there in large numbers some years since, and who seized political power," implemented racist laws, and during the war "turned out upon the public highways, and became robbers, highway robbers").

    2.    <u>The Fourteenth Amendment intentionally prohibited restrictive applications of birthright citizenship.</u>

The prejudiced sentiments and rhetoric driving the Executive Order at issue in this case are not new. They were raised, debated, and conclusively rejected by the Fourteenth Amendment's framers.

The fearmongering of the Clause's opponents emerged from the idea that there were superior and inferior classes in this country, with only the former having claim to the American identity. An exchange between Senators Trumbull and Cowan over the Civil Rights Act of 1866 illustrates the point. Trumbull, who introduced the law, asked "Is not the child born in this country of German parents a citizen? I am afraid we have got very few citizens in some of the counties of good old

Pennsylvania if the children born of German parents are not citizens." Cong. Globe, 39th Cong., 1st Sess. 499 (1866). Cowan responded: "The honorable Senator assumes that which is not the fact. The children of German parents are citizens; but Germans are not Chinese; Germans are not Australians, nor Hottentots, nor anything of the kind. That is the fallacy of his argument." *Id*. The Clause threatened to upend the American caste system. If children could assert citizenship via birth regardless of their color or their parents' status as slave or disfavored immigrant, then those same children could assert a place in the American polity, could be as American as American-born white children. That was unthinkable to the opponents of the law, *see id*. at 529 (Sen. Davis) ("You may bring all of Europe, but none of Asia and none of Africa into our partnership."), but it is precisely what the framers wanted.

This is why Congress included the Citizenship Clause in the Fourteenth Amendment. Despite—indeed in part because of—the fearmongering, it was understood that the real risk was not what immigrants' children might do as citizens, but what the country might revert to in the absence of the Fourteenth Amendment's protections: "We desired to put this question of citizenship and the rights of citizens and freedmen under the civil rights bill beyond the legislative power of such gentlemen . . . who would pull the whole system up by the roots and destroy it, and expose the freedmen again to the oppressions of their old masters." *Id*. at 2896 (Sen. Howard); *see also Wong Kim Ark*, 169 U.S. at 675 ("The same congress . . . evidently

thinking it unwise, and perhaps unsafe, to leave so important a declaration of rights to depend upon an ordinary act of legislation . . . framed the fourteenth amendment of the constitution.").

As the Supreme Court explained nearly one century after ratification, "the Fourteenth Amendment was designed to, and does, protect every citizen of this Nation against a congressional forcible destruction of his citizenship, whatever his creed, color, or race." *Afroyim*, 387 U.S. at 268. Its purpose is baked into the text: "it seems undeniable from the language they used that they wanted to put citizenship beyond the power of any governmental unit to destroy." *Id*. at 263. By protecting the citizenship right, the Clause protects our system of government from itself. *See id*. at 268 ("The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship.").

> 3. Empowering a temporary executive to erode birthright citizenship poses the same risk to individual rights and our democracy that it did in 1866.

The Government, like those who opposed the Fourteenth Amendment in the beginning, tries to focus attention on the purported sins of the parent to justify its unconstitutional attempt to strip American-born children of their citizenship. If it is successful, it will open the door to precisely the dangers presaged by Senator Howard. Such a result would put in the hands of a temporary administration the

authority to determine who can be denied citizenship based on membership in a disfavored class, turning *jus soli* on its head. Birthright citizenship, instead of being a mechanism for ensuring equality amongst American-born citizens, would become a tool to perpetuate a caste system.

Under such a system, oppression of the parent may again become evidence that oppression *should be* passed on to the child. *See*, *e.g.*, Cong. Globe, 39th Cong., 1st Sess. 1679 (1866) (veto statement of President Johnson suggesting that the past enslavement of freedmen is reason to deprive them of "all the privileges and immunities of citizens of the United States"). And if the Citizenship Clause is to be stripped of its plain meaning, if temporary administrations are empowered to exclude certain classes of children from birthright citizenship and create permanent castes of non-citizens, then there too is no protection for anyone—not marginalized communities, not immigrant communities, not disfavored political opponents. As Judge Wilkinson warned, writing on behalf of a unanimous three-judge panel in reviewing the administration's ongoing refusal to facilitate the return of a U.S. resident from the abusive Salvadoran prison where the U.S. government is paying to keep him detained after illegally removing him from the United States: "If today the Executive claims the right to deport without due process and disregard of court orders, what assurance will there be tomorrow that it will not deport American citizens and . . . train its broad discretionary powers upon its political enemies?"

*Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025).

The Fourteenth Amendment was no panacea. Black Americans, Chinese immigrants, and other marginalized communities continued to face oppression. *See, e.g.*, Amanda Frost, *"By Accident of Birth": The Battle over Birthright Citizenship After United States v. Wong Kim Ark*, 32 Yale J.L. & Human. 38, 43-47 (2021) (detailing oppression of, and xenophobia against, Chinese immigrants in the decades around the ratification of the Fourteenth Amendment and the *Wong Kim Ark* decision). But it at least ensured that the country could not go backwards, to deprive Black Americans and non-white immigrants' children their fundamental right to citizenship, or place equality at the mercy and vagaries of temporary government administrations. With the Clause, "the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms." *Wong Kim Ark*, 169 U.S. at 675. The clear text should not now be thrown aside for the same dire warnings expressed by its original detractors, particularly when doing so will undermine the very principles for which it was passed.

## CONCLUSION

For these reasons, this Court should affirm the district court's judgment.

Date:  June 5, 2025

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN PLLP

s/Rachel A. Kitze Collins
Charles N. Nauen (MN #121216)
David J. Zoll (MN #0330681)
Rachel A. Kitze Collins (MN #396555)
R. David Hahn (MN #0401262)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com
rdhahn@locklaw.com

Courtney Hostetler
John Bonifaz
Ben Clements
FREE SPEECH FOR PEOPLE
28 S. Main St., Suite 200
Sharon, MA 02067
(617) 244-0234
chostetlet@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

***Counsel for Amicus Curiae***

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains **6,279** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

s/Rachel A. Kitze Collins
Rachel A. Kitze Collins (MN #396555)

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on June 5, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Rachel A. Kitze Collins
Rachel A. Kitze Collins (MN #396555)
