No. 25-1153

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

CASA, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, ET AL.,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

**BRIEF OF *AMICI CURIAE* TAHIRIH JUSTICE CENTER, HARBORCOV,
ASISTA AND 31 ADDITIONAL NON-PROFIT ORGANIZATIONS
SERVING IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE,
SEXUAL ASSAULT, AND HUMAN TRAFFICKING IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

Reena Parikh, *Counsel of Record*
BOSTON COLLEGE LEGAL SERVICES LAB
CIVIL RIGHTS CLINIC
885 Centre Street
Newton, MA 02459
617-552-0283
reena.parikh@bc.edu

Kursten Phelps
Charlotte Gillingham
TAHIRIH JUSTICE CENTER
6400 Arlington Boulevard, Ste. 400
Falls Church, VA 22042

Juan Camilo Mendez
HARBORCOV
P.O. Box 505754
Chelsea, MA 02150

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-1153__       Caption: __CASA Inc. et al. v. Donald J. Trump et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Tahirih Justice Center, HarborCOV, ASISTA, and 31 additional nonprofit organizations serving immigrant__
(name of party/amicus)

__survivors of domestic violence, sexual assault, and human trafficking, as listed in Appendix A__

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Reena Parikh                    Date:        6/6/2025

Counsel for:  Amici

- 2 -

Print to PDF for Filing

## FRAP RULE 29 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), undersigned counsel for *amici curiae* states that no counsel for the parties authored this brief in whole or in part, and no party, party's counsel, or person or entity other than *amici curiae* or its counsel contributed money that was intended to fund the preparing or submitting of this brief.

All parties have, through counsel, consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

/s/ Reena Parikh
Reena Parikh
*Counsel for amici curiae*

Date: June 6, 2025

i

# **TABLE OF CONTENTS**

INTEREST OF *AMICI CURIAE* ...............................................................1

SUMMARY OF THE ARGUMENT .......................................................3

ARGUMENT ............................................................................................8

    I.   A PRELIMINARY INJUNCTION OF EXECUTIVE ORDER 14160 IS IN THE PUBLIC INTEREST AS IT IS NECESSARY TO PROTECT THE LIVES OF IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE, SEXUAL ASSAULT, AND HUMAN TRAFFICKING. .....................................................8

        A.    Under the EO, Newly Issued U.S. Birth Certificates Will No Longer Be Prima Facie Proof of Citizenship....................................................9

        B.    Domestic Violence, Sexual Assault, and Human Trafficking Against Immigrant Women Are Prevalent in the United States, Where Abusers, Assailants, and Traffickers Often Use a Woman's Immigration Status as a Means of Power and Control. .........................................................10

        C.    The EO Places Immigrant Women Who Are Domestic Violence, Sexual Assault, or Human Trafficking Survivors at Serious Risk of Harm by Requiring Them to Engage with Their Abuser, Assailant, or Trafficker to Establish Their Child's U.S. Citizenship Status......................................................17

    II.   A PRELIMINARY INJUNCTION OF THE EO IS VITAL TO ENSURING IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE, SEXUAL ASSAULT, AND HUMAN TRAFFICKING CAN SAFELY USE THE LEGAL SYSTEM TO SEEK SAFETY AND JUSTICE...........................20

        A.    Congress Has Made Clear Through Legislation That it Serves the Public Interest to Protect Immigrant Survivors of Domestic Violence, Sexual Assault, and Human Trafficking and to Encourage Accountability from Their Abusers, Assailants, and Traffickers.................................................20

        B.    The EO Will Deter Immigrant Mothers from Holding Their Abusers, Assailants, or Traffickers Accountable, Furthering Societal Harm.................24

CONCLUSION ......................................................................................28

ii

# TABLE OF AUTHORITIES

## Cases

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................8

*United States v. Chaudhri*, 134 F.4th 166 (4th Cir. 2025).......................15

*United States v. Wong Kim Ark*, 169 U.S. 649, (1898)..............................3

*Winter v. Nat. Def. Res. Council, Inc.*, 555 U.S. 7 (2008)........................8

## Statutes

22 U.S.C. § 7101(b) ..................................................................................23

42 U.S.C. § 608(a) ...................................................................................19

42 U.S.C. § 654(29) .................................................................................19

8 U.S.C. § 1255(m) ..................................................................................22

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (codified as amended in relevant part at 8 U.S.C. § 1186a(c)(4)) .........................................20

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, 1533 (codified as amended in scattered sections of U.S.C.)22, 23

Violence Against Women Act of 1994, Pub. L. No. 103-322, 108 Stat. 1902 (codified as amended at scattered sections of 18 U.S.C. and 42 U.S.C.)............20

## Other Authorities

Abigail M. Morrison et al., *Intimate Partner Violence and Immigration in the United States: A Systematic Review*, 25 Trauma, Violence, & Abuse 846 (2024)……… ................................................................................. 4, 11, 13. 14

*About Intimate Partner Violence*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/intimate-partner-violence/about/index.html.....................10

Admin. for Child. & Fams., *Chapter Sixteen Domestic Violence and Child Support, in* Essentials For Attorneys in Child Support Enforcement (2021) ....................19

Aisha Alsinai et al., *Use of Immigration Status for Coercive Control in Domestic Violence Protection Orders*, Frontiers Socio., 2023................... 5, 11, 15, 18, 19,

Anne Chandler, *Targeting Trafficking*, The Houston Lawyer, Sep./Oct. 2012 ........5

Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence Among Immigrants: Evidence for VAWA Self-Petitions* (Utah State Univ. Ctr. for Growth & Opportunity Working Paper No. 2020.019, 2020), https://www.thecgo.org/wp-content/uploads/2020/11/Immigration-Domestic-Violence-4.0.pdf..............................................................................................10

*Citizenship Evidence*, U.S. Dep't of St. — Bureau of Consular Affs., https://travel.state.gov/content/travel/en/passports/how-apply/citizenship-evidence.html ....................................................................................................9

Ctrs. for Disease Control & Prevention, *About Adverse Childhood Experiences*, (Oct. 8, 2024), https://www.cdc.gov/aces/about/index.html ...............................26

Ctrs. for Disease Control & Prevention, *About Sexual Violence* (Jan. 23, 2024) https://www.cdc.gov/sexual-violence/about/index.html ....................................11

Decker, M., Raj, A. and Silverman, J., *Sexual Violence Against Adolescent Girls: Influences of Immigration and Acculturation*, 13 Violence Against Women 498 (2007) ................................................................................................................11

