NO. 25-1153

# United States Court of Appeals

*for the*

# Fourth Circuit

---

CASA, INC., ASYLUM SEEKER ADVOCACY PROJECT, INC., MARIBEL, Individually and as next friend to her future child, c/o CASA, Inc., JUANA, Individually and as next friend to her future child, c/o CASA, Inc., TRINIDAD GARCIA, Individually and as next friend to her future child, c/o Asylum Seeker Advocacy Project, MONICA, Individually and as next friend to her future child, c/o Asylum Seeker Advocacy Project, LIZA, Individually and as next friend to her future child, c/o Institute for Constitutional Advocacy and Protection,

*Plaintiffs-Appellees*,

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

---

## BRIEF OF *AMICI CURIAE* MEMBERS OF THE U.S. CONGRESS IN SUPPORT OF APPELLEES

---

DOUGLAS JENSEN
*MICHAEL BASS
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 300-7504

*LINUS CHAN
 *Clinical Professor of Law*
UNIVERSITY OF MINNESOTA
229 19th Avenue South
Minneapolis, Minnesota 55455
(612) 301-1156

JONATHAN WEINBERG
 *Distinguished Professor of Law*
WAYNE STATE UNIVERSITY
471 West Palmer Avenue
Detroit, Michigan 48202
(313) 577-3933
weinberg@wayne.edu

*Attorneys for Amici Curiae*

---

CP COUNSEL PRESS       (800) 4-APPEAL • (382221)

*Not admitted in the Fourth Circuit

– v. –

DONALD J. TRUMP, In his official capacity as President of the United States,
c/o Attorney General of the United States, SECRETARY OF THE UNITED
STATES DEPARTMENT OF STATE, In their official capacity, ATTORNEY
GENERAL OF THE UNITED STATES, In their official capacity, SECRETARY
OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
In their official capacity, c/o Office of the General Counsel, DIRECTOR OF
UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, In their
official capacity, c/o Office of the Chief Counsel, COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION, In their official capacity, c/o Office
of the Chief Counsel, UNITED STATES OF AMERICA, c/o Attorney General of
the United States,

*Defendants-Appellants.*

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS CURIAE ................................................................1

SUMMARY OF ARGUMENT ......................................................................2

ARGUMENT ................................................................................................3

I.      The INA dooms the Government's case. ..........................................3

II.     Congress, in mandating citizenship for all persons "born in the United States, and subject to the jurisdiction thereof," legislated a robust version of *jus soli*. ..........................................................5

      A.    *Jus soli* was United States law before the Nationality Act of 1940. ..........................................................................5

      B.    In Section 201(a) of the Nationality Act of 1940, reenacted in the INA, Congress continued to embrace *jus soli*. ...............................8

            1.    The *Revision and Codification* explicitly endorsed *jus soli*. ......9

            2.    The legislative hearings make plain Congress's plan to incorporate the *jus soli* rule. .......................................10

            3.    The "foundling" provision further underlines Congress's indifference to the parentage of children born in the United States. ...........................................................12

      C.    In the 1952 INA, Congress carried forward the rule embodied in the 1940 Act. ........................................................13

III.    Other provisions of the immigration law are premised on the INA's extension of citizenship to all persons born in the United States. ................15

IV.    Congress has consistently rejected bills that would have amended the INA to incorporate the citizenship rule the Government urges. ...................21

V.    The Executive Order violates the Constitution's separation of powers. .......23

CONCLUSION .........................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accardi v. Shaugnessy,*
 206 F.2d 897 (2d Cir. 1953)................................................................19

*Afroyim v. Rusk,*
 387 U.S. 253 (1967).........................................................................12

*Amy v. Smith,*
 1 Little 326 (Ky. 1822) ......................................................................5

*Clinton v. City of New York,*
 524 U.S. 417 (1998).........................................................................24

*Dred Scott v. Sandford,*
 60 U.S. 393 (1857)............................................................................5

*Elk v. Wilkins,*
 112 U.S. 94 (1884)............................................................................4

*Ex parte Ng Fung Sing,*
 6 F.2d 670 (W.D. Wash. 1925)..........................................................15

*Faustino v. INS,*
 302 F. Supp. 212 (S.D.N.Y. 1969)....................................................17

*Helvering v. Or. Mut. Life Ins. Co.,*
 311 U.S. 267 (1940).........................................................................24

*In re Look Tin Sing,*
 21 F. 905 (D. Calif. 1884)..................................................................7

*Inglis v. Trustees of Sailors' Snug Harbor,*
 28 U.S. 99 (1830)..............................................................................5

*INS v. Chadha,*
 462 U.S. 919 (1983).........................................................................24

ii

*Kendall v. U.S. ex rel. Stokes*,
  37 U.S. 524 (1838) ........................................................................24

*Lynch v. Clarke*,
  1 Sand. Ch. 583 (1844) ......................................................... 5, 9, 10

*Matter of Burris*,
  15 I&N Dec. 676 (1976) ...............................................................15

*Matter of Moorman*,
  19 I&N Dec. 708 (1964) ...............................................................15

*Medellin v. Texas*,
  552 U.S. 491 (2008) ......................................................................24

*Mendez v. Major*,
  340 F.2d 128 (8th Cir. 1965) ........................................................16

*Rogers v. Bellei*,
  401 U.S. 815 (1971) ........................................................................3

*State v. Manuel*,
  20 N.C. 144 (1838) ..........................................................................5

*United States ex rel. Hintopolous v. Shaughnessy*,
  353 U.S. 72 (1957) ........................................................................16

*United States v. Elm*,
  25 F. Cas. 1006 (N.D.N.Y. 1877) ..................................................7

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898) ................................................................ 3, 6, 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................ 24, 25

**Statutes**

Alien Registration Act ........................................................................ 18

Civil Rights Act of 1866 ................................................................. 6, 8

iii

Immigration Act of 1924 ................................................................ 15

Immigration Act of 1965 ........................................................... 16, 17

Immigration Nationality Act of 1952 ........................................ 14, 15

Indian Citizenship Act of 1924 ....................................................... 3

Nationality Act of 1940 ....................................................... 2, 8, 12, 13

8 U.S.C. § 320 ............................................................................. 18

8 U.S.C. § 322 ............................................................................. 18

8 U.S.C. § 334 ............................................................................. 18

8 U.S.C. § 1101 ........................................................................... 19

8 U.S.C. § 1151 ..................................................................... 16, 17

8 U.S.C. § 1152 ........................................................................... 15

8 U.S.C. § 1158 ........................................................................... 20

8 U.S.C. § 1159 ........................................................................... 20

8 U.S.C. § 1229b .................................................................... 18, 19

8 U.S.C. § 1255 ........................................................................... 20

8 U.S.C. § 1401 ..................................................................... passim

**Constitutional Provisions**

U.S. Const., art. I § 1 .................................................................. 24

