No. 25-1153

# In The United States Court of Appeals For the Fourth Circuit

CASA, INC., et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, c/o Attorney General of the United States, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Maryland

_____

**BRIEF OF *AMICI CURIAE* HUMAN RIGHTS FIRST, UNITED STATELESS, AND WOMEN'S REFUGEE COMMISSION IN SUPPORT OF PLAINTIFFS-APPELLEES**

Anwen Hughes
Human Rights First
121 W. 36th St. PMB 520
New York, NY 10018

Samantha Sitterley
United Stateless
P.O. Box 4240
Boulder, CO 80306

Melanie Nezer
Women's Refugee Commission
1012 14th St. NW Suite 1100 Washington DC 2000

Hassan Minhaj Ahmad
The HMA Law Firm
6 Pidgeon Hill Dr #330
Sterling, VA 20165
hma@hmalegal.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………..ii

STATEMENT OF INTEREST OF AMICI AND DISCLOSURES...………...iii

INTRODUCTION AND SUMMARY OF THE ARGUMENT…………………3

ARGUMENT……………………………………………………….……...……..5

     I.     The Current Experience of Statelessness in the United States……….5
          A. Causes of Statelessness ……………………………………………… 7
          B. The lack of a recognized nationality imposes life-altering
             negative consequences on stateless people in the
             United States……………………………………………..…...14

     II.    The E.O. Would Render Many U.S.-Born Children Stateless,
          With Major Negative Consequences ……………………………...18
          A. U.S.-born children, including those born to families the U.S.
             government has pledged to protect, would be left not only
             without any lawful immigration status but in many cases
             without the protection of any nationality………………….…18
          B. Deprivation of U.S. citizenship would have major negative
             consequences not only for the children affected but also for the
             U.S. immigration system………………………………….…24

CONCLUSION……………………………………………………….……..26

# TABLE OF AUTHORITIES

**Cases**

*Trop v. Dulles*, 356 U.S. 86, 102 (1958)....................................................6

**Statutes**

8 U.S.C. § 1157(c)(2)(A) ...............................................................23
8 U.S.C. § 1158(b)(3)(A) ...............................................................23
8 U.S.C. § 1255 ...........................................................................18
8 U.S.C. § 1401 ...........................................................................18

**Regulations**

208.21(b). ..................................................................................23
8 C.F.R. § 101.3 .........................................................................18
8 C.F.R. § 207.7(c)......................................................................23

**Other Authorities**

Amnesty International, *Mauritania 1986 – 1989: background to a crisis: three years of political imprisonment, torture and unfair trials* (Nov. 1, 1989), AFR 38/013/1989 ...............................................................13

Betsy L. Fisher, *Gender Discrimination and Statelessness in the Gulf Cooperation Council States*, 23 Mich. J. Gender & L. 269 (2016)..........................12

Betsy L. Fisher, *The 'Operation of Law' in Statelessness Status Determinations Under the 1954 Convention*, 33 Wis. Intl. L. J. 254 (2015)..................16

Claudena M. Skran, *Refugees in Inter-War Europe: The Emergence of a Regime* (1995).......................................................................................4

Ctr. For Migration Studies, *Statelessness in the United States: A Study to Estimate and Profile the U.S. Stateless Population* (2020)................ 7, 10, 12, 23

David C. Baluarte, *Life after Limbo: Stateless Persons in the United States and the Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 351 (2015)........................................................... 7, 9, 17

Gesetz über den Widerruf von Einbürgerungen und die Aberkennung der deutschen Staatsangehörigkeit, July 14, 1933, RGBl. I, at 480 ..........................12

Global Campaign for Equal Nationality Rights, *The Problem*, https://www.equalnationalityrights.org/the-problem/ ...........................................9

HRW, *Lebanon: Discriminatory Nationality Law* (Oct. 3, 2018)..........................20

Human Rights Watch, *Egypt: Dissidents Abroad Denied Identity Documents* (Mar. 13, 2023) .........................................................................................................21

Louise W. Holborn, *The Legal Status of Political Refugees*, 1920-1928, 32 Am. J. of Int'l Law (1983) ...................................................................................4

Mary Beth Sheridan and Karina Elwood, *Nicaragua Frees More Than 200 Political Prisoners, Sends Them to U.S.*, Wash. Post, Feb. 9, 2023 ....................20

Peter Jettison, *Immigrant Rights Clinic Wins Asylum for 'Nation's Most Famous Stateless Person,'* W&L Magazine, Dec. 3, 2014, https://columns.wlu.edu/immigrant-rights-clinic-wins-asylum-for-nations-most-famous-stateless-person/.................................................................................9

