No. 25-1153

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

CASA, INC., et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, c/o Attorney General of the United States, et al.,

*Defendants-Appellants*.

_____

On Appeal from the United States District Court
for the District of Maryland

_____

**BRIEF OF NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, THE LEAGUE OF WOMEN VOTERS, AND THE EQUAL JUSTICE SOCIETY AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

JAMES J. PASTORE
STEPHANIE D. THOMAS
NATALIE TSANG

DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001
(212) 909-6000

CHESTER S. DUBOV
DEBEVOISE & PLIMPTON LLP
650 California Street, Fl. 31
San Francisco, CA 94108
(415) 738-5700

*Counsel for Amici Curiae*

EDWARD G. CASPAR
OLIVIA N. SEDWICK
*Counsel of Record*

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW
Washington, D.C. 20005
(202) 662-8600

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici* state as follows:

The National Association for the Advancement of Colored People is a nonprofit association that has no parent and issues no stock.

The League of Women Voters is a nonprofit association that has no parent and issues no stock.

The Equal Justice Society is a nonprofit association that has no parent and issues no stock.

## **TABLE OF CONTENTS**

**Page**

INTERESTS OF AMICI CURIAE.................................................................... 1

ARGUMENT ................................................................................................. 2

I.  BIRTHRIGHT CITIZENSHIP IS ENSHRINED BY THE
    RECONSTRUCTION AMENDMENTS AND CANNOT BE UNDONE
    BY EXECUTIVE ACTION. .................................................................. 2

    A.  The Reconstruction Amendments were Enacted to Prevent
        the Resurrection of *Dred Scott* and the Permanent Underclass
        that Decision Created........................................................................ 3

    B.  The Executive Order Defies the Original Intent of the
        Reconstruction Amendments. ...........................................................11

II.  THE EXECUTIVE ORDER WOULD DIMINISH THE ABILITIES OF
     BLACK AMERICANS AND COMMUNITIES OF COLOR TO
     PARTICIPATE MEANINGFULLY IN AMERICAN DEMOCRACY.  15

III. THE EXECUTIVE ORDER THREATENS TO INCREASE ABUSES
     OF CIVIL RIGHTS AND THE CREATION OF A LEGALLY
     INFERIOR UNDERCLASS IN AMERICA. ........................................ 20

CONCLUSION .......................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Afroyim v. Rusk*, 387 U.S. 253 (1967) ............................................................ 13

*Dred Scott v. Sandford*, 60 U.S. 393 (1857).......................................... *passim*

*Kawakita v. United States*, 343 U.S. 717 (1952).......................................... 12

*Plyler v. Doe*, 457 U.S. 202 (1982) ............................................................... 15

*Slaughter-House Cases*, 83 U.S. 36 (1872)................................................... 10

*United States. v. Wong Kim Ark*, 169 U.S. 649 (1898) ........................ 3, 8, 15

**Constitutional Provisions**

U.S. Const. art. I, §§ 2, 3 ............................................................................... 16

U.S. Const. art. II, § 1 .................................................................................... 16

U.S. Const. amend. XIV ...................................................................................8

U.S. Const. amend. XV .................................................................................. 16

**Statutes**

18 U.S.C. § 611 (1996)................................................................................... 16

Act of Mar. 3, 1819, ch. 77, § 5, 3 Stat. 510 (1819)..................................... 12

Act Prohibiting the Importation of Slaves of 1807, ch. 22, 2
    Stat. 426 (1807) ....................................................................................... 12

Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27...........................................5

Illegal Immigration Reform and Immigrant Responsibility Act
    of 1996, Pub. L. 104-08, 110 Stat. 3009-546 (1996) ............................. 16

Immigration and Nationality Act, Pub. L. No. 82-414,
    § 101(a)(22), 66 Stat. 163, 169 (1952) ................................................... 12

iii

**Other Authorities**

Alaa Elassar, *Navajo Nation leaders raise alarm over reports of Indigenous people being questioned and detained during immigration sweeps,* CNN (2025), https://perma.cc/J4Y3-4MCN. ................................................................... 22

Andrew Johnson, *Message from the President of the United States Returning Bill (S. No. 61) "To protect all persons in the United States in their civil rights, and furnish the means of their vindication," with his objections thereto*, S. Exec. Doc. No. 31 (1866) .......................................................6

Cong. Globe, 39th Cong., 1st Sess. 475 (1866)...............................5

Cong. Globe, 39th Cong., 1st Sess. 1809 (1866).......................... 6, 7

Cong. Globe, 39th Cong., 1st Sess. 1861 (1866)...............................7

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866)...............................7

