No. 25-1153

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CASA, INC., et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
District of Maryland, Case No. 8:25-cv-00201
The Honorable Deborah L. Boardman

## BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS
## AND LOCAL GOVERNMENT OFFICIALS
## IN SUPPORT OF PLAINTIFFS-APPELLEES

Jonathan B. Miller
Elaine Poon
Katherine Courtney
Zarah Rahman
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................ 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT ....................................................................................... 4

I.    PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON
      THE MERITS ............................................................................... 4

      A.   The Order Violates the Citizenship Clause of the
           Fourteenth Amendment ...................................................... 4

      B.   The Order Violates the Immigration and Nationality Act ......... 6

II.   A NATIONWIDE INJUNCTION IS NECESSARY TO
      PROTECT THE PUBLIC INTEREST ............................................ 7

      A.   Enforcement of an Unconstitutional Order is Contrary to
           the Public Interest .............................................................. 7

      B.   Citizenship Stripping Will Reduce Resident Eligibility
           for Critical Public Services, Threatening Public Health
           and Increasing Poverty ....................................................... 8

           1.   The Order Will Deny Citizenship to a Large Number
                of Amici's Residents ...................................................... 8

           2.   Citizenship Stripping Will Result in Lost Access to
                Social Safety Nets for Children, Causing Severe
                Ripple Effects .............................................................. 10

                i.    Citizenship Stripping Will Result in Increased
                      Public Health Threats Due to Declines in
                      Insurance Rates and Access to Health Care .............. 11

                ii.   Citizenship Stripping Will Increase Hunger and
                      Threaten School Performance by Limiting the
                      Reach of Childhood Nutrition Programs .................... 15

                iii.  Federal Funding for Schooling-Related Services
                      and Foster Care Will Decrease ................................ 16

iv. The Order will Strain Local and County Safety-Net Services .................................................................17

C. Citizen Stripping Will Strain Community Cohesion..............18

D. The Order Will Hamper Recruitment Efforts, Undermining Academic Excellence and Economic Growth .......................................................................20

E. The Order Will Upend Established Practices of Using Birth Certificates to Demonstrate Citizenship, Jeopardizing Access to Public Benefits, Passports, and Other Privileges for Citizens ..................................................20

III. NATIONWIDE RELIEF IS PROPER AND ESSENTIAL TO PROTECT THE PUBLIC INTEREST AND ENSURE UNIFORMITY IN CITIZENSHIP ELIGIBILITY .....................24

CONCLUSION ................................................................................27

ADDITIONAL COUNSEL ..............................................................29

APPENDIX A – List of *Amici Curiae* ................................................33

# TABLE OF AUTHORITIES

**CASES**

*Arizona v. United States*,
   567 U.S. 387 (2012) ................................................................24

Califano v. Yamasaki,
   442 U.S. 682 (1979) ................................................................24

*Centro Tepeyac v. Montgomery Cnty.*,
   722 F.3d 184 (4th Cir. 2013) .....................................................8

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ...................................................25

*George v. McDonough*,
   596 U.S. 740 (2022) ..................................................................6

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ...................................................24

*I.N.S. v. Rios-Pineda*,
   471 U.S. 444 (1985) ..................................................................5

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020) ..................................................8

*Plyler v. Doe*,
   457 U.S. 202 (1982) ................................................................18

*Roe v. Dep't of Def.*,
   947 F.3d 207 (4th Cir. 2020) ...................................................24

*Schneiderman v. United States*,
   320 U.S. 118 (1943) ................................................................18

*Schrader v. Dist. Att'y of York Cnty.*,
   74 F.4th 120 (3d Cir. 2023) .......................................................8

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ..............25

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ...................................................................7

*United States v. Carvalho*,
   742 F.2d 146 (4th Cir. 1984) ...............................................5

*United States v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) .............................................24

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ......................................................2, 5, 6

*United States. v. Texas*,
   579 U.S. 547 (2016) ..........................................................25

**STATUTES**

8 U.S.C. § 1159(a) ..................................................................10

8 U.S.C. § 1159(b) ..................................................................10

8 U.S.C. § 1401(a) ....................................................................6

8 U.S.C. § 1401(b) ....................................................................5

8 U.S.C. § 1611(a) ............................................................10, 11

8 U.S.C. § 1611(c)(1)(B) ......................................................10

8 U.S.C. § 1621 ......................................................................12

8. U.S.C. § 1641 .....................................................................16

8 U.S.C. § 1641(b) ................................................................11

42 U.S.C. § 18032(f)(3) ........................................................12

CAL. WELF & INST. CODE § 14007.8 ....................................12

**REGULATIONS**

7 C.F.R. § 273.2(f)(1)(vii) ......................................................21

7 C.F.R. § 273.11(c)(3) ..........................................................15

20 C.F.R. § 422.107(d) ................................................................21

22 C.F.R. § 51.42 .......................................................................21

22 C.F.R. § 51.42(a) ..................................................................21

34 C.F.R. § 300.154(d) .............................................................16

42 C.F.R. 435.406 .....................................................................11

42 C.F.R. § 457.320(d) .............................................................12

42 U.S.C. § 1396b(x)(3)(C) ......................................................21

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XIV, § 1 ......................................................4

**EXECUTIVE ORDERS**

Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) .................9

**OTHER AUTHORITIES**

Airin Martinez, *Household fear of deportation in relation to chronic stressors and salivary proinflammatory cytokines in Mexican-origin families post-SB 1070*, 5 SSM Population Health 188 (2018) ...........................................................19

Angela R. Remus, *Caught Between Sovereigns: Federal Agencies, States, and Birthright Citizens*, 34 Stan. L. & Pol'y Rev. 225 (2023)..............................................................20

Anna Gassman-Pines & Laura Bellows, *Food Instability and Academic Achievement: A Quasi-Experiment Using SNAP Benefit Timing*, 55 Am. Educ. Rsch. J., 897 (2018).....................15

Brookings Institute, *Visa Outlook Explorer* ........................................20

Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (Nov. 24, 2025) .........................................................15

Department of Homeland Security, *Statement from DHS Spokesperson on Directives Expanding Law Enforcement and Ending Abuse of Humanitarian Parole* (Jan. 21, 2025)...........14

Holly A. Hill et al., *Vaccination Coverage by Age 24 Months Among Children Born in 2017 and 2018 - National Immunization Survey-Child, United States, 2018-2020*, 70 Morb. Mortal. Wkly Rep., 1435 (2021). .........................................13

Jacob Hamburger, *The Consequences of Ending Birthright Citizenship*, Wash. U. L. Rev. (forthcoming 2025) ........................22

Jean C. Williams, *"It's Always with You, that You're Different": Undocumented Students and Social Exclusion*, 20 J. of Poverty, 168 (2015)..................................................................19

John Creamer, United States Census Bureau, G*overnment Assistance Lifts 45.4 Million Out of Poverty in 2021* (Sept. 13, 2022) .........................................................................................11

Kaiser Family Foundation, *Key Facts on Health Coverage of Immigrants* (Jan. 15, 2025) .............................................................12

Lisa A. Gennetian et al., *Supplemental nutrition assistance program (SNAP) benefit cycles and student disciplinary infractions*, 90 Social Service Rev., 403 (2016) .............................15

