No. 25-1153

# In the United States Court of Appeals for the Fourth Circuit

CASA, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, C/O ATTORNEY GENERAL OF THE UNITED STATES, ET AL.,

*Defendants-Appellants.*

On appeal from the United States District Court for the District of Maryland

## BRIEF OF ORIGINALIST SCHOLARS AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

Brendan Benedict
BENEDICT LAW GROUP PLLC
515 Madison Avenue, 31st Floor
New York, NY 10022
Phone: (212) 287-9501
brendan@benedictlawgroup.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... ii

INTEREST OF AMICI CURIAE ..................................................1

SUMMARY OF ARGUMENT .....................................................2

ARGUMENT ...............................................................................3

   I.   The Original Public Meaning of the Fourteenth Amendment Guarantees
      Citizenship to All People Born in and Governed by the United States. ...........3

      A. The English Common Law Followed This Rule. ........................................5

      B. Early American Courts Followed This Rule. ..............................................6

      C. The Civil Rights Act of 1866 Reflects This Rule. ....................................11

      D. Evidence from Ratification Supports This Rule. ......................................18

  II.  The Government's Contrary Contentions Fail. ...............................................22

      A. Immigration Restrictions Predate Ratification. ........................................22

      B. The Government's Post-Ratification Commentary Lacks Credibility. ....24

      C. Native-Born Children of Aliens Are Citizens. ........................................25

CONCLUSION ...........................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Calvin's Case*,
77 Eng. Rep. 377 (K.B. 1608) ............................................................5, 6

*Dred Scott v. Sandford*,
60 U.S. 393 (1857) ...................................................................... 8, 22

*Ex parte Ah Pong*,
19 Cal. 106 (1861) ..........................................................................23

*Goodell v. Jackson*,
20 Johns. 693 (N.Y. 1823) ..............................................................8

*Inglis v. Trs. of Sailor's Snug Harbor*,
28 U.S. (3 Pet.) 99 (1830)................................................................10

*Kilham v. Ward*,
2 Mass. 236 (1806) ...........................................................................7

*Lin Sing v. Washburn*,
20 Cal. 534 (1862) ..........................................................................23

*Lynch v. Clarke*,
1 Sand. Ch. 583, 1844 N.Y. Misc. LEXIS 1 (N.Y. 1844)............................6, 8, 11

*Op. of the Justices of Supreme Judicial Court*,
44 Me. 505, 1857 Me. LEXIS 151 (1857) ...........................................8

*Payton v. New York*,
445 U.S. 573 (1980) ..........................................................................5

*Plessy v. Ferguson*,
163 U.S. 537 (1896) .........................................................................24

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ..................................................................... 16, 19

*State v. Manuel*,
   20 N.C. 144 (1838) ...................................................................7

*The Schooner Exch. v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812) ...........................................11

*United States v. Rhodes*,
   27 F. Cas. 785 (C.C.D. Ky. 1866)..........................................8

*United States v. Vaello-Madero*,
   596 U.S. 159 (2022) ................................................................9

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ..................................................... 3, 25, 26

*Worcester v. Georgia*,
   31 U.S. (6 Pet.) 515 (1832)....................................................9

**Statutes**

Civil Rights Act of 1866,
   ch. 31, § 1, 14 Stat. 27 .........................................................11

Indian Citizenship Act of 1924,
   ch. 233, 43 Stat. 253 (codified as amended at 8 U.S.C. § 1401(b))....................20

**Treatises**

1 William Blackstone, *Commentaries* (1765).............................................6

Edward Coke, *Institutes* (1797) ...........................................................6

2 James Kent, *Commentaries* (6th ed. 1848).......................................6, 7

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic*
   (Boston, Hilliard, Gray & Co. 1834)..............................................9, 10

1 Zephaniah Swift, *A System of the Laws of the State of Connecticut* (1795)...........7

**Books, Articles, and Reports**

Kerry Abrams, *Polygamy, Prostitution, and the Federalization of Immigration Law*, 105 Colum. L. Rev. 641 (2005) ................................................................22

Randy E. Barnett & Evan Bernick, *The Original Meaning of the Fourteenth Amendment: Its Letter and Spirit* (Harvard 2021) .............................. 1, 13, 18, 19

Bethany R. Berger, *Birthright Citizenship on Trial:* Elk v. Wilkins *and* United States v. Wong Kim Ark, 37 Cardozo L. Rev. 1185 (2016) ................................20

Maggie Blackhawk, *Foreword: The Constitution of American Colonialism*, 137 Harv. L. Rev. 1 (2023) ................................................................ 14, 20

James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367 (2006) ................. 3, 25

Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 Akron L. Rev. 719 (2012)..........................................24

Charles J. McClain, *Chinese Immigrants in the California Supreme Court: The Earliest Civil Cases*, 19 Cal. L. Hist. 73 (2024)....................................................23

Bernadette Meyler, *The Gestation of Birthright Citizenship, 1868-1898 States' Rights, the Law of Nations, and Mutual Consent*, 15 Geo. Immigr. L.J. 519 (2001)..............................................................................................................24

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405 (2020)........................................................................................... 4, 7, 10, 15, 21

William Rawle, *A View of the Constitution of the United States of America* (2d ed. 1829) ................................................................................................................7

