**No. 25-1153**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

———————————

CASA, INC., et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, In his official capacity as President
of the United States, c/o Attorney General of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

**REPLY BRIEF FOR APPELLANTS**

———————————

> BRETT A. SHUMATE
>   *Assistant Attorney General*
>
> ERIC D. McARTHUR
>   *Deputy Assistant Attorney General*
>
> MARK R. FREEMAN
> SHARON SWINGLE
> BRAD HINSHELWOOD
> DEREK WEISS
>   *Attorneys, Appellate Staff*
>   *Civil Division, Room 7230*
>   *U.S. Department of Justice*
>   *950 Pennsylvania Avenue NW*
>   *Washington, DC 20530*
>   *(202) 616-5365*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 4

I.    Plaintiffs Are Not Likely to Succeed on the Merits. .............................. 4

    A.    Political Jurisdiction Is Not Merely Regulatory
        Jurisdiction. ........................................................................5

    B.    Political Jurisdiction Is Formed by Establishing Domicile,
        Which Entails a Greater Degree of Allegiance..............................8

    C.    The Citizenship Clause Adapted the Common Law to
        American Views, Departing from the English Rule...................15

    D.    Plaintiffs' Statutory Claim Fails Because the Statute Has
        the Same Meaning as the Citizenship Clause. ...........................23

II.   The District Court's Injunctive Relief Is Substantially
    Overbroad. .............................................................................. 27

CONCLUSION .................................................................................. 33

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                     **Page(s)**

*Benny v. O'Brien*,
  32 A. 696 (N.J. 1895) ............................................................... 11, 21, 22

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262 (2019) ...................................................................... 23

*Coddington v. Coddington*,
  20 N.J. Eq. 263 (Ch. 1869) ......................................................... 13, 14

*Dred Scott v. Sandford*,
  60 U.S. (19 How.) 393 (1857) ........................................................ 1

*Elk v. Wilkins*,
  112 U.S. 94 (1884) ................................................................2, 5, 7, 8

*Fong Yue Ting v. United States*,
  149 U.S. 698 (1893) ...................................................................... 9

*Goodell v. Jackson ex dem. Smith*,
  20 Johns. 693 (N.Y. 1823) ...........................................................16, 20,

*Gregory v. Stetson*,
  133 U.S. 579 (1890) .......................................................................31

*Hodgson v. De Beauchesne* [1858]
  14 Eng. Rep. 920 ......................................................................... 9

*Hunt v. Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ................................................................. 30, 31

*International Union, UAW. v. Brock*,
  477 U.S. 274 (1986) ..................................................................... 30

*Jackson ex dem. Smith v. Goodell*,
  20 Johns. 188 (N.Y. Sup. Ct. 1822) ........................................... 15-16

*Kaplan v. Tod*,
  267 U.S. 228 (1925) ..................................................................... 26

*Kemp v. United States,*
  596 U.S. 528 (2022) ........................................................ 23

*Lau Ow Bew v. United States,*
  144 U.S. 47 (1892) ........................................................... 9

*Ludlam v. Ludlam,*
  31 Barb. 486 (N.Y. Gen. Term. 1860),
  *aff'd,* 26 N.Y. 356 (1863) ............................................... 19

*Lynch v. Clarke,*
  1 Sand. Ch. 583 (N.Y. Ch. 1844) .................................... 19

*Nishikawa v. Dulles,*
  356 U.S. 129 (1958) ........................................................ 20

*Nishimura Ekiu v. United States,*
  142 U.S. 651 (1892) ........................................................ 26

*Outdoor Amusement Bus. Ass'n v. Department of Homeland Sec.,*
  983 F.3d 671 (4th Cir. 2020) ......................................... 30

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007) ........................................................ 30

*Perkins v. Elg,*
  307 U.S. 325 (1939) ........................................................ 20

*Relations of Indians to Citizenship,*
  7 Op. Att'y Gen. 746 (1856) .......................................... 16

*Renne v. Geary,*
  501 U.S. 312 (1991) ........................................................ 28

*Retail Indus. Leaders Ass'n v. Fielder,*
  435 F. Supp. 2d 481 (D. Md. 2006),
  *aff'd,* 475 F.3d 180 (4th Cir. 2007) ............................... 30

*Rogers v. Bellei,*
  401 U.S. 815 (1971) ........................................................ 20

*Trump v. CASA, Inc.*,
   606 U.S. ___, 2025 WL 1773631 (June 27, 2025) .................. 27, 28, 29, 31, 32

*United States v. Ju Toy*,
   198 U.S. 253 (1905) ................................................................. 26

*United States v. Rahimi*,
   602 U.S. 680 (2024) ................................................................ 15

*United States v. Rogers*,
   45 U.S. (4 How.) 567 (1846) ...................................................... 6

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ......................................... 1, 2, 8, 10, 21, 22

*United States ex rel. Mackey v. Coxe*,
   59 U.S. (18 How.) 100 (1855) ...................................................... 6

*Vance v. Terrazas*,
   444 U.S. 252 (1980) ................................................................ 20

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................ 29

*Wikimedia Found. v. National Sec. Agency*,
   857 F.3d 193 (4th Cir. 2017) ................................................ 28, 29

## Statutes:

Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223, 223 .................................21

Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566 ......................................7

8 U.S.C. § 1401 ............................................................... 23, 26

## Legislative Materials:

Cong. Globe, 35th Cong. 1st Sess. 210 (1858) .................................17

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) ........................... 6, 18

86 Cong. Rec. 11,944 (1940) .................................................................24

*Rep. of H. Comm. on Foreign Affairs Concerning the Rights of
American Citizens in Foreign States*, *in* Cong. Globe,
40th Cong., 2nd Sess. (1868) .............................................20