Domestic Abuse Intervention Programs, *Understanding the Power and Control Wheel*, https://www.theduluthmodel.org/wheels/faqs-about-the-wheels/ ...........17

Erica L. Smith, Bureau of Just. Stat., *Female Murder Victims and Victim-Offender Relationship*, *2021* (Dec. 2022) ........................................................................18

Erica M. Webster, *The Impact of Adverse Childhood Experiences on Health and Development in Young Children*, 9 Global Pediatric Health 1 (2022) ................27

Everytown for Gun Safety, *Guns and Violence Against Women: America's Uniquely Lethal Intimate Violence Partner Problem*, (Oct. 17, 2019) https://everytownresearch.org/reports/guns-intimate-partner-violence..............26

Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025)..................................3, 9

Institute for Women's Policy Research, *Status of Women in the States: Violence & Safety*, https://statusofwomendata.org/explore-the-data/violence-safety/violence-and-safety-full-section ...............................................................................10

Jeni Klugman et al., Ctr. on Gender Equity & Health & Newcomb Inst. Tulane Univ., *The Costs of Intimate Partner Violence in California* ........................................27

Josh T. Smith, *When Immigrants Are and Aren't Afraid of Reporting Crime*, Ctr. for Growth & Opportunity at Utah St. Univ. (Nov. 8, 2021), https://www.thecgo.org/benchmark/when-immigrants-are-and-arent-afraid-of-reporting-crime/ ...............................................................................25

Katrina Castillo et al., Legislative History of VAWA (94, 00, 05), T and U-Visas, Battered Spouse Waiver, and VAWA Confidentiality (2023), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/VAWA_Leg-History_Final.pdf ................................................................ 21, 22

Kyla Baird and Jennifer Connolly, *Recruitment and Entrapment Pathways of Minors into Sex Trafficking in Canada and the United States: A Systematic Review*, 24 Trauma, Violence & Abuse 89 (2023)..................................................13

*Learn More About Domestic Violence*, N.Y. ST., https://opdv.ny.gov/learn-more-about-domestic-violence .............................................................. 15, 18

Legal Momentum, *History of VAWA*, https://www.legalmomentum.org/history-vawa ....................................................................................................21

Leslye E. Orloff, Legal Momentum, *Development, History and Legislative Purpose of VAWA's "Any Credible Evidence" Statutory Requirements*, (2009), https://niwaplibrary.wcl.american.edu/wp-content/uploads/Any-Credible-Evidence_Leg-History-Final_4-28-09.pdf ........................................................23

Marshall B. Knapp, *Social Values and Older Persons: The Role of the Law*, 7 Marquette's Elder Advisor 69 (2012) ................................................................24

Martin R. Huecker et al., *Domestic Violence* (2023), https://www.ncbi.nlm.nih.gov/books/NBK499891 .........................................4, 10

Nat'l Immigrant Women's Advoc. Project, *Empowering Survivors: Legal Rights of Immigrant Victims of Sexual Assault* (Leslye Orloff, ed., 2013), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/pdf/FAM-Man-Full-EmpoweringSurvivors07.13.pdf ..................................................... 5, 15, 26

Nat'l Sexual Violence Res. Ctr., *About Sexual Assault*, https://www.nsvrc.org/about-sexual-assault.......................................................27

Nat'l Sexual Violence Res. Ctr., *Sexual Assault Response Team Toolkit, Section 7: SARTs and Offender Accountability* (2018) https://www.nsvrc.org/sarts/toolkit/7-2..................................................................................................................18

National Human Trafficking Hotline, *National Statistics*, https://humantraffickinghotline.org/en/statistics ................................................11

Olivia Harrison, Note, The Long-Term Effects of Domestic Violence on Children, 41 Child. Legal Rts. J. 63 (2021) ........................................................27

Ruth W. Leemis, et al., Ctrs. for Disease Control & Prevention, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence* (2022) ..............................................................................4

Safe Alliance, *The Ripple Effect of Domestic Violence: How it Touches an Entire Community*, https://www.safealliance.org/blog/ripple-effect-domestic-violence-how-touches-entire-community ..................................................28

Safe House Project, *The Economic Cost of Human Trafficking: Why It Affects Everyone*, (Apr. 10, 2025), https://safehouseproject.org/blog/the-economic-cost-of-human-trafficking-why-it-affects-everyone. ..................................................27

Susanne Lohmann et al., *The Trauma and Mental Health Impacts of Coercive Control: A Systematic Review and Meta-Analysis*, 25 Trauma, Violence & Abuse 630 (2024) ..............................................................................25

T.K. Logan, Robert Walker & Gretchen Hunt, *Understanding Human Trafficking in the United States*, 10 Trauma, Violence & Abuse 3 (2009) ........................ 12, 13

Tahirih Just. Ctr., *Key Findings: 2017 Advocate and Legal Service Survey Regarding Immigration Survivors*, https://www.tahirih.org/wp-content/uploads/2017/05/2017-Advocate-and-Legal-Service-Survey-Key-Findings.pdf ..............................................................................15

Tien-Li Loke, Note, *Trapped in Domestic Violence: The Impact of United States Immigration Laws on Battered Immigrant Women*, 6 B.U. PUB. INT. L.J. 589 (1997) ..............................................................................16

Tiffany Dovydaitis, *Human Trafficking: The Role of the Health Care Provider*, 55 J. Midwifery & Women's Health 462 (2010) ..................................................26

U.S. Citizenship & Immigr. Servs., *Abused Spouses, Children and Parents*, https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents .......22

U.S. Dep't of Justice, *What is Human Trafficking?*, https://www.justice.gov/humantrafficking/what-is-human-trafficking ...............12

U.S. Gov't Accountability Off., GAO-21-487, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations* (2021), https://www.gao.gov/assets/gao-21-487.pdf........................................................9

*Understanding the Impact of Domestic Violence*, Mass General Brigham McLean (Jan. 28, 2025), https://www.mcleanhospital.org/essential/domestic-violence...26

## Regulations

8 C.F.R. § 214.14 (2025) ........................................................................22

## Legislative Materials

136 Cong. Rec. 27085 (daily ed. Oct. 2, 1990) ......................................20

## INTEREST OF *AMICI CURIAE*

The **Tahirih Justice Center** ("Tahirih") is a national, nonprofit organization that serves women, girls, and all immigrant survivors of domestic violence, sexual assault, and other forms of gender-based violence. Tahirih's whole-person approach to services provides each survivor with free legal support and social services to secure the rights they are entitled to under U.S. law and to build stable lives. Tahirih translates expertise gained from serving our clients into training, education, and policy advocacy to ensure that systems, laws, and policies protect immigrant survivors from violence and exploitation. By amplifying the experiences of survivors, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity.