**Legislative Materials**

*Cong Globe*, 39th Cong. 1st Sess .................................................... 6

H.J. Res. 357 (1991) .................................................................... 22

H.R. Comm. on Immigration and Naturalization, 76th Cong., Report
    Proposing a Revision And Codification of the Nationality Laws of the

United States, Part One: Proposed Code with Explanatory Comments (Comm. Print 1939) .................................................. 8-10, 13

H.R. Rep. No. 1365 (1952) .............................................. 14, 15

H.R. 7 (1997) ............................................................... 22

H.R. 73 (1999) ............................................................. 22

H.R. 126 (2009) ........................................................... 22

H.R. 133 (2007) ........................................................... 22

H.R. 140 (2011) ........................................................... 23

H.R. 140 (2013) ........................................................... 23

H.R. 140 (2015) ........................................................... 23

H.R. 140 (2017) ........................................................... 23

H.R. 140 (2019) ........................................................... 23

H.R. 140 (2021) ........................................................... 23

H.R. 569 (2025) ........................................................... 23

H.R. 698 (2005) ........................................................... 22

H.R. 994 (2009) ........................................................... 22

H.R. 1196 (2011) .......................................................... 23

H.R. 1567 (2003) .......................................................... 22

H.R. 1868 (2009) .......................................................... 23

H.R. 1940 (2007) .......................................................... 22

H.R. 3605 (1991) .......................................................... 22

H.R. 4864 (2023) .......................................................... 23

H.R. 5002 (2010) .......................................................... 23

H.R. 6612 (2023) .................................................................................. 23

H.R. 6789 (2008) .................................................................................. 22

H.R. 8838 (2020) .................................................................................. 23

H.R. 9064 (2020) .................................................................................. 23

*Immigration: Hearings Before the Subcommittee on Immigration and Naturalization of the Senate Committee on Judiciary*, 89th Cong. (1965) ........ 17

*Revision of Immigration, Naturalization, and Nationality Laws: Joint Hearings Before the Subcommittees of the Committees on the Judiciary*, 82nd Cong. (1951) .................................................... 14

S. Rep. No. 1137 (1952) ........................................................................ 14

S. Rep. No. 1515 (1950) ........................................................................ 13

S. 45 (2015) ........................................................................................... 23

S. 301 (2013) ......................................................................................... 23

S. 304 (2025) ......................................................................................... 23

S. 723 (2011) ......................................................................................... 23

S. 2117 (2005) ....................................................................................... 22

S. 4459 (2024) ....................................................................................... 23

*To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings Before the Committee on Immigration and Naturalization*, 76th Cong. (1940)................................ 10-12

## Other Authorities

Exec. Order No. 6115 (Apr. 25, 1933) ..................................................... 8

Philip C. Jessup, *Some Phases of the Administrative and Judicial Interpretation of the Immigration Act of 1924*, 35 YALE L.J. 705 (1926).................................. 15

*The Federalist* (Jacob E. Cooke ed., 1961)............................................................ 24

## INTEREST OF AMICUS CURIAE[1]

Proposed *amici* are 170 members of Congress, whose full names and titles appear in the Appendix.  As members of Congress, including Members of the House Committee on the Judiciary and the House Committee on Homeland Security, *amici* are well acquainted with our country's laws governing immigration and naturalization, in particular the Immigration and Nationality Act of 1952 (the "INA").

*Amici* have a compelling interest in ensuring that the Courts uphold not only the United States Constitution, but also the Congressionally enacted INA.  Plaintiffs-appellees' brief establishes that the plain language of the Fourteenth Amendment confers citizenship on all persons born in the United States and subject to its laws. But separate and apart from that Constitutional guarantee, the INA evidences Congress' own intent to confer such citizenship.  Even if the Court were to accept defendants-appellants' (the "Government's") contorted reading of the Fourteenth Amendment, which it should not, the Court must still uphold the INA.  The President's Executive Order seeks to overturn that congressionally enacted statute

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person, aside from amici curiae and its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.  All parties consent to the filing of this brief.

by executive fiat, thus violating both the INA and the Constitution's fundamental principle of separation of powers.

## SUMMARY OF ARGUMENT

Plaintiffs have demonstrated that the Fourteenth Amendment guarantees citizenship to all persons born in the United States and subject to its laws. We need not repeat that proof here. *Amici* write instead to make a different point, one that has not received sufficient attention in this litigation: In addition to violating the Fourteenth Amendment, the Executive Order fails for a separate and independent reason—it violates a Congressional mandate set out in statutory law.

Title 8 U.S.C. § 1401(a) provides that any person "born in the United States, and subject to the jurisdiction thereof" is a citizen of the United States at birth. That statutory command is binding on the Executive. Congress first enacted that language in 1940 with the Nationality Act of 1940, § 201(a), Pub. L. No. 76-853, 54 Stat. 1137, and carried it over without change in 1952 when it enacted the INA. The Government seems to think that its only task here is to convince the Court that the drafters, enactors, and ratifiers of the Fourteenth Amendment in 1868 understood the phrase "subject to the jurisdiction" to incorporate the Government's atextual theory that people born in the United States and subject to its laws are not U.S. citizens. But that is incorrect. The Government must also show that *Congress* in 1940—when it commanded that any person "born in the United States, and subject

2

to the jurisdiction thereof" is a citizen of the United States at birth—also accepted that theory.

The Government cannot make that showing. The legislative history and structure of the 1940 and 1952 statutes make it unmistakably clear that Congress intended and understood its enactments to mandate citizenship for *all* persons born in the United States, subject only to the limited exceptions set out in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

## ARGUMENT

### I. The INA dooms the Government's case.

The Fourteenth Amendment sets out a constitutional minimum—a floor—for birthright citizenship. At a minimum, birthright citizenship must extend to all "persons born . . . in the United States and subject to the jurisdiction thereof." But the Fourteenth Amendment does not set out a ceiling. As the Supreme Court has recognized, Congress is free to confer birthright citizenship even more broadly, to people who have no claim to citizenship solely by virtue of the Constitutional text. *Rogers v. Bellei*, 401 U.S. 815, 830 (1971). Congress has in fact exercised that power, for example granting citizenship "at birth" to certain persons born *outside* the United States. *See* 8 U.S.C. § 1401(c), (d), (e), (g), (h). As another example, Congress decreed that members of Indian tribes were citizens at birth, *see* Indian Citizenship Act of 1924, Pub. L. No. 68-175, 43 Stat. 253 (1924), even after the

Supreme Court ruled in *Elk v. Wilkins*, 112 U.S. 94 (1884), that the Fourteenth Amendment did not make them so.