Polly J. Price, *Stateless in the United States: Current Reality and a Future Prediction*, 46 Vanderbilt J. Transnat'l L. 443 (2021)........................................24

*Ranking of the Major Source Countries of Refugees as of Mid-2024*, Statista.com, https://www.statista.com/statistics/272999/refugees-by-source-country.............14

Reichs- und Staatsangehörigkeitsgesetz, July 22, 1913, Reichsgesetzblatt (RGBl.) 1077 ...............................................................................................................12

Reichsbürgergesetz, Sept. 15, 1935, RGBl. I, at 1146 .........................................12

U.S. Dep't of Homeland Security, Operation Allies Welcome..............................21

U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Nicaragua* ............................................................................................................ 20, 23

U.S. Dep't of State, *Gender-Based Violence Among Stateless and National Populations in the Dominican Republic* (Nov. 1, 2017) (Report by Johns Hopkins University and Centro para la Observación Migratoria y Desarrollo Social en el Caribe (OBMICA))........................................................................15

U.S. Dep't of State, Remarks and Releases, *Genocide, Crimes Against Humanity, and Ethnic Cleansing of Rohingya in Burma* ......................................................13

UNHCR, Citizens of Nowhere: Solutions for the Stateless in the U.S ...................8

**STATEMENT OF INTEREST OF *AMICI* AND DISCLOSURES**

*Amici* are non-governmental non-profit organizations that serve, represent, and research and advocate for the rights of refugees and stateless people.  They unite in filing this *amicus* brief out of shared concern that the Executive Order at issue in this case, Exec. Order No. 14, 160, 90 Fed. Reg. 8449 (Jan. 20, 2025) (E.O.), would, if upheld, render stateless significant numbers of children born in the United States.[1]

Human Rights First (HRF) is a non-profit, nonpartisan international human rights organization based in New York and Washington, D.C. HRF engages in advocacy and litigation to create a just world in which every person's intrinsic human rights are respected and protected and to build societies that value and invest in all their people.  HRF advocates for the rights of refugees and asylum seekers in the United States, populations that include stateless people and people at risk of statelessness.  HRF provides pro bono legal representation to refugees, working in partnership with volunteer lawyers at leading law firms to represent asylum seekers unable to afford counsel.  Some of these asylum seekers are

---

[1] *Amici curiae* confirm that: none of the *amici curiae* has a parent corporation; no publicly held corporation owns 10% or more of the stock of any of the *amici curiae;* no party's counsel has authored this brief in whole or in part; no party or party's counsel has contributed money intended to fund the preparation or submission of the brief; and no person other than amici has contributed money intended to fund the preparation or submission of this brief.

stateless, and HRF has experience with the complications statelessness imposes on noncitizens in their interactions with the U.S. immigration system.

United Stateless is a national organization led by stateless people whose mission is to build and inspire community among those affected by statelessness and to advocate for their human rights. The organization achieves these goals by raising awareness of statelessness issues in the U.S. as well as globally, by educating the community, the public, and stakeholders about the issue of statelessness, and by advocating for the human rights of stateless people and changes to domestic laws to introduce a path to citizenship for the stateless in the United States. United Stateless embraces inclusion over the racism, religious discrimination, xenophobia, prejudice, and gender inequality that divide humanity and perpetuate statelessness. In all its work, United Stateless centers those directly affected by statelessness as experts of their own experience and leaders of the organization. That collective experience and expertise gives it a profound interest in the outcome of this case.

The Women's Refugee Commission (WRC) was created in 1989 to ensure that the rights and needs of women, children, and youth displaced by conflict and crisis are taken into account in humanitarian programs and policies. WCR is a leading research and advocacy organization that works to advance gender equality and resilience across humanitarian response. WRC also plays an important

2

convening role, partnering with local and national organizations, humanitarian agencies, donors, and displaced persons to create a better world for refugees. WRC hosts the Global Campaign for Equal Nationality Rights (GCENR), which mobilizes action to end gender discrimination in nationality laws—a leading cause of statelessness--through a coalition of national and international organizations, UN agencies, and impacted activists in over twenty countries. GCENR is an Advisory Member of the Global Alliance to End Statelessness, a multistakeholder initiative of states, intergovernmental organizations, civil society, and UN agencies, hosted by the UN Refugee Agency, and serves as the co-chair of the Alliance's Working Group on Addressing Discriminatory Nationality Laws and Policies.