Cong. Globe, 39th Cong., 1st Sess. 2896 (1866)...............................4

Darran Simon, *President Trump's other insensitive comments on race and ethnicity,* CNN (2018), https://perma.cc/G5V4-ZN5R ........................................................................ 20, 21

*Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country*, C-SPAN (2023), https://shorturl.at/cMCnk .................... 20

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215 (2021) .................................... 13

Gerald Neuman, *Back to Dred Scott?*, 24 San Diego L. Rev. 485 (1987)............................................................................... 14

Hon. Bernice Bouie Donald, *When the Rule of Law Breaks Down: Implications of the 1866 Memphis Massacre for the Passage of the Fourteenth Amendment*, 98 Boston Univ. L. Rev. 1607 (2018) ............................................................ 10, 11

Jennifer Van Hook & Michael Fix, *Repealing Birthright Citizenship: The Unintended Consequences*, Migration Pol'y Inst. (2015), https://perma.cc/9YTM-2WRX ......................................... 18

Jennifer Van Hook & Michael Fix, *The Demographic Impacts of Repealing Birthright Citizenship*, Migration Pol'y Inst. (2025), https://perma.cc/P9W8-4WCM ................................... 17

Joel Rose & Sergio Martínez-Beltrán, *Trump touts historic deportation plans, but his own record reveals big obstacles*, NPR (2024), https://perma.cc/C936-4YBM ........................... 21

Kathryn Watson & Zak Hudak, *Trump says he'd bring back "travel ban" that's "even bigger than before,"* CBS News (2023), https://perma.cc/F69R-KY6D ..................................... 21

Kevin Morris & Coryn Grange, *Records Show Massive Disenfranchisement and Racial Disparities in 2022 Texas Primary*, Brennan Ctr. for Just. (2022), https://perma.cc/C2MR-75Z7................................................... 19

*Laws permitting noncitizens to vote in the United States*, Ballotpedia (2025), https://perma.cc/7Q5B-Q6VN................................ 16

Lucía Félix Beltrán et al., *Born into Uncertainty: The Health and Social Costs of Ending Birthright Citizenship*, UCLA Latino Pol'y & Pol. Inst. (2025)............................................. 17

Margaret D. Stock, *Is Birthright Citizenship Good for America?*, 32 Cato J. 139 (2012)...................................... 16, 17

Matt A. Barreto et al., *The Racial Implications of Voter Identification Laws in America*, 47 Am. Pol. Rsch. 1 (2018) ................. 20

Randy Capps, Michael Fix & Jie Zong, *A Profile of U.S. Children with Unauthorized Immigrant Parents*, Migration Pol'y Inst. (2016), https://perma.cc/3N2D-W8V6 ................................. 18

Sandra L. Rierson, *From Dred Scott to Anchor Babies: White Supremacy and the Contemporary Assault on Birthright Citizenship*, 38 Geo. Immigr. L. J. 1 (2023) ........................................... 18

Shelley de Alth, *ID at the Polls: Assessing the Impact of Recent State Voter ID Laws on Voter Turnout*, 3 Harv. L. & Pol'y Rev. 185 (2009) ............................................................................ 19, 20

Spencer Overton et al., *Response to the Report of the 2005 Commission on Federal Election Reform*, Brennan Ctr. for Just. (2005), https://perma.cc/GRG3-WRVJ ......................................... 19

Suzanne Gamboa & Nicole Acevedo, *Trump immigration raids snag U.S. citizens, including Native Americans, raising racial profiling fears*, NBC News (2025), https://perma.cc/D2B8-XB7U ................................................. 22

Univ. of Pittsburgh, *The Freedom Papers*, Free at Last? Slavery in Pittsburgh in the 18th and 19th Centuries (2025), perma.cc/W9E4-DG7J................................................................ 22

William H. Frey, *The US will become 'minority white' in 2045, Census projects,* Brookings Inst. (2018), https://perma.cc/Z45E-GQR3 ................................................ 17

## INTERESTS OF *AMICI CURIAE*[1]

The National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the nation's first and foremost civil rights organization. The NAACP's mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. Included in its membership are Black non-citizens and other non-citizens of color.