Mark D. Piehl et al., *Narrowing the gap: decreasing emergency department use by children enrolled in the Medicaid program by improving access to primary care*, 154 Archives Pediatrics Adolescent Med. 791 (2000). .........................................13

National Association of Counties, *Policy Brief: Supplemental Nutrition Assistance Program (SNAP) Reauthorization and Appropriations (*Feb. 13, 2025).....................................................22

National Immigration Law Center, *Health Care Coverage (Maps)* ..........................................................................................12

Office of the Texas Governor, *Governor Abbott Issues Executive Order Requiring Texas Hospitals to Collect,*

*Report Healthcare Costs for Illegal Immigrants* (Aug. 8, 2024) ...........................................................................14

Patricia Gándara et al., *The Impact of a Broken Immigration System on U.S. Students and Schools*, Latino Policy & Politics Institute, Univ. Of Cal., Los Angeles (2023) ...................16

Paul J. Chung et al., *Preventive care for children in the United States: quality and barriers*, 27 Ann. Rev. Public Health 491 (2006). ..........................................................................13

Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times (Mar. 10, 2025) ..................................................14

Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57 Am. Behavioral Scientist, 1174 (2013)..................................19

Romina Tome et al., *Heightened immigration enforcement impacts US citizens' birth outcomes: Evidence from early ICE interventions in North Carolina*, 16 PLoS ONE (Feb. 3, 2021) ...........................................................................14

Steven Carlson, Center on Budget and Policy Priorities, *SNAP is Linked with Improved Health Outcomes and Lower Health Care Costs* (Dec. 14, 2022)............................................15

*U.S. Standard Certificate of Live Birth,* Centers for Disease Control (Nov. 2003)........................................................21

United States Citizenship and Immigration Services, *H-1B Specialty Occupations* ......................................................9

## STATEMENT OF INTEREST

*Amici* are local governments and local government officials from across the nation representing one hundred and seven jurisdictions in twenty-three states.[1] *Amici* write in furtherance of their shared interest in protecting the health and welfare of their residents and the cohesion of their communities. Children who would be deprived of citizenship under President Trump's Executive Order "Protecting the Meaning and Value of American Citizenship" ("Citizenship Stripping Order" or "Order") are valued members of *amici's* communities. Children born on our soil attend our schools. When they are sick, they obtain services through local health care providers. Local hospitals register the births of children born in our localities, and local administrators determine their eligibility for public benefits. When these children grow older, they are our frontline workers, medical providers, and law enforcement personnel. They start businesses, teach schoolchildren, and contribute to our local and national economies. And when they have their own children, they pass American values on to the next generation.

If the district court's preliminary injunction is lifted or narrowed while this case is pending, children born in *amici's* jurisdictions will face immediate

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is provided at Appendix A. Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief.

irreparable harm. Children stripped of citizenship will be excluded from crucial public benefits, undermining their ability to thrive. *Amici* themselves will also be harmed, as local governments will be on the frontlines of confronting the downstream results, including spikes in poverty, disease, and crime. *Amici* will also be charged with adapting local processes for determining public benefits eligibility and may have to overhaul the process for issuing birth certificates to conform with the Order.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it issued a nationwide preliminary injunction blocking the implementation of President Trump's Citizenship Stripping Order while this litigation proceeds through the courts. The Order conflicts with the plain text of the Fourteenth Amendment as definitively interpreted by the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). *Amici* write separately to emphasize the strong public interest supporting the district court's issuance of the preliminary injunction. If this Court overturns or narrows the district court's injunction, immediate and dire consequences will be felt across the nation.

If allowed to go into effect, the Citizenship Stripping Order would restrict *amici*'s residents from fully participating in the community. Infants who, but for the Order, would be U.S. citizens will become ineligible for federally funded benefits programs, including nutrition assistance and health insurance, putting their health

and safety at risk. They will grow up under the specter of deportation and be subjected to stigma and discrimination, undermining their sense of belonging. If implemented, the Order will undercut the social fabric and cohesion of communities by creating a permanent underclass of people with unequal rights. Denying citizenship to the children of lawful immigrants will also hamper our universities' and businesses' efforts to recruit international talent, stunting economic growth and innovation. The Order will affect not only the targeted children but will also jeopardize access to public benefits and identification documents for *citizen* children, because a U.S. birth certificate will no longer serve as proof of citizenship.

The broad harm to local economies, education rates, and public health outcomes will be immediate and irreversible. Even if courts ultimately hold the Order unconstitutional, stripping those born on U.S. soil of citizenship while litigation is ongoing will cause, for example, children to miss critical early-childhood vaccinations and families to be denied support necessary to keep them safely housed. Moreover, state and local governments charged with issuing birth certificates and determining their residents' eligibility for federally-funded benefits will face administrative upheaval, and they will likely have to promptly invest significant resources to overhaul administrative processes.

These harms will undeniably be felt in every corner of the nation, warranting the maintenance of nationwide injunctive relief. Furthermore, federal courts have

consistently pronounced the need for national uniformity in immigration law. To allow citizenship to depend on whether a baby's parents are members in the Plaintiff organizations would flout this well-established principle. For these reasons, *amici* join Appellees in respectfully requesting that this Court affirm the district court's preliminary injunction.

## ARGUMENT

## I.   PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS

The Citizenship Stripping Order is a flagrant attack on a pillar of American law and an attempt by the Executive Branch to rewrite the Constitution as well as federal statute. It contradicts the plain text of the Fourteenth Amendment and the Immigration and Nationality Act. The Order also runs headlong into the Supreme Court's decision over a century ago in *Wong Kim Ark*, rejecting categorically the proposition that the citizenship of children born in the United States depends on their parents' immigration status.

### A.    The Order Violates the Citizenship Clause of the Fourteenth Amendment

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and

4

under the protection of the country, including *all children* here born of resident aliens […]," subject to only very narrow exceptions. *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). That inescapable conclusion has been affirmed by the Supreme Court and appellate courts in the more than 125 years since the decision in *Wong Kim Ark. See, e.g.*, *I.N.S. v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (noting that undocumented resident "had given birth to a child, who, born in the United States, was a citizen of this country"); *United States v. Carvalho*, 742 F.2d 146, 148 (4th Cir. 1984) (child of noncitizens who lacked legal status was "a United States citizen by virtue of her birth in the United States").

Appellants argue that the phrase "subject to the jurisdiction thereof" significantly limits the Constitutional grant of birthright citizenship. This argument has no basis in the text of the Fourteenth Amendment, lacks historical support, and conflicts with binding Supreme Court precedent. In *Kim Wong Ark* the Court held that the phrase "subject to the jurisdiction thereof" reflects four finite and exceptional categories of children excluded from birthright citizenship: children born to foreign sovereigns or their ministers, children born on foreign public ships, children born to enemies during a hostile occupation, and Native American children.[2] 169 U.S. at 693. These common-law exceptions, the Court explained, are "as old as the rule [of birthright citizenship] itself," and the Court carefully detailed

---

[2] Congress subsequently provided for Native American birthright citizenship by statute in 1924. 8 U.S.C. § 1401(b).

the historical, political, and practical basis for each one. *See id.* at 657–58, 683–685. Apart from these narrow exceptions, the Court affirmed that "the amendment in clear words and in manifest intent, includes the children born within the territory of the United States of *all other persons*, of whatever race or color, domiciled within the United States." *Id.* at 693 (emphasis added). Appellants' attempt to import "domicile" and "allegiance" requirements onto the *parents* of children born in the United States is thus at odds with the Supreme Court's holding and reasoning in *Wong Kim Ark* and ignores the plain language of the Fourteenth Amendment.