Hon. Antonin Scalia, Address Before the Attorney General's Conference on Economic Liberties (June 14, 1986), *in* Original Meaning Jurisprudence: A Sourcebook (U.S. Dep't of Justice ed., 1987) ......................................................16

Peter H. Schuck, *Immigration*, *in* Understanding America: The Anatomy of An Exceptional Nation (Peter H. Schuck & James Q. Wilson, eds. 2008)..................4

iv

Mark Shawhan, *"By Virtue of Being Born Here": Birthright Citizenship and the Civil Rights Act of 1866*, 15 Harv. Latino L. Rev. 201 (2012), *available at*: https://bit.ly/4mPbmp3 ...........................................................................14

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351 (2010).................................. 13, 17

Jed H. Shugerman, *An Originalist Case for Birthright Citizenship of Unlawful Immigrants' Children: 1850s-1860s Anti-Chinese Restrictions as Categorical Context*, *available at*: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5278199 (June 1, 2025) ..................................................................................... 1, 22, 23, 24

Jed H. Shugerman, *The People's Courts: Pursuing Judicial Independence in America* (2012) .......................................................................................1

M. St. Clair Clarke & David A. Hall, *Cases of Contested Elections in Congress, from the Year 1789 to 1834, Inclusive* (1834) .......................................7

Noah Webster, *An American Dictionary of the English Language* (Chauncy A. Goodrich & Noah Porter eds., Springfield G. & C. Merriam 1865)....................4

William Yates, *Rights of Colored Men to Suffrage, Citizenship and Trial by Jury* (Philadelphia: Merrihew & Gunn 1838) ............................................26

## Other Authorities

Cong. Globe, 39th Cong., 1st Sess. (1866)...................................................... passim

Andrew Johnson, *Veto Message on Civil Rights Legislation* (Mar. 27, 1866), *available at*: https://bit.ly/4dPdnOa ...................................................13

U.S. Dep't of State, 8 *Foreign Affairs Manual* § 301.1-1(d) (2018) ......................25

## INTEREST OF AMICI CURIAE[1]

**Evan Bernick** is an Associate Professor of Law at Northern Illinois University College of Law. He is a constitutional law scholar committed to the original public meaning of the Constitution. He has co-authored a book on the originalist interpretation of the Fourteenth Amendment, closely studying the ratification debates. *See* Randy E. Barnett & Evan Bernick, *The Original Meaning of the Fourteenth Amendment: Its Letter and Spirit* (Harvard 2021).

**Jed Handelsman Shugerman** is a Professor of Law at Boston University. He subscribes to the interpretation of the Constitution based on original public meaning (originalism). His expertise on the Reconstruction era is demonstrated in his book *The People's Courts: Pursuing Judicial Independence in America* (2012) and a series of articles on the Department of Justice and the rise of modern administrative law. This brief summarizes his research in *An Originalist Case for Birthright Citizenship of Unlawful Immigrants' Children: 1850s-1860s Anti-Chinese Restrictions as Categorical Context*, *available at*: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5278199 (June 1, 2025).

---

[1] All parties consented to the timely filing of this brief. No counsel for any party authored this brief in whole or part, and no person besides *amici curiae* and their counsel contributed money intended to fund the brief's preparation or submission.

## SUMMARY OF ARGUMENT

The Government's proposition that the citizenship of someone born in the United States turns on the "allegiance" of the child's parents at the time of birth, which requires a parent to both be domiciled in the United States and express allegiance in some additional way (*see* Gov't Br. 34-35), is contrary to the original public meaning of the Fourteenth Amendment.

*First*, the common law in England before the Founding, early American caselaw and commentary, the materials surrounding the adoption of the Civil Rights Act of 1866, and the record of the drafting of the Fourteenth Amendment refute the Government's historical evidence. All credible sources affirmed the general rule that birth within a jurisdiction makes one a citizen of that jurisdiction, regardless of parental citizenship status.

*Second*, this evidence of the original public meaning of the Fourteenth Amendment disproves several of the links in the Government's chain of reasoning. The Government claims that the children of illegal aliens cannot be citizens when born in the United States because "illegal alien" as a category post-dates the Fourteenth Amendment's ratification. This assertion is historically inaccurate. In the two decades before the ratification of the Fourteenth Amendment, federal and state laws created categories of unlawful immigrants, targeting Asian immigrants and Chinese nationals in particular. Yet the

congressional debates indicate an original understanding that the "subject to the jurisdiction" text would grant citizenship to the children of Chinese immigrants.

Similarly, the Government relies on post-ratification commentary that the Supreme Court already rejected. With narrow exceptions not relevant here—for the children of foreign diplomats (and their staff), foreign heads of state, and invading military forces—children born in territory governed by the United States are born citizens no matter the legal status of their parents.

## ARGUMENT

I.  **The Original Public Meaning of the Fourteenth Amendment Guarantees Citizenship to All People Born in and Governed by the United States.**

The Citizenship Clause guarantees citizenship to all persons born in and subject to the jurisdiction of the United States. This guarantee of birthright citizenship "must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution." *United States v. Wong Kim Ark*, 169 U.S. 649, 655 (1898). As Judge Ho summarized in his account of the Fourteenth Amendment's Citizenship Clause, the Framers made clear that the Clause's language conveys "the longstanding English common law doctrine of *jus soli*, or citizenship by place of birth." James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367, 369 (2006). Even scholars advancing a contrary

3

view, chief among them Peter Schuck, admit the accepted rule: "Regardless of the parents' legal status, a child born on American soil becomes an American citizen at the moment of birth under the rule of *jus soli* (law of the soil) . . . which dates back to the sixteenth-century English common law". Peter H. Schuck, *Immigration*, *in* Understanding America: The Anatomy of An Exceptional Nation 341, 358-59 (Peter H. Schuck & James Q. Wilson, eds. 2008).