**Other Authorities:**

Gregory Ablavsky, *"With the Indian Tribes": Race,
Citizenship, and Original Constitutional Meanings*,
70 Stan. L. Rev. 1025 (2018) ............................................. 16

Philemon Bliss, *Citizenship* (1858) .....................................................17

Clement L. Bouvé, *A Treatise on the Laws Governing the
Exclusion and Expulsion of Aliens in the United States* (1912) ......................26

1 William Burge, *Commentaries on Colonial and Foreign
Laws* (1838) ...............................................................13

2 Charles Cheney Hyde, *International Law* (2d rev. ed. 1947)........................25

Frederick A. Cleveland, *American Citizenship as
Distinguished from Alien Status* (1927) ......................................13, 14

Comm'rs of the Code, *The Political Code of the State of
New York* (1860)...............................................................17

David Dudley Field, *Outlines of an International Code*
(2d ed. 1876) .................................................................19

Richard W. Flournoy, *Dual Nationality and Election*,
30 Yale L.J. 545 (1921) ...................................................... 13, 24

3 Green Hayword Hackworth, *Digest of International Law*
(1942) .........................................................................25

H.W. Halleck, *International Law* (1861)..............................................14

M.W. Jacobs, *A Treatise on the Law of Domicil* (1887) ...................................10, 14

Sidney Kansas, *Immigration and Nationality Act Annotated*
(4th ed. 1953) ...................................................24

2 James Kent, *Commentaries on American Law* (10th ed. 1860) ......................11

Kurt T. Lash, *Prima Facie Citizenship* (rev. Apr. 17, 2025),
https://perma.cc/ARN2-5CSJ ........................................3, 6, 17, 20

Letter from Sen. Lyman Trumbull to President Andrew
Johnson (*in* Andrew Johnson Papers, Reel 45, Manuscript
Div., Library of Cong.) ...................................................18

2 John Bassett Moore, *A Digest of International Law* (1906).............................14

Alexander Porter Morse, *The Citizen in Relation to the State*
(1884) ...................................................15

4 Robert Phillimore, *Commentaries Upon International Law*
(2d ed. 1874) ................................................... 13-14

Mark Shawhan, Comment, *The Significance of Domicile
in Lyman Trumbull's Conception of Citizenship*,
119 Yale L.J. 1351 (2010) ................................................... 17-18

Joseph Story, *Commentaries on the Conflict of Laws,
Foreign and Domestic* (6th ed. 1865) ...................................9, 13, 14, 16

*The Nationality Act of 1940*,
54 Harv. L. Rev. 860 (1941) ................................................... 25, 26

1 Travers Twiss, *The Law of Nations Considered as Independent
Political Communities* (1st ed. 1861) ...................................................13

1 Henry St. George Tucker, *Commentaries on the Laws of
Virginia* bk. I (3d ed. 1846)................................................... 16-17

Francis Wharton, *A Treatise on the Conflict of Laws* (1872) ...................................14

Henry Wheaton, *Elements of International Law* (Richard
Henry Dana, Jr. ed., 1866) ...................................................13, 14

Ilan Wurman, *Jurisdiction and Citizenship* (rev. Apr. 21, 2025),
   https://perma.cc/5DFJ-Z9BN ...............................................................14, 19

## INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment "rightly repudiated" the Supreme Court's "shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race."  A4. Rectifying that injustice to the recently freed slaves, all agree, was the principal purpose of the Citizenship Clause.  Nothing in the Clause's text or historical context supports the conclusion that it also extended citizenship to birth tourists and other transient visitors or those who enter the country in violation of our laws.

On the contrary, the text makes clear that to qualify for birthright citizenship, an individual must be not only born in the United States, but also "subject to the jurisdiction thereof"—an independent requirement that the Supreme Court has held excludes those who are not "completely subject to the political jurisdiction of the country."  *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898).  The children of aliens whose presence here is temporary or unlawful do not meet this requirement because they lack the requisite connection and allegiance to the United States.

A country has complete political jurisdiction over individuals who owe it sufficient allegiance, such as children of citizens and aliens lawfully "domiciled here," *id.*, but not over those who owe only the lesser allegiance of merely obeying the law, such as children of tribal Indians, *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). This distinction reflects principles that were well recognized at the time the Fourteenth Amendment was ratified, when domicile was understood to confer a more substantial allegiance than mere presence, a type of allegiance akin to citizenship that subjected an individual to the complete jurisdiction of the country of domicile with corresponding rights and reciprocal duties. Children of aliens here temporarily or illegally, whose only allegiance is the duty to obey the laws while they are here, lack sufficient allegiance to come within the United States' complete political jurisdiction. This historically grounded explanation reconciles the Supreme Court's cases and explains the substantial focus on domicile in the debates leading up to the Citizenship Clause and the legal scholarship and Executive Branch practice in the years thereafter.

Plaintiffs offer no interpretation of the Citizenship Clause that explains that history or reconciles the Supreme Court's decisions in *Elk* and

2

*Wong Kim Ark*. They argue that "subject to the jurisdiction thereof" refers only to regulatory jurisdiction (the ability to impose laws regulating individuals). This theory cannot explain *Elk* because Congress clearly had authority to regulate tribal Indians (even if Congress did not fully exercise that authority). Plaintiffs' only response is to call *Elk* "irrelevant" because it focused on "Indian tribes." Br. 37-38. But plaintiffs' attempt to argue that "jurisdiction" means something other than regulatory jurisdiction for Indians but regulatory jurisdiction for everyone else disregards the Clause's historical context and lacks any textual support. As they acknowledge (at 31), the debates over the Clause considered the status of tribal Indians at length. *See also, e.g.*, Kurt T. Lash, *Prima Facie Citizenship* 45-54 (rev. Apr. 17, 2025), https://perma.cc/ARN2-5CSJ. In crafting the Citizenship Clause, Congress eschewed the Indian-specific language of the Civil Rights Act of 1866 and adopted a general test for all persons born in the United States. But plaintiffs offer no such general test.