**HarborCOV** has been addressing the needs of survivors of domestic and sexual violence in Massachusetts since 1998. They provide direct legal representation to immigrant survivors of domestic violence, helping them obtain abuse prevention orders and immigration benefits. They also provide essential support services to domestic violence survivors, including case management, housing support, public education and assistance through a 24-hour hotline.

**ASISTA** is a national network of attorneys and advocates working at the intersection of immigration and gender-based violence. The organization worked with Congress to create and expand routes to secure immigration status for survivors

of domestic violence, sexual assault, and other crimes, which were incorporated in the 1994 Violence Against Women Act (VAWA), as amended, and associated regulations and interim agency rulemaking. Today, ASISTA educates attorneys and advocates representing immigrant survivors and engages in policy advocacy and litigation. ASISTA also trains and provides technical support to local law enforcement officials and civil and criminal court judges. ASISTA has previously filed *amicus* briefs in cases before the U.S. Supreme Court, federal courts of appeals, the Board of Immigration Appeals, and the Administrative Appeals Office ("AAO").

In this filing, *amici* are joined by 31 other local, state, and national non-profit organizations who serve and advocate on behalf of immigrant survivors of domestic violence, sexual assault, or human trafficking in various ways. Some *amici* represent and advocate for immigrant women, including domestic violence, sexual assault, and human trafficking survivors, who are seeking immigration relief. Others provide critical assistance and resources to survivors of domestic abuse, sexual assault, human trafficking, and other gender-based violence in the United States. Through their work, *amici* have direct knowledge of the many ways in which abusive partners ("abusers"), assailants, and traffickers control and threaten women using their immigration status.

As such, *amici* are deeply concerned that Executive Order 14160 ("the EO"), which would eliminate birthright citizenship, poses a grave danger to

2

immigrant mothers who survive domestic violence, sexual assault, or human trafficking, by forcing them to re-engage with their U.S. Citizen ("USC") or Lawful Permanent Resident ("LPR") abuser, assailant, or trafficker to obtain documentation to establish that their U.S-born child has U.S. citizenship. The district court's February 5, 2025 Order enjoining the EO serves the public interest, because, in part, the preliminary injunction protects immigrant mother survivors of domestic violence, sexual assault, and human trafficking from further violence, which benefits them, their children, and society at large. As such, *amici* support Plaintiffs-Appellees' position that the district court's preliminary injunction should be affirmed. A complete list of additional *amici* is attached as Appendix A.

## SUMMARY OF THE ARGUMENT

Under Executive Order 14160, U.S. citizenship will no longer be granted automatically for nearly all children born on U.S. soil, upending the century-old understanding of rights conferred by the Fourteenth Amendment. *See* Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025); *see also United States v. Wong Kim Ark*, 169 U.S. 649, 687–88 (1898).

The district court's preliminary injunction of the EO must be upheld, because Plaintiffs meet the required standard. In particular, the district court correctly determined that a preliminary injunction maintaining the status-quo of birthright citizenship during litigation would serve the public interest. To permit the

EO to go into effect would severely undermine the safety and autonomy of women who are undocumented or present in the United States lawfully but temporarily, (hereinafter referred to as "immigrant women"), and who have experienced domestic violence, sexual assault, or human trafficking.

Gender-based violence is endemic in the United States. Family and domestic violence affect around 10 million individuals yearly.[1] One in four women report being the victim of an attempted or completed rape during their lifetime.[2] Although there is no reliable estimate of prevalence within the United States, human trafficking has been reported in all 50 states and the District of Columbia, on Tribal land, and within U.S. territories.[3]

Ensnared in this endemic violence are immigrant women, who are uniquely vulnerable, whether they are undocumented, are in a temporary lawful status, or are in the process of securing permanent immigration status. Immigrant women experience not only the trauma of sexual assault but community, legal, and economic

---

[1] Martin R. Huecker, et al., *Domestic Violence* (2023), https://www.ncbi.nlm.nih.gov/books/NBK499891; *see also* Abigail M. Morrison, et al., *Intimate Partner Violence and Immigration in the United States: A Systematic Review*, 25 Trauma, Violence, & Abuse 846, 846 (2024).

[2] Ruth W. Leemis, et al., Ctrs. for Disease Control & Prevention, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence* 3 (2022).

[3] U.S. Dep't of Homeland Sec., *Human Trafficking Quick Facts*, https://www.dhs.gov/human-trafficking-quick-facts (last visited May 18, 2025).

barriers arising from their non-citizen status.[4] Immigrants also experience vulnerability to human trafficking, as traffickers use their victims' lack of legal status—or their dependence on the traffickers for legal status—as a control mechanism to "keep their victims silent and compliant."[5] In the context of abusive relationships, immigrant women often face immense barriers to leaving relationships or seeking help because they experience social isolation, language differences, lack of social capital, and fear of deportation. These compounding factors are frequently exploited by abusers: between thirty to sixty percent of immigrant women in the United States are estimated to have experienced domestic violence, and they are almost twice as likely as USC women to lose their lives as a result.[6]

The EO further pushes immigrant women who experience domestic violence, sexual assault, or human trafficking into harm's way. The EO renders a U.S. birth certificate insufficient as prima facie evidence of citizenship. Instead, under the EO's directive, a U.S.-born child of an immigrant woman who is

---

[4] Nat'l Immigrant Women's Advoc. Project, *Empowering Survivors: Legal Rights of Immigrant Victims of Sexual Assault* 1-2 (Leslye Orloff, ed., 2013)*, https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/pdf/FAM-Man-Full-EmpoweringSurvivors07.13.pdf.

[5] Anne Chandler, *Targeting Trafficking*, The Houston Lawyer, Sep./Oct. 2012, at 11.

[6] Aisha Alsinai, et al., *Use of Immigration Status for Coercive Control in Domestic Violence Protection Orders*, Frontiers Socio., 2023, at 1, 2.