This means that, even if this Court were to drastically narrow the citizenship guarantee provided by the Fourteenth Amendment, that misconstruction would have no bearing on the citizenship guarantee provided by the statute enacted by Congress, 8 U.S.C. § 1401. The Government relies on the fact that the statute and the Fourteenth Amendment use the same words ("subject to the jurisdiction thereof"). And so, the Government imagines, if it can convince the Court that that phrase should be read in a manner contrary to its plain meaning, the same argument will suffice for both the Constitution and statute.

But that is incorrect. The 1868 Fourteenth Amendment and the 1940 Nationality Act (reenacted in 1952's INA) are different documents, enacted by different bodies many years apart, with different legislative histories. To be sure, Congress in 1940 understood the words "subject to the jurisdiction thereof" in the Nationality Act to have the same meaning they attributed to that phrase in the Constitution. But the standard embodied in the 1940 Act is the one that Congress *in 1940* understood the Constitution to embody—and we have ample evidence as to what that standard was.

When Congress enacted the Nationality Act in 1940, and re-enacted it in 1952, it understood both the Constitution, and pre-existing statutory law, to grant birthright

citizenship to *all* persons born in the United States, subject only to the exceptions explicitly described in *Wong Kim Ark*.  Congress reaffirmed that understanding and ratified the same standard repeatedly over subsequent years.

## II.  Congress, in mandating citizenship for all persons "born in the United States, and subject to the jurisdiction thereof," legislated a robust version of *jus soli*.

### A.  *Jus soli* was United States law before the Nationality Act of 1940.

Under the British common law, a person's birth anywhere within the sovereign's territorial jurisdiction conferred the status of British subject.  United States courts before 1866 ruled consistently that the same common-law rule (known as *jus soli*) applied in this country—that citizenship attached to all persons born within our borders and subject to our laws.  *See, e.g.*, *Inglis v. Trustees of Sailors' Snug Harbor*, 28 U.S. 99, 164 (1830) (opinion of Story, J.); *State v. Manuel*, 20 N.C. 144 (1838); *Lynch v. Clarke*, 1 Sand. Ch. 583 (1844).

Even when some courts adopted the view that free Black persons should not enjoy citizenship in this country, they did not endorse the claim that parentage should displace place of birth as the source of American citizenship.  Instead, courts in Southern states articulated a *jus soli* exception.  *See Amy v. Smith*, 1 Little 326, 334 (Ky. 1822).  Chief Justice Taney in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), in announcing that no person could be a citizen if that person were Black, thus presented that holding in the context of the *jus soli* rule.  *See id.* at 417 (explaining

that naturalization was by its nature inapplicable to persons born in the United States).

In 1866, Congress fixed *jus soli* in statute. It enacted the Civil Rights Act of 1866, which began with the words, "[A]ll persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." Senate Judiciary Chair Trumbull, who introduced the bill, explained that its language carried forward the common-law rule. *Cong. Globe*, 39th Cong. 1st Sess. 498 (Jan. 30, 1866); *see also id.* at 1757 (Apr. 4, 1866) ("[T]he infant child of a foreigner born in this land is a citizen of the United States long before his father."). *See also United States v. Wong Kim Ark*, 169 U.S. 649, 688 (1898) (explaining that the 1866 statute mandated citizenship for all "native-born children of foreign . . . parents not in the diplomatic service of their own country, nor in hostile occupation of part of our territory").

In the Congressional debate over the Fourteenth Amendment in 1868, proponents explicitly stated that they meant to carry forward the common-law rule: citizenship derived from a person's being "born within the limits of the United States and subject to their laws." *Cong. Globe*, at 2765 (May 23, 1866) (Sen. Howard). The phrase "subject to the jurisdiction" in the constitutional text, they explained, meant that the individual at birth must be subject to U.S. law—not born as a member of an Indian tribe subject to the civil and criminal jurisdiction of the tribe rather than

that of the U.S. government, or into the family of a foreign ambassador.  *See id.* at 2893-94 (May 30, 1866) (Sen. Trumbull); *see also id.* at 2897 (Sen. Williams); *id.* at 3031-32 (Jun. 8, 1866) (Sen. Henderson).  Courts agreed.  *See United States v. Elm*, 25 F. Cas. 1006, 1006-07 (N.D.N.Y. 1877); *In re Look Tin Sing*, 21 F. 905, 606 (D. Calif. 1884) (Field, J., sitting as Circuit Justice).

When *United States v. Wong Kim Ark* was argued thirty years later, even the Solicitor General—arguing against Mr. Wong's citizenship—was forced to concede that the common-law rule was reflected in unbroken longstanding precedent.  As he put it, "the opinions of the Attorneys-General, the decisions of the Federal and State courts, and, up until 1885, the rulings of the State Department all concurred in the view that birth in the United States conferred citizenship."  Brief for the United States at 28, *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

The Supreme Court in *Wong Kim Ark* upheld that unbroken precedent.  It held, emphatically, that the Civil Rights Act and the Fourteenth Amendment carried forward the common-law rule.  That is, United States citizenship had always (aside from Black persons under *Dred Scott*) encompassed *everyone* "born in the United States," excluding only "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, [or] children of members of [] Indian tribes."  169 U.S. at 693; *see also id.* at 698.

7

**B.    In Section 201(a) of the Nationality Act of 1940, reenacted in the INA, Congress continued to embrace *jus soli*.**

The 1866 Civil Rights Act's definition of United States birthright citizenship remained in force for seventy-four years.  The road to a new statute began in 1933, when President Roosevelt instituted a revision and codification of U.S. citizenship laws.  Exec. Order No. 6115, *Revision and Codification of the Nationality Laws of the United States* (Apr. 25, 1933).  The result was the Nationality Act of 1940.

The 1940 Act changed the statutory language governing birthright citizenship, but it did not change its substance.  Instead of the phrase used in the 1866 Civil Rights Act—"not subject to any foreign power, excluding Indians not taxed"—the 1940 Act used the language contained in the Fourteenth Amendment—"subject to the jurisdiction thereof."  The legislative and drafting history of the Act makes clear that Congress intended to maintain the *jus soli* principle incorporated in both the 1866 Act and the Fourteenth Amendment.

That legislative history includes two key sources.  First, the agencies tasked by President Roosevelt with proposing the recodification transmitted to Congress a proposed *Revision and Codification of the Nationality Laws of the United States*, together with explanatory commentary.  H.R. COMM. ON IMMIGRATION AND NATURALIZATION, 76TH CONG., REPORT PROPOSING A REVISION AND CODIFICATION OF THE NATIONALITY LAWS OF THE UNITED STATES, PART ONE: PROPOSED CODE WITH EXPLANATORY COMMENTS (Comm. Print 1939) (hereafter, "*Revision and*

8

*Codification*"). Second, the House and Senate conducted extensive hearings. Each of those sources makes plain Congress's desire to maintain citizenship for all those born in the territory of the United States.