All parties consent to the filing of this brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Although human beings possess human rights simply by virtue of being human, access to a nationality—a reciprocal legal claim to a state to which the citizen can turn for domestic and international protection—remains an essential condition to secure the protection of those rights particularly in the international sphere. The right to a nationality is itself a fundamental human right enshrined in core international human rights instruments. Statelessness—the lack of a nationality--not only imposes severe impediments on the stateless in nearly every

3

aspect of their lives, it also creates challenges for states.  For both these reasons, an early focus of international treaty-making relating to refugee protection in the aftermath of World War I was to address the situation of people who were no longer recognized as nationals of their countries of origin and to provide them with travel documents.   Louise W. Holborn, *The Legal Status of Political Refugees*, 1920-1928, 32 Am. J. of Int'l Law 680 (1983); Claudena M. Skran, *Refugees in Inter-War Europe: The Emergence of a Regime* (1995).  In the period following World War II, the Universal Declaration of Human Rights declared that "everyone has the right to a nationality" and that "no one shall be arbitrarily deprived of his nationality."  Universal Declaration of Human Rights art. 15, G.A. Res. 217A (III), U.N. Doc. A/810 (1948).

Despite this, and despite provisions in multiple international human rights treaties aimed at preventing or reducing statelessness, there are an estimated 15 million stateless people globally, including a stateless population in this country estimated at over 200,000.[2]

---

[2] The treaties in question are the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171; S. Exec. Doc. E, 95-2 (1978); S. Treaty Doc. 95-20; 6 I.L.M. 368 (1967); Convention on the Rights of the Child, Nov. 20, 1989, 1577 U.N.T.S. 3; 28 I.L.M. 1456; Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, 1249 U.N.T.S. 13, 19 I.L.M. 33 (1980); Convention on the Nationality of Married Women, G.A. Res. 1040, U.N. GAOR, 11th Sess., Supp. No. 17, at 18, (1957), 309 U.N.T.S. 65, (entered into force August 11, 1958); Convention on the Reduction of

In the United States, the combination of birthright citizenship, the ability of U.S. citizens of both sexes to confer citizenship on their children, and near-universal birth registration has meant that while statelessness, in this country, continues to have very serious impacts on foreign-born residents who either arrive in the United States as stateless people or become stateless after their arrival here, the United States does not have a significant native-born stateless population.

The Executive Order at issue in this case would change that. As explained in this *amicus* brief, the E.O. would render stateless significant numbers of U.S.-born children, including the children of refugee parents to whom the United States is offering protection. These are children whose parents' countries do not recognize them as citizens or who have no way of obtaining documentation of citizenship by descent. Much of U.S. immigration law is premised on the correct understanding that with very rare exceptions, children born in the United States are United States citizens. As a result, the immigration statutes, including those enacted for the protection of refugees, provide no status or legal framework for the U.S.-born children who would be rendered stateless by this E.O. for the purposes

Statelessness, 989 U.N.T.S. 175 (Aug. 30, 1961); Convention Relating to the Status of Stateless Persons, art. 1(1), Sept. 28, 1954, 360 U.N.T.S. 117; Convention on the Rights of Persons with Disabilities, May 3, 2008, A/RES/61/106, Annex I.

of offering them immigration services or benefits, while their statelessness would also prevent them from being removed or from departing the country. The legal anomalies and grave human suffering that would result from the implementation of the E.O. are further evidence that Plaintiffs'-Appellees' arguments, detailed in their own briefing, are correct.

## ARGUMENT

### I.    The Current Experience of Statelessness in the United States

A stateless person is defined as one "not considered a national by any State under the operation of its law." Convention Relating to the Status of Stateless Persons, art. 1(1), Sept. 28, 1954, 360 U.N.T.S. 117 (the Statelessness Convention). While the United States is not a party to the Statelessness Convention, the U.S. Supreme Court has long recognized the devastating impact of lacking a nationality, describing it as "a fate of ever increasing fear and distress." *Trop v. Dulles*, 356 U.S. 86, 102 (1958) (invalidating as prohibited by the 8th Amendment a provision of the Nationality Act of 1940 that purported to strip a U.S.-born military deserters of U.S. citizenship). Thanks to the U.S. recognition of *jus soli* under the Fourteenth Amendment and the provision of the Immigration and Nationality Act that closely mirrors it, statelessness in the United States has been a problem for migrants rather than the native-born. The experience of those

migrants cautions against subjecting—or attributing to Congress any intention to subject--much larger numbers of U.S.-born children to this fate.

### A. Causes of statelessness

A study carried out in 2020 estimated the number of U.S. residents who were potentially stateless or at risk of stateless at around 218,000.  Ctr. For Migration Studies, *Statelessness in the United States: A Study to Estimate and Profile the U.S. Stateless Population* 2 (2020), https://cmsny.org/wp-content/uploads/2020/01/StatelessnessReportFinal.pdf ("*CMS Study*").  These noncitizens, spread across all 50 states, have found themselves in this predicament through a range of circumstances.  The dissolution of states has historically been a major cause of statelessness among residents and former residents of the defunct state.  The break-up of the Soviet Union, for example, rendered many of its former citizens stateless, including a good many who were in the United States at the time and—in some cases for that reason—did not obtain citizenship in any of its successor states.