The League of Women Voters ("LWV") is a non-profit, nonpartisan, grassroots, membership organization committed to protecting voting rights, empowering voters, and defending democracy. LWV empowers voters and defends democracy through advocacy, education, mobilization, and litigation at the local, state, and national levels. Founded in 1920, the League works to ensure that all voters—including those from historically marginalized

---

[1] Defendants-Appellants and Plaintiffs-Appellees consent to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for *amici curiae* authored this brief in whole; no party's counsel authored, in whole or in part, this brief; and no person or entity other than *amici* and their counsel contributed monetarily to preparing or submitting this brief.

communities, like Black voters, other voters of color, and new citizens—can use their fundamental right to vote, participate in our democratic system, and be protected equally by our constitution.

The Equal Justice Society ("EJS") is a national legal organization founded in 2000 to transform the nation's consciousness on race through law, social science, and the arts. EJS's focus is to repair the harm of historic racial discrimination and to promote and defend policies that move society toward a true multiracial democracy where race is no longer a barrier to opportunity. The protection and full realization of the anti-discrimination safeguards of the Fourteenth Amendment and the other Reconstruction Amendments are central to EJS's mission.

## ARGUMENT

## I. BIRTHRIGHT CITIZENSHIP IS ENSHRINED BY THE RECONSTRUCTION AMENDMENTS AND CANNOT BE UNDONE BY EXECUTIVE ACTION.

The Executive Order must be rejected because it purports to abolish a constitutional right. The rights guaranteed by the Reconstruction Amendments—including the Fourteenth Amendment's citizenship clause—were enshrined in the Constitution precisely because their architects anticipated that changing political sentiment could otherwise endanger them.

The history of the Reconstruction Amendments weighs strongly in favor of this Court invalidating the Executive Order. And as the U.S. Supreme Court noted within a few decades after their passage: "In the forefront, both of the [F]ourteenth [A]mendment of the [C]onstitution, and of the [C]ivil [R]ights [A]ct of 1866, the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms." *U.S. v. Wong Kim Ark*, 169 U.S. 649, 675 (1898). That black letter law has not changed in the past 127 years and should not be changed now.

### A. The Reconstruction Amendments were Enacted to Prevent the Resurrection of *Dred Scott* and the Permanent Underclass that Decision Created.

The drafters of the Fourteenth Amendment enshrined the guarantee of birthright citizenship in the Constitution as a wholesale rejection of *Dred Scott v. Sandford*, 60 U.S. 393 (1857). In *Dred Scott*, the Supreme Court announced that Black people "are not included, and were not intended to be included, under the word 'citizens' in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States." *Id.* at 404. In doing so, the Court articulated the belief (of that time) that Black people were "considered as a subordinate and inferior class of beings . . . and had no rights or privileges but such as those

3

who held the power and the Government might choose to grant them." *Id.* at 404-05. The holding swept broadly—citizenship included "neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not[.]" *Id.* at 407.

Through its core holding, *Dred Scott* created a permanent underclass of Americans who—it asserted—"were not even in the minds of the framers of the Constitution when they were conferring special rights and privileges upon the citizens of a State in every other part of the Union." *Id.* at 411-12. Further, the Supreme Court explained that because of their enslaved condition, Black people were not "supposed to possess any political rights which the dominant race might not withhold or grant at their pleasure." *Id.* at 412. These holdings threatened to cement the repugnant mistreatment of, and discrimination against, Black people by all levels of American government.

Following *Dred Scott*, Republican members of the 39th Congress responded to the legal and social consequences of *Dred Scott* by codifying citizenship in the Civil Rights Act of 1866, the nation's first civil rights statute. *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 2896 (1866) (Senator Howard arguing that the Fourteenth Amendment's drafters "desired to put this question of citizenship and the rights of citizens and freedmen under the civil rights bill

beyond the legislative power of [politicians] who would . . . expose the freedmen again to the oppressions of their old masters.").

The citizenship clause of the Civil Rights Act of 1866 directly repudiated *Dred Scott* by declaring "[t]hat all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States . . . ." *See* Act of Apr. 9, 1866, ch. 31, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (1952)). While introducing the Act on the Senate Floor, Senator Trumbull noted that this legislative move was necessary because "[t]he people of those [slaveholding] States have not regarded the colored race as citizens, and on that principle[,] many of their laws making discriminations between the whites and the colored people are based[.]" Cong. Globe, 39th Cong., 1st Sess. 475 (1866). Accordingly, the Act not only granted Black people citizenship, but it explicitly granted to citizens "of every race and color" other basic personal, economic, and participatory rights including the right to make and enforce contracts, transact in property, and participate in court proceedings. *See* Act of Apr. 9, 1866, ch. 31, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (1952)).