### B.    The Order Violates the Immigration and Nationality Act

The Plaintiffs are also likely to succeed on their independent claim that the Order violates the statutory grant of birthright citizenship in section 1401(a) of the Immigration and Nationality Act, which provides for birthright citizenship for persons "born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). By adopting the verbatim language of the Fourteenth Amendment, Congress enshrined the contemporaneous meaning of birthright citizenship into federal immigration law. *See George v. McDonough*, 596 U.S. 740, 746 (2022) (explaining that when Congress adopts language "obviously transplanted from another legal source it brings the old soil with it." (citation omitted) (cleaned up)). Accordingly, in adopting section 1401, Congress imported the Supreme Court's authoritative interpretation of the Citizenship Clause in *Wong Kim Ark* into the statutory meaning, which was universally accepted at the time. Accordingly, for the

same reasons Appellees are likely to succeed on their Constitutional claim, so too are they likely to succeed on their statutory claim.

## II. A NATIONWIDE INJUNCTION IS NECESSARY TO PROTECT THE PUBLIC INTEREST

The district court properly considered the public interest in exercising its discretion to craft injunctive relief and correctly held that the public interest weighs strongly in favor of entering a nationwide preliminary injunction. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project* ("*IRAP*"), 582 U.S. 571, 579 (2017). The interests of the public in this case weigh definitively in favor of maintaining nationwide injunctive relief while the merits are being litigated. Not only is enforcement of an unconstitutional order contrary to the public interest generally, but the consequences if the Citizenship Stripping Order goes into effect, even temporarily, will be severe and widespread.

### A. Enforcement of an Unconstitutional Order is Contrary to the Public Interest

As an initial matter, the public interest weighs in favor of upholding the preliminary injunction in this case because Appellees are likely to succeed on the merits of their constitutional claim and "upholding constitutional rights surely serves the public interest." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184,

191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *accord Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("'[E]nforcement of an unconstitutional law is always contrary to the public interest.'") (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023) ("'[T]he enforcement of an unconstitutional law vindicates no public interest.'") (quoting *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013)). Guided by this principle, the district court properly concluded that the public interest weighs in favor of preliminarily enjoining the Order, which plainly violates the Fourteenth Amendment as interpreted by this Court in *United States v. Wong Kim Ark*.

### B. Citizenship Stripping Will Reduce Resident Eligibility for Critical Public Services, Threatening Public Health and Increasing Poverty

The interests of the public additionally weigh in favor of the injunction because any implementation of the Order would strip children of eligibility for essential public benefits, leading to rippling harms in *amici*'s communities.

### 1. The Order Will Deny Citizenship to a Large Number of Amici's Residents

The broad scope of the Order must first be emphasized to frame the grave impacts that will be felt across the nation if the district court's preliminary injunction order is reversed or narrowed. Though political rhetoric surrounding President

Trump's issuance of the Order has focused on children born to newly-arrived, undocumented parents, the Order applies much more broadly. It excludes from citizenship children born in the United States to any mother whose presence is "lawful but temporary" if their fathers are also not citizens or legal permanent residents. *See* Exec. Order No. 14160, § 1, 90 Fed. Reg. 8449 (Jan. 20, 2025). The Order thus denies citizenship to children whose parents hold long-term work and student visas. Many of these visa holders have lived in the United States for years and are on a pathway to permanent residency.[3]

The Order is ambiguous as to its broader application, as there are other statuses that could also be considered "lawful but temporary."[4] It thus potentially also denies citizenship to children born to Deferred Action for Childhood Arrivals (DACA) recipients who, by definition, themselves came to the United States as young children and have resided here continuously since. The Order may likewise apply to children of residents who have been granted asylum or are awaiting an

---

[3] For example, H1-B specialized occupation visas are initially valid for three years and extendable to six years, and H1-B visa holders can apply for legal permanent residency. *See* United States Citizenship and Immigration Services, *H-1B Specialty Occupations,* https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last visited Apr. 28, 2025).

[4] The Order describes "lawful but temporary" status as including persons "such as, *but not limited to*, [those] visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa." *See* 90 Fed. Reg. at 8449 (emphasis added).

asylum determination, and to refugees, all of whom may apply for legal permanent residency after being in the United States for one year. *See* 8 U.S.C. §§ 1159(a),(b).

Overall, thousands of children born in the United States each year will likely be rendered ineligible for citizenship under the Order. As just one data point, Appellee ASAP estimates that approximately 7,500 children will be born to ASAP's 680,000 members alone in 2025. JA69–70, ¶¶ 5, 24. The broad scope of the Order and significant number of children that will be affected are especially salient because neither the Order nor current federal immigration law provide any alternative legal immigration status to a child denied birthright citizenship. If this Court grants the government's request to reverse the district court's order, the immediate effect will be that children denied citizenship under the Order would lack legal immigration status in the United States upon birth.

### 2. Citizenship Stripping Will Result in Lost Access to Social Safety Nets for Children, Causing Severe Ripple Effects

In denying citizenship to thousands of children born in the United States, the Order will render those children ineligible for essential public benefits. Doing so will severely impact public health and community well-being both in the short and long terms. Numerous federally-funded public benefits programs targeted at low-income families are available only to citizens and to limited categories of "qualified" resident aliens. *See* 8 U.S.C. §§ 1611(a) ("an alien who is not a qualified alien . . . is not eligible for any Federal public benefit"), (c)(1)(B) (defining "Federal public

benefit" as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit"). While lawful permanent residents, refugees, and asylum recipients are "qualified" immigrants for the purpose of these benefits, work and student visa holders are not. 8 U.S.C. § 1641(b). Nor are individuals who lack any legal status. *Id.*

Overall, federally funded public benefits help keep tens of millions of families out of poverty nationwide.[5] By denying children birthright citizenship and rendering them ineligible for federal public assistance, the Order will increase hunger, poverty, and preventable disease across the nation. Even families with citizen children will face significant barriers to accessing the public benefits that they *are* eligible for because, as discussed below, *infra,* Part I.E, regularly issued birth certificates will no longer suffice to demonstrate citizenship.

### i. Citizenship Stripping Will Result in Increased Public Health Threats Due to Declines in Insurance Rates and Access to Health Care

Children denied citizenship under the Order will have very limited health insurance options because of their exclusion from federal benefits. They will be unable to receive subsidized insurance through Medicaid or the Children's Health

---

[5] John Creamer, United States Census Bureau, G*overnment Assistance Lifts 45.4 Million Out of Poverty in 2021* (Sept. 13, 2022), https://www.census.gov/library/stories/2022/09/government-assistance-lifts-millions-out-of-poverty.html.