The Citizenship Clause uses language familiar to the ratifying public, with settled ordinary meanings. *See* Noah Webster, *An American Dictionary of the English Language* 732 (Chauncy A. Goodrich & Noah Porter eds., Springfield G. & C. Merriam 1865) (defining "jurisdiction" as the "[p]ower of governing or legislating", "the power or right of exercising authority", the "limit within which power may be exercised", or "extent of power or authority"); *see also* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 440 (2020) (stating that it "does not appear that there were competing definitions of 'subject to the jurisdiction' in the pre-Amendment period"). But the Framers did not rely on dictionaries in explaining what this text meant. They cited treatises and cases, praising some and criticizing others. They expounded concepts that are traceable to the earliest days of the common law. The legal community and the public following the debates would have understood the reference to "jurisdiction" to

mean subject to governance—and as a result, to mean that children of noncitizens who are born in and governed by the United States are citizens.

Each of (a) the English common law, (b) early American jurisprudence, (c) materials surrounding the Civil Rights Act of 1866, and (d) evidence from the drafting and ratification of the Fourteenth Amendment confirms that all people born in and governed by the United States are U.S. citizens.

### A.    The English Common Law Followed This Rule.

Start with Lord Coke, who was "widely recognized by the American colonists as the greatest authority of his time on the laws of England". *Payton v. New York*, 445 U.S. 573, 593-94 & n.36 (1980) (cleaned up) (collecting surveys). In the foundational *Calvin's Case*, Lord Coke, then Chief Justice of the Common Pleas, spoke of a temporary allegiance arising from a foreigner's fleeting presence in the realm which would make that person's child a natural-born subject. *See Calvin's Case*, 77 Eng. Rep. 377, 379, 384 (K.B. 1608). The opinion discussed the hypothetical of a Frenchman who came to England "in amity with the King" but then joined with Englishmen in treason; he would be subject to trial in England for the crime. *Id*. That's because "he owed to the King local obedience, that is, so long as he was within the King's protection; which local obedience being *but momentary and uncertain*, is yet strong enough to make a natural subject, *for if he hath issue here, that issue is (g) a natural born subject*". *Id.* (emphases added).

This proposition had an even older vintage as "settled law in the time of Littleton, who died in 1482." *Lynch v. Clarke*, 1 Sand. Ch. 583, 1844 N.Y. Misc. LEXIS 1, at *11 (N.Y. 1844). On the eve of the Founding, Blackstone stated the same rule: "The children of aliens, born here in England, are, generally speaking, natural-born subjects, and entitled to all the privileges of such." 1 William Blackstone, *Commentaries* *354, *361-62 (1765).

Coke's opinion identifies one exception to this rule: children born to enemy invaders in hostile occupation of the sovereign's territory are not citizens. *See Calvin's Case*, 77 Eng. Rep. at 399. Coke separately recognized that ambassadors and their families were governed by the law of nations when residing outside their home countries. *See* 4 Edward Coke, *Institutes* *153 (1797). As a result, although birthright citizenship was "the rule of the common law, without any regard or reference to the political condition or allegiance of" the child's parents, there was an "exception [for] the children of ambassadors, who are in theory born within the allegiance of the foreign power they represent." 2 James Kent, *Commentaries* 38 n.a (6th ed. 1848).

### B. Early American Courts Followed This Rule.

Early American commentators and courts agreed that children of foreigners born in the United States were citizens. In the first session of Congress, James Madison called it "an established maxim that birth is a criterion of

allegiance", which "derives its force sometimes from place, and sometimes from parentage; but in general, place is the most certain criterion", as it is in the United States. Ramsey, 109 Geo. L.J. at 414 (quoting M. St. Clair Clarke & David A. Hall, *Cases of Contested Elections in Congress, from the Year 1789 to 1834, Inclusive* 33 (1834)). Treatises of American law also applied the common-law rule. *See id.* (citing the following sources); *see, e.g.*, 1 Zephaniah Swift, *A System of the Laws of the State of Connecticut* 163, 167 (1795) ("The children of aliens, born in this state, are considered as natural born subjects, and have the same rights with the rest of the citizens."); William Rawle, *A View of the Constitution of the United States of America* 86 (2d ed. 1829) ("[E]very person born within the United States . . . whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution".); Kent, *supra*, at 38 n.a.