Text and historical context thus confirm that the Executive Order's interpretation of the Citizenship Clause is correct, and the preliminary injunction should be reversed.

3

## ARGUMENT

### I.    Plaintiffs Are Not Likely to Succeed on the Merits.

The Civil Rights Act of 1866 and the Citizenship Clause of the Fourteenth Amendment repudiated *Dred Scott* and confirmed that freed slaves and their children were citizens of the United States.  Plaintiffs' efforts to paint this case as a modern-day analogue to that odious decision are mistaken.  No one disputes that *Dred Scott* is deservedly overruled—or that fixing the citizenship status of freed slaves and their children was the central purpose of the Citizenship Clause.  But nothing about the historical context of the Citizenship Clause suggests that it extended to the children of foreigners who freely choose to enter the country illegally.  The history of the Clause's adoption is entirely devoid of concern for such illegal aliens, a group that did not yet exist given the absence of federal immigration restrictions.  Instead, Congress chose language that would encompass freed slaves but still limited citizenship to individuals who are completely subject to the political jurisdiction of the United States—a category that excludes transient visitors and illegal aliens.

4

### A. Political Jurisdiction Is Not Merely Regulatory Jurisdiction.

All agree that the phrase "subject to the jurisdiction thereof" in the Citizenship Clause excludes the U.S.-born children of (1) foreign ambassadors, (2) persons on foreign public ships, (3) invading armies, and (4) members of Indian tribes.  These exceptions share a single common feature: the child's parents do not fall within the "political jurisdiction" of the United States because they lack sufficient allegiance to the United States and owe primary allegiance to another sovereign.  *Elk v. Wilkins*, 112 U.S. 94, 102 (1884).  That understanding of the Clause squares with its text, history, and the Supreme Court's precedents.

Plaintiffs, by contrast, press the view that "jurisdiction" encompasses all persons subject to the United States' "power or right of exercising authority."  Br. 18 (quotation omitted).  That view cannot explain the long-recognized exceptions to the Citizenship Clause.  The United States plainly has the *power* to exercise authority over the categories of persons long understood to be excluded from the Clause.  *See* Gov't Br. 17-19.  Indian tribes are an especially powerful example.  It was well settled when the Citizenship Clause was ratified that the United States could exercise

5

regulatory power over Indian tribes. *See, e.g.*, *United States ex rel. Mackey v. Coxe*, 59 U.S. (18 How.) 100, 104 (1855) ("Cherokee country … is within our jurisdiction and subject to our laws."); *United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846); *see* Lash, *supra*, at 23-24.

The Congressional debates preceding the Clause reflected that understanding: multiple Senators recognized that Indian tribes were subject to congressional regulation. *See* Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (Senator Johnson stating that "the courts would have no doubt" about Congress's "authority to legislate" with respect to Indian tribes); *id.* at 2892 (Senator Doolittle stating that there were many Indians who were subject to U.S. regulatory jurisdiction "who ought not to be included as citizens"). As Senator (and former Attorney General) Reverdy Johnson observed, the few contrary statements during the debate (which plaintiffs quote, Br. 31-32) conflated "the authority to legislate" with the extent to which Congress had actually legislated.[1] *See* Cong. Globe, 39th Cong., 1st Sess. 2893.

---

[1] Plaintiffs' assertion (at 31) that the debates did not focus on "allegiance," is clearly belied by the Congressional Globe, 39th Cong., 1st Sess. 2893 ("What do we mean by 'subject to the jurisdiction of the United

*Continued on next page.*

6

Plaintiffs rely on an 1870 Senate Committee report (at 26-27) which similarly conflates having authority with exercising that authority. Both tribal Indians and temporary sojourners were within the United States' regulatory authority, but the U.S. exercised complete authority over neither group. *See infra* pp. 13-15. To the extent the committee's report could be read to suggest a lack of authority over Indians, it would conflict with the congressional debates just discussed; with Congress's passage the following year of a statute declaring that it would no longer recognize Indian tribes as "independent nation[s], tribe[s], or power[s] with whom the United States may contract by treaty," Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566; and with the Supreme Court's reasoning in *Elk*, which explained that children of tribal Indians were not made citizens by the Fourteenth Amendment, even though the United States could "deal" with Indian tribes "through acts of Congress in the ordinary forms of legislation," 112 U.S. at 99.

Finally, plaintiffs argue (at 40) that even if regulatory jurisdiction cannot explain *Elk*'s holding that all tribal Indians are outside the

---

States?' Not owing allegiance to anybody else. That is what it means."). *See id.* at 2895-96.

Citizenship Clause, regulatory jurisdiction could explain the lack of citizenship for the subset of tribes that the United States allowed, by treaty, to exercise their own regulatory jurisdiction or that were beyond the practical reach of the United States. But a partial explanation only underscores the incompatibility of their interpretation with binding Supreme Court precedent. Moreover, waiving regulatory jurisdiction in some treaties reinforces that the United States had regulatory jurisdiction absent a treaty.

"Jurisdiction" in the Citizenship Clause cannot mean the bare power to regulate or enforce federal law. It requires something more.