"unlawfully present" or whose presence in the United States is "lawful but temporary" will only be a citizen if the child's biological father is a USC or LPR. As a result, a new mother could be forced to locate and re-engage with her abuser, assailant, or trafficker (and father of her child), and plead with him to obtain documentation of his permanent status or citizenship and paternity, if he is not listed on the birth certificate, to prove that the child is a U.S. citizen to relevant government agencies (e.g., social security office and healthcare, education, and immigration agencies). An immigrant woman whose pregnancy results from violence perpetrated by an unknown assailant or trafficker would confront an additional barrier of identifying her child's father. This forced interaction with and dependence on an abuser, assailant, or trafficker, reinforces patterns of exploitative control. In turn, it jeopardizes an immigrant woman's ability to disengage from violence or exploitation, and to pursue safety. An abuser, assailant, or trafficker can withhold this necessary documentation to exercise extreme control over the immigrant mother, to coerce her against seeking help from service providers or law enforcement, and thereby keep her stuck in a cycle of abuse or subject to further violence or exploitation.

This dangerous weaponization of citizenship status by USC or LPR traffickers, assailants, and abusers runs counter to Congress' clear determination that safety and accountability for immigrant survivors and crime victims are essential to

the public's interest. Congress has explicitly and repeatedly contemplated the vulnerable position of immigrants who experience domestic violence, sexual assault, or human trafficking in the United States. In its pursuit of public safety, Congress has additionally recognized the importance of a victim's ability to seek stable immigration status without reliance upon their abuser, or to otherwise access protective immigration status to remove barriers to engaging law enforcement. Various bipartisan Congresses passed landmark legislation such as the Immigration Act of 1990, the Violence Against Women Act ("VAWA"), and the Trafficking Victims Protection Act ("TVPA"). Among other things, these contribute to public safety interests by providing domestic violence, human trafficking, sexual assault, and other violent crime survivors with pathways to lawful immigration status that do not rely upon the participation of their abuser. They also expand the pool of survivors empowered to work with the legal system to hold assailants or traffickers accountable.

Because the EO requires that an immigrant mother secure the father's cooperation to establish a child's U.S. citizenship, the EO provides the perpetrator of rape, human trafficking, and abuse with a powerful weapon of abuse and control. It deters an immigrant mother from seeking justice against her assailant, trafficker, or abuser, out of fear that he will not cooperate to affirm their child's citizenship. Refraining from filing for a protection order or reporting violence will also increase

the likelihood of harm to the child—including physical harm and mental and social impacts—which in turn could result in short-term and long-term public harm. This includes creating more adverse childhood experiences (ACEs) for adolescents, which impact children's development and long-term health, as well as burdening social structures and institutions. Given the immense individual and social harm that would occur as a result of the EO, *amici* organizations respectfully request that the Court affirm the district court's February 5, 2025, preliminary injunction as it serves the public interest.

## ARGUMENT

I.  **A PRELIMINARY INJUNCTION OF EXECUTIVE ORDER 14160 IS IN THE PUBLIC INTEREST AS IT IS NECESSARY TO PROTECT THE LIVES OF IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE, SEXUAL ASSAULT, AND HUMAN TRAFFICKING.**

A preliminary injunction may be granted if the plaintiff establishes that 1) they are "likely to succeed on the merits," 2) they are "likely to suffer irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their] favor," and 4) "an injunction is in the public interest." *Winter v. Nat. Def. Res. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors of the injunction test "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In this case, the public interest would be served by upholding the district court's injunction of the EO. The EO would make an immigrant mother whose child's father is a USC or LPR rely upon the father to establish the child's citizenship

status, even if the father has raped, trafficked, or abused the mother. This would expose the mother—and the child—to renewed or ongoing violence or abuse, harming the immigrant mother, the child, and the community at large.

A. Under the EO, Newly Issued U.S. Birth Certificates Will No Longer Be Prima Facie Proof of Citizenship.

USCs historically have been able to use their U.S. birth certificates as proof of citizenship because of birthright citizenship.[7] The EO destroys that long-standing convention. If the EO is upheld, U.S. birth certificates would no longer serve as prima facie proof of citizenship because an additional test would be required: the parents' citizenship status. Under the EO, a child of a USC or LPR mother would need the mother's cooperation and documentation of immigration status to establish their U.S. citizenship; however, a child needing to claim citizenship through their USC or LPR "immediate male biological progenitor" ("father") would also need their father's cooperation to submit documentation (and possibly DNA tests) to establish paternity and citizenship. Exec. Order No. 14160, § 4(b), 90 Fed. Reg. 8450 (Jan. 29, 2025). This requirement grants the father of a child whose mother is an

---

[7] *Citizenship Evidence*, U.S. Dep't of St. — Bureau of Consular Affs., https://travel.state.gov/content/travel/en/passports/how-apply/citizenship-evidence.html (last updated Sept. 14, 2024); *see* U.S. Gov't Accountability Off., GAO-21-487, Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations 2 (2021), https://www.gao.gov/assets/gao-21-487.pdf.

immigrant the power over whether that child will receive the benefits and protections of U.S. citizenship. He can withhold his cooperation as a means of punishment, intimidation, or control.

> B. Domestic Violence, Sexual Assault, and Human Trafficking Against Immigrant Women Are Prevalent in the United States Where Abusers, Assailants, and Traffickers Often Use a Woman's Immigration Status as a Means of Power and Control.

Domestic violence, sexual assault, and human trafficking are prevalent in the United States.[8] Intimate partner violence, a principal form of domestic violence, involves "abuse or aggression that occurs in a romantic relationship," including harms of "physical violence, sexual violence, stalking, and psychological aggression."[9] Approximately twenty people experience physical battery by a romantic partner every minute.[10] Immigrant women are at an increased risk of being

---

[8] Institute for Women's Policy Research, *Status of Women in the States: Violence & Safety*, https://statusofwomendata.org/explore-the-data/violence-safety/violence-and-safety-full-section (last visited May 28, 2025).

[9] *About Intimate Partner Violence*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/intimate-partner-violence/about/index.html (last updated May 16, 2024).

[10] Huecker, et al., *supra* note 1; Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence Among Immigrants: Evidence for VAWA Self-Petitions* 3 (Utah State Univ. Ctr. for Growth & Opportunity Working Paper No. 2020.019, 2020),

https://www.thecgo.org/wp-content/uploads/2020/11/Immigration-Domestic-Violence-4.0.pdf.

in abusive relationships.[11] Between thirty to sixty percent of immigrant women in the United States are estimated to have experienced domestic abuse by a romantic partner, and they are almost twice as likely as USC women to be killed by an abuser.[12]

Sexual violence is also prevalent in the United States. Over half of women have experienced sexual violence involving physical contact in their lifetime, and one in four women have experienced an attempted or completed rape in their lifetime.[13] Studies also indicate immigrant women may be particularly vulnerable to sexual assault, and being an immigrant confers increased vulnerability to recurring sexual assault.[14]

And although there are no agreed-upon reliable estimates of human trafficking in the United States, tens of thousands of possible victims have been identified.[15] Traffickers frequently prey upon their targets' vulnerabilities, including

---

[11] Morrison, et al., *supra* note 1, at 846.