### 1. The *Revision and Codification* explicitly endorsed *jus soli*.

The *Revision and Codification*'s explanatory notes provided that the draft language in proposed section 201(a) was "a statement of the common-law rule, which has been in effect in the United States from the beginning." *Id.* at 7. The Commentary explained the guiding principle of this rule in the same way that the Supreme Court had in *Wong Kim Ark*: The rule extended citizenship to all persons born in the United States, with the limited exceptions set out in that case. *See id.* The *Revision and Codification* took pains to emphasize that although the petitioner in *Wong Kim Ark* had been born to parents who were domiciled in the United States according to the submitted facts stipulated in that case, the rule of *Wong Kim Ark*— and of section 201—extended beyond those facts. It was "also applicable to a child born in the United States of parents residing therein temporarily." *Id.*

The *Revision and Codification*, supporting this conclusion, noted that *Wong Kim Ark* had relied on *Lynch v. Clarke*, 1 Sand. Ch. 583 (1844). That case involved a child born in New York during her parents' "temporary sojourn" to this country. While still only a few months old, she relocated with her parents to Ireland. Upon returning to the U.S. fifteen years later, her right to collect an inheritance turned on

whether she was a U.S. citizen at birth. The court held that the common-law rule applied, and that under that rule she was "indisputabl[y]" a citizen. 1 Sand. Ch., at 639. Indeed, there was "no doubt, but that by the law of the United States, every person born within the dominions and allegiance of the United States, *whatever were the situation of his parents*, is a natural born citizen." *Id.* at 663 (emphasis added). The *Revision and Codification* summed up all the case law reflected in section 201 as follows: "[I]t is the fact of birth within the territory and jurisdiction, and not the domicile of the parents, which determines the nationality of the child." *Revision and Codification*, at 7.

### 2. The legislative hearings make plain Congress's plan to incorporate the *jus soli* rule.

The Congressional hearings demonstrate the legislators' agreement with the drafters of the *Revision and Codification*. Both witnesses and Members made clear that while Congress could vary its rules granting citizenship to children born abroad, the U.S. citizenship of children born here was a given. As one deputy commissioner put it: "In the United States, insofar as the question of citizenship is concerned, the doctrine of *jus soli* applies." *To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immigr. and Naturalization*, 76th Cong. 49 (Feb. 12, 1940); *see also id.* (Congressman Poage agreed); *id.* at 37 (same).

Congress understood the principle of *jus soli* to apply even to children born

of temporary visitors who had minimal ties to the United States.  In a meeting of the Immigration and Naturalization Committee, Congressman Curtis posed this hypothetical: "Just one more question.  We will suppose a Frenchman and his wife [came] over here from France on a visitor's visa and 2 weeks after they arrive in this country there is to them born a child.  What is the nationality of that child?"  *Id.* at 246 (May 2, 1940).  Both the witness and a second congressman responded that the child would be an American citizen.  The committee chairman pointed out the anomaly that "under French law they can claim him as a Frenchman," but Congressman Curtis stood firm: "And yet that child has been born within the territory of the United States and is declared by law to be a citizen of the United States."  *Id.*

The implications of that rule concerned some members of Congress and of the Administration.  In one hearing, for example, a representative of the State Department testified:

> Another class [of citizens] is composed of those persons who are born in the United States of alien parents and are taken by their parents to the countries from which the parents came and of which they are nationals. . . .
>
> Many of them are taken in early infancy.  There are hundreds of thousands of those persons living around different parts of the world who happen to have been born here and acquire citizenship under the fourteenth amendment, but they are brought up in the countries of their parents and they are in no true sense American, and yet they may not only enter this country themselves as

> citizens, but may marry aliens in those countries and have
> children and those children are born citizens.

*Id.* at 37 (Feb. 12, 1940).  But the proper response to this concern, he continued, was not a change to the *jus soli* rule.  Rather, he explained, "[w]e have control over citizens born abroad, and we also have control over the question of expatriation." *Id.*  That is, Congress could provide a means for these citizens to lose their citizenship after living abroad.[2]  Or Congress might provide a means to restrict the ability of U.S. citizens to transmit their citizenship when having children outside of the United States.  The witness was emphatic, however, that "no one proposes" to restrict *jus soli* citizenship, *id.* at 38.  Indeed, he stated that such a change would be absurd.

### 3. The "foundling" provision further underlines Congress's indifference to the parentage of children born in the United States.

The irrelevance of parentage to the citizenship of children born in the United States is further demonstrated by the 1940 Nationality Act's "foundling" provision.  Section 201(f) of the Act, as enacted, conferred citizenship on a "child of unknown

---

[2]  Congress had done just that, responding to a similar concern in the context of certain children born outside the United States with citizenship *jus sanguinis*.  *See* Nationality Act of 1940, § 201(g) (if the child does not "reside in the United States" for "five years between the ages of thirteen and twenty-one . . . his American citizenship shall thereupon cease").  More recent case law has placed sharp limits on Congress's ability to take away citizenship from persons entitled to it by virtue of their birth in the United States.  *See Afroyim v. Rusk*, 387 U.S. 253 (1967).

parentage found in the United States, until shown not to have been born in the United States."  Nationality Act of 1940, § 201(f), Pub. L. No. 76-853, 54 Stat. 1137.

The foundling provision, still in force with minor changes, *see* 8 U.S.C. § 1401(f), creates a presumption of birth inside the United States for any child found within the territory of the United States.  It gives no consideration to the status of the child's (unknown) parents, reflecting a conviction that the identity and status of those parents is unimportant.  Had Congress intended to exclude children of temporary visitors or undocumented non-citizens from citizenship, then the foundling provision would have made little sense.  Rather, the foundling provision encapsulates what the Commentary began with: "[I]t is the fact of birth within the territory and jurisdiction, and not the domicile of the parents, which determines the nationality of the child." *Revision and Codification*, at 7.

### C.     In the 1952 INA, Congress carried forward the rule embodied in the 1940 Act.

In 1952, Congress recodified the nation's immigration and nationality laws in the INA.  The new statute carried forward § 201 of the Nationality Act of 1940, without change, at 8 U.S.C. § 1401(a).

The legislative history makes plain Congress's understanding that under the 1940 Act, "all native-born persons, except those born of parents who are in the diplomatic service of foreign states, are citizens at birth."  Senate Judiciary Comm., *The Immigration and Naturalization Systems of the United States*, S. Rep. No. 1515,

13

81st Cong, 2d Sess. 685 (1950).