Mikhail, for example, had fled his country of birth, Azerbaijian, with his Armenian family during the war between Azerbaijian and Armenia.  David C. Baluarte, *Life after Limbo: Stateless Persons in the United States and the Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 351 (2015).  Finding no welcome in Russia, the family moved on to Turkmenistan,

which at the time was still part of the Soviet Union. At the age of 22 Mikhail fled

Turkmenistan for the United States on his Soviet passport and applied for asylum.

*Id.*  His asylum claim was denied, and by the time he was ordered removed—to

Russia or Turkmenistan in the alternative--the Soviet Union was no more, his

Soviet passport had expired, and neither Russia nor now-independent

Turkmenistan recognized him as a citizen.  *Id.*  Mikhail was detained by U.S.

immigration authorities as they attempted to remove him to Azerbaijian and

Armenia.  Neither country would take him, as Azerbaijian took the position that he

was Armenian, and Armenia, that he was not.  It was only after he had applied for

travel documents to more than a dozen countries that the immigration authorities

resigned themselves to releasing him from detention.  *Id.*

    After more than a decade living under supervised release, Mikhail took a

vacation to American Samoa in the course of which he made a day trip to Western

Samoa and thereby unknowingly executed the removal order against him.  *Id.* at

352.  For the next year, Mikhail, who had started to build a life for himself despite

the restrictions imposed on him by his stateless condition, was stranded in

American Samoa.  "I wish nobody would have to go through what I am going

through," he said, "because nationality is a fundamental link between the

individual and the state."  UNHCR, Citizens of Nowhere: Solutions for the

Stateless in the U.S., https://www.unhcr.org/us/sites/en-us/files/legacy-

pdf/580e5b544_0.pdf.  It was only through concerted advocacy efforts that he was finally allowed to return to the U.S. mainland and apply for asylum afresh.  That application was granted in 2014, but only after Mikhail had spent 15 years in legal limbo.  David C. Baluarte, *Life after Limbo: Stateless Persons in the United States and the Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 352 (2015); Peter Jettison, *Immigrant Rights Clinic Wins Asylum for 'Nation's Most Famous Stateless Person*,' W&L Magazine, Dec. 3, 2014, https://columns.wlu.edu/immigrant-rights-clinic-wins-asylum-for-nations-most-famous-stateless-person/.

Gender discrimination in nationality laws that deny citizens the equal right to confer their nationality on their child or noncitizen spouse or to acquire, change, or retain their nationality on the basis of sex is an additional cause of statelessness, both globally and among noncitizens in the United States.  Today, nationality laws in 24 countries deny women the right to confer citizenship on their children at birth on an equal basis with men: The Bahamas, Bahrain, Barbados, Brunei, Burundi, Eswatini, Iran, Iraq, Jordan, Kiribati, Kuwait, Lebanon, Libya, Malaysia, Mauritania, Nepal, Oman, Qatar, Saudi Arabia, Sudan, Syria, Togo, and the United Arab Emirates.  Global Campaign for Equal Nationality Rights, *The Problem*, https://www.equalnationalityrights.org/the-problem/.  This can lead to statelessness for children born to a woman who is a citizen of one of these countries and a

stateless father, or a father who for other reasons cannot confer his nationality on the child or will not fulfill the administrative requirements necessary for the child's acquisition of citizenship. This can occur in countries where the parents must have a legally recognized marriage in order for the father to transmit citizenship.

Kuwait, for example, has a population of stateless Bidoon (short for *bidoon jinsiya,* or "without nationality"), who are not recognized as Kuwaiti citizens and face significant hurdles to naturalization. Although up to a third of them are married to Kuwaiti women, Kuwaiti nationality law does not allow women to transmit citizenship, leaving their children stateless. *CMS Study* at 10, 22. Lebanese nationality law, likewise, discriminates against women in their ability to transmit nationality to their children. In the words of one stateless victim of this situation:

> They looked at me, heard my voice, and thought I was one of them because I am. I was born and raised in Lebanon. I speak the same language, share the same culture, and I went to school here, just like any Lebanese student. [Because I am denied my mother's nationality], I was treated differently in the education system. I faced rejection, delays, and legal complications in school and university paperwork, things my classmates with Lebanese citizenship never had to think about. One painful memory: when I tried to submit official documents, I was told I couldn't. They called us "foreigners." That word stuck with me. How can I be foreign in my own country, with a Lebanese mother by my side? . . . Despite my strong grades and dedication, I was denied the chance to study medicine, the field I had dreamed of since I was a child. . . They pushed me away from becoming a doctor.