Opponents of the Act understood the intended reach of the birthright citizenship provision. In explaining his decision to veto the Act, President Andrew Johnson acknowledged:

> This provision comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the entire race designated as blacks, people of color. Negroes, mulattoes, and persons of African blood. Every individual of these races born in the United States is by the bill made a citizen of the United States.

U.S. President, Andrew Johnson, Message from the President of the United States Returning Bill (S. No. 61) "To protect all persons in the United States in their civil rights, and furnish the means of their vindication," with his objections thereto, S. Exec. Doc. No. 31 (Mar. 27, 1866). Going further, President Johnson questioned the wisdom of extending citizenship to free Black people and the other nonwhite groups he identified, positing that they may not "possess the requisite qualifications to entitle them to all the privileges and immunities of citizens[.]" *Id*. President Johnson's rejection of the 39th Congress's conception of birthright citizenship was clear. But the Reconstruction Congress was resolved, and it responded decisively. On April 10, 1866, Congress firmly repudiated President Johnson's exclusionary view of birthright citizenship by overriding his veto. Cong. Globe, 39th Cong., 1st

6

Sess. 1809 (Apr. 6, 1866) (Senate), Cong. Globe, 39th Cong., 1st Sess. 1861 (Apr. 10, 1866) (House).

Having overridden the President's veto of the Civil Rights Act of 1866, the 39th Congress recognized the need to place birthright citizenship beyond the reach of shifting political winds. Accordingly, the Reconstruction Congress added birthright citizenship to the Constitution to squarely place the issue beyond the reach of politics.

Thus, enshrining birthright citizenship in the Constitution was a deliberate measure undertaken to thwart future jurists or administrations that might otherwise be hostile to the principle. Senator Benjamin Wade was mindful of the very moment we find ourselves in as a nation when he said:

> I have always believed that every person, of whatever race or color, who was born within the United States was a citizen of the United States; but by the decisions of the courts there has been a doubt thrown over that subject; and if the Government should fall into the hands of those who are opposed to the views that some of us maintain, those who have been accustomed to take a different view of it, they may construe the provision in such a way as we do not think it liable to construction at this time, unless we fortify and make it very strong and clear.

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866) (statement of Senator Benjamin Wade). The architects of the Fourteenth Amendment echoed the

language of the Civil Rights Act of 1866, making clear that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV. Accordingly, birthright citizenship became a constitutionally protected right to endure through—and in spite of—changes in prevailing political sentiment. *See Wong Kim Ark,* 169 U.S. at 676 (explaining that the "main purpose" of the Fourteenth Amendment was to "put it beyond doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States, are citizens of the United States."). The Court further explained:

> The amendment, in clear words and in manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.

*Id*. at 693. Notably, the Amendment's use of, and the Court's plain interpretation of, this constitutional language has no limitation concerning

how the person came to be born in the United States or the immigration status of their birth parents.[2]

In the decades following the adoption of the Reconstruction Amendments, the Supreme Court confirmed that the Amendments' essential purpose was to undo the intolerable social conditions created by *Dred Scott*. The Fourteenth Amendment, with its guarantees of birthright citizenship and civil rights, was enacted soon after the ratification of the Thirteenth Amendment, which prohibited slavery, and shortly before the Fifteenth Amendment, which extended the right to vote to all male citizens.

Only two years after the Fifteenth Amendment was ratified in 1870, the Supreme Court reaffirmed in *The Slaughter-House Cases* that "one pervading purpose" of these Reconstruction Amendments was "[the] freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of

---

[2] Defendants-Appellants argue that "unlawfully present" aliens and temporary legal residents are not "domiciled" in the United States and therefore are not subject to the United States' jurisdiction within the meaning of the Fourteenth Amendment's Citizenship Clause. Brief for Appellants, Dkt. No. 40 at 50, Casa, Inc. v. Trump, No. 25-1153 (4th Cir. Mar. 31, 2025) ("Appellants' Br."). However, the plain text of the Fourteenth Amendment is devoid of any qualifying language regarding domicile, the manner in which a child's parents entered the country, or their intentions to remain here.

those who had formerly exercised unlimited dominion over him." *The Slaughter-House Cases*, 83 U.S. 36, 71 (1872). So, it is clear that the Reconstruction Amendments were intentionally designed to work together to not only establish those rights, but to also ensure their permanence—birthright citizenship was necessarily part of that framework.