Insurance Program (CHIP). *See* 8 U.S.C. § 1611(a); 42 C.F.R. § 435.406 (Medicaid); 42 C.F.R. § 457.320(d) (CHIP). They will also be ineligible to enroll in private insurance through health insurance marketplaces. *See* 42 U.S.C. § 18032(f)(3).

Some states have elected to extend subsidized insurance coverage under state programs to individuals whose immigration status bars them from federally-funded benefits. *See, e.g.,* CAL. WELF & INST. CODE § 14007.8 (expanding California's Medicaid coverage to all children and adults regardless of immigration status); *see also* 8 U.S.C. § 1621 (providing that non-qualified immigrants are not eligible for state and local public benefits unless a state otherwise provides). These states, however, are in the minority: only thirteen states provide medical insurance coverage to all children irrespective of immigration status, and only seven states provide any form of subsidized health care to adults who are ineligible for federal Medicaid because of immigration status.[6]   The limited options for health insurance for immigrants without legal status is reflected in insurance coverage rates: in 2023, 50% of undocumented immigrants and 18% of lawfully present immigrants were

---

[6] National Immigration Law Center, *Health Care Coverage (Maps)*, https://www.nilc.org/resources/healthcoveragemaps/ (last updated Feb.18, 2025).

uninsured, compared to only 8% of U.S.-born citizens and 6% of naturalized citizens.[7]

Children who lack health insurance are much less likely to receive preventative care, including vaccinations, health screenings, and wellness visits, making them more vulnerable to preventable diseases.[8] A decline in preventative health care at the individual level increases public health risks in a community. Obtaining high vaccination rates, for example, is essential to prevent the spread of communicable diseases among children. Yet uninsured children are less likely to receive vaccines than their insured peers. A recent study found uninsured children to be 9.2% to 37.8% less likely to receive vaccines, varying by vaccine type, and 3.3% of the uninsured children in the study had received *no* vaccinations.[9] Any increase in the rate of unvaccinated children would increase the risks of disease spread and even death from preventable childhood illnesses. Preventative health care also reduces hospitalizations and emergency department use, thus saving health care

---

[7] Kaiser Family Foundation, *Key Facts on Health Coverage of Immigrants* (Jan. 15, 2025), https://www.kff.org/racial-equity-and-health-policy/fact-sheet/key-facts-on-health-coverage-of-immigrants/.

[8] Paul J. Chung et al., *Preventive care for children in the United States: quality and barriers*, 27 Ann. Rev. Public Health 491, 491–515 (2006).

[9] Holly A. Hill et al., *Vaccination Coverage by Age 24 Months Among Children Born in 2017 and 2018 - National Immunization Survey-Child, United States, 2018-2020*, 70 Morb. Mortal. Wkly Rep., 1435, 1435–1440 (2021).

providers and the government money.[10]

Additionally, the Order will likely have a chilling effect on health care access for families with non-citizen children that *do* have health insurance because of increased fear of immigration enforcement. The Trump administration's prioritization of mass deportation has already led immigrant families to avoid even necessary outings,[11] and with federal immigration enforcement officials newly permitted to detain patients in sensitive areas, including hospitals,[12] families whose children are denied citizenship at birth may choose to avoid any non-emergency healthcare.[13] The impact on health care access would likely be most acute in states like Texas, which since 2024 requires public hospitals to collect and report patient

---

[10] *See, e.g.,* Mark D. Piehl et al., *Narrowing the gap: decreasing emergency department use by children enrolled in the Medicaid program by improving access to primary care*, 154 Archives Pediatrics Adolescent Med. 791, 791–95 (2000).

[11] Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times (Mar. 10, 2025), https://www.nytimes.com/2025/03/09/business/economy/immigrant-workers-deportation-fears.html.

[12] Department of Homeland Security, *Statement from DHS Spokesperson on Directives Expanding Law Enforcement and Ending Abuse of Humanitarian Parole* (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

[13] For example, a 2004 study found increased immigration enforcement caused expectant mothers to seek prenatal care later and less frequently. *See* Romina Tome et al., *Heightened immigration enforcement impacts US citizens' birth outcomes: Evidence from early ICE interventions in North Carolina*, 16 PLoS ONE (Feb. 3, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7857575/.

data on immigration status.[14] Overall, reversing the district court injunction will have the predictable effect of jeopardizing access to health care for some of our nation's most vulnerable residents.

### ii. Citizenship Stripping Will Increase Hunger and Threaten School Performance by Limiting the Reach of Childhood Nutrition Programs

If not preliminarily enjoined, the Order will further undermine public health by reducing the number of families eligible for federal nutrition assistance benefits through the Supplemental Nutrition Assistance Program (SNAP) program. SNAP is considered "the nation's most important anti-hunger program."[15] An average of 41 million people received benefits through SNAP each month in 2024.[16] Proper early-life nutrition is essential for young children and adults to thrive. SNAP benefits improve school performance: they are correlated with higher test scores and fewer

---

[14] *See* Office of the Texas Governor, *Governor Abbott Issues Executive Order Requiring Texas Hospitals to Collect, Report Healthcare Costs for Illegal Immigrants* (Aug. 8, 2024), https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-requiring-texas-hospitals-to-collect-report-healthcare-costs-for-illegal-immigrants.

[15] Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (Nov. 24, 2025), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.

[16] *Id.*

disciplinary issues.[17] SNAP also has lifelong impacts: adults who received SNAP benefits as children have a lower risk of heart disease and obesity.[18] Critically, SNAP benefits are available to mixed-status families containing citizen children and non-citizen parents. *See* 7 C.F.R. § 273.11(c)(3) (eligibility determined for each household member). In these cases, stripping children of citizenship means parents will lose support for their children's nutritional needs, increasing the family's overall financial burden.

### iii. Federal Funding for Schooling-Related Services and Foster Care Will Decrease

Access to certain schooling-related and foster care services that are administered at the local level will also be impacted by the Order. Federal law requires school districts to provide services to students with disabilities under the Individuals with Disabilities in Education Act and partially reimburses districts for providing those services to citizens and qualified immigrants. *See* 34 C.F.R. § 300.154(d) (federal reimbursement under IDEA based on Medicaid eligibility).

---

[17] Anna Gassman-Pines & Laura Bellows, *Food Instability and Academic Achievement: A Quasi-Experiment Using SNAP Benefit Timing*, 55 Am. Educ. Rsch. J., 897, 897–927 (2018); Lisa A. Gennetian et al., *Supplemental nutrition assistance program (SNAP) benefit cycles and student disciplinary infractions*, 90 Social Service Rev., 403, 403–433 (2016).

[18] Steven Carlson, Center on Budget and Policy Priorities, *SNAP is Linked with Improved Health Outcomes and Lower Health Care Costs* (Dec. 14, 2022), https://www.cbpp.org/research/food-assistance/snap-is-linked-with-improved-health-outcomes-and-lower-health-care-costs.

Under the Order, school districts would lose this funding for impacted students. Additionally, policies hostile to immigrants deter parents from sending their children to school due to fear of deportation or other concern for their families.[19] When that happens, schools lose attendance-based federal funding.