Other antebellum and pre-ratification decisions were of a piece:

- "The doctrine of the common law is, that every man born within its jurisdiction is a subject of the sovereign of the country where he is born". *Kilham v. Ward*, 2 Mass. 236, 264-65 (1806) (seriatim op. of Sewall, J.);

- "Whatever distinctions may have existed in the Roman law between citizens and free inhabitants, they are unknown to our institutions. Before our Revolution all free persons born within the dominions of the king of Great Britain, whatever their colour or complexion, were native born British subjects—those born out of his allegiance were aliens. . . . [Thus,] all free persons born within the State are born citizens of the State." *State v. Manuel*, 20 N.C. 144, 24-25 (1838);

7

- There is "no doubt, but that by the law of the United States, every person born within the dominions and allegiance of the United States, whatever were the situation of his parents, is a natural born citizen. . . . [T]he general understanding of the legal profession, and the universal impression of the public mind . . . is that birth in this country does of itself constitute citizenship. . . . No one asks [a voter] whether his parents were citizens or were foreigners. It is enough that *he was born here*, whatever were the *status* of his parents. . . .The universality of the public sentiment in this instance . . . . confirms the position that the adoption of the Federal Constitution wrought no change in [the common law] principle." *Lynch*, 1844 N.Y. Misc. LEXIS at *55-57 (1844) (emphases in original);

- "And as no person born within the jurisdiction can avoid this allegiance [to the sovereign] . . . . But with th[e] exception [of Indian Tribes], every person born within our territorial limits owes this allegiance, and is constituted a citizen, as an inevitable consequence of his birth". *Op. of the Justices of Supreme Judicial Court*, 44 Me. 505, 1857 Me. LEXIS 151, at *123-24 (1857) (op. of Davis, J.);

- "All persons born in the allegiance of the king are natural born subjects, and all persons born in the allegiance of the United States are natural born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as of England. There are two exceptions, and only two, to the universality of its application. The children of ambassadors are in theory born in the allegiance of the powers the ambassadors represent, and slaves, in legal contemplation, are property, and not persons." *United States v. Rhodes*, 27 F. Cas. 785, 789 (C.C.D. Ky. 1866) (Swayne, Circuit Justice).

To be sure, some early American cases denied birthright citizenship to the children of slaves (and in some cases, free black Americans) and Native peoples who were members of sovereign Indian Tribes. *See Dred Scott v. Sandford*, 60 U.S. 393, 404 (1857); *Goodell v. Jackson*, 20 Johns. 693, 712, 717 (N.Y. 1823) (affirming that Indians "are not our subjects . . . born in obedience to us" and

8

recognizing the "political existence" of their "nations"). But the Fourteenth Amendment rejected racially exclusionary citizenship. "Congress enacted the Civil Rights Act of 1866 to both repudiate *Dred Scott* and eradicate the Black Codes", and "[o]nce incorporated into the Fourteenth Amendment, the Citizenship Clause forever closed the door on *Dred Scott*". *United States v. Vaello-Madero*, 596 U.S. 159, 174-75 (2022) (Thomas, J., concurring) (cleaned up). And members of Indian Tribes, as explained below, are citizens of self-governing nations, some of which occupy land masses the size of States, and all of which possess sovereignty that is recognized by the Constitution, treaties, and centuries of precedent. *See Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832). That is not the case for foreigners whose children the Government seeks to exclude from citizenship today.

The Government ignores much of the pre-ratification caselaw, citing Justice Story's *Commentaries* to support a general rule requiring parental domicile for birthright citizenship. (*See* Gov't Br. 26, 28-29.) That is triply flawed.

*First*, Justice Story's *Commentaries*—which concern the law of nations, not the common law (*see* Pls.' Br. 42)—admit the general rule and frame his interpretation in normative, rather than descriptive, terms:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. *A reasonable qualification of this rule would seem to be*, that it should not apply to the children of parents, who were who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business. *It would be difficult, however, to assert, that in the present state of public law such a qualification is universally established.*

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (Boston, Hilliard, Gray & Co. 1834) (emphases added). The Government's quotation of this passage (at 22) omits the final sentence.

 *Second*, this distinction makes a world of difference because four years earlier, Justice Story wrote in dissent in *Inglis* that "[n]othing is better settled at the common law than the doctrine that the children even of aliens born in a country, while the parents are resident there under the protection of the government, *and owing a temporary allegiance thereto*, are subjects by birth." *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (Story, J., dissenting) (emphasis added). The Government's quotation of this passage (at 44) likewise omits the emphasized language that contradicts its interpretation. But that language shows that, consistent with Coke's reasoning, aliens temporarily in the United States *owe a temporary allegiance* to the United States sufficient to confer citizenship on their children born here. This allegiance consisted in an obligation to follow "the ordinary laws, enforcement power, and judicial orders of U.S. authorities to the same extent as citizens." Ramsey, 109 Geo. L.J. at 446.

*Third*, the Supreme Court implicitly, and New York's Court of Chancery explicitly, rejected Story's gloss on the children of transient noncitizens. *See The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812) ("When private individuals of one nation spread themselves through another as business or caprice may direct . . . it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not *owe temporary and local allegiance, and were not amenable to the jurisdiction of the country*." (emphasis added)); *Lynch*, 1844 N.Y. Misc. LEXIS 1, at *84 ("The qualifications mentioned by Judge Story . . . are certainly unknown to the common law in England, and as established in the United States.").

### C.    The Civil Rights Act of 1866 Reflects This Rule.

The Civil Rights Act of 1866 ("1866 Act") gives more support for birthright citizenship. It was enacted by a congressional supermajority over President Johson's veto and provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared citizens of the United States." 1866 Act, ch. 31, § 1, 14 Stat. 27. Supporters of the 1866 Act affirmed that, as Pennsylvania Representative John Broomall put it, all those "who by reason of [their] being born within the jurisdiction of a Government owe[] allegiance to that Government" and are

11

therefore citizens. Cong. Globe, 39th Cong., 1st Sess. 1262 (1866). No member endorsed a categorical rule that children born in the United States to foreigners were not citizens. They did, however, repudiate what they saw as a deviant exception for black Americans.