### B. Political Jurisdiction Is Formed by Establishing Domicile, Which Entails a Greater Degree of Allegiance.

**1.** "The evident meaning" of the phrase subject to the jurisdiction thereof, the Supreme Court has explained, "is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Elk*, 112 U.S. at 102; *accord Wong Kim Ark*, 169 U.S. at 693. The United States exercised less jurisdiction over nondomiciled aliens because of those aliens' primary allegiance to a different sovereign.

8

The nineteenth-century legal community understood the important relationships between domicile and the concepts of allegiance, jurisdiction, and citizenship. Aliens who had established domicile developed a degree of "allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council); *see* Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 49a, at 48 (6th ed. 1865) (discussing *Hodgson* as a "very extensiv[e] and learne[d] discuss[ion]" by "counsel of great eminence" and a "judge of very great learning"). Domiciled aliens "acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 62 (1892); *Fong Yue Ting v. United States*, 149 U.S. 698, 734 (1893) (Brewer, J., dissenting) (similar). And unlike temporarily present aliens—whose obligation to, and protection by, the United States ends upon departure—domiciled aliens could call on the United States for diplomatic protection abroad. *Fong Yue Ting*, 149 U.S. at 724.

*Wong Kim Ark* reflects the significance of this concept. The Supreme Court repeatedly emphasized that Wong's parents, though "subjects of the

Emperor of China," had "a permanent domicil and residence in the United States."  169 U.S. at 653; *accord id.* at 652, 693, 696, 705.  Indeed, the Court's paragraph announcing its "conclusions" from its analysis of the common law and other antecedents, *id.* at 693-94, underscores the importance of domicile:  "Every citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States," and thus that the Citizenship Clause "includes the children born within the territory of the United States of all other persons … *domiciled within the United States*."  *Id.* at 693 (emphases added).  And echoing the language of *Elk*, the Court concluded by noting that those domiciled here are "*completely* subject to the political jurisdiction" of the United States by comparing them to those temporarily present: "seeing that" even a temporary visitor to "the dominions of a foreign government" has a duty of "obedience to the laws of that government" during his presence "independently" of any "domiciliation," the Court explained that it "can hardly be denied that an alien is *completely* subject to the political jurisdiction of the country in which he resides."  *Id.* at 693-94 (emphases added) (quotation omitted); *see* M.W. Jacobs, *A Treatise on the Law of Domicil* § 75, at 123 & n.2 (1887) (collecting cases equating

10

residence and domicile); 2 James Kent, *Commentaries on American Law* 576 n.(c) (10th ed. 1860) (similar).

Plaintiffs dismiss these statements as neither "central" nor "relevant" "to the holding." Br. 44. But it is difficult to understand why the Court would have repeatedly included domicile in announcing its holding if that status was irrelevant. And it is all the more improbable given the dispute before the Court, as the parties briefed the case with contemporaneous principles of domicile in mind. The government, addressing the holding in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895), that citizenship did not extend to those "*temporarily traveling here*," argued that all Chinese aliens were here temporarily, Brief for the United States at 26 (No. 132) (U.S. Jan. 13, 1897), and that Wong's parents were "temporary sojourners," Reply Brief for the United States at 7 (No. 132) (U.S. Mar. 3, 1897). Wong's lawyers submitted separate briefs expressly addressing domicile. One brief repeatedly invoked domicile to explain why Wong's father was "subject to the jurisdiction" of the United States, contending that Wong's father "could have been … drafted into the armies of the United States" as an "obligation[] ordinarily incident to [a] foreign domicile" and (citing *Fong Yue Ting*) that Wong's father could "invoke" the United States' "protection

11

against the country of his origin." Brief of the Appellee at 22-23, 26-27 (No.

132) (Feb. 27, 1897) (quotation omitted). The other brief responded to the

government's position by arguing that temporary presence was sufficient

for citizenship and devoted an entire section to the assertion that an

individual's "citizenship" did not "depend … upon the 'domicile' of their

parents." Brief for the Appellee 87-89 (No. 132) (Mar. 3, 1897).

Against this background, the Supreme Court's repeated emphasis on

domicile in crafting both the question presented and its holding is properly

understood as reflecting the limits of the Court's holding, not a mere

description of the facts or rejection of the relevance of domicile and

allegiance. And these points illustrate why in the years after *Wong Kim Ark*,

Executive Branch practice and scholarly commentators recognized that

children of nondomiciled aliens were *not* citizens at birth. Gov't Br. 31-33,

46-47. Indeed, the State Department official whom plaintiffs rely upon

acknowledged the consensus of treatise-writers that "in order that a person

born in the United States of alien parents may have American citizenship,

his parents must have been domiciled in this country at the time of his

birth," and admits that *Wong Kim Ark* "did not directly decide the precise

12

point" because the "parents were domiciled in the United States."  Richard

W. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 545, 552 (1921).

**2**.  Domicile was "one of the fundamental considerations in

controversies over citizenship" because it was "so closely related to matters

of civil jurisdiction."  Frederick A. Cleveland, *American Citizenship as*

*Distinguished from Alien Status* 35 (1927).  As a matter of comity, the nation

where an individual was domiciled had jurisdiction to determine the

"numerous civil rights of the person."  1 William Burge, *Commentaries on*

*Colonial and Foreign Laws* 32 (1838); *accord, e.g.*, *Coddington v. Coddington*, 20

N.J. Eq. 263, 264 (Ch. 1869) (explaining that it was "well settled" that the

government of a person's domicile "regulated" "the positive and relative

status of [the] person"); *see* Story, *supra*,  § 51, at 53; Henry Wheaton,

*Elements of International Law* § 84, at 141 (Richard Henry Dana, Jr. ed., 1866).