[12] Alsinai, et al., *supra* note 6, at 2.

[13] Ctrs. for Disease Control & Prevention, *About Sexual Violence* (Jan. 23, 2024) https://www.cdc.gov/sexual-violence/about/index.html.

[14] Decker, M., Raj, A. and Silverman, J., *Sexual Violence Against Adolescent Girls: Influences of Immigration and Acculturation*, 13 Violence Against Women 498, 507 (2007).

[15] U.S. Dep't of Homeland Sec., *supra* note 3; National Human Trafficking Hotline, *National Statistics*, https://humantraffickinghotline.org/en/statistics (last visited May 23, 2025).

poverty, limited English proficiency, or lack of lawful immigration status, to compel or coerce them to provide labor or services, or to engage in commercial sex acts.[16] Fear of being deported or suffering physical or sexual violence against themselves or family members are among the common factors that keep immigrants entrapped in human trafficking situations.[17]

The *amici*'s experience with immigrant clients reflects the prevalence:

- A transnational criminal organization forced Alex[18] into sex trafficking. When she escaped, she was nine months pregnant as a result of one of the many rapes she endured. She remains fearful that her traffickers will find her and harm both her and her child.

- Maria, married to a USC, left her husband to escape his abuse. Soon after, her husband began stalking her, and finally caught up to her on her commute to work. When she stepped out of her car, he stabbed and very nearly killed her.

---

[16] U.S. Dep't of Justice, *What is Human Trafficking*? (last updated June 26, 2023), https://www.justice.gov/humantrafficking/what-is-human-trafficking.

[17] T.K. Logan, Robert Walker & Gretchen Hunt, *Understanding Human Trafficking in the United States*, 10 Trauma, Violence & Abuse 3, 13 (2009).

[18] For the privacy and safety of the *amici*'s clients, pseudonyms are being used for each example shared in this brief.

- Claudia reported that when she tried to end her relationship with her abusive husband, he grabbed their child's tricycle and hit her in the head with it. Chasing her through their home, he then threw a heavy suitcase at her.

- Lena was 15 years old when she was targeted and raped in a park near her high school. She became pregnant with her first child as a result of this rape.

Circumstances prevalent in immigrant communities increase immigrant women's likelihood of experiencing abuse and barriers to escaping it or accessing help to hold their abusers accountable. These circumstances might include poverty, education inaccessibility, being part of a racial or cultural minority, critical stress levels, language barriers, lack of social support outside the home, or residing in communities with high levels of other violence and crime.[19] Abusers, assailants, and traffickers exploit and even facilitate these circumstances to trap women in abusive relationships or target them for violence—for example, by ensuring the survivor's financial dependence, preventing them from learning English, or impregnating them.[20]

---

[19] Logan, et al., *supra* note 17, at 2; Morrison, et al., *supra* note 1, at 846.

[20] *See* Kyla Baird and Jennifer Connolly, *Recruitment and Entrapment Pathways of Minors into Sex Trafficking in Canada and the United States: A Systematic Review*, 24 Trauma, Violence & Abuse 89, 196, 198 (2023).

- Fatima's partner, a USC, forbade her from taking formal English classes, prohibited her from forming relationships with anyone who might teach her English, and refused to allow her to apply for a job at Dunkin' Donuts.

- Adele, whose abusive husband was also a USC, was not allowed by her abuser to open her own bank account, as a means of financially preventing her from escaping the relationship.

- Nina was 18, struggling to make ends meet, and had been working in her job for only a few weeks when her employer raped her, resulting in her pregnancy.

- Mallory was forced into a labor trafficking scheme as a teenager. Her trafficker, a USC, raped her multiple times over the years, resulting in the births of her children. When she escaped, her trafficker threatened to take custody of the children and kill her.

USC or LPR abusers, assailants, and traffickers—who do not fear deportation themselves—commonly take advantage of their victims' insecurity in their immigration status as a means of coercion.[21] This coercion includes threatening to turn their partner over to immigration authorities and taking custody of their children, and hiding or destroying their partner's passports, visas, or other

---

[21] Morrison, et al., *supra* note 1, at 847.

immigration documents.[22] Sexual assault survivors may also avoid reporting being raped out of fear of being deported. This is particularly true when the assailant is in a position of authority over the victim, such as an employer, supervisor, or professor.[23] A 2017 survey of more than 700 advocates working with domestic violence, sexual assault, and human trafficking survivors revealed that 43 percent of advocates had clients who dropped a civil or criminal case due to fear of immigration enforcement.[24]

- Samira tried to leave her abuser, and he retaliated by contacting Immigrant and Customs Enforcement and claiming that she only married him to gain permanent lawful residency.

---

[22] *See, e.g., United States v. Chaudhri*, 134 F.4th 166 (4th Cir. 2025) (affirming district court's convictions and explaining that "Appellants created a climate of fear and violence through repeated physical abuse and threats of deportation when they were dissatisfied with M.B.'s work or with her attitude, and that was a scheme, plan, or pattern intended to make M.B. believe she would be deported and/or separated from her children if she did not continue making Appellants happy by completing the assigned labor."); *see also* Alsinai, et al., *supra* note 6, at 2; *Learn More About Domestic Violence*, N.Y. ST., https://opdv.ny.gov/learn-more-about-domestic-violence.

[23] Nat'l Immigrant Women's Advoc. Project, *supra* note 4, at 21.

[24] Tahirih Just. Ctr., *Key Findings: 2017 Advocate and Legal Service Survey Regarding Immigration Survivors*, https://www.tahirih.org/wp-content/uploads/2017/05/2017-Advocate-and-Legal-Service-Survey-Key-Findings.pdf (last visited May 22, 2025).

- Soon after Daniela married her husband, he demanded she cut off contact with her family, threatening to not file her immigration paperwork if she did not comply.

- Nancy's USC spouse got her a green card but hid it from her and told her that she just had a temporary visa.

- Deborah's abusive husband repeatedly threatened that if she left him, he would have her deported and he would keep their young daughter, who was born in the United States. To protect her daughter, Deborah remained in the home, despite her husband pushing her down the stairs, physically attacking her, and repeatedly raping her.