The Congressional hearings reflected the same understanding. As one witness put it, if a child is born to a noncitizen held in detention on U.S. soil after seeking admission at the border, "[t]his child is, of course, a citizen of the United States. There can be no question about that." *See Revision of Immigration, Naturalization, and Nationality Laws*: *Joint Hearings Before the Subcomms. of the Comms. on the Judiciary*, 82nd Cong. 188 (Mar. 9, 1951). Another witness stated that, if a noncitizen arrives in the United States as a temporary visitor, remains here illegally, applies for suspension of deportation, and fathers children while waiting for the application to be adjudicated, those children "are, of course, American citizens." *Id.* at 327 (Mar. 14, 1951).

Congress in the 1952 INA carried that older law forward. *See* H.R. Rep. No. 1365, 82d Cong. 2d Sess. 76 (1952) (the 1952 statute carried forward the birthright citizenship provisions of the Nationality Act of 1940); S. Rep. No. 1137, 82d Cong., 2d Sess. 38 (1952) (same; "[t]he only exceptions are those persons born in the United States to alien diplomats"); H.R. Rep. No. 1365, *supra*, at 25 (same).[3]

---

[3] The immigration title of the 1952 Act includes one provision that bears explanation. In setting out the "national origins" system of immigration quotas, which depended on the country in which a person was born, section 202(a)(3) of the Act provided: "[A]n alien born in the United States shall be considered as having been born in the country of which he is a citizen or subject, or if he is not a citizen or subject of any country then in the last foreign country in which he had his

**III.  Other provisions of the immigration law are premised on the INA's extension of citizenship to all persons born in the United States.**

Congress has amended the immigration law repeatedly over the years. Several of those amendments have implemented policies directly connected to the statute's extension of citizenship to all persons born in the United States.  Indeed, the amendments would have rendered the law incoherent if not for the *jus soli* rule.

One example is the 1965 Immigration and Nationality Act's definition of the category of "immediate relative."  Immigrants to the United States had long been subject to a complex set of numerical limitations and quotas.  Spouses and minor children of U.S. citizens had been exempt from those quotas, on the theory that citizens should have the companionship of their close family members.  In 1965, Congress introduced an innovation: Certain *parents* of U.S. citizens would also be

---

residence."  This provision was a rewording and updating of § 12(a) of the Immigration Act of 1924, which read: "An immigrant born in the United States who has lost his United States citizenship shall be considered as having been born in the country of which he is a citizen or subject."  Immigration Act of 1924, § 12(a), 43 Stat. 160 (1924).  *See* H.R. Rep. No. 1365, 82d Cong., 2d Sess. 119 (1952) (side-by-side comparison of existing and proposed law, setting out the two provisions in opposite columns).  The 1952 provision, whose modern counterpart is 8 U.S.C. § 1152(b)(3), has only been applied to birthright United States citizens who later accepted or manifested citizenship in another country and thus lost their U.S. citizenship.  *See Matter of Burris*, 15 I&N Dec. 676 (1976); *Matter of Moorman*, 19 I&N Dec. 708 (1964).  For the similar application of the older law, *see, e.g.*, *Ex parte Ng Fung Sing*, 6 F.2d 670 (W.D. Wash. 1925) (Ms. Ng was born a U.S. citizen but married a noncitizen, which under then-extant law expatriated her); *see also* Philip C. Jessup, *Some Phases of the Administrative and Judicial Interpretation of the Immigration Act of 1924*, 35 Yale L.J. 705, 723 (1926).

treated as "immediate relatives" and gain the same favorable immigration status.

The 1965 Act thus defined its "immediate relative" category to include "the children, spouses, and parents of a citizen of the United States: *Provided*, That in the case of parents, such citizen must be at least twenty-one years of age."  Immigration Act of 1965, Pub. L. 89-236, 79 Stat. 911, § 1.  That definition remains the law today. 8 U.S.C. § 1151(b)(2)(A)(i).

Two things are notable about the 1965 Act's "immediate relative" definition. First, Congress's reason for including the proviso—directing that parents of minor U.S. citizen children would *not* be "immediate relatives"—was precisely because all children born in the United States were U.S. citizens.  The Congressional drafters were aware of *United States ex rel. Hintopolous v. Shaughnessy*, 353 U.S. 72 (1957), in which Mr. and Mrs. Hintopolous had been illegally present in the United States and had a child during their unauthorized stay.  They then applied for suspension of deportation, noting the hardship to their infant child if they were to be forced out of the country.  Justice Harlan, writing for the Court, noted that "the child is, of course, an American citizen by birth."  But the Court upheld the hearing officer's decision to deny relief.  *Id.* at 73; *see also, e.g.*, *Mendez v. Major*, 340 F.2d 128, 132 (8th Cir. 1965).

In the hearings leading to enactment of the 1965 Act, both the legislators and the Executive were mindful that all children born in the United States were U.S.

citizens. They wanted adult U.S. citizens to be able to bring their parents to this country but felt that it would be problematic if foreigners could gain special immigration rights simply by virtue of having a baby in this country and thereby becoming the parents of a U.S. citizen. *See Immigration: Hearings Before the Subcomm. on Immigration and Naturalization of the S. Comm. on Judiciary*, 89th Cong. 270 (Mar. 5, 1965) (Sen. Ervin) (absent restrictive language, all "a married couple from some foreign country would have to do . . . to become eligible for admittance to America immediately as nonquota immigrants would be to arrange to come over under a temporary visa and have the wife give birth to a child while here"); *id.* (Assistant Attorney General Schlei) (same). The over-21 requirement responded to that concern, ensuring that while a child born here had American citizenship at birth, that fact did not provide immediate immigration benefits to the child's parents. *See Faustino v. INS*, 302 F. Supp. 212, 214-215 (S.D.N.Y. 1969), *aff'd*, 432 F.2d 429 (2d Cir. 1970), *cert. denied*, 401 U.S. 921 (1971).

Second, the very fact that Congress saw the need to legislate regarding parents of U.S. citizen minor children, excluding them from the "immediate relative" definition, 8 U.S.C. § 1151(b)(2)(A)(i), demonstrates the statutory *jus soli* rule. People seeking "immediate relative" status under the 1965 Act were not themselves citizens or lawful permanent residents. Immigration Act of 1965, Pub. L. 89-236, 79 Stat. 911, § 1. So how would such people come to be parents of U.S. citizen

children?  As a general matter, the answer was the statute's *jus soli* rule.  Because a minor child could not become a naturalized citizen except derivatively (that is, by virtue of having a citizen parent), *see* 8 U.S.C. §§ 320, 322, 334(b), its only avenues for citizenship were having a U.S. citizen parent or being born in this country.[4]

The immigration law's hardship waiver provisions make this even plainer. Those provisions address cases like those of Mr. and Mrs. Hintopolous.  While Congress did not want the illegally present parents to derive immigration benefits automatically, solely by virtue of their child's birth here, Congress concluded that it *did* want immigration authorities to have the discretion to allow parents to stay in this country, given the possibility of hardship to their U.S. citizen child.