(Interview by "My Nationality Is a Right for Me and My Family" Campaign Lebanon, coalition member of GCENR, on file with Women's Refugee Commission.)

Other people may lose their nationality through inadvertence or mistake, for example by failing to register with their embassy or consulate during a prolonged period of residence abroad, or by failing to take steps to declare their nationality upon reaching adulthood. HRF represented an asylum seeker from Syria, for example, who had derived the nationality of a European country from his father and arrived in the United States on that country's passport. When that passport expired after his arrival and he sought its renewal at the local consulate, he was denied on the grounds that he was supposed to have made a formal declaration of citizenship upon turning 18—even though the same country had previously renewed his passport in Syria after his 18th birthday without notifying him of this requirement.

Birth registration and proof of parentage are critical to the establishment of nationality under the laws of most countries. Yet for a variety of reasons, birth registration is not universal, with lack of registration particularly affecting vulnerable segments of the population in many developing countries: ethnic and religious minorities, those living in remote rural areas, those born into poor households, and the children of unrecognized marriages or single mothers, among

11

other examples. *CMS Study* at 11; *see also* Betsy L. Fisher, *Gender Discrimination and Statelessness in the Gulf Cooperation Council States*, 23 Mich. J. Gender & L. 269, 285 (2016) ("When a child's birth is not documented, the child's nationality may not be recognized by her state of nationality for lack of proof that she is entitled to that nationality. If she does not have another nationality, she will likely be left stateless.")

Statelessness can also result from the deliberate persecutory actions of a state in stripping a segment of its population—or specific individuals--of citizenship. When Hitler came to power in Germany in 1933, his government turned the country's previously non-discriminatory citizenship laws into a tool of national-socialist race ideologies, stripping Jewish citizens of their citizenship rights. *See* Reichs- und Staatsangehörigkeitsgesetz, July 22, 1913, Reichsgesetzblatt (RGBl.) at 583, *as amended b*y Gesetz, Nov. 5, 1923, RGBl. 1077 (Imperial Citizenship Law); Gesetz über den Widerruf von Einbürgerungen und die Aberkennung der deutschen Staatsangehörigkeit, July 14, 1933, RGBl. I, at 480 (Law on Denaturalization and Revocation of Citizenship); Reichsbürgergesetz, Sept. 15, 1935, RGBl. I, at 1146 (*Reich* Citizenship Law). Repressive governments continue to employ these exclusionary tactics, as a tool of persecution and sometimes also as a stage on the road to extermination.

Myanmar, for example, excluded its Rohingya ethnic minority from citizenship in 1982, framing them as unauthorized migrants from Bangladesh, before its military unleashed a campaign of massacres, arson, and rape against them in 2017. Those atrocities, which the United States in 2022 determined to be genocide, drove hundreds of thousands of Rohingya to flee Myanmar, U.S. Dep't of State, Remarks and Releases, *Genocide, Crimes Against Humanity, and Ethnic Cleansing of Rohingya in Burma*, https://2021-2025.state.gov/burma-genocide/ . The United States is also home to a significant population of Black Mauritanians who settled in this country after being expelled from Mauritania by a government that characterized them as unauthorized immigrants from Senegal, destroying their Mauritanian identification governments before expelling them, and refusing thereafter to recognize their Mauritanian citizenship. Amnesty International, *Mauritania 1986 – 1989: background to a crisis: three years of political imprisonment, torture and unfair trials* (Nov. 1, 1989), AFR 38/013/1989, https://www.amnesty.org/en/documents/afr38/013/1989/en/.

The risk of statelessness increases in situations of migration, displacement, and conflict, due to the combination of lost or destroyed civil documents, family separation, disconnection or even rupture between migrants and refugees and their home-country governments, and an inability to prove a legal link to missing or deceased parents. Close to half the countries previously cited that deny women's

right to confer nationality on their children are the source of large migrant and/or refugee populations, including those residing in the United States. *Ranking of the Major Source Countries of Refugees as of Mid-2024*, Statista.com, https://www.statista.com/statistics/272999/refugees-by-source-country/.

### B. The lack of a recognized nationality imposes life-altering negative consequences on stateless people in the United States

Stateless people in the United States confront a host of practical and moral injuries that have major consequences for their daily lives and their futures, and that vary in severity depending on whether or not they are able to obtain legal status in the United States that can provide them with personal documentation and put them on a path to U.S. citizenship.

Acquiring even the most basic personal documentation from the country of their birth or former residence can be an insurmountable challenge for stateless people whom no foreign consulate recognizes as its own. Especially as the United States has moved towards increasing stringency in issuing driver's licenses and state identification documents, many stateless people struggle to assemble enough "points" of identification to qualify for a driver's license. For many noncitizens, their passport is a critical document for this and other similar purposes, but stateless people, when their passports expire after their arrival in the United States, have no ability to obtain new ones.