As the *Slaughter-House* Court recognized, even after slavery was abolished in the rebelling Confederate states, newly freed Black people were subjected to discriminatory "laws which imposed upon [them] onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value[.]" *Id.* at 70. Black people were forced to live and work on land without the right to purchase or own it, were excluded from many occupations, and were not permitted to give testimony in court cases involving a white party. *Id.*

Moreover, the *Dred Scott* era created the conditions whereby Black people were especially vulnerable to socially condoned and legally accepted racial violence. Indeed, *Dred Scott* "struck a blow against personhood for blacks . . . [,] affirming that blacks had no reasonable expectation of the rule of law" that might protect them from violence in southern states. Hon. Bernice Bouie Donald, *When the Rule of Law Breaks Down: Implications of the 1866*

*Memphis Massacre for the Passage of the Fourteenth Amendment*, 98 Boston Univ. L. Rev. 1607, 1632 (2018). Black people were subjected to horrific acts of racial terrorism at the hands of both southern government officials and terrorist groups such as the Ku Klux Klan, before and after the advent of birthright citizenship. Ultimately, without question or confusion, the Reconstruction Amendments' drafters intended to permanently end the legacy of slavery and *Dred Scott*.

### B. The Executive Order Defies the Original Intent of the Reconstruction Amendments.

Defendants-Appellants incorrectly premise an individual's access to birthright citizenship on the imagined requirement of "primary allegiance" to the United States, claiming that a child of those who are temporarily or "unlawfully present" in the United States lacks the necessary reciprocal relationship with the United States to merit citizenship. *See* Appellants' Br. at 26-43, 50. But this understanding of citizenship under the Fourteenth

11

Amendment cannot be squared with the knowledge, actions, and intent of the 39th Congress.[3]

The 39th Congress intended to confer citizenship even upon individuals who were unlawfully present in the United States and whose children would be denied citizenship under this Executive Order. Prior to the Civil War, Congress passed various acts to restrict or ban the importation of, and accelerate the deportation of, enslaved individuals. *See, e.g.*, Act Prohibiting the Importation of Slaves of 1807, ch. 22, 2 Stat. 426 (1807) (prohibiting the importation of "any negro, mulatto, person of colour, with the intent to hold, sell or dispose of such negro, mulatto, or person of colour, as a slave, or to be held in service or labour"); Act of Mar. 3, 1819, ch. 77, § 5, 3 Stat. 510 (1819) (providing for the deportation of illegally trafficked slaves). This meant that

---

[3] Moreover, neither the Supreme Court nor Congress has recognized any expectation that individuals pledge sole allegiance to the United States. U.S.-born citizens and naturalized citizens may add and retain dual citizenship. *See Kawakita v. U.S.*, 343 U.S. 717, 723-24 (1952) (describing dual nationality as "a status long recognized in the law" and holding that "a person may [] be subject to the responsibilities of both [countries]"); Immigration and Nationality Act, Pub. L. No. 82-414, § 101(a)(22), 66 Stat. 163, 169 (1952) (codified as amended at 8 U.S.C. § 1101) (permitting allegiance to multiple countries). A parent's allegiance is not contemplated anywhere. If it were, that would suggest children of dual citizens and lawful permanent residents would not be birthright citizens—a conclusion that even the Executive Order does not contemplate.

any enslaved individuals who were brought to American shores were, by definition, unlawfully present.

The drafters of the Fourteenth Amendment were well-aware of how Black people were unlawfully arriving to this country—through no fault of their own. Nevertheless, they conferred citizenship upon them and their existing and future children. The drafters would have known, for instance, about the *Wanderer*, a ship that arrived off the Georgia coast in 1858 with over four hundred enslaved individuals who were smuggled into the United States. Gabriel J. Chin and Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2243 (2021) (noting that the *Wanderer* incident was widely publicized in newspapers and magazines at the time). By ratifying the Fourteenth Amendment, the drafters conferred citizenship on the children of these individuals, even though their parents arrived in the United States unlawfully. That makes good sense given that the "undeniable purpose" of the Fourteenth Amendment was to "make citizenship of [Black Americans] permanent and secure" if they were born in the United States without regard to how their parents arrived in the United States. *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).

13

Further, enslaved people brought from Africa to these shores against their will unquestionably lacked the "mutual consent" with the federal government that Defendants-Appellants claim is necessary to confer birthright citizenship. Appellants' Br. at 49. Yet, the Reconstruction Amendments were passed precisely to confer citizenship and corresponding rights specifically to them and their progeny.