Similarly, many *amici* localities administer foster care programs that rely on federal Title IV-E funds that are only available for citizen and "qualified alien" children. *See* 8. U.S.C. § 1641. Reduced funding for these foster care programs would limit their effectiveness and the number of children they can serve. In both the schooling and foster care contexts, localities will have to bear the full financial burden of program operations if they are to continue to provide life-altering services to all children that need them.

### iv. The Order will Strain Local and County Safety-Net Services

Inevitably it will be states, cities, and counties that must deal with the on-the-ground consequences of reduced federally-funded health and welfare benefits for children and families. In our federal system, counties and cities provide safety-net services to uninsured, low-income, and vulnerable populations. County governments generally run public hospitals, community health centers, and free

---

[19] A 2017–18 national survey of educators found a 58% increase in absenteeism associated with increased immigration enforcement. *See* Patricia Gándara et al., *The Impact of a Broken Immigration System on U.S. Students and Schools*, Latino Policy & Politics Institute, Univ. Of Cal., Los Angeles (2023).

health clinics. Cities, counties, and states collaborate to provide homelessness services. Local education departments provide resources to high-needs students in schools. And law enforcement officials address public safety issues that rise in correlation with increases in poverty. *Amici* local governments do not have the resources to absorb the anticipated spike in demand for these services that would follow implementation of the Order. Upholding the district court's injunction strongly serves the public interest because it will prevent a flood of demand, and an inevitable strain, on local safety-net services.

### C.    Citizen Stripping Will Strain Community Cohesion

In addition to impacting health, nutrition, and economic security, stripping U.S. born children of citizenship will also damage community cohesion and cause immense mental and social strain on affected families. To start, the Order creates the dire immediate possibility that a baby born to lawfully present parents would be at risk of deportation. The resulting family separation would inevitably wreak untold havoc on families and communities. What's more, children targeted by the Order who remain in the United States will be excluded from the "priceless benefits" of citizenship. *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Over forty years ago, the Supreme Court cautioned against the creation of "a permanent caste of undocumented resident aliens . . . denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe*, 457 U.S. 202, 218–19

(1982). In unilaterally seeking to rewrite the Constitution, the Order would do exactly that. Children born as non-citizens will exist as an "underclass"—and denying them full participation in our communities will fray "the fabric of our society." *Id*. at 219, 221.

Children denied citizenship that grow up in our communities will experience stigma and social exclusion, undermining their ability to integrate. Although these children will, like their citizen peers, go to local schools, learn to speak English, internalize U.S. values, and envision their futures here, they will at the same time be excluded from core aspects of American life, including voting and, in some states, getting drivers' licenses. Scholars have documented the severe negative impacts of social exclusion and discrimination on undocumented youth in the United States, including persistent feelings of fear, stress, and shame.[20] These children will also face the threat of deportation, despite knowing no other home, the stress of which itself causes negative health outcomes.[21] When residents experience social isolation,

---

[20] *See e.g.*, Jean C. Williams, *"It's Always with You, that You're Different": Undocumented Students and Social Exclusion*, 20 J. of Poverty, 168, 168–193 (2015); Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57 Am. Behavioral Scientist, 1174, 1174–199 (2013).

[21] *See* Airin Martinez, *Household fear of deportation in relation to chronic stressors and salivary proinflammatory cytokines in Mexican-origin families post-SB 1070*, 5 SSM Population Health 188, 188–200 (2018).

exclusion, and constant stress, local governments are left to deal with the consequences, like poor educational outcomes, increased crime, and unemployment.

### D. The Order Will Hamper Recruitment Efforts, Undermining Academic Excellence and Economic Growth

Not only will the Order have devastating impacts on children born to non-citizens, but it will also likely have the intended effect of deterring at least some immigrants. The Order risks imposing a "brain drain" on localities that rely on international recruitment and retention to thrive. Any international applicant considering a job offer or an acceptance to a university in the United States may rightfully be wary of moving, even temporarily, to a country where their child would be denied benefits and potentially face harm. *Amici's* economies are bolstered by robust, competitive universities and corporations that recruit and produce great talent. According to the Brookings Institute, "The U.S. is grappling with growing labor shortages across various industries [...] [i]mmigrant labor plays a pivotal role, stabilizing our workforce and driving economic growth."[22] The Order would make it more difficult to address these needs in the labor market.

### E. The Order Will Upend Established Practices of Using Birth Certificates to Demonstrate Citizenship, Jeopardizing Access to Public Benefits, Passports, and Other Privileges for Citizens

---

[22] Brookings Institute, *Visa Outlook Explorer* https://brooking-wof-immigration -8h3.pages.dev/ (last visited Apr. 29, 2025).

On a practical level, the Order will throw into disarray the administration of public benefits programs and the provision of identity documents, and burden local governments with having to adopt new administrative systems. Over the last 150 years, federal, state, and local governments have built an administrative structure centered around the accepted fact that birth in the United States is a guarantee of citizenship.[23] The U.S. has no federal birth registry or national identification document granted at birth. Instead, states and local governments (often county health departments and recorders, in coordination with state agencies) register local births and issue birth certificates. In most cases, these local administrators forward birth registry information for U.S. born citizens to federal agencies to generate social security numbers.[24]

The administration of federally funded health and welfare benefits relies on locally issued birth certificates to demonstrate citizenship. *See, e.g.*, 7 C.F.R. § 273.2(f)(1)(vii) (birth certificates can prove identity for SNAP benefits, among other acceptable identity documents such as a driver's license); 42 U.S.C. § 1396b(x)(3)(C) (birth certificates can be submitted to prove Medicaid eligibility when documentary evidence of citizenship is required). Similarly, U.S. born citizens

---

[23] *See generally* Angela R. Remus, *Caught Between Sovereigns: Federal Agencies, States, and Birthright Citizens*, 34 Stan. L. & Pol'y Rev. 225 (2023).

[24] *See* Social Security Administration, *How long does it take to get my child's Social Security number?*, SSA.GOV (Apr. 28, 2025), https://www.ssa.gov/faqs/en/questions/KA-01969.html.

must also submit birth certificates when applying for a passport. 22 C.F.R. § 51.42. A birth certificate is also a primary form of evidence accepted to prove U.S. citizenship when applying for a social security card. 20 C.F.R. § 422.107(d).

Under current regulations, birth certificates submitted for federal purposes are not required to contain any information about a newborn child's parents' immigration status. *See, e.g.,* 22 C.F.R. § 51.42(a) (specifying the information that must be included on a birth certificate submitted by a U.S. born passport applicant as proof of citizenship).[25] Local agencies involved in registering births and issuing birth certificates thus have no reason to, and do not, collect information about parents' immigration status.

Accordingly, if the Executive Order goes into effect, birth certificates as currently issued will no longer be adequate for demonstrating federal benefits eligibility or entitlement to federal identity documents. With respect to benefits administration, states and localities will be left to grapple with the administrative consequences, given that the federal government delegates the administration of most federally funded public benefits programs to the states, which in turn delegate

---

[25] Similarly, the U.S. Standard Certificate of Live Birth, a template provided by the Center for Disease Control, does not contain fields for parents' immigration status. *U.S. Standard Certificate of Live Birth,* Centers for Disease Control (Nov. 2003), https://www.cdc.gov/nchs/data/dvs/birth11-03final-acc.pdf.

to counties in some cases.[26] States and local governments will struggle to administer benefits programs under the Order, having no immediate means of determining and demonstrating the U.S. citizenship of babies born in their jurisdictions.