In referring to black Americans, Senator Lyman Trumbull, the principal drafter of the relevant language, echoed the common law and said that his "own opinion is that all these persons born in the United States and under its authority, owing allegiance to the United States, are citizens without any act of Congress." *Id.* 527. Trumbull later explained that he had "already said that in [his] opinion birth entitles a person to citizenship, that every free-born person in this land is, by virtue of being born here, a citizen of the United States, and that the" Act was "but declaratory of what the law now is". *Id.* at 600. Trumbull cited the above passage from *State v. Manuel* in support of this rule. *See id.* at 527. Trumbull's public statement of the law was clear and unequivocal: "I understand that under the naturalization laws the children who are born here of parents who have not been naturalized are citizens." *Id.* at 498. Trumbull admitted that this would mean citizenship at birth for children of Chinese nationals and purported "Gypsies":

> Mr. COWAN. I will ask whether [Trumbull's amendment] will not have the effect of naturalizing the children of Chinese and Gypsies born in this country?
>
> Mr. TRUMBULL. Undoubtedly.

*Id.* at 498.

President Andrew Johnson, for his part, understood the effect of the 1866

Act in the same way in explaining his reasons for vetoing it:

> By the first section of the bill all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States. This provision comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the entire race designated as blacks, people of color. . . . Every individual of these races born in the United States is by the bill made a citizen of the United States.

Andrew Johnson, *Veto Message on Civil Rights Legislation* (Mar. 27, 1866),

*available at*: https://bit.ly/4dPdnOa. Congress then overrode the veto. *See* Barnett

& Bernick, *supra*, at 124. In response to President Johnson's veto,

Senator Trumbull cited a fellow Senator for the proposition that "even the infant

child of a foreigner born in this land is a citizen of the United States long before his

father." Cong. Globe, 39th Cong., 1st Sess. 1757.

Dispensing with this evidence, the Government makes much out of a single

letter from Senator Trumbull to President Johnson (*see* Gov't Br. 23 & n.3), which

apparently was not cited in legal scholarship for another 144 years until a law

student unearthed it. (*See* Gov Br. 23 n.3 (citing Mark Shawhan, Comment, *The*

*Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale

L.J. 1351, 1352-53 (2010))); *see also* Shawhan, *supra*, at 1353 n.9. In the letter,

Senator Trumbull says that the 1866 Act "declares 'all persons' born of parents

domiciled in the United States, except untaxed Indians, to be citizens of the United States." Shawhan, *supra*, at 1352-53 (quotation omitted). Trumbull, potentially fearing President Johnson's veto, may have downplayed the scope of the statutory language. Of course, whatever Trumbull meant the letter to communicate, President Johnson's statement showed that he understood the 1866 Act to broadly confer citizenship on racial minorities and their children born in the United States.[2]

Trumbull spoke of one exception to the general rule that citizenship obtained upon birth within the United States: "Indians", affirming the constitutional status of Native nations and peoples. *See* Cong. Globe, 39th Cong., 1st Sess. 527, 572, 2893-94; Maggie Blackhawk, *Foreword: The Constitution of American Colonialism*, 137 Harv. L. Rev. 1, 10 (2023). As Trumbull explained in the debates over the Fourteenth Amendment, there were Native peoples physically within U.S. territory who were not ordinarily subject to U.S. governance. In proposing the "Indians not taxed" language in the 1866 Act, Trumbull cited Article I, Section 2 of

---

[2] Indeed, Shawhan himself doubted the letter's relevance for original meaning and in fact endorsed expansive birthright citizenship in a subsequent full-length article that the Government ignores. *See* Mark Shawhan, *"By Virtue of Being Born Here": Birthright Citizenship and the Civil Rights Act of 1866*, 15 Harv. Latino L. Rev. 201 (2012), *available at*: https://bit.ly/4mPbmp3; *see id.* at 219-220 n.123 (explaining that while Trumbull "privately interpreted" the bill more narrowly, that view "seems not to have been expressed publicly in debate over the Act, nor shared by other members of Congress").

the Constitution, which excludes "Indians not taxed" from the population count for apportionment of seats in the House of Representatives. Cong. Globe, 39th Cong., 1st Sess. 527. He explained that this phrase included Tribal citizens with "separate governments of their own" with whom the United States dealt with "by treaty". *Id.* at 498. And the phrase also included Native people who were not citizens of any Tribal nation with which the U.S. had treaties but were present in territories that remained unorganized by the United States. *See id*. at 525 (referring to Native peoples "outside of the organized jurisdiction of the United States in the Indian country"); Ramsey, *supra*, at 459. Trumbull did allow for the possibility that individual Indians could renounce their Tribal ties and *become* U.S. citizens. *See id.* at 572 (explaining that Native persons who "are separated from those tribes, and come within the jurisdiction of the United States so as to be counted . . . are citizens of the United States."); *id.* at 2893 (giving example of Native persons physically "there and within the jurisdiction of Colorado, and subject to the laws of Colorado," who "ought to be citizens"). But he denied that the United States had any legitimate constitutional power over Native peoples that was not mediated by Tribal sovereignty. *See id.* at 2894 (claiming that it would be a "violation of our treaty obligations, a violation of the faith of this nation, to extend our laws over these Indian tribes with whom we have made treaties saying we would not do it").