It was this relationship between domicile and jurisdiction over

personal or civil rights that caused treatise writers to describe domicile as

"the foundation of jurisdiction over persons" "under the Law of Nations,"

1 Travers Twiss, *The Law of Nations Considered as Independent Political*

*Communities* § 164, at 239 (1st ed. 1861), and a "caus[e] which subject[s] the

individual to the jurisdiction of a particular territory," 4 Robert Phillimore,

*Commentaries Upon International Law* 32 (2d ed. 1874); *see* Cleveland, *supra*, at 34 ("In dealing with domicil we are dealing with the question of jurisdiction—the right of the government to exercise control over the social population, and the rights of individuals to claim protection or to enjoy the benefits which are attached to residence."); Francis Wharton, *A Treatise on the Conflict of Laws* § 708 (1872) ("Domicil, of course, implies a voluntary submission to the local law, and invests the courts of the domicil with jurisdiction over the party thus domiciled.").

The United States thus yielded to the government of an alien's domicile to determine whether the alien was a minor, Story, *supra*, § 66, at 71; the rights of married women, *id.* § 66a, at 72; the rules of inheritance for personal property, Wheaton, *supra*, § 83, at 140; the forum to administer divorces, *Coddington*, 20 N.J. Eq. at 264, and insolvency proceedings, Jacobs, *supra*, § 47, at 80 n.3; and to subject an individual to conscription, H.W. Halleck, *International Law* 385 (1861), or tax worldwide income, 2 John Bassett Moore, *A Digest of International Law* § 183, at 59-61 (1906). *See also* Ilan Wurman, *Jurisdiction and Citizenship* 80-84 (rev. Apr. 21, 2025), https://perma.cc/5DFJ-Z9BN; *id.* at 81 & n.413. Consequently, alien visitors were only "subject to the jurisdiction of the State when in foreign

14

territory in a much-qualified sense."  Alexander Porter Morse, *The Citizen in Relation to the State* 10-11 (1884).

### C. The Citizenship Clause Adapted the Common Law to American Views, Departing from the English Rule.

Plaintiffs attempt to draw support from English common law and early American sources, but these cannot overcome the Citizenship Clause itself.  The Constitution "did not purport to take English law or history wholesale and silently download it into" American law.  *United States v. Rahimi*, 602 U.S. 680, 722 n.3 (2024) (Kavanaugh, J., concurring).  While the English common law regarded children even of transients as citizens at birth, there is no dispute that the Citizenship Clause departed from English common law in some respects.  As early as the 1820s, American courts rejected the suggestion that members of Indian tribes were born citizens, even though they satisfied the English common-law rule.  When the New York Supreme Court of Judicature applied the English common-law rule to conclude that tribal Indians were "born in allegiance to the government of this state, for [New York's] jurisdiction extends to every part of the state; they receive protection from [New York], and are subject to [New York's] laws," *Jackson ex dem. Smith v. Goodell*, 20 Johns. 188, 192-93 (N.Y. Sup. Ct.

15

1822), Chancellor Kent reversed its decision because Indians had "never been regarded as citizens or members of [New York's] body politic," *Goodell v. Jackson ex dem. Smith*, 20 Johns. 693, 710 (N.Y. 1823); *see* Gregory Ablavsky, *"With the Indian Tribes": Race, Citizenship, and Original Constitutional Meanings*, 70 Stan. L. Rev. 1025, 1056 (2018) (stating that "Indians were described as subjects" of the King "by both British officials and Native peoples themselves"); *Relations of Indians to Citizenship*, 7 Op. Att'y Gen. 746, 749 (1856) (concluding that Indians were not citizens even though they are "in our allegiance" in a more limited sense of the term).

Moreover, as noted, Justice Story explained that citizenship at birth required more than temporary physical presence.  Story, *supra*, § 48, at 46.  The plaintiffs (at 42) suggest that Story's statement is undermined because he followed it with an acknowledgment that this idea was not "universally established," Story, *supra*, § 48, at 46.  But given that the treatise covered both American and English law, *see id.* at xi-xiii, Story's qualification is merely evidence of how American views had begun to differ from the strict English rule.  Story's view of citizenship requiring more than temporary presence was also shared by other American authorities.  *See* 1 Henry St.

16

George Tucker, *Commentaries on the Laws of Virginia* bk. I, at 56 (3d ed. 1846) (describing the conclusion as "sufficiently obvious").

Importantly, by Reconstruction, the Republicans championing the Civil Rights Act of 1866 and the Citizenship Clause had adopted this American position. In 1858, Representative Philemon Bliss gave a floor speech criticizing *Dred Scott*—later reprinted as a pamphlet—where he explained "[t]he few exceptions" to citizenship at birth as "children of foreign ministers or temporary sojourners." Cong. Globe, 35th Cong. 1st Sess. 210 (1858); Philemon Bliss, *Citizenship* 3 (1858). Prominent Civil War Republican lawyer David Dudley Field led a New York commission to codify laws that in 1860 proposed a citizenship provision that excluded "the children of transient aliens and of alien public ministers and consuls." Comm'rs of the Code, *The Political Code of the State of New York* § 5(1) (1860). Representative Bingham and Senator Trumbull—sponsors of the Fourteenth Amendment—both emphasized the importance of domicile to citizenship at birth. *See* Lash, *supra*, at 18 (noting speech by Representative Bingham declaring that "all free persons born and *domiciled* within the United States" are citizens (emphasis added) (quotation omitted)); Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's*

17

*Conception of Citizenship*, 119 Yale L.J. 1351, 1352-53 (2010) (quoting Letter

from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew

Johnson Papers, Reel 45, Manuscript Div., Library of Cong.)).