Even when an immigrant woman has some kind of lawful immigrant status, the fear that any contact with a governmental authority will expose their presence in the country and result in deportation, bolstered by an abuser's threats, can trap a survivor in an abusive relationship or make them afraid to request anything from the abuser, trafficker, or assailant.[25]

Abusers, assailants, and traffickers exploit these circumstances to use threat, intimidation, and coercion to instill fear of retaliation or further violence in

---

[25] Tien-Li Loke, Note, *Trapped in Domestic Violence: The Impact of United States Immigration Laws on Battered Immigrant Women*, 6 B.U. PUB. INT. L.J. 589, 591 (1997).

survivors.[26] That fear can stop a survivor from seeking help to end the violence, to hold their abuser, assailant, or trafficker accountable for the violence, or to leave a violent or exploitative situation. The EO would add another circumstance abusers, assailants, and traffickers could exploit to exert power and control over survivors: forcing survivors to request proof of their U.S. citizenship or lawful permanent residence or to engage in a legal process to compel their abusers, assailants, or traffickers to provide such documentation.                                    .

C. The EO Places Immigrant Women Who Are Domestic Violence, Sexual Assault, or Human Trafficking Survivors at Serious Risk of Harm by Requiring Them to Engage with Their Abuser, Assailant, or Trafficker to Establish Their Child's U.S. Citizenship Status.

Because birth certificates will no longer serve as prima facie proof of U.S. citizenship, immigrant mothers who lack permanent immigration status will be reliant on their children's fathers' cooperation and documentation to affirm their child's citizenship. Rape survivors who do not know their assailants would be unable to affirm their children's citizenship without enduring the added trauma and danger of locating, identifying, and contacting their rapists. Immigrant women assaulted, abused, or trafficked by someone they know and weighing the consequences of

---

[26] Domestic Abuse Intervention Programs, *Understanding the Power and Control Wheel*, https://www.theduluthmodel.org/wheels/faqs-about-the-wheels/ (last visited May 28, 2025).

reporting the violence imposed upon them may be compelled against disclosure. In exchange for cooperation with the EO's documentation requirements, survivors may refrain from reporting their abuse or seeking a restraining order, or may make concessions in custody matters when they would have otherwise raised domestic violence or sexual assault concerns.[27] Survivors weighing whether to leave an abusive relationship or exploitative situation may remain out of fear that their assailants, traffickers, or abusers would refuse to furnish the required documentation. As such, the EO harms these women—and their children—by tipping the scales in favor of capitulating to the demands of their traffickers, assailants, or abusers, or avoiding further interaction with them altogether. This harms whole communities by creating impunity and enabling repeat offenses.[28] If a survivor chooses a legal route (if even available) to compel cooperation without capitulation, the abuser may become angry, increasing the chance of continued violence or death.[29]

---

[27] *See* Alsinai, et al., *supra* note 6, at 6; *Learn More About Domestic Violence*, N.Y. ST., https://opdv.ny.gov/learn-more-about-domestic-violence.

[28] Nat'l Sexual Violence Res. Ctr., *Sexual Assault Response Team Toolkit, Section 7: SARTs and Offender Accountability* (2018) https://www.nsvrc.org/sarts/toolkit/7-2.

[29] *See* Erica L. Smith, Bureau of Just. Stat., *Female Murder Victims and Victim-Offender Relationship, 2021*, 1 (Dec. 2022).

- After initiating legal proceedings, Leslie's ex-spouse threatened to hurt her family in her home country, stating that he knew where they lived and could arrange for someone to hurt them.

- Ingrid's ex-spouse threatened to kill her children because she filed a lawsuit against him.

This risk extends to immigrant women who have separated themselves and their U.S.-born children from their abusers, assailants, or traffickers. If they leave the relationship or otherwise distance themselves from their abuser, assailant or trafficker before obtaining the father's documentation, they will be required to re-engage to obtain it, risking subsequent assaults, exploitation or even to return to the abusive relationship.[30] Congress acknowledged this risk of repeated or ongoing victimization when it established a good cause exception in the Temporary Assistance for Needy Families Act that exempts mothers with abusive partners from having to establish their child's paternity before being eligible for government assistance.[31] 42 U.S.C. § 608(a) (2018).

---

[30] *See* Alsinai, et al., *supra* note 6, at 2.

[31] Section 654(29) allows the applicant or recipient to not cooperate with establishing paternity of the child if they can demonstrate their abusive partner is likely to retaliate by harming the mother or child. *Id.* § 654(29); Admin. for Child. & Fams., *Chapter Sixteen Domestic Violence and Child Support, in* Essentials For Attorneys in Child Support Enforcement 1, 6–7 (2021).

## II. A PRELIMINARY INJUNCTION OF THE EO IS VITAL TO ENSURING IMMIGRANT SURVIVORS OF DOMESTIC VIOLENCE, SEXUAL ASSAULT, AND HUMAN TRAFFICKING CAN SAFELY USE THE LEGAL SYSTEM TO SEEK SAFETY AND JUSTICE.

### A. Congress Has Made Clear Through Legislation That It Serves the Public Interest to Protect Immigrant Survivors of Domestic Violence, Sexual Assault, and Human Trafficking and to Encourage Accountability from Their Abusers, Assailants, and Traffickers.

For decades, Congress has consistently codified support for immigrant survivors of domestic violence and other forms of violence. In 1990, Congress first recognized the dangers posed by abusers using their spouse's immigration status as a tool of coercion when it introduced a waiver for domestic violence survivors seeking to remove the conditions of their marriage-based permanent residence.[32] *See* Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (codified as amended in relevant part at 8 U.S.C. § 1186a(c)(4)). Congress went on to pass VAWA in 1994. *See* Violence Against Women Act of 1994, Pub. L. No. 103-322, 108 Stat. 1902 (codified as amended in scattered sections of 18 U.S.C. and 42 U.S.C.). A watershed bill with bipartisan support, VAWA introduced sweeping provisions to address and reduce domestic violence by expanding resources for survivors,

---

[32] *See* 136 Cong. Rec. 27085 (daily ed. Oct. 2, 1990), (statement of Rep. Louise Slaughter).

strengthening legal protections, and improving the mechanisms of accountability in cases of abuse.[33]

In a key component of this legislation, Congress sought to eliminate barriers and create a channel for immigrant women in abusive relationships to secure safety, justice, and permanent status.[34] Legislators recognized that "domestic battery problems can become terribly exacerbated in marriages where one spouse is not a citizen, and the non-citizen's legal status depends on his or her marriage to the abuser."[35] The legislative record highlights a concern for the apprehension and paralysis many immigrant women face in households with domestic violence— "fear[ing] both continued abuse if they stay with their batterers and deportation if they attempt to leave."[36] Recognizing this unique vulnerability, VAWA permits immigrant women who have suffered battery or extreme cruelty at the hands of a

---

[33] Legal Momentum, *History of VAWA*, https://www.legalmomentum.org/history-vawa (last visited May 28, 2025).