Thus, in 1940, Congress gave the Attorney General discretion to suspend a noncitizen's deportation if "deportation would result in serious economic detriment" to the noncitizen's minor U.S. citizen child.  Alien Registration Act, Pub. L. 76-670, 54 Stat. 670, 672, § 19(c) (1940).  The modern version of that provision is 8 U.S.C.

---

[4]  It's possible to imagine cases not implicating *jus soli* in which a noncitizen could become the parent of a citizen minor child, who but for the 21-year-old limitation could petition for him as an immediate relative.  In theory, for example, a noncitizen could have married a U.S. citizen, who later bore his child outside the United States (after having satisfied the law's residency requirements, so that the child was a citizen *jus sanguinis*), and then divorced the citizen spouse, and still later entered illegally with the child.  Or a noncitizen could adopt a U.S. citizen child. But as the legislative history quoted above makes clear, those are not the cases Congress had in mind.

§ 1229b(b), which allows an immigration judge to "cancel" the removal of a noncitizen who is in the United States without status or on a temporary visa, on a showing of sufficient hardship to the noncitizen's United States citizen or lawful permanent resident spouse or unmarried minor child.[5]

From the beginning, the Board of Immigration Appeals and the courts effectuated Congress's intent that discretionary relief would be available for illegally present noncitizens with children who were citizens by virtue of having been born in the United States. *See, e.g.*, *Accardi v. Shaugnessy*, 206 F.2d 897, 899 (2d Cir. 1953) (Mr. Accardi entered illegally, married a noncitizen, and had a child who was a U.S. citizen by virtue of having been born here; the agency recognized his eligibility for relief but denied it as a matter of discretion), *rev'd*, 347 U.S. 260 (1954) (remanding for a new determination). Indeed, once again, the category of applicants with U.S. citizen or lawful permanent resident unmarried minor children would be scant but for Congress's *jus soli* mandate. Persons applying for cancellation of removal under § 1229b(b) are illegally present or here on temporary visas. Their unmarried minor children born outside of the United States have no better status than they. If they have unmarried minor children who are U.S. citizens, it will generally be by virtue of the *jus soli* rule.

---

[5] The statute references the noncitizen's "child," but by virtue of 8 U.S.C. § 1101(b)(1), the word "child" in this portion of the statute is limited to "an unmarried [child] under twenty-one years of age."

19

More generally, the INA relies on the *jus soli* rule to a degree that its outcomes would be incoherent in that rule's absence. Consider the following example: A noncitizen arrives in the United States with her husband, fleeing persecution in a foreign country. An immigration judge grants her and her husband asylum. Before they can adjust to lawful permanent resident status, they have a baby girl. Under the rule prescribed by Congress, that girl is a U.S. citizen. Her future here is secure.

Under the rule urged by the Government, on the other hand, the result is a hash. Depending on the laws of the country her parents fled, the girl is either a citizen of that country or is stateless. Either way, she has no valid immigration status in the United States. She does not partake of her parents' asylee status. *See* 8 U.S.C. § 1158(b)(3)(A) (derivative asylum is available to children "accompanying, or following to join" the asylee, but both of those terms require the derivative asylee to have been admitted to the United States from another country, as the girl was not, and to already have been born when asylum was granted, as the girl was not).

The girl's parents are eligible to become permanent residents under 8 U.S.C. § 1159(b), but the girl isn't, because adjustment under that provision is only available to persons who were "granted asylum"—which, again, she was not. *Id.* § 1159(b)(2).

Even after her parents become lawful permanent residents, they will not be able to petition for her adjustment to lawful permanent resident status under 8 U.S.C.

§ 1255(a) because that provision is only available if the beneficiary was "admitted or paroled into the United States"—which she was not. So she will lack status, and, absent some form of official mercy, she will have to leave the United States, and presumably her parents with her. Yet the only place the family will be able to go will be the country of persecution that her parents fled, to which they cannot be forced to return under United States and international law.

The point of this example is not that the consequences of the Government's proposed rule would be nonsensical and harsh—though they would be. The point is that they would be nonsensical and harsh because the immigration statute, in its length and breadth, is built around the 8 U.S.C. § 1201(a) *jus soli* rule, which Congress first enacted in 1866 and re-enacted in 1940 and 1952. If Congress were to repeal its *jus soli* rule, it would have to rewrite the rest of the statute.

## IV. Congress has consistently rejected bills that would have amended the INA to incorporate the citizenship rule the Government urges.

Critics of the *jus soli* rule have long recognized that the INA is inconsistent with their preferred result. Thus, for more than three decades, such critics have introduced bills in Congress seeking to amend the statute to eliminate the provisions guaranteeing birthright citizenship. These bills are significant in at least two respects. First, the efforts to amend the INA to eliminate birthright citizenship represent a concession by lawmakers that the statute does in fact provide for such citizenship. Second, Congress has rejected every one of those proposed bills.

21

One such bill was introduced in 1991, as part of a package comprising two pieces of legislation.  The first component was H.J. Res. 357, 102d Cong., 1st Sess. (1991), which proposed a constitutional amendment that would eliminate the birthright citizenship guarantee for any person whose mother was not a "legal resident[]" of the United States.  The second component was H.R. 3605, 102d Cong., 1st Sess. (1991).  That bill—which provided that it would become effective only after ratification of the above proposed constitutional amendment—proposed a parallel amendment to 8 U.S.C. § 1401(a) to cut back on the statutory citizenship guarantee.

The sponsors of these bills, in other words, understood that they would have to overcome *both* a constitutional provision mandating citizenship for all persons born in the United States *and* a statutory provision doing the same.  Congress, however, refused the sponsors' invitation; it declined to enact either bill.