14

The inability to obtain a valid state identification document, in turn, will make it impossible to open a bank account, making it very difficult for a stateless person to take part in the economic life of a modern developed country, and placing the person at risk of multiple forms of crime and exploitation, including as a result of their exclusion from formal employment.  Access to healthcare and housing also become a challenge.  In addition, research sponsored by the U.S. Department of State in other countries has shown that statelessness contributes to heightened risks of gender-based violence.  *See, e.g.,* U.S. Dep't of State, *Gender-Based Violence Among Stateless and National Populations in the Dominican Republic* (Nov. 1, 2017) (Report by Johns Hopkins University and Centro para la Observación Migratoria y Desarrollo Social en el Caribe (OBMICA)), https://2017-2021.state.gov/prm-funded-research-and-evaluation/gender-based-violence-among-stateless-and-national-populations-in-the-dominican-republic/.

The inability to travel due to lack of access to an international travel document can result in permanent separation from family members living in other countries, and statelessness greatly complicates, when it does not completely impede, attempts to achieve family reunification through normal immigration channels.

Living like this is exhausting and humiliating, an experience of global rejection that goes beyond the practical and emotional challenges of lacking lawful

status in a foreign country.  One stateless asylum seeker HRF represented, who
after many years of waiting was granted asylum and then permanent residence
based on persecution in her country of former habitual residence, expressed relief
at the fact that her green card listed her country of birth rather than "stateless" as
her country of citizenship, simply because it made her look "normal" and spared
her the confusion of others and intrusive follow-up inquiries into her life history
that typically arose at the notion of her statelessness.

The Immigration and Nationality Act makes no specific accommodation for
stateless people, and adjudicators have often been confused by their legal situations
and failed to assess them accurately.   Betsy L. Fisher, *The 'Operation of Law' in
Statelessness Status Determinations Under the 1954 Convention*, 33 Wis. Intl. L. J.
254, 270-73 (2015).  Some stateless people—many of whom arrived in this
country legally—have at least the theoretical ability to avail themselves of what
options for lasting status are available to noncitizens generally under U.S.
immigration law.  But for those whose personal circumstances do not make them
eligible for those forms of status, or who apply and are denied, a legal entry into
the United States is often followed by protracted and traumatic episodes of
immigration detention and re-detention, as U.S. immigration authorities make
futile attempts to deport them to countries that do not want them and will not
accept them.  David C. Baluarte, *Life after Limbo: Stateless Persons in the United*

*States and the Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 352, 362-65 (2015). Release from custody, when it finally comes, is accompanied by intrusive monitoring, supervision, and check-in requirements that serve as a regular reminder of their stateless condition and a source of severe stress. Such conditions may continue for the remainder of a stateless person's life.

One stateless woman who fled Ukraine at the end of the Soviet era and, after being ordered deported along with her son, being detained, and then spending close to 20 years under an order of supervision, spoke publicly about her situation and its psychological impact on her family, noting that her son as an adult was hesitant to marry out of fear that he could be taken away from his family. *Id.* at 365 n. 56. Leaving the United States of their own accord is also not an option for the stateless, due to their lack of travel documents, rendering many family separations permanent.

For stateless people in the United States, one comfort has been the knowledge that any children they have here will be spared their ordeal, that they will always have a country where they belong. For them, and for other parents with less than permanent immigration status in the United States, the E.O. attempts to destroy that one measure of security.

17

## II.     The E.O. Would Render Many U.S.-Born Children Stateless, With Major Negative Consequences

### A. U.S.-born children, including those born to families the U.S. government has pledged to protect, would be left not only without any lawful immigration status but in many cases without the protection of any nationality

Because U.S. immigration law is premised on the understanding of the Fourteenth Amendment and of 8 U.S.C. § 1401 argued by Plaintiffs-Appellees and confirmed by every district court to have considered this issue, the Immigration and Nationality Act offers no path to lawful permanent residence to U.S.-born children.[3] A threshold requirement for eligibility to apply for permanent residence from within the United States, under the statutory provision based on which the overwhelming majority of noncitizens eligible to apply for permanent residence from within the United States do so, is that the applicant have been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255. Birth in the United States is not a process involving inspection, admission, or parole by U.S. immigration authorities. The E.O. would thus leave children born in the United

---

[3] The Department of Homeland Security by regulation has given the U.S.-born children of accredited diplomats—who are *not* United States citizens under the Fourteenth Amendment—the option of registering for permanent residence in the United States through a process by which they elect to give up diplomatic immunity. 8 C.F.R. § 101.3. The E.O. has not been accompanied by any similar provision for the U.S.-born children to whom it purports to deny citizenship.