This premise of "mutual consent" was also absent in the question of granting citizenship to individuals of other races. For example, during the first wave of Chinese immigration to the United States in the late 1800s, the United States "denied [Chinese] immigrants any opportunity for citizenship, then attempted to prevent more laborers from arriving, forbade their reentry if they left the country, and began expelling those who had not secured certificates demonstrating the legality of their presence." Gerald Neuman, *Back to Dred Scott?*, 24 San Diego L. Rev. 485, 495-96 (1987). In other words, the polity at the time had no interest in granting citizenship and basic rights to Chinese immigrants. But in *Wong Kim Ark*, the Supreme Court nevertheless upheld the citizenship of a Chinese man born to lawful permanent resident (but noncitizen) Chinese parents, thereby demonstrating the "irrelevance of 'consent.'" *Id.* at 495.

14

This extension of citizenship to all individuals born in the United States was necessary to secure the civil rights of all nonwhite people. Though initially focused on abolishing discrimination against Black people, the Reconstruction Amendments collectively serve a common constitutional purpose to afford the same rights to all persons in this nation. Likewise, the Amendments collectively operate to prevent federal, state, and local government bodies from ever recreating another *Dred Scott*-era underclass. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 210-11 (1982) (affirming that the Fourteenth Amendment's Equal Protection Clause and Due Process Clause protect all people in the United States, including unauthorized immigrants, from unconstitutional state action); *Wong Kim Ark*, 169 U.S. at 676 (affirming that the Fourteenth Amendment's citizenship clause has "universal" application and is not limited to Black people).

## II.    THE EXECUTIVE ORDER WOULD DIMINISH THE ABILITIES OF BLACK AMERICANS AND COMMUNITIES OF COLOR TO PARTICIPATE MEANINGFULLY IN AMERICAN DEMOCRACY.

Without birthright citizenship, the American-born children of undocumented or temporary legal residents—like the children of the enslaved—would become a "large class of stateless children who are born and

15

raised in the United States but who do not have strong ties to any other nation." Margaret D. Stock, *Is Birthright Citizenship Good for America?*, 32 Cato J. 139, 150 (2012). Among the various harms already outlined by Plaintiff-Appellees and other *amici*, this stateless underclass would be cut off from the franchise, and the influence of communities of color on American democracy would be increasingly diminished.

The Executive Order will bar from the franchise millions of children who would otherwise become eligible voters and eliminate their ability to run for political office in most jurisdictions. *See* U.S. Const. amend. XV (predicating the right to vote in federal elections on citizenship); U.S. Const. art. I, §§ 2, 3 (requiring minimum citizenship periods for elected members of Congress); U.S. Const. art. II, § 1 (restricting eligibility for the presidency to citizens); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-08, 110 Stat. 3009-546, codified as 18 U.S.C. § 611 (1996) (prohibiting noncitizen voting in federal elections); *see also Laws permitting noncitizens to vote in the United States*, Ballotpedia, https://perma.cc/7Q5B-Q6VN (last visited May 10, 2025) (noncitizens are allowed to vote in certain local elections in only three states and the District of Columbia, with a trend amongst states to prohibit it). And racial minorities, like the membership of

16

the NAACP, are most likely to bear the brunt of these effects. As a result, the implementation and enforcement of the Executive Order will reshape the electorate and entrench the racial hierarchy that this country long ago rejected.

A study by the Migration Policy Institute projected that if birthright citizenship were eliminated, America would lose somewhere between 4.7 and 13.5 million future citizens. *See* Stock*, supra*, at 148. Most of these future citizens would be people of color—especially Latinos, who make up 55% of the total noncitizen population and three-quarters of the unauthorized immigrant population in the United States. Lucía Félix Beltrán et al., *Born into Uncertainty: The Health and Social Costs of Ending Birthright Citizenship*, UCLA Latino Pol'y & Pol. Inst. at 9 (Feb. 13, 2025), https://perma.cc/3RBY-BE52; see *also* Jennifer Van Hook and Michael Fix, *The Demographic Impacts of Repealing Birthright Citizenship*, Migration Pol'y Inst. at 5-6 (Feb. 12, 2025), https://perma.cc/P9W8-4WCM. Census population projections have indicated that in 2045, the U.S. will be a majority-minority nation. William H. Frey, *The US will become 'minority white' in 2045, Census projects*, Brookings Inst. (Mar. 14, 2018), https://perma.cc/Z45E-GQR3. If the Executive Order is implemented, the

electorate will not reflect these changing demographics because people of color will disproportionately be barred from voting in elections.