The consequences will be two-fold. First, at least initially, benefits administrators will be *unable* to prove newborn residents' eligibility for benefits programs and eligible citizens may be denied essential benefits. Second, whatever new systems are established for determining eligibility, a substantial administrative burden will surely fall on states and local governments.[27] Local governments will likely need to develop new processes and procedures to comply with new federal rules. Although the Order provides no information about how citizenship will be confirmed for U.S. born children, it is plausible that the process for issuing a birth certificate itself will need to be overhauled. State and local agencies involved in newborn birth registration may be called upon to verify and substantiate information

---

[26] For example, ten states delegate to counties responsibility for administering SNAP benefits, representing 34.3% of program participants. National Association of Counties, *Policy Brief: Supplemental Nutrition Assistance Program (SNAP) Reauthorization and Appropriations (*Feb. 13, 2025), https://www.naco.org/resources/supplemental-nutrition-assistance-program-snap-reauthorization-and-appropriations.

[27] *See generally* Jacob Hamburger, *The Consequences of Ending Birthright Citizenship*, Wash. U. L. Rev. (forthcoming 2025), *available at* SSRN: https://ssrn.com/abstract=5106022 (discussing the "bureaucratic consequences" of the Executive Order as related to the issuance of passports, social security numbers, and federal and state benefits).

about parents' citizenship and/or immigration status. The burden of designing and implementing any such reforms, and dealing with pitfalls that inevitably emerge, will be immense. Whatever form the administrative changes take, they will require significant time and expense at every stage, including design, training, and implementation. The practical consequences of upending benefits determinations will be felt without delay nationwide if the preliminary injunction is reversed, starting with the first baby born on U.S. soil, whether to citizen parents or not. With nearly 10,000 children born each day in the United States, chaos will rapidly snowball.

III.    **NATIONWIDE RELIEF IS PROPER AND ESSENTIAL TO PROTECT THE PUBLIC INTEREST AND ENSURE UNIFORMITY IN CITIZENSHIP ELIGIBILITY**

As these examples illustrate, the impacts of the Order on economic security, community stability, and public health will be felt not just by members of the plaintiff organizations in this case, but by residents in diverse circumstances in every corner of the country, as well as by the local governments that serve them. Given the national nature of the harm, the district court did not abuse its discretion in awarding nationwide relief and applying the order to non-parties. As this Court has explained, "the Supreme Court [has] affirmed the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants." *Roe v. Dep't of Def.*, 947 F.3d 207, 231–33 (4th

Cir. 2020). Furthermore, a nationwide injunction may be particularly "appropriate when the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (citing *Roe,* 947 F.3d at 232-33.) This jurisprudence is consistent the Supreme Court's instruction that "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Nationwide injunctive relief is particularly appropriate in this case because the Order seeks to redefine (contrary to Supreme Court precedent and over a century of Executive Branch practice) which children born in this country get to be citizens, an issue of indisputable national significance. The Supreme Court has recognized federal immigration law to be a "comprehensive and unified system." *Arizona v. United States*, 567 U.S. 387, 401 (2012). This Circuit has similarly described immigration law as "an area with extensive federal presence." *United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013).

Given the unique character of immigration law, several circuits courts have found a need for national uniformity in this area of law and, on that basis, upheld nationwide injunctions in cases involving immigration policies. For example, the Fifth Circuit denied a motion to stay a nationwide preliminary injunction preventing

implementation of policies that would have provided legal presence to immigrant parents of U.S. citizens and lawful permanent residents and would have expanded the DACA program. *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015), *as revised* (Nov. 25, 2015). The Fifth Circuit reasoned that a universal injunction was appropriate in that case because "the Constitution requires a *uniform* Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*; and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Id.* (emphasis in original) (internal quotations and citations omitted). The Supreme Court, in an evenly divided ruling, affirmed that decision. *United States v. Texas*, 579 U.S. 547, 548 (2016). The Ninth Circuit has also upheld nationwide preliminary injunctions in immigration cases based on the need for uniformity in immigration policy. *See, e.g., E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021).

The need for a nationwide permanent injunction to maintain uniform rules governing birthright citizenship while the constitutionality of the Citizenship Stripping Order is litigated is plain. Blocking implementation of the Order nationwide is essential to maintain uniform rules governing citizenship and is consistent with over 100 years of precedent and practice. As this Court recognized when it denied the government's application for a stay of the injunction, "limiting the injunction would make the citizenship of babies turn on the happenstance of their

parents' membership in the plaintiff organizations, causing 'inequitable treatment' in an area in which uniformity is needed." ECF 29 at 4 (citing *HIAS,* 985 F.3d at 326-327). Such a result would be incoherent and fundamentally at odds with the guarantee of national citizenship provided in the Fourteenth Amendment. Many of *amici*'s residents are not members of the plaintiff organizations. Yet all of *amici*'s communities, across every state where they are located, will suffer greatly if the Order is allowed to go into effect.

## CONCLUSION

President Trump's Citizenship Stripping Order brazenly violates the Fourteenth Amendment and threatens to unleash turmoil in *amici*'s communities, injuring countless children and families. For these reasons and for the reasons provided by Appellees, *Amici* Local Governments and Government Officials respectfully request that this Court uphold the district court's injunction in full.

Respectfully submitted,

*/s/ Elaine Poon*
Elaine Poon
Jonathan B. Miller
Katherine Courtney
Zarah Rahman
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788
jon@publicrightsproject.org

*Attorneys for Amici Curiae*

Dated: June 6. 2025

28

**ADDITIONAL COUNSEL**

YIBIN SHEN
City Attorney
2263 Santa Clara Avenue, Room 280
Alameda, CA 94501
*Attorney for the City of Alameda,*
*California*

DONNA R. ZIEGLER
County Counsel
1221 Oak Street
Oakland, CA 94612
*Counsel for the County of Alameda,*
*California*

ROSALYN GUY-MCCORKLE
Allegheny County Solicitor
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
*Attorney for Allegheny County,*
*Pennsylvania*

ATLEEN KAUR
City Attorney
Guy C. Larcom City Hall
301 East Huron, 3rd Floor
Ann Arbor, MI 48104
*Attorney for the City of Ann Arbor,*
*Michigan*

EBONY M. THOMPSON
City Solicitor
Baltimore City Department of Law
100 North Holliday Street
Baltimore, MD 21202
*Attorney for the City of Baltimore,*
*Maryland*

ADAM CEDERBAUM
Corporation Counsel
One City Hall Square, Room 615
Boston, MA 02201
*Attorney for the City of Boston,*
*Massachusetts*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of
Chicago
121 North LaSalle Street, Room 600
Chicago, IL 60602
*Attorney for the City of Chicago,*
*Illinois*

ZACHARY M. KLEIN
Columbus City Attorney
77 N. Front Street, 4th Floor
Columbus, OH 43215
*Attorney for the City of Columbus,*
*Ohio*