15

Trumbull gave one other exception to the general rule of birthright citizenship: "We cannot make a citizen of the child of a foreign minister who is temporarily residing here." *Id.* at 572. His justification for this exception mirrored the common-law understanding of temporary allegiance from *McFaddon*: "upon investigation it was found that a sort of allegiance was due to the country from persons temporarily resident in it whom we would have no right to make citizens"—namely, the children of foreign ministers. *Id*. If the children of those with temporary allegiance to the United States did not become citizens when born here, there would be no need for an exception for children of diplomats.

Even if the Government's interpretation of Trumbull's letter and statements were correct, its case would fare no better. A private letter can't provide reliable context about public meaning. *Cf. Ramos v. Louisiana*, 590 U.S. 83, 98 & n.40 (2020) (rejecting reliance on private correspondence from James Madison). Any conflict between Senator Trumbull's floor statements and his letter is another reason to privilege public meaning over private intentions. *See* Hon. Antonin Scalia, Address Before the Attorney General's Conference on Economic Liberties (June 14, 1986), *in* Original Meaning Jurisprudence: A Sourcebook 103 (U.S. Dep't of Justice ed., 1987) (admonishing originalists to pursue "[t]he most plausible meaning of the words of the Constitution to the society that adopted it— regardless of what the Framers might secretly have intended"). Recall that Senator

16

Trumbull represented to Senator Cowan that the children of Chinese nationals and "Gypsies" would "undoubtedly" be birthright citizens under the 1866 Act. Legislators assumed that members of these populations did not all intend to permanently reside in the United States, such that their children would become citizens without being domiciled here. *Compare* Cong. Globe, 39th Cong., 1st Sess. 2891 (statement of Senator Conness, R-Cal.) ("The habits of [Chinese immigrants], and their religion, appear to demand that they all return to their own country . . . . Those persons return invariably, while others take their places".) *with* Shawhan, *Significance* 1353 (explaining that U.S. domicile during the antebellum period required "the intention of making [this country] one's permanent residence[]").

Of course, other legislators that debated the 1866 Act stated the rule of birthright citizenship:

- Senator Morrill: "[E]very man, by his birth, is entitled to citizenship, and that upon the general principle that he owes allegiance to the country of his birth, and that country owes him protection. That is the foundation, as I understand it, of all citizenship . . . ." Cong. Globe, 39th Cong., 1st Sess. 570;

- Senator Lane: "The freemen are citizens of the United States; not [by] the naturalization law, [or] any treaty, but citizens because they are born natives to the soil. That makes them citizens." *Id.* at 741;

- Representative Thayer: "According to my apprehension, every man born in the United States, and not owing allegiance to a foreign Power, is a citizen of the United States. It is a rule of universal law, adopted and maintained among all nations, that they who are born

17

upon the soil are the citizens of the State. They owe allegiance to the State . . . . Such is the law, whether you put it into this bill or not." *Id.* at 1152;

- Representative Raymond: "I do not see where we get any authority to except these native-born Africans from the general rule of law that all born upon the soil are subjects or citizens of the Government. That is the rule in England, it is the rule in France, it is, and always has been, the rule in this country." *Id.* at 1266.

They included Representative Wilson, who the Government cites (at 30-31) as endorsing an exception for children born "to temporary sojourners or representatives of foreign Governments." But like Trumbull, Wilson favorably cited *State v. Manuel* (as well as Blackstone) in support of the common-law rule, "which claims as a subject every person born within the jurisdiction of the Crown". Cong. Globe, 39th Cong., 1st Sess. 1117. That principle "applies to this country as well as to England", Wilson said. *Id.* at 1116.

### D. Evidence from Ratification Supports This Rule.

After overcoming President Johnson's veto to enact the 1866 Act, Congress took up what would become the Fourteenth Amendment the next month. *See* Barnett & Bernick, *supra*, at 137. In introducing the original text—which did not define citizenship—Senator Jacob Howard of Michigan discussed the Privileges or Immunities Clause, and in doing so, explained that "a citizen of the United States is held by the courts to be a person who was born within the limits of the United States and subject to their laws." Cong. Globe, 39th Cong., 1st Sess. 2765.

18

Summarizing the common law, Howard said that it "recognizes persons born within the jurisdiction of every country as being subjects or citizens of that country. Such persons were, therefore, citizens of the United States as were born in the country". *Id.*

To be sure, Senator Wade proposed that the Privileges or Immunities Clause apply to "persons born in the United States or naturalized" into citizenship, and the Government points out that Senator Fessenden asked whether that would apply to someone "born here of parents from abroad temporarily in this country." (Gov't Br. 31 (quoting Cong. Globe, 39th Cong., 1st Sess. 2768-69).) But Wade answered that he knew of one exception: "the case of the children of foreign ministers", who, under a legal fiction, are "not supposed to be residing here". Cong. Globe, 39th Cong., 1st Sess. 2769. In any event, "rather than dwelling on text left on the cutting room floor, we are much better served by interpreting the language Congress retained and the States ratified." *Ramos*, 590 U.S. at 98.