The Civil Rights Act of 1866—the predecessor to the Citizenship

Clause—was drafted with this difference between American and English

law in mind.  Senator Trumbull explained that in drafting the Act he faced

a "difficulty"; namely, he initially considered using the phrase "all persons

born in the United States and owing allegiance thereto" but rejected that

approach because "upon investigation it was found that a sort of allegiance

was due to the country from persons temporarily resident in it."  Cong.

Globe, 39th Cong., 1st Sess. 572 (quotation omitted).  The Act's eventual

language—persons were citizens if they were "not subject to any foreign

power"—addressed this concern.  The Citizenship Clause's use of

affirmative language—being subject to the jurisdiction of the United

States—was not intended to alter this result.  *See, e.g.*, *id.* at 2890 (Senator

Howard proposing language he described as "declaratory of …. the law of

the land already"); *id.* at 2894 (Senator Trumbull saying "[t]he object to be

arrived at" by the language in the Act and the Clause was "the same").

18

Against this background, plaintiffs rely heavily on *Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. 1844), but overstate its importance. Julia Lynch was born during the four years her parents spent in the United States, and a low-ranking New York judge concluded she was a citizen at birth under the English common-law rule. *Id.* at 587, 640-46, 655. But there is little indication that *Lynch* reflected a universal view, much less one incorporated wholesale into the Citizenship Clause.[2] As David Dudley Field observed, *Lynch* "seems not to be entirely approved" and "probably would at the most be considered as authority only in regard to the right of succession to real property within that State." David Dudley Field, *Outlines of an International Code* 132 n.1 (2d ed. 1876). When New York judges were later faced with the inverse of *Lynch*—a child born to Americans temporarily abroad—they divided on whether the child was also a citizen of the foreign country. Wurman, *supra*, at 28-29 (discussing *Ludlam v. Ludlam*, 31 Barb. 486, 503 (N.Y. Gen. Term. 1860), *aff'd*, 26 N.Y. 356 (1863)). Nor was *Lynch* the test that New York applied to all of its

---

[2] Sources applying English law from the "Founding era," Br. 22, or pre-revolutionary "colonial period," Br. 23, are not probative of post-revolutionary practices, particularly the practices and attitudes prevalent nearly a century later, in the 1860s.

19

inhabitants, notably tribal Indians.  *See Goodell*, 20 Johns. 693.  Given that

the debates about the phrase "subject to the jurisdiction thereof" focused

on Indian citizenship, *Lynch* unsurprisingly played almost no role in those

debates, being mentioned only once, by a "minor player" who

mischaracterized the decision, Lash, *supra*, at 20-21, 44-45.[3]

When the Citizenship Clause was being ratified, Congress was

criticizing the mode of reasoning employed in *Lynch*—that "everything that

was law in England before, was law in America after the Revolution"—as

having "no just foundation," and in particular objecting to American

courts' acceptance of the English common law's "obsolete claim of

inalienable allegiance."  *Rep. of H. Comm. on Foreign Affairs Concerning the*

*Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th Cong., 2nd

Sess. app. at 94, 99 (1868).  Just weeks after the Fourteenth Amendment was

---

[3] Plaintiffs identify (at 34-35) other cases they claim adopt their interpretation, but none are reasoned and most are consistent with the government's position and, in any event, dicta.  Two children had a U.S.-citizen parent.  *Perkins v. Elg*, 307 U.S. 325, 327 (1939) (father); Brief for the Appellant at 3-4, *Vance v. Terrazas*, 444 U.S. 252 (1980) (No. 78-1143), 1979 WL 213802, at *3-4 (mother).  Another involved a family apparently domiciled here.  *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958).  Others focus on different situations, like birth abroad and expatriation.  *See, e.g.*, *Rogers v. Bellei*, 401 U.S. 815, 830 (1971).

ratified, Congress passed the Expatriation Act of 1868, forcefully

repudiating the English doctrine of inalienable allegiance to one's birth

country as incompatible with "the enjoyment of the rights of life, liberty,

and the pursuit of happiness." Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223,

223.

The plaintiffs concede that the Citizenship Clause departs from the

English common-law rule to include at least some "American

invention[s]." Br. 26. *Elk* and *Wong Kim Ark* acknowledged that the Clause

departed from the English rule in how it treated Indians. The New Jersey

Supreme Court in *Benny v. O'Brien*, 32 A. 696—which *Wong Kim Ark* quoted

favorably, 169 U.S. at 692-93, but plaintiffs ignore—similarly recognized

that America departed in how it treated non-domiciled aliens. The court

reasoned that the Civil Rights Act and Citizenship Clause make clear that

some aliens' children are not citizens because they are "subject to [a]

foreign power." *Benny*, 32 A. at 697. The "[p]ersons intended to be

excepted," the court explained, are "those born in this country of foreign

parents who are temporarily traveling here" because "[s]uch children are,

in theory, born within the allegiance of the sovereign power to which they

belong." *Id.* at 698. By contrast, for people who settled here and raised

21

their children here—*i.e.*, became "domiciled here"—"it is clear that it will never be conceded by our government that such persons are subject to any foreign power" because they are instead "subject to the jurisdiction of the United States." *Id.* at 697-98.

Plaintiffs underscore their misunderstanding of domicile in arguing (at 36) that foreigners domiciled here lack sufficient allegiance under the government's theory; as we explained, *see* Gov't Br. 20-22, a person domiciled here is subject to the complete "political jurisdiction" of the United States, *Wong Kim Ark*, 169 U.S. at 693, even if they remain citizens of another nation (as Wong's parents were). Similarly, their misplaced criticism (at 36) that domicile focuses on the parent and not the child fails to grapple with the well-understood rule that a newborn's domicile was that of their parents. *See* Gov't Br. 21-22. And their argument (at 46) that "legal capacity to establish domicile" is irrelevant fails to grapple with the extensive historical tradition of legal barriers to establishing domicile, *see* Gov't Br. 36-37 (quotation omitted).