[34] Katrina Castillo, et al., *Legislative History of VAWA (94, 00, 05), T and U-Visas, Battered Spouse Waiver, and VAWA Confidentiality* 2 (2023), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/VAWA_Leg-History_Final.pdf.

[35] *Id.* at 5.

[36] *Id.*

USC or LPR to independently "self-petition" for LPR status, without the involvement of the abuser.[37]

Congress continued to underscore the importance of protecting immigrant women from violent crime and intimate partner violence with the passage of the TVPA in 2000. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2(a)(1), 114 Stat. 1464, 1533 (codified as amended in scattered sections of U.S.C.). Importantly, the TVPA established the U nonimmigrant status, an immigration status that confers employment authorization and a pathway to lawful permanent residence to victims of certain crimes, including domestic violence, rape, and sexual assault. 8 C.F.R. § 214.14(b), (c)(7) (2025); 8 U.S.C. § 1255(m) (2018). In enacting the U nonimmigrant status, Congress aimed to provide immigrant women experiencing certain criminal acts of violence protection against deportation, despite the threats of their perpetrators, and the freedom to cooperate with law enforcement without fear that their perpetrator would retaliate by taking actions to have them deported or by withdrawing— or threatening to withdraw—access to an immigration benefit under their control.[38]

---

[37] U.S. Citizenship & Immigr. Servs., *Abused Spouses, Children and Parents*, https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents (last updated Jan. 24, 2025).

[38] Castillo, et al., *supra* note 34, at 33.

Congress further reinforced its efforts to protect immigrant women facing severe violence or exploitation by establishing the T visa. Focused primarily on providing protections for victims of human trafficking, the T visa stands as another example of Congress's commitment to protecting immigrant women in exploitative situations, providing them with a pathway towards stability. *See* § 107, 114 Stat. at 1477. In so doing, Congress recognized the "coercive effects" of traffickers' threats of physical harm to their victim if they escape or attempt to escape the trafficking situation. *See* 22 U.S.C. § 7101(b)(7). Congress has made it clear that it recognizes the inherent difficulties and dangers posed to domestic violence, sexual assault and human trafficking victims in processes that require the participation of or reliance upon their abusers, assailants, or traffickers. To require such participation or reliance would undermine the public interest in immigrant survivors seeking safety and justice from their abusers, assailants, and traffickers.[39]

This legislative history should not be forgotten, understated, nor undermined, for it offers a window into widely accepted truths. In many ways, the "law reflects and embodies prevailing social attitudes by codifying or enshrining them with a

---

[39] *See* Leslye E. Orloff, Legal Momentum, *Development, History and Legislative Purpose of VAWA's "Any Credible Evidence" Statutory Requirements*, (2009), https://niwaplibrary.wcl.american.edu/wp-content/uploads/Any-Credible-Evidence_Leg-History-Final_4-28-09.pdf.

formal, official, and enforceable status."[40] By enacting legislation like the Immigration Act of 1990, VAWA and TVPA, Congress not only offers concrete avenues for relief but also signals that immigrant women are not invisible or expendable; rather, they must be protected for the public interest. These statutes acknowledge the unique and often intersectional forms of harm immigrant women face—ranging from domestic violence to sexual exploitation to systemic barriers in accessing justice and resources. These laws do more than regulate behavior—they reflect and shape cultural norms, combat stigma, and reaffirm a national commitment to justice, equity, and safety for all, regardless of status. These laws thus serve both a practical and symbolic function, underscoring the federal government's recognition that reducing harm to immigrant women is essential to the health, integrity, and moral direction of the nation.

### B. The EO Will Deter Immigrant Mothers from Holding Their Abusers, Assailants, or Traffickers Accountable, Furthering Societal Harm.

Allowing the EO to take effect would subvert the long-standing policy objectives of the aforementioned legislation by erecting new legal and psychological barriers to critical legal relief for domestic violence, sexual assault, and human trafficking survivors. It would shield abusers, rapists, and traffickers from

---

[40] Marshall B. Knapp, *Social Values and Older Persons: The Role of the Law*, 7 Marquette's Elder Advisor 69, 72 (2012) (emphasis removed).

accountability. When survivors cannot seek safety, the harms do not remain isolated. Rather, they reverberate outward, triggering a cascade of negative outcomes that threaten the health and stability of entire communities.

As discussed, under this EO, immigrant mothers are rendered wholly dependent on the male progenitors' willingness to affirm their children's citizenship. This coercive reliance discourages immigrant survivors from seeking legal protections or cooperating with authorities to hold their abusers, assailants, or traffickers accountable.[41] Reporting rates of violent crimes are already disproportionately low within immigrant communities; the EO threatens to further suppress those rates by intensifying fear, reinforcing dependency, and deepening power imbalances in abusive or exploitative relationships.[42]

More specifically, this EO compromises public health by allowing violence to go unchecked. Sexual assault survivors experience a range of short-term and long-term physical and psychological effects, including Post Traumatic Stress Disorder,

---

[41] *See* Susanne Lohmann, et al., *The Trauma and Mental Health Impacts of Coercive Control: A Systematic Review and Meta-Analysis*, 25 Trauma, Violence & Abuse 630 (2024).

[42] Josh T. Smith, *When Immigrants Are and Aren't Afraid of Reporting Crime*, Ctr. for Growth & Opportunity at Utah St. Univ. (Nov. 8, 2021), https://www.thecgo.org/benchmark/when-immigrants-are-and-arent-afraid-of-reporting-crime/.

sleep disturbances, and thoughts of suicide.[43] Human trafficking survivors may experience health issues ranging from sexually transmitted infection and chronic pain, to effects of psychological trauma, including depression and suicidal ideation.[44] Survivors trapped in abusive relationships face elevated risks of chronic physical illness, mental health and substance use disorders, reproductive harm, and even suicide.[45] But these long term health consequences also affect the children and other community members. A study of domestic violence-related homicides in 16 states found that one in five victims were individuals other than the abuse survivor, including children, other family members, and community members.[46] Even where domestic violence does not end in homicide, witnessing violence in the home constitutes an adverse childhood experience (ACE).[47] ACE is often "associated with poor health and developmental outcomes," and witnessing domestic violence, a specific type of ACE, can lead to greater risk of "juvenile pregnancy, criminal

---

[43] Nat'l Immigrant Women's Advoc. Project, *supra* note 4, at 8.