In fact, bills to amend the INA to eliminate its guarantee of citizenship to all persons born in the United States have been introduced—and rejected—in nearly every Congress since 1991.  *See, e.g.*, H.R. 7, 105th Cong., 1st Sess. (1997); H.R. 73, 106th Cong., 1st Sess. (1999); H.R. 1567, 108th Cong., 1st Sess. (2003); H.R. 698, 109th Cong., 1st Sess. (2005); S. 2117, 109th Cong., 1st Sess. (2005); H.R. 133, 110th Cong., 1st Sess. (2007); H.R. 1940, 110th Cong., 1st Sess. (2007); H.R. 6789, 110th Cong., 2d Sess. (2008); H.R. 126, 111th Cong., 1st Sess. (2009); H.R. 994,

111th Cong., 1st Sess. (2009); H.R. 1868, 111th Cong., 1st Sess. (2009); H.R. 5002, 111th Cong., 2d Sess. (2010); H.R. 140, 112th Cong., 1st Sess. (2011); H.R. 1196, 112th Cong., 1st Sess. (2011); S. 723, 112th Cong., 1st Sess. (2011); H.R. 140, 113th Cong., 1st Sess. (2013); S. 301, 113th Cong., 1st Sess. (2013); H.R. 140, 114th Cong., 1st Sess. (2015); S. 45, 114th Cong., 1st Sess. (2015); H.R. 140, 115th Cong., 1st Sess. (2017); H.R. 140, 116th Cong., 1st Sess. (2019); H.R. 8838, 116th Cong., 2d Sess. (2020); H.R. 9064, 116th Cong., 2d Sess. (2020); H.R. 140, 117th Cong., 1st Sess. (2021); H.R. 4864, 118th Cong., 1st Sess. (2023); H.R. 6612, 118th Cong., 1st Sess. (2023); S. 4459, 118th Cong., 2d Sess. (2024); H.R. 569, 119th Cong., 1st Sess. (2025); S. 304, 119th Cong., 1st Sess. (2025).

This long history makes two things clear. First, legislators on all sides of the debate understood that the INA mandates birthright citizenship for all persons born in the United States. That mandate remains unless and until Congress amends the statute. And second, Congress has refused to amend the statute. It has maintained *jus soli* citizenship as a statutory command.

## V.    The Executive Order violates the Constitution's separation of powers.

Beginning over thirty years ago, opponents of birthright citizenship have striven to change the law by constitutional means—the democratic process of introducing bills in Congress both to amend the INA, and to begin the process of Constitutional amendment. Those efforts having failed, the Executive now seeks to

attain the administration's goals by unilateral executive fiat. This blatantly illegal act violates both the INA and the Constitution's fundamental principle of separation of powers.

"The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). As to the latter, Article I vests "[a]ll legislative powers" in Congress, U.S. Const., art. I, § 1, and "no provision in the Constitution [] authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), including the INA. That power rests with Congress and Congress alone. *See INS v. Chadha*, 462 U.S. 919, 954 (1983) (The "repeal of statutes, no less than enactment, must conform with Art. I."); *see also Helvering v. Or. Mut. Life Ins. Co.*, 311 U.S. 267, 272 (1940) (concluding that "only Congress can take away" a particular right conferred by statute). "As Madison explained in The Federalist No. 47, under our constitutional system of checks and balances, 'the magistrate in whom the whole executive power resides cannot of himself make a law.'" *Medellin v. Texas*, 552 U.S. 491, 527-28 (2008) (quoting J. E. Cooke, *The Federalist* 326 (1961)). To hold otherwise "would be clothing the President with a power entirely to control the legislation of congress." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

24

Nor is there a statutory basis for the President's actions. There "is no statute that expressly authorizes the President" to overturn the INA, and there is no "act of Congress" from which such a power can be fairly implied. *See Youngstown*, 343 U.S. at 585. Without power "from the Constitution itself" or "an act of Congress," *id.*—both of which are wholly lacking here—a president who disagrees with a law enacted by Congress is "limit[ed] . . . to the recommending of laws he thinks wise and the vetoing of laws he thinks bad," *id.* at 587.

In other words, the President must participate in the political process and adhere to our constitutional structure, not simply ignore them. And unless and until Congress changes the laws, the President must follow them. Here, however, rather than trying to persuade Congress to exercise *its* authority to amend or repeal the INA, the President seeks to evade that well-established process with an unconstitutional power grab. That cannot stand.

## CONCLUSION

For the foregoing reasons, the Court should affirm the decision below.

Date: June 6, 2025          Respectfully submitted,

Douglas Jensen                  /s/ Jonathan Weinberg
Michael Bass                    Jonathan Weinberg
SHER TREMONTE LLP         Distinguished Professor of Law
90 Broad St., 23rd Fl.          WAYNE STATE UNIVERSITY
New York, NY 10004         471 W. Palmer Ave.
                                     Detroit, MI 48202
                                     (313) 577-3933
                                     weinberg@wayne.edu

                                     Linus Chan
                                     Clinical Professor of Law
                                     UNIVERSITY OF MINNESOTA
                                     229 19th Ave. South
                                     Minneapolis, MN 55455

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), as the brief contains 6,483 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: June 6, 2025          */s/ Jonathan T. Weinberg*
                              Jonathan T. Weinberg