18

States to noncitizen parents with less than permanent immigration status in limbo, without rights under either the Citizenship Clause of the Fourteenth Amendment or the provisions of the Immigration and Nationality Act that provide paths to status and documentation for noncitizens.

A significant number of these children, however, would suffer a further deprivation of rights under the E.O., because they are *also* unable to derive the citizenship of their non-U.S.-citizen parents. This arises in cases where the nationality laws of the parents' country or countries of origin, on their face, do not recognize the child as a citizen, where the parents have been affirmatively stripped of citizenship by their own governments, but also in cases where those states as a matter of practice will not recognize the child's citizenship.

Facial ineligibility for citizenship in a parent's country of origin for a child born in the United States to a noncitizen parent can arise, as indicated above, where the parent is also stateless, or where the parent lacks the ability to transmit citizenship under the letter of that country's citizenship laws. For example, the U.S.-born child of a Lebanese mother and a Palestinian father originally from the West Bank and lacking other nationality cannot derive a recognized citizenship from either parent, because Lebanese nationality law does not allow women to transmit Lebanese citizenship to their children born outside of Lebanon where the father is a foreigner whose identity is known, or to provide access to Lebanese

19

citizenship to their spouses. HRW, *Lebanon: Discriminatory Nationality Law* (Oct. 3, 2018), https://www.hrw.org/news/2018/10/03/lebanon-discriminatory-nationality-law.

In other cases, a child may be unable to derive citizenship from a parent because that parent's country of citizenship has deliberately taken away the parent's citizenship.  For example, Nicaragua in 2023 stripped over 317 Nicaraguan dissidents of their citizenship, 222 of them political prisoners or prisoners of conscience for whose release from dire prison conditions the United States government had been advocating.  The Nicaraguan government finally agreed to release them only on the condition of expelling them to the United States, where most of them remain. Mary Beth Sheridan and Karina Elwood, *Nicaragua Frees More Than 200 Political Prisoners, Sends Them to U.S.*, Wash. Post, Feb. 9, 2023; U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Nicaragua* 6.  Of these and of the other Nicaraguans denationalized by arbitrary government action, some were dual nationals of Nicaragua and another country, but the rest were rendered stateless.  The Nicaraguan authorities proceeded to erase all public records of the 317 people it had denationalized, making it impossible for them to confer Nicaraguan citizenship by descent on any later-born children.  *2023 Country Reports: Nicaragua* at 29.

Scenarios of this kind are not unique to Nicaragua: the Egyptian government has treated many dissidents abroad, including in the United States, in similar fashion, banning them from obtaining routine civil registration documents in retaliation for their political activities, making it impossible for their children to obtain proof of Egyptian citizenship. Human Rights Watch, *Egypt: Dissidents Abroad Denied Identity Documents* (Mar. 13, 2023) (https://www.hrw.org/news/2023/03/13/egypt-dissidents-abroad-denied-identity-documents).

In other cases, children who are entitled to citizenship in their parents' country of origin that the country's government would likely recognize are unable to obtain official recognition of their citizenship from the authorities of that country, for example because their parents are refugees and/or because the parents' country of origin lacks diplomatic ties with the United States. Take for example a married couple of Afghan nationals who were evacuated to the United States during the U.S. withdrawal from Afghanistan in 2021. They were paroled into the United States upon arrival as part of what was known as Operation Allies Welcome. U.S. Dep't of Homeland Security, Operation Allies Welcome, https://www.dhs.gov/archive/operation-allies-welcome. During the two-year period of their humanitarian parole, and before being granted permanent status, the

couple had a baby.[4]  Even though Afghan nationality law would consider this child to be an Afghan citizen by descent, the fact that the baby's parents are refugees and that Afghanistan's embassy and consulates in the United States have been closed for over three years would make it impossible for the couple to obtain an Afghan passport for their child.[5]

The husband's past work for the United States government made him eligible for a Special Immigrant Visa and he and his wife were eligible to apply for lawful permanent residence in the United States on that basis.  They had no reason to include their U.S.-born child in that application because the child is a U.S. citizen.  Under the E.O., however, parents in this situation would not be able to include their child in their application for permanent residence because the child was never inspected and admitted or paroled into the United States, but rather was born here, and they would also be unable to obtain documentation of the child's Afghan citizenship.

Other Afghan married couples who were unable to be evacuated in 2021 were resettled in the United States as refugees.  Under the E.O., it is unclear whether children born to these couples after their arrival in the United States—and

---

[4] In the aftermath of the U.S. withdrawal from Afghanistan, *amicus* HRF provided legal representation to many Afghan couples in this situation.