Between 2009 and 2013, over five million children were living with at least one unauthorized immigrant parent, representing 7% of the total U.S. child population. Randy Capps, Michael Fix, and Jie Zong, *A Profile of U.S. Children with Unauthorized Immigrant Parents*, Migration Pol'y Inst. at 1 (Jan. 2016), https://perma.cc/3N2D-W8V6. Nearly 80% of these children are U.S. citizens by birth. *Id.* While the Executive Order does not apply retroactively, going forward, similarly situated children would be barred from becoming citizens. "Because second-generation immigrants with at least one undocumented parent are less likely to be white than the general population, the elimination of birthright citizenship would disproportionately disenfranchise racial and ethnic minorities and otherwise deprive them of the benefits of citizenship, especially Hispanics." Sandra L. Rierson, *From Dred Scott to Anchor Babies: White Supremacy and the Contemporary Assault on Birthright Citizenship*, 38 Geo. Immigr. L. J. 1, 64 (2023); *see also* Jennifer Van Hook and Michael Fix, *Repealing Birthright Citizenship: The Unintended Consequences*, Migration Pol'y Inst. at 1 (Aug. 2015), https://perma.cc/9YTM-2WRX (noting that about three-fourths of all

"unauthorized immigrants" in the United States are from Mexico and Central America).

Even for those who are citizens, the Executive Order would greatly diminish Black and Brown people's ability to participate in the political process, furthering disenfranchisement. This is because the Executive Order would necessarily heighten the vetting of citizenship status. It would have a comparable impact to that of stringent voter ID laws recently passed in various states, which studies show have a negative impact on Black and Brown voter turnout across states, in part because they are less likely to have sufficient documentation. *See, e.g.*, Spencer Overton et al., *Response to the Report of the 2005 Commission on Federal Election Reform*, Brennan Ctr. for Just. (Sept. 19, 2005), https://perma.cc/GRG3-WRVJ (explaining that Black Americans in Louisiana were less likely than white citizens to have sufficient photo identification); Kevin Morris and Coryn Grange, *Records Show Massive Disenfranchisement and Racial Disparities in 2022 Texas Primary*, Brennan Ctr. for Just. (Oct. 20, 2022), https://perma.cc/C2MR-75Z7 (explaining that Asian, Latino, and Black voters in Texas were more likely to have application or mail ballots rejected under new voting laws); Shelley de Alth, *ID at the Polls: Assessing the Impact of Recent State Voter ID Laws on*

*Voter Turnout*, 3 Harv. L. & Pol'y Rev. 185, 193 (2009) (showing that racial minority voter turnout decreased in states requiring photo identification); Matt A. Barreto et al., *The Racial Implications of Voter Identification Laws in America*, 47 American Pol. Rsch. 1, 5-6 (2018) (finding that people of color were consistently less likely than whites to have valid identification for voting). In sum, the Executive Order will only compound the difficulties already faced by communities of color and further diminish their collective ability to participate in democracy and have a voice in this country.

## III. THE EXECUTIVE ORDER THREATENS TO INCREASE ABUSES OF CIVIL RIGHTS AND THE CREATION OF A LEGALLY INFERIOR UNDERCLASS IN AMERICA.

The Executive Order continues a trend of hostility towards immigrants of color, foretells a swelling wave of civil rights violations, and would re-establish a legally inferior underclass in America.

This Administration's animus toward immigrants, particularly immigrants of color, is well documented. *See, e.g.*, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country,"* C-SPAN, (Dec. 16, 2023), https://shorturl.at/cMCnk (President Trump stating that immigrants are "poisoning the blood of our country"); Darran Simon, *President Trump's other*

20

*insensitive comments on race and ethnicity*, CNN (Jan. 13, 2018), https://perma.cc/G5V4-ZN5R (President Trump falsely stating that Mexican immigrants were "people that have lots of problems" who are "bringing drugs" and "crime" and are "rapists"); Kathryn Watson and Zak Hudak, *Trump says he'd bring back "travel ban" that's "even bigger than before,"* CBS News (July 7, 2023), https://perma.cc/F69R-KY6D (President Trump stating that the Muslim travel ban was to prevent people from "blowing up our cities" and "stealing our farms"). That antipathy cannot be shrugged off. Rather, the Order stands as a harbinger for further violations of civil rights when viewing the Executive Order in light of such unabashed statements of hostility to nonwhite immigration. This administration has followed through on then-candidate Trump's promise to launch "the largest deportation operation in the history of our country" by increasing the number of raids involving the detention and questioning of nonwhite U.S. citizens, who have been apparently targeted and detained because of their skin color. *See* Joel Rose and Sergio Martínez-Beltrán, *Trump touts historic deportation plans, but his own record reveals big obstacles*, NPR (Aug. 14, 2024), https://perma.cc/C936-4YBM. For instance, at least fifteen Native Americans in Arizona and New Mexico were "stopped at their homes and workplaces,