CARLOS PABELLON
Corporation Counsel
DAVID R. GAULT
Deputy Corporation Counsel
Room 419, City-County Building
210 Martin Luther King, Jr.,
Boulevard
Madison, WI 53703
*Attorneys for County of Dane,*
*Wisconsin*

29

KATIE MCLOUGHLIN
Acting City Attorney
1437 Bannock Street
Denver, CO 80202
*Attorney for the City and County of Denver, Colorado*

KIMBERLY M. REHBERG
City Attorney
101 City Hall Plaza, Suite 2200
Durham, NC 27701
*Attorney for the City of Durham, North Carolina*

CHRISTINA SANCHEZ
El Paso County Attorney
320 South Campbell Street, Suite 200
El Paso, TX 79901
*Attorney for the County of El Paso, Texas*

CHRISTIAN D. MENEFEE
Harris County Attorney's Office
1019 Congress Street
Houston, TX 77002
*Attorney for Harris County, Texas*

LEESA MANION
Prosecuting Attorney
Chinook Building
401 Fifth Avenue Suite 800
Seattle, WA 98104
*Prosecuting Attorney for Martin Luther King, Jr. County, Washington*

MICHAEL HAAS
City Attorney
210 Martin Luther King Jr. Blvd., Room 401
Madison, WI 53703
*Attorney for the City of Madison, Wisconsin*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive,
San Rafael, CA 94903
*Attorney for the County of Marin, California*

KRISTYN ANDERSON
City Attorney
350 South Fifth Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis, Minnesota*

SUSAN K. BLITCH
County Counsel
188 West Alisal Street, 3rd Floor
Salinas, CA 93901
*Attorney for the County of Monterey, California*

JOHN P. MARKOVS
Montgomery County Attorney
101 Monroe Street
Rockville, MD 20850
*Attorney for Montgomery County, Maryland*

PATRICIA KING
Corporation Counsel
Office of New Haven Corporation
    Counsel
165 Church Street, 4th Floor
New Haven, CT 06510
*Attorney for the City New Haven,*
    *Connecticut*

MURIEL GOODE-TRUFANT
Corporation Counsel
100 Church Street
New York, NY 10007
*Counsel for the City of New York,*
    *New York*

ALAN SEEWALD
City Solicitor
One Roundhouse Plaza, Suite 304
Northampton, MA 01060
*Attorney for the City of*
    *Northampton, Massachusetts*

LAURA CONOVER
County Attorney
Pima County Attorney's Office
32 North Stone Avenue
Tucson, AZ 85745
*Attorney for Pima County, Arizona*

KRYSIA KUBIAK
City Solicitor and Chief Legal Officer
414 Grant Street
Pittsburgh, PA 15219
*Attorney for the City of Pittsburgh,*
    *Pennsylvania*

ROBERT TAYLOR
City Attorney
1221 SouthWest Fourth Avenue,
    Room 430
Portland, OR 97204
*Attorney for the City of Portland,*
    *Oregon*

JEFFREY DANA
City Solicitor
444 Westminster Street, Suite. 220
Providence, RI 02903
*Attorney for the City of Providence,*
    *Rhode Island*

SUSANA ALCALA WOOD
City Attorney
915 I Street
Sacramento, CA 95814
*Attorney for City of Sacramento,*
    *California*

LYNDSEY M. OLSON
City Attorney
400 City Hall & Court House
15 West Kellogg Boulevard
Saint. Paul, MN 55102
*Attorney for the City of St. Paul,*
    *Minnesota*

HEATHER FERBERT
San Diego City Attorney
1200 Third Ave., Suite 1100
San Diego, CA 92101
*Attorney for the City of San Diego,*
    *California*

TONY LOPRESTI
County Counsel
70 West Hedding Street East Wing,
   9th Floor
San José, CA 95110
*Attorney for the County of Santa
   Clara, California*

ERIN K. MCSHERRY
City Attorney
200 Lincoln Avenue
Santa Fe, NM 87501
*Counsel for the City of Santa Fe, New
   Mexico*

DOUGLAS T. SLOAN
City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
*Attorney for the City of Santa Monica,
   California*

MIKE RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
*Attorney for the City of Tucson,
   Arizona*

LAUREN LANGER
City Attorney
Best Best & Krieger LLP
300 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
*Attorney for City of West Hollywood,
   California*

## APPENDIX A – List of *Amici Curiae*

## Local Governments

City of Alameda, California

County of Alameda, California

Allegheny County, Pennsylvania

City of Ann Arbor, Michigan

City of Austin, Texas

City of Baltimore, Maryland

City of Boston, Massachusetts

City of Chicago, Illinois

City of Columbus, Ohio

Dane County, Wisconsin

City and County of Denver, Colorado

City of Durham, North Carolina

El Paso County, Texas

City of Evanston, Illinois

Harris County, Texas

King County, Washington

City of Madison, Wisconsin

Marin County, California

City of Minneapolis, Minnesota

County of Monterey, California

Montgomery County, Maryland

City of New Haven, Connecticut

City of New York, New York

City of Northampton, Massachusetts

Pima County, Arizona

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Providence, Rhode Island

City of Sacramento, California

City of St. Paul, Minnesota

City of San Diego, California

County of Santa Clara, California

City of Santa Fe, New Mexico

City of Santa Monica, California

City of Tucson, Arizona

City of West Hollywood, California

**Local Government Leaders**

Josh Acevedo
*District 2 City Representative, City of El Paso, Texas*

34

Brenda Adams
*Supervisor, Town of Canaan, New York*

Elizabeth Alcantar
*Mayor, City of Cudahy, California*

Luis Alejo
*Supervisor, Monterey County, California*

Soli Alpert
*Rent Stabilization Board Chair, City of Berkeley, California*

Miguel Arredondo
*Consolidated Independent School District Trustee At-Large,*
*City of San Marcos, Texas*

Valarie Bachelor
*Unified School District Board Director, City of Oakland, California*

Brian Beck
*Councilmember, City of Denton, Texas*

Sarah Benatar
*Treasurer, Coconino County, Arizona*

Celina Benitez
*Mayor, City of Mount Rainier, Maryland*

Ravinder Bhalla
*Mayor, City of Hoboken, New Jersey*

Justin Bielinski
Supervisor, Milwaukee County, Wisconsin

Xouhoa Bowen
*Vice Mayor, City of San Leandro, California*

Lisa Brown
*Clerk/ Register of Deeds, Oakland County, Michigan*

35

Lisa Brown
*Mayor, City of Spokane, Texas*

Bill Burgess
*Clerk, Marion County, Oregon*

Jackie Butler
*Precinct 1 Commissioner, El Paso County, Texas*

Barb Byrum
*Clerk, Ingham County, Michigan*

Chris Canales
*Councilmember, City of El Paso, Texas*

Michael Chameides
*Supervisor, Columbia County, New York*

John Clark
*Mayor, Town of Ridgway, Colorado*

Domonique Clemons
*Clerk and Register of Deeds, Genesee County, Michigan*

Jeff Corpora
*Councilmember, Northampton County, Pennsylvania*

Christine Corrado
*Councilmember, Town of Brighton, New York*

Becky Corran
*Councilmember, City of Las Cruces, New Mexico*

Mindy Cuppy
*Clerk, City of Sacramento, California*

Kara Davis
*District Attorney, Wasco County, Oregon*

Olgy Diaz
*Councilmember, City of Tacoma, Washington*

Roger Dickinson
*District 2 Councilmember, City of Sacramento, California*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Michael Dougherty
*District Attorney, Boulder County, Colorado*