A week later, Howard introduced the Citizenship Clause. Barnett & Bernick, *supra*, at 331. Its text and structure closely resembled his initial exposition. We can infer that Howard thought of "subject to [U.S.] laws" and "subject to the jurisdiction thereof" interchangeably because, like Trumbull, he described the Citizenship Clause as "declaratory of . . . the law of the land already". Cong. Globe, 39th Cong., 1st Sess. 2890.

19

Howard added that "every . . . class of persons" other than "persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States" would be guaranteed birthright citizenship. *Id.* Read in context, Howard was not enumerating exceptions; he was instead referring to a single exception for the children of foreign officials. There was no exception for the children of "foreigners" or "aliens" established as "the law of the land already".

Congressional discussion again touched upon Native nations and peoples. Bethany Berger explains that the Senate "voted not to include the 'Indians not taxed' exception in the citizenship clause of the Fourteenth Amendment . . . based on the belief that although tribal Indians were 'born in the United States,' they were not 'subject to the jurisdiction thereof'" for the same reasons that Trumbull offered for excepting them from the 1866 Act's birthright citizenship guarantees. Bethany R. Berger, *Birthright Citizenship on Trial:* Elk v. Wilkens *and* United States v. Wong Kim Ark, 37 Cardozo L. Rev. 1185, 1196 (2016). Speaking about non-Tribal "Indians with whom we have no treaty," Trumbull agreed that they were not subject to U.S. jurisdiction either. *See* Cong. Globe, 39th Cong., 1st Sess. 2892-93. The citizenship of Native children is today guaranteed by statute. *See* Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 (codified as amended at 8 U.S.C. § 1401(b)); Blackhawk, *supra*, at 2212.

20

Legislators again raised the issue of extending citizenship to the children of Chinese immigrants and purported "Gypsies." Senator Cowan returned to the point, using explicitly racist language. Cong. Globe, 39th Cong., 1st Sess. 2891 (claiming that "Gypsies" "infest society"). Evidently, he understood "subject to the jurisdiction thereof" to include the children of foreign nationals, just as he had understood "not subject to any foreign power" to mean that. Senator John Conness of California confirmed this understanding, stating that the Citizenship Clause did declare "the children begotten of Chinese parents in California" to be citizens because "the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States". *Id.* "No Senator was recorded disagreeing with Conness's view of the Clause's effect, including Howard, who had proposed the language." Ramsey, 109 Geo. L.J. at 448. Perhaps that is why, as Ramsey suggests, California—with its regular enactment of discriminatory laws against Asian immigrants—did not ratify the Fourteenth Amendment until 1959. *See id.* at 448 n.206.

The Government also selectively quotes (at 24) Senator Reverdy Johnson, omitting his language refuting the Government's point: "I know of no better way to give rise to citizenship than the fact of birth within the territory of the United States, born of parents who at the time were *subject to the authority of the United States*." Cong. Globe, 39th Cong., 1st Sess. 2893 (emphasis added).

21

II.     **The Government's Contrary Contentions Fail.**

A.     **Immigration Restrictions Predate Ratification.**

The Government claimed in the prior Supreme Court appeal that "illegal aliens" were not "a discrete class" at the time of the Fourteenth Amendment's ratification. (Tr. of Oral Arg. 8:4-6, *Trump v. Casa* (2025) (No. 24A884).) That ignores several antebellum federal immigration laws. A federal statute in 1862, the "Coolie Trade Prohibition Act," regulated Chinese immigration by establishing penalties for the American citizens involved with alleged "coolie labor." *See* Kerry Abrams, *Polygamy, Prostitution, and the Federalization of Immigration Law*, 105 Colum. L. Rev. 641, 670 (2005). Although the Act did not by its terms "punish the Chinese immigrants themselves, it made the legal status of alleged 'coolies'"—a racist term for Chinese laborers—ambiguous: "their status was arguably or foreseeably 'illegal' or 'undocumented'", despite being encouraged to immigrate in practice. Shugerman, *supra*, at 3.

Before 1866, some states and western territories had adopted immigration restrictions—most notably California starting in the early 1850s. *See* Shugerman, *supra*, at 9-10. Because state citizenship status had been legally relevant for national citizenship, *see generally Dred Scott*, 60 U.S. 393, these state restrictions were relevant during the ratification of the Fourteenth Amendment and the legal background. In 1858, California adopted its own exclusion act barring persons of

"the Chinese or Mongolian races" from entering the State, which its Supreme Court struck down. *Lin Sing v. Washburn*, 20 Cal. 534, 564 (1862) (statement of counsel). California's Revenue Act of 1861 taxed all "foreigners not eligible to become citizens of the United States" living in "any mining district" in the State. *Ex parte Ah Pong*, 19 Cal. 106, 108 (1861). California was even more explicit in an 1862 law titled, "An Act to protect free white labor against competition with Chinese coolie labor, and discourage the immigration of the Chinese into the State of California." *Lin Sing*, 20 Cal. at 564. This last law was known as the "Chinese Police Tax," requiring anyone from "the Mongolian race" to pay a monthly tax of $2.50. *See* Charles J. McClain, *Chinese Immigrants in the California Supreme Court: The Earliest Civil Cases*, 19 Cal. L. Hist. 73, 96 (2024). These measures raised a "reasonable question about whether some Chinese immigrants were already in—or soon would be placed in—a category of unlawful" status. Shugerman, *supra*, at 3.