22

### D. Plaintiffs' Statutory Claim Fails Because the Statute Has the Same Meaning as the Citizenship Clause.

Plaintiffs argue that even if the Executive Order reflects the original meaning of the Citizenship Clause, this Court should nonetheless affirm because the 1940 and 1952 enactment of 8 U.S.C. § 1401 and its precursor codified their interpretation of the Fourteenth Amendment, which they assert (at 48) was "universally understood" at the time.

Plaintiffs, however, point to no "well-settled" interpretation, *Kemp v. United States*, 596 U.S. 528, 539 (2022) (quotation omitted), necessary to overcome the general rule that similarly worded legal instruments should be read to have the same meaning, *see Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019).[4]  As discussed, the weight of legal authority in the decades after *Wong Kim Ark* recognized that the decision was limited to children born to individuals domiciled in the United States and did not extend to the children of temporary visitors.  In contrast to the numerous authorities advancing this reading between 1898

---

[4] Plaintiffs' suggestion (at 53) that the government's Supreme Court stay application made a concession about the 1940 or 1952 understanding of the phrase "subject to the jurisdiction thereof" is baseless.  The filing merely acknowledged that at some point during the 20th century, the Executive Branch adopted plaintiffs' interpretation.

23

and 1952, *see* Gov't Br. 32-33, 46-47, plaintiffs identify relatively few adopting their interpretation. And as noted above, at least one of their sources from the relevant time period, Flournoy's *Yale Law Journal* article, acknowledges that it is challenging the consensus view. Flournoy, *supra*, at 552.

Plaintiffs cite a report by the Roosevelt Administration that accompanied the bill Flournoy helped draft and Executive Branch practice after 1940 to urge that Congress intended to reject any requirement of domicile (Br. 48-52), but neither is particularly probative about whether the disagreement identified by Flournoy had resolved into a consensus on that issue.[5] To the contrary, the continued disagreement between the Executive Branch's position and contemporaneous treatises strongly suggests it had not. *See* Sidney Kansas, *Immigration and Nationality Act Annotated* 183 (4th ed. 1953) (describing the statute as excluding "children of … transients or visitors"). Plaintiffs' show, at most, that the issue remained a contested one—not that there was a "well-settled" meaning incorporated into the

---

[5] Plaintiffs also (at 49-50) take Representative Dickstein's statement out of context to imply he said *all* children born of alien parents are citizens, when the statement merely implied that *some* of those children were citizens. *See* 86 Cong. Rec. 11,944 (1940).

statute.  Even a treatise that agreed with the Administration's
interpretation acknowledged the unsettled nature of the issue, stating that
"*at the present time*" "the State Department is not" "disposed to raise a
distinction based upon the domicile of the parents," while acknowledging
that all of the case law involved aliens domiciled here.  2 Charles Cheney
Hyde, *International Law* § 344 & n.7 (2d rev. ed. 1947) (emphasis added).

Apparently divergent views were reached, for example, about the
status of a child born to parents awaiting admission at Ellis Island.
*Compare The Nationality Act of 1940*, 54 Harv. L. Rev. 860, 861 (1941)
(concluding they were not citizens), *with* 3 Green Hayword Hackworth,
*Digest of International Law* § 221, at 10 (1942) (reporting, after passage of the
1940 statute, earlier State Department memorandum concluding that one
such person was a citizen).  Even Clement L. Bouvé, who argued that aliens
here illegally *should* be covered by the Fourteenth Amendment, identified
no case law supporting his position, and rejected the plaintiffs' position
that mere presence was enough, instead requiring "residence or domicile."

*See* Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 425-27 (1912).[6]

Finally, even if plaintiffs were able to show a well-settled meaning of "subject to the jurisdiction thereof," their facial claim would fail because many individuals covered by the Executive Order would not be "in the United States" as that term was understood in 1940 and 1952. The Supreme Court's decisions in *Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *United States v. Ju Toy*, 198 U.S. 253, 263 (1905); and *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892), had created a well-understood rule that parents who had not been legally admitted into the United States "were not within the United States" and thus would not fall within the statutes. *The Nationality Act of 1940*, *supra*, at 861 n.8. Therefore, even if the midcentury understanding of 8 U.S.C. § 1401(a)'s requirement to be born "subject to the jurisdiction" of the United States could help plaintiffs, the midcentury

---

[6] Plaintiffs (at 45) quote Bouvé out of context. After asking whether violating the immigration laws prevents later-born children from being citizens, Bouvé answers: "Obviously not, *unless the bare legal prohibition suffices to prevent the parents from acquiring a residence or domicile*—it is immaterial which—in this country." Bouvé, *supra*, at 426 (emphasis added).

26

understanding of the second requirement of being "born in the United States" would defeat their facial challenge.

## II.    The District Court's Injunctive Relief Is Substantially Overbroad.

As our opening brief explained, and the Supreme Court held, the district court's nationwide injunction was inappropriate.  Neither relief beyond the plaintiffs and members of the plaintiff organizations, *Trump v. CASA, Inc.*, 606 U.S. ___, 2025 WL 1773631, at *11 (June 27, 2025), nor a prohibition on "developing and issuing public guidance," *id.* at *15, were necessary to provide plaintiffs complete relief.