[44] Tiffany Dovydaitis, *Human Trafficking: The Role of the Health Care Provider*, 55 J. Midwifery & Women's Health 462, 464 (2010).

[45] *Understanding the Impact of Domestic Violence*, Mass General Brigham McLean (Jan. 28, 2025), https://www.mcleanhospital.org/essential/domestic-violence.

[46] Everytown for Gun Safety, *Guns and Violence Against Women: America's Uniquely Lethal Intimate Violence Partner Problem*, (Oct. 17, 2019) https://everytownresearch.org/reports/guns-intimate-partner-violence.

[47] Ctrs. for Disease Control & Prevention, *About Adverse Childhood Experiences*, (Oct. 8, 2024), https://www.cdc.gov/aces/about/index.html.

behavior, suicidal tendencies, and bedwetting."[48] Additionally, children who witness domestic violence are significantly more likely to experience intimate partner violence themselves later on in adulthood—either as victims or by engaging in abusive behavior themselves—thus perpetuating an intergenerational cycle of harm.[49]

Indeed, the ripple effects of domestic violence, sexual assault, and human trafficking extend far beyond the household. Higher rates of domestic violence, sexual assault, and human trafficking strain the very systems tasked with protecting community well-being—overburdening hospitals, schools, shelters, and mental health providers with the long-term fallout of domestic violence, sexual assault and human trafficking.[50] Co-workers, neighbors, and service providers are also impacted by the destabilizing presence of unchecked abuse, with damaging effects ranging

---

[48] Erica M. Webster, *The Impact of Adverse Childhood Experiences on Health and Development in Young Children*, 9 Global Pediatric Health 1, 8 (2022); Olivia Harrison, Note, The Long-Term Effects of Domestic Violence on Children, 41 Child. Legal Rts. J. 63, 63 (2021).

[49] *Id.*

[50] *See* Jeni Klugman, et al., Ctr. on Gender Equity & Health & Newcomb Inst. Tulane Univ., *The Costs of Intimate Partner Violence in California*, 9; Nat'l Sexual Violence Res. Ctr., *About Sexual Assault*, https://www.nsvrc.org/about-sexual-assault (last visited May 23, 2025); Safe House Project, *The Economic Cost of Human Trafficking: Why It Affects Everyone*, (Apr. 10, 2025), https://safehouseproject.org/blog/the-economic-cost-of-human-trafficking-why-it-affects-everyone.

from lost productivity to escalating mental health crises.[51] Public health, at its core, depends on the ability of communities to respond to and recover from collective harm. By isolating survivors and weakening accountability mechanisms, this EO directly impairs that capacity, ignoring the widespread and compounding damage that domestic violence, sexual assault, and human trafficking inflict on individuals, families, and communities alike.

In sum, this EO is not merely a legal misstep—it is a public health and safety hazard. It frustrates sustained bipartisan efforts to reduce domestic violence, sexual assault, and human trafficking, protect survivors, and promote collective well-being. There is a compelling public interest in promoting the health and safety of immigrant survivors and ensuring accountability for abusers, assailants, and traffickers. EO 14160 undermines these objectives and harms the health of our communities.

## CONCLUSION

*Amici* urge this Court to affirm the preliminary injunction. An injunction

---

[51] Safe Alliance, *The Ripple Effect of Domestic Violence: How it Touches an Entire Community*, https://www.safealliance.org/blog/ripple-effect-domestic-violence-how-touches-entire-community (last visited May 28, 2025).

preventing EO 14160 from taking effect is squarely in the public interest.

Respectfully submitted,

/s/ Reena Parikh
Reena Parikh, *Counsel of Record*
Boston College Legal Services LAB
Civil Rights Clinic
885 Centre Street
Newton Centre, MA 02459
(617) 552-0283
reena.parikh@bc.edu

Kursten Phelps
Charlotte Gillingham
Tahirih Justice Center
6400 Arlington Boulevard, Suite 400
Falls Church, VA 22042
(571) 282-6161
kurstenp@tahirih.org
charlotteg@tahirih.org

Juan Camilo Mendez
HarborCOV
P.O. Box 505754
Chelsea, MA 02150
juan@harborcov.org

Date: June 6, 2025                    *Counsel for Amici Curiae*

*Boston College Law School Civil Rights Clinic students John Cort, Kira Hinchey, Shaquan McDowell and Carolyn Zaccaro and law graduate with HarborCOV, Sarai Suarez, assisted with the preparation of this brief under supervision by counsel for Amici.

## Appendix A

## Full List of *Amici Curiae*

Apoyo Legal Migrante Asociado
Asian Law Alliance
ASISTA
Ayuda
Brazilian Women's Group
CARECEN-Central American Resource Center
Center for Gender & Refugee Studies
Children's Legal Center
De Novo
Dignidad and The Right to Immigration Institute
Freedom Network USA
HarborCOV
Immigrant Law Center of Minnesota
Immigrant Legal Resource Center (ILRC)
Immigration Center for Women and Children
Just Neighbors
Life Span
Massachusetts Law Reform Institute
MetroWest Legal Services
Migrant and Immigrant Community Action Project
National Network to End Domestic Violence
Oasis Legal Services
Pennsylvania Immigration Resource Center
Public Counsel
Refugee and Immigrant Center for Education and Legal Services (RAICES)
Rian Immigrant Center
Southern Arizona Legal Aid Inc.
Sunita Jain Anti-Trafficking Initiative, Loyola Law School
Survivor Justice Center
Tahirih Justice Center
The Door- A Center of Alternatives
The Human Trafficking Legal Center
Ujima, The National Center on Violence Against Women in the Black Community
Virginia Poverty Law Center

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5), 32(a)(7)(B) and 32(a)(5)-(6), I certify that this brief of *amici curiae* complies with the Type-Volume limit of Fed. R. App. P because it contains 6,280 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief of *amici curiae* complies with typeface and typestyle requirements because it has been prepared in a proportionally spaced typeface, using Microsoft Word in 14-point Times New Roman.

/s/ Reena Parikh
Reena Parikh

Date: June 6, 2025

31

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court

for the United States Court of Appeals for the Fourth Circuit by using the appellate

CM/ECF system on June 6, 2025. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.

/s/ Reena Parikh
Reena Parikh


Date: June 6, 2025