## APPENDIX: LIST OF *AMICI CURIAE*

**Jamie Raskin**
Representative of Maryland

**Pramila Jayapal**
Representative of Washington

**Bennie G. Thompson**
Representative of Mississippi

**Adriano Espaillat**
Representative of New York

**Yvette Clarke**
Representative of New York

**Grace Meng**
Representative of New York

**Jerrold Nadler**
Representative of New York

**Bradley Scott Schneider**
Representative of Illinois

**Hakeem Jeffries**
Representative of New York

**Katherine Clark**
Representative of Massachusetts

**Pete Aguilar**
Representative of California

**Joe Neguse**
Representative of Colorado

**Rosa L. DeLauro**
Representative of Connecticut

**Gabe Amo**
Representative of Rhode Island

**Yassamin Ansari**
Representative of Arizona

**Jake Auchincloss**
Representative of Massachusetts

**Becca Balint**
Representative of Vermont

**Nanette Barragán**
Representative of California

**Joyce Beatty**
Representative of Ohio

**Wesley Bell**
Representative of Missouri

**Ami Bera, M.D.**
Representative of California

**Donald S. Beyer Jr.**
Representative of Virginia

**Sanford D. Bishop, Jr.**
Representative of Georgia

**Suzanne Bonamici**
Representative of Oregon

**Brendan F. Boyle**
Representative of Pennsylvania

**Shontel Brown**
Representative of Ohio

**Julia Brownley**
 Representative of California

**Nikki Budzinski**
 Representative of Illinois

**Janelle Bynum**
 Representative of Oregon

**Salud O. Carbajal**
 Representative of California

**André Carson**
 Representative of Indiana

**Troy A. Carter, Sr.**
 Representative of Louisiana

**Sean Casten**
 Representative of Illinois

**Kathy Castor**
 Representative of Florida

**Joaquin Castro**
 Representative of Texas

**Sheila Cherfilus-McCormick**
 Representative of Florida

**Judy Chu**
 Representative of California

**Gilbert R. Cisneros, Jr.**
 Representative of California

**Emanuel Cleaver, II**
 Representative of Missouri

**James E. Clyburn**
 Representative of South Carolina

**Steve Cohen**
 Representative of Tennessee

**J. Luis Correa**
 Representative of California

**Jim Costa**
 Representative of California

**Joe Courtney**
 Representative of Connecticut

**Angie Craig**
 Representative of Minnesota

**Jasmine Crockett**
 Representative of Texas

**Jason Crow**
 Representative of Colorado

**Danny K. Davis**
 Representative of Illinois

**Madeleine Dean**
 Representative of Pennsylvania

**Diana DeGette**
 Representative of Colorado

**Suzan K. DelBene**
 Representative of Washington

**Chris Deluzio**
 Representative of Pennsylvania

**Mark DeSaulnier**
  Representative of California

**Maxine Dexter**
  Representative of Oregon

**Debbie Dingell**
  Representative of Michigan

**Lloyd Doggett**
  Representative of Texas

**Sarah Elfreth**
  Representative of Maryland

**Veronica Escobar**
  Representative of Texas

**Dwight Evans**
  Representative of Pennsylvania

**Cleo Fields**
  Representative of Louisiana

**Lizzie Fletcher**
  Representative of Texas

**Bill Foster**
  Representative of Illinois

**Valerie P. Foushee**
  Representative of North Carolina

**Lois Frankel**
  Representative of Florida

**Laura Friedman**
  Representative of California

**Maxwell Alejandro Frost**
  Representative of Florida

**John Garamendi**
  Representative of California

**Jesús G. "Chuy" García**
  Representative of Illinois

**Robert Garcia**
  Representative of California

**Sylvia Garcia**
  Representative of Texas

**Dan Goldman**
  Representative of New York

**Jimmy Gomez**
  Representative of California

**Maggie Goodlander**
  Representative of New Hampshire

**Josh Gottheimer**
  Representative of New Jersey

**Al Green**
  Representative of Texas

**Jahana Hayes**
  Representative of Connecticut

**Pablo José Hernández**
  Representative of Puerto Rico

**Jim Himes**
  Representative of Connecticut

**Jared Huffman**
  Representative of California

**Glenn F. Ivey**
  Representative of Maryland

**Jonathan L. Jackson**
  Representative of Illinois

**Sara Jacobs**
  Representative of California

**Henry C. "Hank" Johnson, Jr.**
  Representative of Georgia

**Julie Johnson**
  Representative of Texas

**Sydney Kamlager-Dove**
  Representative of California

**William Keating**
  Representative of Massachusetts

**Robin L. Kelly**
  Representative of Illinois

**Timothy M. Kennedy**
  Representative of New York

**Ro Khanna**
  Representative of California

**Raja Krishnamoorthi**
  Representative of Illinois

**Greg Landsman**
  Representative of Ohio

**Rick Larsen**
  Representative of Washington

**John B. Larson**
  Representative of Connecticut

**George Latimer**
  Representative of New York

**Mike Levin**
  Representative of California

**Sam T. Liccardo**
  Representative of California

**Ted W. Lieu**
  Representative of California

**Zoe Lofgren**
  Representative of California

**Stephen F. Lynch**
  Representative of Massachusetts

**Seth Magaziner**
  Representative of Rhode Island

**John W. Mannion**
  Representative of New York

**Doris Matsui**
  Representative of California

**Lucy McBath**
  Representative of Georgia

**Sarah McBride**
  Representative of Delaware

**April McClain Delaney**
Representative of Maryland

**Jennifer L. McClellan**
Representative of Virginia

**Betty McCollum**
Representative of Minnesota

**James P. McGovern**
Representative of Massachusetts

**LaMonica McIver**
Representative of New Jersey

**Gregory W. Meeks**
Representative of New York

**Robert J. Menendez**
Representative of New Jersey

**Kweisi Mfume**
Representative of Maryland

**Dave Min**
Representative of California

**Gwen S. Moore**
Representative of Wisconsin

**Joseph D. Morelle**
Representative of New York

**Kelly Morrison**
Representative of Minnesota

**Seth Moulton**
Representative of Massachusetts

**Kevin Mullin**
Representative of California

**Richard E. Neal**
Representative of Massachusetts

**Eleanor Holmes Norton**
Representative of the District of Columbia

**Johnny Olszewski**
Representative of Maryland

**Frank Pallone, Jr.**
Representative of New Jersey

**Chris Pappas**
Representative of New Hampshire

**Nancy Pelosi**
Representative of California

**Scott H. Peters**
Representative of California

**Brittany Pettersen**
Representative of Colorado

**Chellie Pingree**
Representative of Maine

**Stacey E. Plaskett**
Representative of the Virgin Islands

**Nellie Pou**
Representative of New Jersey

**Mike Quigley**
Representative of Illinois

**Delia C. Ramirez**
  Representative of Illinois

**Emily Randall**
  Representative of Washington

**Deborah K. Ross**
  Representative of North Carolina

**Andrea Salinas**
  Representative of Oregon

**Linda T. Sánchez**
  Representative of California

**Mary Gay Scanlon**
  Representative of Pennsylvania

**Jan Schakowsky**
  Representative of Illinois

**Kim Schrier, M.D.**
  Representative of Washington

**David Scott**
  Representative of Georgia

**Robert C. "Bobby" Scott**
  Representative of Virginia

**Terri A. Sewell**
  Representative of Alabama

**Brad Sherman**
  Representative of California

**Mikie Sherrill**
  Representative of New Jersey

**Lateefah Simon**
  Representative of California

**Darren Soto**
  Representative of Florida

**Melanie A. Stansbury**
  Representative of New Mexico

**Greg Stanton**
  Representative of Arizona

**Suhas Subramanyam**
  Representative of Virginia

**Thomas R. Suozzi**
  Representative of New York

**Eric Swalwell**
  Representative of California

**Mark Takano**
  Representative of California

**Shri Thanedar**
  Representative of Michigan

**Mike Thompson**
  Representative of California

**Dina Titus**
  Representative of Nevada

**Rashida Tlaib**
  Representative of Michigan

**Jill Tokuda**
  Representative of Hawaii

**Norma J. Torres**
    Representative of California

**Ritchie Torres**
    Representative of New York

**Lori Trahan**
    Representative of Massachusetts

**Derek T. Tran**
    Representative of California

**Lauren Underwood**
    Representative of Illinois

**Juan Vargas**
    Representative of California

**Marc Veasey**
    Representative of Texas

**Nydia M. Velázquez**
    Representative of New York

**Eugene Vindman**
    Representative of Virginia

**Debbie Wasserman Schultz**
    Representative of Florida

**Maxine Waters**
    Representative of California

**Bonnie Watson Coleman**
    Representative of New Jersey

**Nikema Williams**
    Representative of Georgia

**Frederica S. Wilson**
    Representative of Florida