[5] Afghans are not the only foreign nationals in this situation: Venezuela, Iran, and Syria also currently do not have open embassies or consulates in the United States.

thus not covered by the grant of refugee status to the parents under 8 U.S.C. § 1157(c)(2)(A)—would be considered U.S. citizens, even though they have no access to documentation of any other nationality.  The same uncertainty would arise for children born in the United States to an Afghan evacuee couple who had already been granted asylum in the United States at the time of the child's birth.  8 U.S.C. § 1158(b)(3)(A).  With respect to both refugee resettlement and asylum status, the grant of protection only covers spouses and children whose relationship with the principal refugee or asylee existed at the time the principal was granted protection. 8 C.F.R. §§ 207.7(c); 208.21(b).

Similar problems would arise for the children of parents who lack proof of their *own* nationality.  Both Mexico and Guatemala, for example, have substantial populations of people who lack birth or nationality registration.  *CMS Study* at 38.  It was estimated that ten percent of Guatemala's population in 2018 lacked proof of nationality.  *Id.*  Nicaragua also has a significant problem of non-registration of births in rural areas, leaving those not registered with no proof of Nicaraguan citizenship.  U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Nicaragua* 33 (2024).  All three countries currently send significant numbers of migrants to the United States; the U.S.-born children of those migrants would also be at risk of statelessness under the E.O. Polly J. Price, *Stateless in the United States: Current Reality and a Future Prediction*, 46 Vanderbilt J. Transnat'l

23

L. 443, 446 (2021) (restrictions on birthright citizenship in the United States would "extend statelessness to second or subsequent generations, as well as create statelessness for some children even when the parent has a recognized nationality").

### B. Deprivation of U.S. citizenship would have major negative consequences not only for the children affected but also for the U.S. immigration system

Over the past decade, the United States has been a global leader in efforts to combat statelessness, including through its current role as an Advisory Committee member of the Global Alliance to End Statelessness.  Ending birthright citizenship domestically would result in a dramatic setback for efforts to combat statelessness and would undermine the United States' global leadership on this issue.

The consequences for affected children would mirror the experiences of other stateless people already in the United States and described above, but the E.O. would replicate this suffering on a significantly larger scale.  The consequences of this would be devastating for them and their families, in ways that would also create significant complications for the U.S. government.  In a time of mass interior immigration enforcement, the threat of permanent family separation would be very real, as non-stateless parents facing removal would not even have

the option of bringing with them their stateless children who would be ineligible for travel documents from any country.  The same would be true of stateless children whose parent or parents are in the United States in lawful but non-permanent status and would otherwise plan to relocate out of the United States for professional or personal reasons after the conclusion of their lawful stay in this country.  Their status would also leave the children ineligible for basic social services in the United States whose enabling legislation requires applicants to fall into the baskets established by existing immigration law, making it impossible for them to survive on their own.

For stateless U.S.-born children—regardless of whether or not their parents hold the citizenship of another country—the E.O. leaves the future entirely unclear.  The Immigration and Nationality Act, while it does not provide a path to lawful status specific to stateless people generally, would also struggle to accommodate a new class of "aliens" who never entered the country, were never inspected and admitted, but were simply created by executive pronouncement.  Yet their statelessness would also prevent their removal, or their voluntary departure from the United States, because no country would issue them travel documents.  Neither 8 U.S.C. § 1401 nor the Fourteenth Amendment allow this result.

## CONCLUSION

For these reasons and those laid out in Plaintiffs-Appellees' own brief, the

Court should affirm the district court's preliminary injunction.

Dated: June 6, 2024.               Respectfully submitted,

                                            s/ Hassan Minhaj Ahmad

Anwen Hughes                         Hassan Minhaj Ahmad

Human Rights First                   The HMA Law Firm

121 W. 36th St. PMB 520           6 Pidgeon Hill Dr #330

New York, NY 10018               Sterling, VA 20165

                                            Tel.: (703) 964-0245

                                            Fax: (703) 997-8556

                                            hma@hmalegal.com

Samantha Sitterley

United Stateless                        *Counsel for Amici Curiae*

P.O. Box 4240

Boulder, CO 80306

Melanie Nezer

Women's Refugee Commission

1012 14th St. NW Suite 1100

Washington DC 20005

26

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,798 words, excluding the parts of the document exempted by Rule 32(f), less than half the applicable limitation of Rule 32(a)(7)(B).  This brief was prepared in 14-point Times New Roman font, a proportionally-spaced typeface, using Microsoft Word.

s/ Hassan Minhaj Ahmad
Counsel for *Amici Curiae*

27

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

s/ Hassan Minhaj Ahmad
Counsel for *Amici Curiae*

28