questioned or detained by federal law enforcement and asked to produce proof of citizenship" within a week of President Trump taking office. Alaa Elassar, *Navajo Nation leaders raise alarm over reports of Indigenous people being questioned and detained during immigration sweeps*, CNN (Jan. 27, 2025), https://perma.cc/J4Y3-4MCN. And in New Jersey, ICE led a warrantless raid of a seafood warehouse wholesaler and requested documentation only for the nonwhite employees. *See* Suzanne Gamboa and Nicole Acevedo, *Trump immigration raids snag U.S. citizens, including Native Americans, raising racial profiling fears*, NBC News (Jan. 28, 2025), https://perma.cc/D2B8-XB7U. These actions are reminiscent of a time prior to and during Reconstruction when newly freed Black people had to carry their manumission papers on hand for fear of being abducted and forced back into slavery. *See* Univ. of Pittsburgh, *The Freedom Papers*, Free At Last? Slavery in Pittsburgh in the 18th and 19th Centuries, https://perma.cc/W9E4-DG7J (last visited May 10, 2025).

The Executive Order, in effect, helps recreate and entrench a racial hierarchy—precisely the one that the Reconstruction Amendments sought to dismantle and prevent from recurring. In turn, the attack on birthright citizenship in this country cannot be divorced from the historical context and

22

origins of birthright citizenship itself. If allowed to stand, the Executive Order will effectively revive *Dred Scott'*s unconstitutional and exclusionary conception of citizenship. What is worse, it will once again condemn generations of future, native-born Americans to live as members of a legally inferior underclass. America long ago rejected that abhorrent proposition, and this Court should, too.

## CONCLUSION

For the foregoing reasons, and those set forth by the Appellees, this Court should affirm the District Court's order enjoining the enforcement and implementation of the Executive Order on a nationwide basis.

Dated: June 6, 2025

Respectfully submitted,

*/s/ Edward G. Caspar*

JAMES J. PASTORE
STEPHANIE D. THOMAS
NATALIE TSANG

DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001
(212) 909-6000

CHESTER S. DUBOV
DEBEVOISE & PLIMPTON LLP
650 California Street, Fl. 31
San Francisco, CA 94108
(415) 738-5700

EDWARD G. CASPAR
OLIVIA N. SEDWICK
*Counsel of Record*

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW
Washington, D.C. 20005
(202) 662-8600

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This amicus brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 29(a)(5) because it contains 4,635 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word 365 Times New Roman 14-point font.

Dated: June 6, 2025                     Respectfully submitted,

                                        /s/ Edward G. Caspar

JAMES J. PASTORE                        EDWARD G. CASPAR
STEPHANIE D. THOMAS                     OLIVIA N. SEDWICK
NATALIE TSANG                           *Counsel of Record*

DEBEVOISE & PLIMPTON LLP                LAWYERS' COMMITTEE FOR CIVIL
66 Hudson Blvd.                         RIGHTS UNDER LAW
New York, NY 10001                      1500 K St. NW
(212) 909-6000                          Washington, D.C. 20005
                                        (202) 662-8600
CHESTER S. DUBOV
DEBEVOISE & PLIMPTON LLP
650 California Street, Fl. 31
San Francisco, CA 94108
(415) 738-5700

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: June 6, 2025                    Respectfully submitted,

                                      */s/ Edward G. Caspar*

**JAMES J. PASTORE**                  **EDWARD G. CASPAR**
**STEPHANIE D. THOMAS**               **OLIVIA N. SEDWICK**
**NATALIE TSANG**                     *Counsel of Record*

DEBEVOISE & PLIMPTON LLP              LAWYERS' COMMITTEE FOR CIVIL
66 Hudson Blvd.                       RIGHTS UNDER LAW
New York, NY 10001                    1500 K St. NW
(212) 909-6000                        Washington, D.C. 20005
                                      (202) 662-8600
**CHESTER S. DUBOV**
DEBEVOISE & PLIMPTON LLP
650 California Street, Fl. 31
San Francisco, CA 94108
(415) 738-5700

                    *Counsel for Amici Curiae*