Dennis Michael Dvorchak
*Supervisor, Town of Hillsdale, New York*

Jack Eckblad
*District 4 Board Supervisor, Milwaukee County, Wisconsin*

Saundra Edwards
*School Committee Member, City of Lawrence, Massachusetts*

Diane M. Ellis-Marseglia
*Commissioner and Vice-Chair, Bucks County, Pennsylvania*

Scott Esserman
*At-Large Public School Board Member, City of Denver, Colorado*

Johnny Flores
*School Board Trustee, City of Hays, Texas*

Nikki Fortunato Bas
*Supervisor, Alameda County, California*

Brenda Gadd
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Ed Gainey
*Mayor, City of Pittsburgh, Pennsylvania*

Adrian Garcia
*Precinct 2 Commissioner, Harris County, Texas*

Heidi Garrido
*Councilmember, City of Hopkins, Minnesota*

Alyssa Garza
*Deputy Mayor Pro Tem, City of San Marcos, Texas*

Caroline Gomez-Tom
*District 14 Board Supervisor, Milwaukee County, Wisconsin*

Lorenzo Gonzalez
*Place 5 Councilmember, City of San Marcos, Texas*

Eric Guerra
*District 6 Councilmember, City of Sacramento, California*

Jonathan Guzmán
*School Committee Vice-Chair, City of Lawrence, Massachusetts*

Beau Harbin
*Legislator and Democratic Minority Leader, Cortland County, New York*

Robert J. Harvie, Jr.
*Commissioner and Chair, Bucks County, Pennsylvania*

Bear Heiser
*Mayor Pro Tem, City of Kyle, Texas*

Michele Hirsch
*Adlerperson, City of Kingston, New York*

Jani Hitchen
*Councilmember, Pierce County, Washington*

Iliana Holguin
*Commissioner, El Paso County, Texas*

Stephanie Howse-Jones
*Councilmember, City of Cleveland, Ohio*

Susan Hughes-Smith
*Legislator, Monroe County, New York*

Debbie Ingalsbe
*Precinct 1 Commissioner, Hays County, Texas*

Christopher Jaramillo
*School Board President, Norristown Area School District, Pennsylvania*

Clay Lewis Jenkins
*Judge, Dallas County, Texas*

Lisa Kaplan
*Councilmember, City of Sacramento, California*

Lawrence Kestenbaum
*Clerk and Register of Deeds, Washtenaw County, Michigan*

Lisa Lawitzke
*Clerk, Township of Bellevue, Michigan*

Drew Lawrence
*Councilmember, New Cumberland County, New Jersey*

Jerald Lentini
*Director, Town of Manchester, Connecticut*

Sarah Leonardi
*School Board Member, Broward County,* Florida

Jessie Lopez
*Councilmember, City of Santa Ana, California*

Stephanie Loredo
*Governing Board Member, Culver City Unified School District, California*

Quinton D. Lucas
*Mayor, City of Kansas City, Missouri*

Joseph Makhlouf
*Alderperson, City of Wauwatosa, Wisconsin*

Caity Maple
*District 5 Councilmember, City of Sacramento, California*

Adrian Mapp
*Mayor, City of Plainfield, New Jersey*

Alexander Marion
*Auditor, City of Syracuse, New York*

Randall Martin
*1st Ward Supervisor, City of Hudson, New York*

Juan Miguel Martinez
*Supervisor, Milwaukee County, Wisconsin*

Josh Maxwell
*Commissioner and Board Chair, Chester County, Pennsylvania*

Yasmine-Imani McMorrin
*Councilmember, City of Culver, California*

Jessica McParlin
*Chief Deputy Treasurer, Sandoval County, New Mexico*

Carolina Mejia
*Commissioner, Thurston County, Washington*

Ryan Mello
*Executive, Pierce County, Washington*

William Moehle
*Supervisor, Town of Brighton, New York*

*Marian Moskowitz*
*Commissioner, Chester County, Pennsylvania*

Steve Mulroy
*District Attorney, County of Shelby, Tennessee*

Jessee Muñiz-Poland
*Director, Town of Manchester, Connecticut*

Omar Narvaez
*District 6 Councilmember, City of Dallas, Texas*

Anne O'Connor
*Board Supervisor, Milwaukee County, Wisconsin*

Myra Ortiz
*School Committee Member, City of Lawrence, Massachusetts*

Sean Parker
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Dontae Payne
*Mayor, City of Olympia, Washington*

Isabel Piedmont-Smith
*Councilmember, City of Bloomington, Indiana*

Veronica Pillar
*Legislator, Tompkins County, New York*

Phil Pluckebaum
*District 4 Councilmember, City of Sacramento, California*

Jacqueline "Jack" Porter
*Commissioner, City of Tallahassee, Florida*

Delishia Porterfield
*Councilmember At Large, Metropolitan Nashville & Davidson County, Tennessee*

41

Zohaib "Zo" Qadri
*Councilmember, City of Austin, Texas*

Jaime Resendez
*Councilmember, City of Dallas, Texas*

Satya Rhodes-Conway
*Mayor, City of Madison, Wisconsin*

Ryan Richardson
*City Attorney, City of Oakland, California*

Lenin Roa
*School Committee Member, City of Lawrence, Massachusetts*

Michael Rodriguez
*22nd Ward Alderperson, City of Chicago, Illinois*

Miguel Sanchez
*Councilmember, City of Providence, Rhode Island*

Jasmin Santana
*Councilmember, City of Cleveland, Ohio*

Dawn Marie Sass
*Clerk/Deputy Treasurer, Town of Exeter, Wisconsin*

Eli Savit
*Prosecuting Attorney, Washtenaw County, Michigan*

Gina-Louise Sciarra
*Mayor, City of Northampton, Massachusetts*

Sandra Sepulveda
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Kony Serrano Portillo
*Councilmember, Town of Edmonston, Maryland*

David Stout
*Precinct 2 Commissioner, El Paso County, Texas*

Zulfat Suara
*Councilmember at Large, Metropolitan Nashville & Davidson County, Tennessee*

Clifford Thompson
*Unified School Board Director, City of Oakland, California*

Terry Vo
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Anissa Welch
*Mayor, City of Milton, Wisconsin*

Ginny Welsch
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Robin Wilt
*Councilmember, Town of Brighton, New York*

Gregory Young
*Supervisor, Fulton County, New York*

Estevan Zarate
*Independent School District Trustee, City of Round Rock, Texas*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This amicus brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 29(a)(5) because it contains 6,125 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word 365 Times New Roman 14-point font.

*/s/ Elaine Poon*
Elaine Poon

Dated: June 6, 2025

44

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Elaine Poon*
Elaine Poon

Dated: June 6, 2025