Some Americans of the time portrayed Chinese immigrants as "Coolies," a "racist slur that referred to indentured servitude and loyalty to foreign masters." *Id.* at 1. If the public had wondered if the text of the Fourteenth Amendment's citizenship clause included a "loyalty" test, someone would have asked. "If the public thought the citizenship clause might not apply to Chinese immigrants who were plausibly 'unlawful'"—or merely temporary residents—"someone would

have asked." *Id.* As shown above, members of Congress *did* discuss the issue. The historical record of original public meaning confirms a birthright citizenship rule applicable to the children of unlawful immigrants, regardless of any doubt about personal loyalty.

### B.    The Government's Post-Ratification Commentary Lacks Credibility.

The Government cites several late-nineteenth-century commentators—prominent among them, Alexander Porter Morse—who rejected birthright citizenship for the children of foreign nationals; some conditioned birthright citizenship on domicile. (*See* Gov't Br. 32.) This does not help the Government, for several reasons. First, some commentators espousing these views were racist. The Government incredibly cites Morse, the lawyer defending segregation for the State of Louisiana in *Plessy v. Ferguson*, 163 U.S. 537 (1896). *See* Bernadette Meyler, *The Gestation of Birthright Citizenship, 1868-1898 States' Rights, the Law of Nations, and Mutual Consent*, 15 Geo. Immigr. L.J. 519, 520 (2001). Second, some commentators were also hostile to the common law, believing it out of step with the law of nations. *See id.* at 544. Third, isolated dicta supporting these views "contrasted with far more numerous judicial holdings equating 'jurisdiction' with 'sovereign authority.'" Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 Akron L. Rev. 719, 764-65 (2012).

The Government's citation to statements from two Secretaries of State (at 33-34) is similarly dubious. Both were cited in Justice Fuller's *dissent* in *Wong Kim Ark*. *See* 169 U.S. at 719. They are not the law. The modern State Department, during the first Trump Administration, recognized that "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth." U.S. Dep't of State, 8 *Foreign Affairs Manual* § 301.1-1(d) (2018). That ordinary meaning is the same today.

### C.    Native-Born Children of Aliens Are Citizens.

There are no cogent reasons to believe that the original public meaning of the Citizenship Clause expresses a rule excluding the children of temporary visitors, unlawful entrants, or asylees. Children of these categories are upon maturity governed by the United States, just like other citizens. They are bound by legislation; they can be sued in U.S. courts; they can be arrested by U.S. police officers and prosecuted by U.S. attorneys. They do not occupy any territory which is beyond U.S. control; they are not governed within U.S. borders by any laws enacted by another sovereign which—as Jacob Howard said of Native nations— "intervenes and ousts what would otherwise be perhaps a right of jurisdiction of the United States." Cong. Globe, 39th. Cong., 1st Sess. 2895; *see also* Ho, *supra*, at 372 ("[T]here is no doubt that foreign countries enjoy no such sovereign status

25

within U.S. borders. And there is likewise no doubt that U.S. law applies to their nationals who enter U.S. territory.").

But the Government's position has a more fundamental problem. Abolitionists and Republicans insisted that people from whom the United States demanded obedience were entitled to citizenship. Thus did New York abolitionist William Yates in 1838 claim that citizenship "reaches the man of one complexion as much as that of another" for one "is not a citizen to obey, and an alien to demand protection." William Yates, *Rights of Colored Men to Suffrage, Citizenship and Trial by Jury* 37 (Philadelphia: Merrihew & Gunn 1838). If among the core evils against which the Citizenship Clause was directed was allegiance-without-citizenship, then not only does the "letter" (text) of the Citizenship Clause support birthright citizenship, but so too does its original purpose, or "spirit."

Birthright citizenship was and is the law of the land. It was recognized by antebellum courts applying principles of the common law dating to the 1400s, which the drafters of the 1866 Act and the Fourteenth Amendment were familiar with, and which the public at large understood. After more than five centuries recognizing the birthright of every person born within the sovereign's jurisdiction to be a citizen of that state, the Government discovers a different rule for the first time in a private letter and in the same recycled citations that the Supreme Court already rejected in *Wong Kim Ark*. This Court should reject them, too.

26

## CONCLUSION

For all these reasons, the Court should affirm.

June 6, 2025                         Respectfully submitted,

                                     */s/ Brendan Benedict*
                                     Brendan Benedict
                                     515 Madison Avenue, 31st Floor
                                     BENEDICT LAW GROUP PLLC
                                     New York, NY 10022
                                     Phone: (212) 287-9501
                                     *brendan@benedictlawgroup.com*

                                     *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App.

P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted

by Fed. R. App. P. 32(f), this document contains 6,498 words. This document

complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-

style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in

proportionally spaced serif typeface (14-point Century Schoolbook and Times New

Roman) using Microsoft Word for Office 365.

*/s/ Brendan Benedict*
Brendan Benedict

**CERTIFICATE OF SERVICE**

I certify that on June 6, 2025, I served this brief on all parties or their

counsel of record through the CM/ECF system.

*/s/ Brendan Benedict*
Brendan Benedict