The parties' remaining dispute about the scope of the injunction is whether injunctive relief for organizational members who have not established standing exceeds a court's Article III and equitable powers when that relief is not otherwise necessary to provide relief to an individual with standing.  *See CASA*, 2025 WL 1773631, *4 n.2 (declining to address that argument in the first instance).  Based on longstanding legal and equitable principles, such relief exceeds a court's power, a conclusion reinforced by the Supreme Court's reasoning in *CASA*.

27

Plaintiffs must establish standing for all the relief they seek.  As this Court explained in *Wikimedia Foundation v. National Security Agency*, 857 F.3d 193, 216-17 (4th Cir. 2017), that includes standing to justify the scope of the injunction.  When plaintiffs seek a broader injunction giving "individualized relief" to additional people, each individual seeking relief must establish standing.  *Id.*  For example, if all of CASA's and ASAP's members had been plaintiffs in this lawsuit, each would be required to establish standing to obtain injunctive relief.  *See CASA*, 2025 WL 1773631, at *15.  Nobody disputes that many members lack Article III standing—the vast majority likely are not expecting a child and have no plans to have a child—and that other unidentified members have failed to "affirmatively" establish their standing.  *Renne v. Geary*, 501 U.S. 312, 316 (1991).  The organizations instead argue (at 59-62) that even though a court would lack power to issue an injunction providing a remedy to members who have not established standing if the members had brought their claims directly, the court can nonetheless grant relief because the individuals are represented by an organization.

Plaintiffs misread the Supreme Court's associational-standing case law, which does not exempt individuals from normal Article-III-standing

28

scrutiny merely by having their claim brought by an association.  To the contrary, the Supreme Court has made clear that associational standing "does not eliminate or attenuate" the requirements of standing.  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Individuals who lack standing and cannot receive injunctive relief do not cure their problem merely by bringing their suit through an organization alongside other members with standing.

Plaintiffs' cited cases do not support their associational-standing exemption from ordinary Article III and equitable requirements. Associations will frequently be able to obtain all the relief they seek while establishing the standing of a single member because that single member would themselves be entitled to the full scope of relief.  *See CASA*, 2025 WL 1773631, at *11 & n.12 (explaining that relief granted to one plaintiff may sometimes "have the *practical effect* of benefiting nonparties," but such effects are "merely incidental" (quotation omitted)).  In such cases— regardless of whether an association is involved—"once the Court decide[s] that a single party ha[s] standing, it ma[kes] no difference to the resolution of [the] case whether any other party ha[s] standing."  *Wikimedia Found.*, 857 F.3d at 217.  If one affected member is entitled to relief that incidentally benefits all the members, then only that one member's

29

standing needs to be established to obtain that relief.  The cases plaintiffs identify do not address or conflict with these principles.  *See, e.g.*, *Outdoor Amusement Bus. Ass'n v. Department of Homeland Sec.*, 983 F.3d 671, 676 (4th Cir. 2020) (reaching the merits and ruling against the plaintiffs); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (remedying a single member's injury of "being forced to compete in a race-based system" would require system-wide relief); *International Union, UAW. v. Brock*, 477 U.S. 274, 281 (1986) (holding union could "proceed solely as a representative of *those of its members injured by* the Secretary's policy" (emphasis added)); *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-45 (1977) (considering whether a state-created agency representing apple growers could assert claims of those growers like a traditional membership organization); *Retail Indus. Leaders Ass'n v. Fielder*, 435 F. Supp. 2d 481, 484 n.1 (D. Md. 2006) (issuing declaratory judgment to only member injured by the challenged state law), *aff'd*, 475 F.3d 180 (4th Cir. 2007).  The members here would clearly be required to each establish standing if they had sued directly, and channeling their lawsuit through an association does not exempt them from this ordinary Article III and equitable requirement.

30

The Supreme Court's decision in *CASA* reinforces these conclusions. Given "the party-specific principles that permeate our understanding of equity," 2025 WL 1773631, at *7, "a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it," *id.* (quoting parenthetically *Gregory v. Stetson*, 133 U.S. 579, 586 (1890)). While the associational plaintiffs are the named parties, granting equitable relief to their members requires treating the members as "constructively before" the court. Given that members who have not established standing could not obtain relief if they were *actually* before the court, it makes no sense to provide relief when they are only *constructively* before the court.

Opposing the stay motion in this Court, the organizations argued that it was "ASAP and CASA, not their members, who are parties to this case" and so only the organizations' standing needed to be established and only the organizations would be bound by the judgment. Opp'n to Stay 19. As we explained, that is inconsistent with the basic premise of associational standing where the association lacks a claim of its own; the only claims such an association can press are "the claims of its members," *Hunt*, 432 U.S. at 342, and those members must necessarily be bound by the adjudication of their claims, *see CASA*, 2025 WL 1773631, at *9 (explaining

31

that in traditional equity practice, absent individuals were bound by a
representative suit).  The parties receiving relief are required to establish
their standing for the same reasons that the parties receiving relief are
bound by the judgment:  to receive relief from a court of equity, they must
be parties constructively before the court.  Traditional equitable principles
limit a court to "provid[ing] complete relief to each plaintiff with standing
to sue."  *Id.* at *15.  The organizations here need no relief for themselves.
They thus seek relief for their members but claim that those members need
not establish, or even be capable of establishing, "standing to sue."  That
approach is untenable and inconsistent both with traditional Article III and
equitable principles and with Supreme Court precedent.

## CONCLUSION

The preliminary injunction should be reversed or, at a minimum,

narrowed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

  *s/ Derek Weiss*
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *derek.l.weiss@usdoj.gov*

July 2025

33

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,491 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss